# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **BLAKE DEWS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:05-CV-1045-T** |
| **TROY UNIVERSITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT

---

Peyton Lacy, Jr.
James C. Pennington
Joseph V. Musso
Attorneys for Defendants
Troy University, et al

OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000

i

**TABLE OF CONTENT**

I.    INTRODUCTION ...................................................................1

II.   STATEMENT OF FACTS ...................................................... 2

    A.    GENERAL INFO ................................................... 2-3

    B.    TROY FACULTY AND ADMINISTRATION ................. 4-5

    C.    2003 FALL SEMESTER COLLABORATIVE
        STUDIO COURSE .................................................. 5-7

    D.    NUDITY IN THE BIRTH ASSIGNMENT PIECE ........... 7-8

    E.    DEWS PLEADS THE FIFTH ................................... 8-9

    F.    DEWS' LACK OF KNOWLEDGE REGARDING
        HIS MODELS' AGES ............................................. 9

    G.    TROY'S STUDENT PHOTOGRAPH STUDIO ............. 9-10

    H.    THE JURIED STUDENT ART SHOW ......................... 10-11

    I.    THE ADAMS MEMORABILIA ROOM IN
        HAL HALL ........................................................ 11-13

    J.    LENGTH OF THE STUDENT ART SHOW ................. 13-14

    K.    THE STUDENT ART SHOW OPENS ........................... 14-15

    L.    NOTIFYING THE PUBLIC OF THE NUDITY ............... 15

    M.    MIDDLE SCHOOL AND HIGH SCHOOL
        CHILDREN ........................................................ 15-17

    N.    MINORS ATTEMPT TO ACCESS THE
        STUDENT ART SHOW .......................................... 17-18

O.   PROVIDING ACCESS TO ADULTS,
     PROTECTING MINORS ...................................................... 18

P.   DEWS HAD NO PROBLEM WITH TROY'S
     AGE RESTRICTION ...................................................... 19-20

Q.   DEWS' PERSONAL PHILOSOPHY ON
     AGE RESTRICTIONS ..................................................... 20-21

R.   DEWS' FIRST MEETING WITH JOHNSON
     REGARDING CONCERNS OF OVER
     THREE PHOTOGRAPHS .............................................. 21-22

S.   DEWS' NEXT MEETING WITH JOHNSON ............. 23-24

T.   THE ENTIRE SHOW CLOSES BEFORE 2004
     SPRING SEMESTER ...................................................... 24-25

U.   DISMANTLING THE STUDENT ART SHOW ................ 26

V.   DEWS' ALLEGATION REGARDING
     BOB JOSLIN .................................................................. 27-28

W.   THE SPRING 2004 COLLABORATIVE
     STUDIO ART SHOW .......................................................... 29

X.   MORE FULL-FRONTAL NUDITY IN A
     SUBSEQUENT STUDENT ART SHOW ...................... 29-31

Y.   DEWS' SENIOR THESIS SHOW ........................................ 31

Z.   NO CONTACT WITH DR. JACK HAWKINS ............. 31-32

AA.  ED NORIEGA DID NOT VIOLATE DEWS'
     RIGHTS ........................................................................... 32-33

BB.  DEWS NEVER COMPLAINED OR
     UTILIZED ANY APPEALS PROCESS ............................. 33

**CC. TROYS' WRITTEN POLICIES DID NOT AFFECT DEWS** ...................................... 33-34

**DD. HOW DEWS CLAIMS THE ISSUES REGARDING HIS BIRTH ASSIGNMENT PIECE AFFECTED HIS ART** ........................................................ 34-35

**III. ANALYSIS** .................................................................. 36

**A. OFFICIAL CAPACITY CLAIMS SHOULD BE DISMISSED AS REDUNANT AND POTENTIALLLY CONFUSING TO A JURY** ............. 36-37

**B. ALL CLAIMS AGAINST TROY ARE DUE TO BE DISMISSED EITHER BASED ON IMMUNITY, MOOTNESS, OR STANDING** ........................................ 37-38

**1. Troy Is an Instrumentality of the State of Alabama and Has Not Waived Its Sovereign Immunity** ...................................................... 38

**a. Troy is an Instrumentality of Alabama** .......................................................... 38-39

**b. No Waiver of Eleventh Amendment Immunity** .............................................................. 39

**2. Eleventh Amendment Immunity Bars Money Damages** ............................................. 39-40

**3. Dews' Federal Constitutional Claims for Equitable Relief Are Moot** ...................................... 40-42

**a. No Class Certification** .................................... 42-43

**c. The "Capable of Repetition, Yet Evading Review" Exception Does not Apply** ...................................................... 43

iv

4.     Dews Has No Constitutional Standing
       to Bring a Lawsuit Based on His
       Claims that Troy's Written Policies
       Violated His Rights ................................ 43-44

       a.     No "Injury in Fact" or
              "Causation"................................. 44-45

       b.     No Redressability ............................. 45

5.     Any 42 U.S.C. § 1983 Claim against
       Troy Must be Dismissed ......................... 45-46

       a.     Troy Not a "Person" Acting Under
              Color of State Law......................... 46-47

       b.     Eleventh Amendment to the U.S.
              Constitution Bars § 1983 Claims
              against Troy ...................................... 47

6.     Section 14 of the Alabama Constitution
       Precludes Dews from Recovering Money
       Damages for his State Constitution Claim ................ 48

7.     Sovereign Immunity Prohibits Dews'
       Alabama State Law Contract Claim................... 48-49

C.     DEWS CANNOT PLEAD THE FIFTH AND
       PROCEED WITH HIS CONSTITUTIONAL
       CLAIMS ............................................. 49-52

D.     DEFENDANTS ARE SEPARATELY DUE
       SUMMARY JUDGMENT ON THE MERITS ................. 52

1.     Defendants Are Due Summary Judgment
       on the First Amendment Claim ............................ 52-53

       a.     No Constitutional Right to Shoot
              Pornography in the Student
              Photograph Lab ................................ 53

(i)    The Student Photograph
Lab Is a Classroom, Not
a Public Forum .....................................53-55

(ii)   Troy may impose reasonable
Restrictions .........................................55-57

(iii)  Joslin's was Dews' teacher
And was free to criticize
Dews' work .........................................57-58

b.    No Constitutional Violation Involving
the Juried Student Art Show ......................58-63

(i)    The Purpose of the Juried
Student Art Show Was
Pedagogical, not to Create a
Public Forum .....................................63-64

(ii)   Troy may impose reasonable
Restrictions .........................................64-65

(iii)  Dews suffered no adverse action
because nothing Johnson did
would likely deter a person of
ordinary firmness from the
exercise of First Amendment
rights...................................................65-68

c.    No Constitutional Violation involving
Troy's sexual harassment policy, its
hazing policy, or any other written
policies and procedures...............................68-70

2.    Troy is Due Summary Judgment on the
Alabama State Constitution Claim .............................70

3.    Troy is Due Summary Judgment on the Due
Process Claims...........................................70-72

4.      Troy Is Due Summary Judgment on the
        Equal Protection Claim ................................. 72

        a.      A Restatement of the First Amendment
                Claim ............................................ 72-73

        b.      No Equal Protection Claim Based
                on a Suspect Class .......................... 73-74

5.      Troy Is Due Summary Judgment on Dews'
        Alleged Unlawful Conditions Placed on
        Receipt of State Benefits Claim ............................ 74-75

D.  THE CLAIMS AGAINST THE INDIVIDUAL
    DEFENDANTS ARE DUE TO BE DISMISSED
    BASED ON QUALIFIED IMMUNITY AND
    DISCRETIONARY IMMUNITY ......................................... 76

    1.      The § 1983 Claims Against the Individual Defendants
            Are Due to Be Dismissed Based on Qualified
            Immunity .............................................. 76-77

            a.      Dr. Hawkins ............................. 77-78

            b.      Robert Joslin .......................... 78-79

            c.      Jerry Johnson........................... 79-80

    2.      The Individual Defendants Are Immune from
            Civil Liability Under Alabama Law ..................... 80-81

            a.      Dr. Hawkins ....................................... 81

            b.      Robert Joslin ..................................... 81

            c.      Jerry Johnson........................... 81-82

E.  TROY IS DUE SUMMARY JUDGMENT ON
    THE STATE LAW CONTRACT ......................................... 82

1.      The Allegations in the Complaint ........................... 82-83

2.      Elements of a State Law Breach
Contract Claim ............................................................. 83

     a.    The Student Handbook and
           Undergraduate Bulletin ..................................... 83

           (i)     No allegation anything contained
                  in the Student Handbook or
                  Undergraduate Bulletin guaranteed
                  Dews anything on behalf of the
                  individual defendant ........................... 83-84

           (ii)    Dews' own deposition testimony
                  shows there was a breach ................... 84-85

           (iii)   The alleged censorship of Dews'
                  birth assignment piece was not a
                  breach of contract .................................... 85

           (iv)   The mere existence of the "speech
                  codes" cannot constitute a breach
                  of any contract between the
                  University and Dews .............................. 85

     b.    No Promise to Display His Work
           in HAL Hall ........................................................ 86

           (i)     No meeting of the minds ..................... 86-87

           (ii)    No breach ............................................. 87-88

     c.    Individual defendants Dr. Hawkins and
           Joslin cannot be liable for breach of
           contract because they were not parties
           to any contract with plaintiff ....................... 88-90

IV.   CONCLUSION ........................................................................

# I.

# __INTRODUCTION__

Plaintiff Blake Dews (hereinafter "Dews") sued his college alma mater. He sued the Chancellor of his college alma mater. He sued two of his alma mater's professors. He sued because one of his professors told him the obvious, that he could not shoot pornography in the student photography lab; because a piece of art he created was not displayed in a student art show for as long as he wanted it displayed; and because he did not like certain language in a student handbook and undergraduate bulletin, language which he admits was never used to harm him in any way.

More specifically, Dews sued Troy University (hereinafter "Troy") and individual defendants Dr. Jack Hawkins, Robert Joslin, and Jerry Johnson in their official and individual capacities. He is claiming the defendants violated his rights under the First and Fourteenth Amendment to the U.S. Constitution and Article I, § 14 of the Alabama Constitution. He is also bringing an Alabama state law breach of contract claim.

Defendants' Motion for Summary Judgment is due to be granted and all of Dews' claims against all defendants are due to be dismissed with prejudice because there is no genuine issue as to any material fact. In short, Dews has no case.

## II.

## STATEMENT OF FACTS

Defendants Troy University, Dr. Jack Hawkins, Robert Joslin, and Jerry Johnson submit the following Statement of Facts below for summary judgment purposes only:[1]

### A.    GENERAL INFO

1.    Dews graduated at the end of the 2005 spring semester[2] with a B.A. from Troy's art and design program with a specialty in photography. (Tab A at pp. 22:23, 23:1-6, 25:20-23, 26:1-5, 27:10-13).[3] He graduated *summa cum laude* with a 3.9 out of 4.0 grade point average, (Tab A at pp. 23:17-20, 24:9-12). According to Dews, he graduated when he wanted to and on time. (Tab A at p. 301:17-22).

2.    Dews first attended Furman University in South Carolina as a music performance (voice) major. (Tab A at pp. 11:17-20, 12:2-4, 12:9-14). He attended Furman for one semester, but he returned home to Alabama

---

[1] Defendants deny many of Dews' allegations, but for purposes of a motion for summary judgment, the facts must be considered in a light most favorable to the non-movant.

[2] Dews testified in his deposition that he graduated at the end of the 2005 spring semester, but in reality it was at the end of the 2005 fall semester. That fact is not material for the purposes of defendants' motion for summary judgment.

[3] Tab A refers to Dews' deposition, which corresponds to Tab A in defendants' summary judgment evidentiary submission. Other references to tabs appearing within parenthetical citations also reference defendants' summary judgment evidentiary submission. The citation references to the page(s) and line number(s) in Dews' deposition appear as ___:___ [page(s):line number(s)].

after losing a scholarship because he dropped his voice major. (Tab A at pp. 11:21-23, 12:5-8, 14:2-4, 14:8-10). Back in Alabama, Dews attended Wallace Community College for a year to obtain some core classes. (Tab A at pp. 14:2-7, 15:21-22).

3.    Dews then enrolled at Troy because it was close to his hometown of Headland, Alabama, and because he had some friends in Troy. (Tab A at p. 16:15-18).

4.    Dews now lives and works in Birmingham, Alabama. (Tab A at p. 9:2-6, 41:10-14). He has not taken any art or photography classes after graduating from Troy. (Tab A at p. 36:19-23).

5.    Dews has not attended graduate school nor applied for admission to any graduate schools. (Tab A at pp. 36:16-18, 37:1-3) However, he has considered applying at Columbia College of Art and Design in Chicago, Rhode Island School of Design, and Parsons School of Design in New York. (Tab A at p. 37:7-23). He was exploring the Masters of Fine Arts ("MFA") program at Rhode Island and Parsons and the Masters of Arts ("MA") program at Columbia College. (Tab A at p. 39:8-17). Troy does not offer an MFA or MA in art, design, photography, or art history. (Tab C at p. 7, ¶28).[4]

---

[4] Tab C refers to Hal Fulmer's affidavit.

## B.    TROY FACULTY AND ADMINISTRATION

6.    Pamela Allen, a teacher in Troy's Department of Art and Design, was Dews' academic advisor most of the time he was enrolled there. She was his advisor at the time of his graduation. (Tab A at pp. 28:21-23, 29:1-11).

7.    While Dews' was enrolled at Troy, Jerry Johnson was the Chairperson of the Department of Art and Design. (Tab A at pp. 35:19-23, 36:1-15). Johnson taught Dews two Collaborative Studio courses (2003 fall and 2004 spring semesters respectively) and a senior thesis course. (Tab A at pp. 33:7-12, 33:19-23, 34:1-12).

8.    Duane Paxson assisted Johnson in teaching the 2003 fall semester Collaborative Studio course, but Johnson was the lead professor in the class. (Tab A at pp. 34:13-17, 35:16-18).

9.    Bob Joslin taught Dews photography courses, including the Photo Studio I course, the Photo Studio II course, and the Photo Studio III course. (Tab A at pp. 32:12-19, 263:4-10). Joslin taught Dews the Photo Studio III course in the 2003 fall semester. (Tab A at pp. 262:19-23, 263:1).

10.    Ed Noreiga is a professor of design who taught Dews a Color and Technology course. (Tab A at pp. 171:18-23, 172:1-8).

11.    Dr. Hal Fulmer is currently Troy's Associate Provost and the Dean of Undergraduate Studies. From August 2002 to July 2005, he was Dean of the College of Communication and Fine Arts. From January 2004 to July 2004, he served the dual role of Dean of the College of Communication and Fine Arts and Interim Associate Provost. From August 2004 to July 2005, he was the Associate Provost. In August 2005, he was named the Dean of Undergraduate Studies and continued as the Associate Provost. (Tab C at p. 1, ¶¶3-4).

12.    While Fulmer held the position of Dean of the College of Communication and Fine Arts from August 2005 to July 2005, he was the immediate supervisor of Department of Art and Design Chairperson Johnson. (Tab C at p. 1, ¶4).

13.    Dr. Jack Hawkins is the Chancellor of the Troy University System. (Tab E at 3, ¶6).[5]

## C.    2003 FALL SEMESTER COLLABORATIVE STUDIO COURSE

14.    Dews' 2003 fall semester Collaborative Studio course was primarily made up of art majors. (Tab A at p. 44:8-10). The main assignment for the course was to create a piece of art based on the thematic concept of birth (hereinafter the "birth assignment piece") (Tab A at  p. 50:9-13).

---

[5] Tab E refers to the Complaint.

15.    Dews' birth assignment piece incorporated sculpture and photography. (Tab A at p. 53:14-17). More specifically, it consisted of sixteen Plexiglas cubes with a photograph placed in each cube. (Tab A at p. 112:9-11; Tab B at DX2). The Plexiglas cubes were held together by a frame, and light illuminated the cubes. (Tab A at pp. 112:2-23; 113:1-3, 113:21-23, 114:1-2). The finished piece weighed from 100-200 pounds and was hung from a ceiling when displayed. (Tab A at p. 113:4-7).

16.    A photograph of Dews' finished birth assignment piece appears at Exhibit 2 of Tab B[6] in Troy's summary judgment evidentiary submission. Troy is contemporaneously filing with its summary judgment evidentiary submission a motion to file Exhibit 2 of Tab B of that submission under seal because of the possibility that some of the nude individuals appearing in the photographs were under 18 years of age at the time the photographs were taken.

17.    The sixteen photographs that appear in the Plexiglas cubes appear at Exhibit 3 of Tab B in Troy's summary judgment evidentiary submission. Troy is contemporaneously filing with its summary judgment evidentiary submission a motion to file Exhibit 3 of Tab B under seal because of the possibility that some of the nude individuals appearing in the

---

[6] Tab B refers to the exhibits to Dews' Deposition.

14

photographs were under 18 years of age at the time the photographs were taken.

18.    Dews received an "A" in the 2003 fall semester Collaborative Studio course based on the work he completed for the birth assignment. (Tab A at pp. 55:2-5).

## D.    NUDITY IN THE BIRTH ASSIGNMENT PIECE

19.    The sixteen photographs in Dews' birth assignment piece were of people. (Tab B at DX2, DX3). Of those sixteen photographs, five prominently displayed the genitals of the person being photographed, specifically —

- A nude man holding a long-stemmed rose, his penis and testicles fully exposed. (Tab B at DX3, p.5). (hereinafter referred to in this brief as "Photo 1").

- Two females sitting up against fence boards and looking skyward. They are holding hands. One female appears to be wearing only a feather boa that covers her breasts and genitalia. The other is nude except for a bow tie around her neck. Her breasts are exposed except for her nipples, which are covered by her knees. Her genitals (vulva) are clearly exposed. (Tab B at DX3, p. 6). (hereinafter referred to in this brief as "Photo 2").

- A female standing. She is wearing a coat and a torn shirt. One of her breasts is revealed through the torn shirt and she is wearing no pants or underwear, revealing her genitals and pubic hair. She appears to have been abused, her shirt torn and her face battered. (Tab B at DX3, p.7). (hereinafter referred to in this brief as "Photo 3").

● A male standing. He is nude except for a necklace. One hand rests on his chest, the other holds his penis, which his hand tilts to the side. His penis is clearly visible. (Tab B at DX3, p.8). (hereinafter referred to in this brief as "Photo 4").

● A man standing, nude except for a black glove on his left hand. His penis and testicles are fully exposed. His nipples and navel are pierced. (Tab B at DX3, p. 14). (hereinafter referred to in this brief as "Photo 5").

20. In another of the sixteen photographs, a female is photographed standing. She is covered from the waist down with cloth. She is wearing a jacket, which is open. Her entire breasts are fully exposed. (Tab B at DX3, p. 15).

21. Dews made the decision whether an individual would or would not appear nude in a photograph. (Tab A at p. 111:5-7).

## E.    DEWS PLEADS THE FIFTH

22. In his deposition on April 27, 2006, Dews asserted a Fifth Amendment privilege against self-incrimination when asked the age of a nude female who appears in two photographs in his birth assignment piece. In both photographs, ("Photo 2" and "Photo 3"), the female's genitals are exposed. (Tab A at pp. 84:19-23, 85:1-19; Tab B at DX4, pp. 6-7). Dews also asserted a Fifth Amendment privilege against self-incrimination when asked the age of a female appearing in "Photo 2" who is holding hands with

another female whose genitals are exposed. (Tab A at pp. 84:19-23, 85:1-2, 87:14-23; Tab B at DX4, p. 6).

**F.    DEWS' LACK OF KNOWLEDGE REGARDING HIS MODELS' AGES**

23.    In the sixteen photographs appearing in his birth assignment, Dews photographed a total of fifteen individuals, excluding the infant appearing in two photographs. Out of those fifteen individuals, Dews (a) pled the Fifth with regard to two females, (See Fact No. 22, *supra*), (b) knew his age and the age of another female, (Tab A at pp. 78:3-6, 86:15-23, 87:1), and (c) did not know the ages of the other eleven individuals at the time he took their photo or at the time of his deposition on April 27, 2006. (Tab A at pp. 83:1-23, 84:1-18, 85:20-23, 86:1-4, 87:2-13, 88:1-11, 18-23, 89:1-14)

24.    Dews did not obtain model release forms from any of his models appearing in his birth assignment piece. He alleges he was not aware they were necessary. (Tab A at p. 89:14-19).

**G.    TROY'S STUDENT PHOTOGRAPHY STUDIO**

25.    Dews took all of the photographs for his birth assignment in the Department of Art and Design's photography studio, which is not a large room. (Tab A at pp. 99:17-23, 100:1-2). Joslin is the teacher in charge of the studio. (Tab A at p. 100:3-5). The purpose of the photography lab is pedagogical. It exists as an extended classroom for Troy students. It is not

17

open for the general public. (Tab D at p. 8, ¶31).[7] The photography studio contained equipment, including lights and backdrops, which Dews used in taking the photographs for his birth assignment piece. (Tab A at p. 102:17-23).

## H.    THE JURIED STUDENT ART SHOW

26.    Johnson and Paxson, professors in the 2003 fall semester Collaborative Studio class, told Dews that the birth assignment pieces created by all members of the class had the potential for being in a juried student art show. (Tab A at p. 60:19-23). Dews already had learned about and had already started the birth assignment before he learned about the student art show. (Tab A at p. 65:9-16). No one guaranteed Dews at the beginning of the class that his piece was going to be in the juried show, and no one promised him that either. (Tab A at p. 345:6-12).

27.    The Department of Art and Design sponsored the student art show, which was hosted by the Department's 2003 fall semester Collaborative Studio class. (Tab C at p. 1, ¶5; Tab D at p. 1, ¶ 4). The show was limited to Troy students. (Tab A at p. 63:7-9).

28.    Because the Collective Studio class was hosting the show and because Johnson was aware of the complexity, craftsmanship, and scale of

---

[7] Tab D refers to Jerry Johnson's affidavit.

work required in his birth assignment for the class, he automatically included the assignment work of each class member in the student art show. (Tab D at p. 1, ¶5). Dews' birth assignment piece was chosen to be exhibited in the show. (Tab A at pp. 54:20-23; 55:1; 62:14-20).

29.     All other student art work submitted to the show was reviewed by a panel of art professors so that they could decide which work would ultimately be included in the show. (Tab D at p. 1, ¶ 5). A select group of individuals (a "jury") decided which pieces received awards. (Tab A at pp. 61:12-23, 62:1-7).

30.     Dews' birth assignment piece received an award from the jury. (Tab A at p. 62:14-16).

## I.     THE ADAMS MEMORABILIA ROOM IN HAL HALL

31.     The student art show was held in the Adams Memorabilia Room in Hawkins-Adams-Long Hall (hereinafter "HAL Hall"). (Tab A at pp. 165:13-23, 166:1-5; Tab C at p. 1, ¶5; Tab D at p. 2, ¶7). Either Johnson or Paxson told Dews the student art show's venue. (Tab A at p. 66:13-18).

32.     Dews had never been in HAL Hall before being told of the student art show's venue. (Tab A at p. 68:16-20). The first time Dews stepped into HAL Hall was when he — and maybe the rest of the Collaborative Studio class members — visited the space before the student

art show opened in order to check it out. (Tab A at pp. 68:21-23, 69:1-4, 70:8-12). He knew "little about the building." (Tab A at p. 72:15-16). When Dews entered the Adams Memorabilia Room in HAL Hall that first time, he noticed "old artifacts, old photographs, some display cases with things in them." (Tab A at pp. 69:2-23, 70:1-2, 165:13-23, 166:1-5).

33.    HAL Hall was made possible by a generous gift from Dr. Ralph Adams, a former Troy University president. A written agreement was signed in 1995 by Dr. Adams and the Troy State University Foundation, noting that the conditions for Dr. Adams gift for the building included rooms devoted to the following purposes: (i) the display of memorabilia and a library of archives representing the history of Troy University and, particularly, the tenure of Dr. Ralph Adams; (ii) the National Band Association Hall of Fame; (iii) offices for Drs. Ralph Adams, John Maloy Long, and their secretaries; and (iv) a concert and reception area. (Tab C at p. 5, ¶22).

34.    The Adams Memorabilia Room in HAL Hall, where the student art show was held, is not an art gallery. Its reason for existence is to fulfill the 1995 written agreement between Dr. Adams and Troy to include a room in HAL Hall to house a display of memorabilia and a library of archives representing the history of Troy University and, particularly, the tenure of Dr. Adams. (Tab C at p. 5, ¶21; Tab D at p. 2, ¶7).

35.     The Department of Art and Design borrowed the Adams Memorabilia Room for the student art show, which opened on December 2, 2003. That was the first time the Department of Art and Design had ever borrowed that space, and the first time that space had ever been used for an art show. (Tab C at p. 5, ¶23; Tab D at p. 2, ¶9). Before the art show could open, however, the memorabilia on display in the Adams Memorabilia Room had to be removed and temporarily stored out of the public view. (Tab A at p. 176:12-18; Tab C at p. 5-6, ¶23; Tab D at p. 3, ¶9).

36.     The Department of Art and Design has its own gallery space, the Malone Gallery, (Tab A at p. 75:15-21). The Malone Gallery could not be used for the student art show that 2003 fall semester because the Malone Gallery had already been committed for something else. (Tab D at p. 2, ¶7).

**J.    LENGTH OF THE STUDENT ART SHOW**

37.     Dews believes Johnson told him that the student art show was going to be up "through the [Christmas] break and that it would be taken down at some point which would be scheduled after we got back." (Tab A at pp. 74:12-23, 75:1-5). However, when asked if those were the words Johnson used, Dews answered "[n]ot exactly" and that he could not recall the words Johnson used. (Tab A at p. 75:6-11). Johnson never told Dews

how long the Department of Art and Design had the use of the Adams Memorabilia Room. (Tab A at p. 73:13-15).

## K.    THE STUDENT ART SHOW OPENS

38.    The student art show opened on December 2, 2003. (Tab C at p. 1, ¶5; Tab D at p. 3, ¶10). Dews attended the opening for about fifteen minutes. (Tab A at pp. 214:14-18, 216:11-13).

39.    The student art show opening coincided with the Sounds of the Season Holiday Musical Spectacular ("Sounds of the Season"). (Tab A at pp. 211:23, 212:1-2; Tab C at p. 2, ¶6; Tab D at p. 3, ¶10;). Sounds of the Season is an annual concert during the Christmas holidays put on by the College of Communication and Fine Arts. It features University musical groups (instrumental and choral) and it is attended by several hundred people. The general public is invited to attend. Adults pay a small admission charge and students and children are admitted free. (Tab C at p. 2, ¶6; Tab D at p. 3, ¶10).

40.    In 2003, Sounds of the Season was held at the Claudia Crosby Theatre.  The Claudia Crosby Theatre is located very near HAL Hall, with only the band building separating the two. (Tab C at p. 2, ¶6; Tab D at p. 3, ¶10). At the conclusion of the 2003 Sounds of Season, the Sounds of the Season audience was informed that the Department of Art and Design was

opening an art show in the Adams Memorabilia Room in HAL Hall and that everyone was invited to attend. (Tab C at p. 2, ¶8; Tab D at p. ¶11).

## L.    NOTIFYING THE PUBLIC OF THE NUDITY

41.    According to Dews, when the student art show opened there was a "tiny little sign" on the "door walking into the memorabilia room" that said "[p]lease be advised, nudity, something like that." (Tab A at p. 215:1-8). Dews had no problem with that sign being there. (Tab A at pp. 215:1, 216:1-2). Also, on opening night Johnson personally stood outside the door at times to inform people that the exhibit contained some nudity. (Tab D at p. 3, ¶13).

42.    Dews said there were works in the student art show other than his that showed genitalia. There was a life drawing piece that showed a woman's vagina and breasts. (Tab A at pp. 218:20-23, 219:1-5). Dews' was the only piece that exhibited genitalia with photography. (Tab A at p. 218:16-18).

## M.    MIDDLE SCHOOL AND HIGH SCHOOL CHILDREN

43.    From December 4-6, 2003, Troy's Department of Speech and Theatre hosted the annual Walter Trumbauer Theatre Competition ("Trumbauer Competition"). During this event, approximately 1,000 students ranging in grades 9-12 from across the State of Alabama traveled to

Troy's campus to compete for drama awards, attend drama workshops, and attend plays. A significant number of parents attended as well, including the students' teachers. The Trumbauer Competition ended with an awards ceremony which filled the Claudia Crosby Theatre to overflowing, close to 1,200. (Tab C at p. 3, ¶13; Tab D at p. 4, ¶14).

44.     From December 4-6, 2003, Troy's School of Music hosted the annual Southeastern United States Middle School Concert Band Clinic and Honor Bands ("SEUS Band Event"). Approximately 350 middle school children from across the Southeast participated in this event, with a significant number of parents and school band directors attending as well. (Tab C at p. 3, ¶14; Tab D at p. 4, ¶ 15).

45.     From December 4-6, 2003, the high school students attending the Trumbauer Competition and the middle school students attending the SEUS Band Event were in close proximity to the Adams Memorabilia Room, where the student art show was held. (Tab C at p. 3-4, ¶15; Tab D at p. 4, ¶16).

46.     Many of the events related to the Trumbauer Competition were held in buildings very near HAL Hall. Moreover, the Claudia Crosby Theatre, which was separated from HAL Hall only by the band building, was not only the location for the Trumbauer Competition Awards

Ceremony, but its stage was used extensively during the three days for plays and its large seating area was a popular place to watch those plays. (Tab C at p. 4, ¶16).

47.    Registration for the SEUS Band Event was held in HAL Hall. The band building, where many of the SEUS Band Events were held, is immediately is next to HAL Hall. Moreover, HAL Hall, along with housing the Adams Memorabilia Room, also houses the National Band Association Hall of Fame. The National Band Association Hall of Fame would be of particular interest to band students and band directors, and it was located in a room immediately next to the Adams Memorabilia Room. (Tab C at p. 4, ¶17).

## N.    MINORS ATTEMPT TO ACCESS THE STUDENT ART SHOW

48.    Because the art show contained photographs displaying full frontal nudity and because there were a large number of minor school children on campus in close proximity to the student art show from December 4-6, 2003, the Adams Memorabilia Room was locked and access was limited to Troy students and individuals over the age of 18 unless accompanied by a parent or guardian. (Tab C at p. 4, ¶18). Johnson had been informed by a secretary who worked in HAL Hall near the Adams Memorabilia Room that minors unaccompanied by an adult were attempting

to enter the art show. (Tab D at p. 4, ¶17). The secretary who informed Johnson of the minors trying to see the show was available with a key to unlock door when age-appropriate individuals wanted to see the show. (Tab C at p. 4, ¶18; Tab D at p. 4-5 ¶17). Her office was within sight of the Adams Memorabilia Room. (Tab C at p. 4, ¶18).

## O.    PROVIDING ACCESS TO ADULTS, PROTECTING MINORS

49.    To protect from underage minors accessing the art show, the Adams Memorabilia Room remained locked after December 6, 2003, through the end of the show, with the secretary remaining available to provide access to age-appropriate persons, i.e., Troy students and individuals over the age of 18 unless accompanied by a parent or guardian. That secretary was performing a favor for the Department of Art and Design as she was not assigned to the Department and had other duties on top of providing access to the art show. (Tab C at p. 4-5, ¶19; Tab D at p. 4-5, ¶18).

50.    On one occasion Dews when went to the Adams Memorabilia Room, he "had to ask the secretary to let [him] in, and [he] got in. [The secretary], of course, said are you a student, are you of age? And [he] got in. And [he] said yes, one of [his] pieces is in there." (Tab A at p. 233:15-22). According to Dews, the secretary is in the entranceway. (Tab A at p. 234:9-12).

## P.     DEWS HAD NO PROBLEM WITH TROY'S AGE RESTRICTION

51.    Dews did not have a problem with Troy having a rule that a person wanting to view the student art show had to be a Troy student or eighteen years or older if unaccompanied by an adult. (Tab A at pp. 237:16-23, 238:1-5).

52.    Rather, Dews had "a problem with the way it was carried out." (Tab A at p. 238:9-14). According to Dews —

> "the concept of doing this was carried out after the show had opened and had not been planned out efficiently where people who wanted to view this show couldn't get in if there wasn't somebody there to unlock the door. I mean, I was told — and I was told by a faculty member, and I'm going to go ahead and say I don't remember who the faculty member was, but that this had sort of skyrocketed people actually coming to shows, and people were coming and couldn't get in. And that bothered me a great deal."

(Tab A at p. 239:12-23, 240:1-2).

53.    Dews alleged that sometimes the secretary was in the entranceway and sometimes she was not, and that some of his friends told him that there were times they couldn't get into the exhibit because nobody was there and the doors were locked, but Dews says "that's all hearsay." (Tab A at p. 234:11-17). Dews admitted that these students were able to see the show "at some point, yes." (Tab A at p. 241:14-17).

54.    Dews cannot recall any student who wasn't able to see the student art show because of Troy's policy of locking the Adams Memorabilia Room and having to ask the secretary for entry. (Tab A at p. 241:18-21).

55.    Some friends told Dews that they had gone to see the exhibit and the door was locked, but someone was available to let them in. (Tab A at p. 235:6-10).

56.    Individuals personally asked Johnson to see the show, and he facilitated these individuals in viewing the art. (Tab D at p. 5, ¶19). Fulmer is aware of at least one entire class at Troy viewing the exhibit. (Tab C at p. 5, ¶20).

## Q.    DEWS' PERSONAL PHILOSOPHY ON AGE RESTRICTIONS

57.    Dews had a "personal" problem with Troy's age restriction because he "support[s] challenging work, graphic work, that's just [his] whole artistic stance. And that's [his] own personal idea. And [he] think[s] that artwork, period, should be viewable to anybody of any age." (Tab A at p. 236:8-20). For instance, Dews would not restrict access to his birth assignment piece to a twelve-year-old:

> Q.    If you are standing at the door and say a twelve-
> year-old walked up and was about to walk in that
> door, would you tell that twelve-year-old you can't
> go in there because there's pictures that you

probably shouldn't see?

A.    Would I say that?

Q.    Yes.

A.    No.

(Tab A at p. 237:16-23, 238:1-5).

**R.    DEWS' FIRST MEETING WITH JOHNSON REGARDING CONCERNS OVER OF THREE PHOTOGRAPHS**

58.    Immediately before Troy students left for Christmas break, Dews returned to the student art show to view other students' work. Some time after that, he had a discussion with two of his teachers, Johnson and Noreiga, in Johnson's office. (Tab A at pp. 218:9-15, 219:3-8, 221:16-23, 222:1-11). Johnson told Dews there was concern over Dews' work breaching Alabama obscenity laws and that he, Johnson, had been notified by the school's attorneys that there might need to be some action taken about Dews' work. (Tab A at p. 223:7-14). Johnson handed Dews a stack of papers that had Alabama's obscenity laws written on them. (Tab A at p. 223:17-20).

59.    Johnson told Dews there were three photographs out of the sixteen that "were in question." (Tab at p. 224:10-13). Johnson told Dews they were (a) "[t]he photograph of Tim Jones," (Photo 4) (b) "the

photograph of [R.V.]," (Photo 3) and (c) "the two girls holding hands." (Photo 2) (Tab A at p. 224:18-22).

60.    According to Dews, Johnson gave Dews reasons why the three photographs "were in question." (Tab A at p. 224:23). Dews says that Johnson told him that Photo 4 "could be viewed as a scene of masturbation"; that Photo 3 "could be viewed as an act of sadomasochism, in a prurient interest"; and that Photo 2 "could be construed as some sort of sexual activity." (Tab A at pp. 225:14-23, 226:1).

61.    In the pre-Christmas break conversation, Johnson told Dews that he would be in contact with him and that there were options Dews had with regard to three photographs. Johnson told him he (a) could either remove three photographs that were of concern, (b) conceal in some way the specific portions of the three photographs that were of concern, or (c) remove the entire piece. (Tab A at p. 224:7-17). Dews told Johnson that he did not want to remove the three photographs or censor them. (Tab A at pp. 231:15-23, 232:1-10). Johnson told Dews he would discuss further with higher-ups and get back to Dews "on what possibilities there were." (Tab A at p. 227:1-6, 227:13-14).

**S.**    **DEWS' NEXT MEETING WITH JOHNSON**

62.    The next time Dews spoke with Johnson was after the Christmas break in January 2004, "right before classes began the next term." (Tab A at p. 228:9-23). Johnson had phoned him and told him that he needed to come in and have a discussion. (Tab A at p. 229:11-15, 229:20-23).

63.    Before going to Johnson's office, Dews went to the Adams Memorabilia Room to photograph his birth assignment piece, "just to have documentation, stuff like that, standard things," and three photographs were removed: Photo 4,[8] Photo 2,[9] and Photo 3.[10] (Tab A at pp. 229:23, 230:1-17).

64.    Dews then proceeded to Johnson's office. Dews' three photographs were in Johnson's office. In a very brief conversation, Johnson stated the three options Dews had: (a) remove three photographs that were of concern; (b) conceal in some way the specific portions of the three photographs that were of concern; or (c) remove the entire piece. (Tab A at pp. 241:22-23, 242:1-16).

65.    Johnson returned the photographs to Dews and told him that "we need it out by this time and here's your photographs, photograph it, do whatever you need to do, document it, that's fine." (Tab A at p. 243:19-23).

---

[8] Tab B at DX3, p. 8.
[9] Tab B at DX3, p. 7.
[10] Tab B at DX3, p. 6.

66.     Johnson was "always polite" in how he handled the matter with Dews. (Tab A at p. 244:1-8). Dews assumes Johnson disagreed with the decision regarding the three photographs of concern because Dews made an A in his Collaborative Studio that semester. (Tab A at p. 245:6-13).

67.     Dews removed his birth assignment piece that same day with the help of his friend Dan Gibbs. (Tab A at p. 245:14-20).

## T.    THE ENTIRE SHOW CLOSES BEFORE 2004 SPRING SEMESTER

68.     Fulmer and Johnson jointly and solely decided that the student art show would be closed before the beginning of the 2004 spring semester for the following reasons:

> (a)     individuals had already had an opportunity over several days to attend the art show, including individuals who attended the Sounds of the Season event;

> (b)     one of the reasons the art show existed was to exhibit the class assignments of the Fall 2003 Collaborative Studio class taught by Johnson, and that class was over and a Spring 2004 Collaborative Studio class was about to start meeting, which would provide an opportunity for another show, where in fact, Dews again exhibited works showing full frontal nudity;

> (c)     the pedagogical reason for holding the show, the primary reason for it to be held, had been completed: (i) students had the opportunity to make art; (ii) if their work was selected by Johnson and other professor, their art work was exhibited; (iii) their work, if chosen, was displayed to an audience and to a team of qualified art judges, (iv) they

competed for awards, which were given out; and (v) in most instances, including Dews', they received academic credit;

(d)    the Department of Art and Design was relying on the assistance of a secretary, who did not work for the Department of Art and Design, to perform not only her regular duties, but to ensure that minors did not have unrestricted access to the photographs depicting full frontal nudity; and

(e)    there were concerns by Fulmer and Johnson that some of the photographs could be construed to be in breach of Alabama obscenity laws.

(Tab C at p. 6-7, ¶24; Tab D at p. 5-6, ¶23).

69.    The primary reason, though, that Fulmer and Johnson decided to close the show was that the Adams Memorabilia room was borrowed space. The room existed not to exhibit student art, but to fulfill part of the agreement tied to Dr. Adams' generous gift, that is, the display of memorabilia and a library of archives representing the history of Troy University and, particularly, the tenure of Dr. Ralph Adams. If the Department of Art and Design ever wanted to request the use of the room for future art shows, it would need to be sensitive of the agreement made between the University and Dr. Adams and his estate. To that end, it was important that the Adams Memorabilia Room be restored to its stated purpose. (Tab C at p. 7 ¶25; Tab D at p. 7 ¶24).

## U.    DISMANTLING THE STUDENT ART SHOW

70.    It took a few weeks to remove all of the artwork out of the Adams Memorabilia Room. It was necessary to coordinate the closing with the University's Physical Plant, the School of Music, and other art faculty in order to facilitate students picking up the work on their own or art instructors picking it up for them. The students or a professor had to be located and since some of the work included large furniture designs, moving logistics had to be coordinated. (Tab D at p. 7, ¶25).

71.    Dews had another piece of art that was displayed in the show. It was returned to him along with other students' works in the Department of Art and Design's Malone Gallery. Dews cannot recall when that happened. (Tab A at p. 251:9-23).

72.    After the show was cleared out of the Adams Memorabilia Room, Director of the School of Music Dr. Bill Denison and Johnson agreed to place a work order in the Physical Plant to have the walls repainted and holes patched from hanging the students' work. Moreover, the Department of Art and Design wanted to be kind enough to reorganize the space for the repositioning of the Adams memorabilia, which it subsequently did after the Physical Plant was able to complete the work order. (Tab D at p. 7, ¶26).

## V.    DEWS' ALLEGATIONS REGARDING BOB JOSLIN

73.    After Dews returned from Christmas 2003 vacation, he went to pick up his portfolio of photographs he had taken for his fall 2003 Photo Studio III class, which was taught by Joslin, his photography teacher. (Tab A at p. 265:1-7). The photographs in his portfolio for his fall 2003 Photo Studio III class included some of the photographs that Dews took for his fall 2003 Collaborative Studio class, but not any of the nudes. (Tab A at pp. 265:23, 266:1-10; 267:9-15). Dews had taken Joslin's Photo Studio I and Photo Studio II class earlier at Troy and had made an A in both courses. (Tab A at p. 263:11-15).

74.    Joslin told Dews he made a "B" in the Photo Studio III class. (Tab A at p. 265:1-7). When Dews asked Joslin why he made a B instead of an A, Joslin told him that Dews had "spent far too much time on [his] collaborative piece and that [his] work wasn't at the quality that he thought it should be." (Tab A at p. 269:10-17). According to Dews, it started to get heated that day with Joslin —

> "because I was really – I was mainly upset about my grade. And it sort of turned into this other thing. We started to talk about subject matter, and I could tell he was getting angry with me. And so, you know, I was well, whatever, I'm going to leave, because I didn't want to be – I didn't want to get to this point where people are yelling, especially while other people are around. And I started to walk out and he got up and grabbed me and told me not to shoot porno in his studio."

35

(Tab A at p. 269:22-23, 270:1-11).

75.     Joslin never pointed Dews to any photos he thought were pornographic. (Tab A at p. 272:20-22). Before "everything started to get heated," Joslin had told Dews that "he liked what he saw" in the fall 2003 Collaborative Studio student art show. (Tab A at p. 279:13-22).

76.     When asked whether he ever received a low grade from any professor because of the subject matter of any of his work, Dews said "I guess that's subjective." (Tab A at p. 261:8-16). Dews then said he believed he received a "B" in Joslin's Photo Studio III class instead of an "A" because Dews was taking pictures of human genitalia. (Tab A at pp. 261:22-23, 262:1-5). Dews said that Joslin "[m]ight have mentioned that all photographs needed to be tasteful. But once again, tasteful is subjective." (Tab A at p. 264:12-18).

77.     Dews said "a definition of pornography would be anything that applies to prurient interests. It is a voyeuristic look into sexuality. And it is used for those specific purposes of sexual gratification." When asked whether art could do the same thing, he answered, "[a]rt can do the same thing, and there is a thin line there. And that is an age old question, since the birth of art. (Tab A at p. 330:2-22).

**W.    THE SPRING 2004 COLLABORATIVE STUDIO ART SHOW**

78.    Dews took another Collaborative Studio course during the Spring 2004 semester taught by Johnson. (Tab A at pp. 259:19-22, 260:12-14). There was an art show for that Collaborative Studio class too, this time based upon an attic theme. (Tab A at pp. 259:23, 260:1-2). The faculty chose the space for the show, (Tab A at p. 283:21-23), which was held at a loft in downtown Troy rented by Dews and another Troy art student. (Tab A at p. 281:8-10, 281:15-23, 282:3-8).

**X.    MORE FULL-FRONTAL NUDITY IN A SUBSEQUENT STUDENT ART SHOW**

79.    Dews was pleased with the piece he exhibited in the spring 2004 Collaborative Studio student art show. (Tab A at p. 284:17-19). It included photographs of a male and female, neither of whose ages Dews knew on April 27, 2006, the day of his deposition, or at the time he took the photographs.[11] (Tab A at pp. 289:14-23, 290:1-12). The photographs in the piece included visible breasts of the female and "possibly" pictures of the female's vagina. (Tab A at pp. 291:1-7, 291:18-21; Tab B at DX7). The

---

[11] Defendant Troy University is also moving to have these photographs filed under seal because the ages of the people in the photograph cannot be verified at this time. See defendants' motion to file portions of the summary judgment evidence under seal, which is being filed contemporaneously with defendants' summary judgment evidence.

piece included pictures of a male with his penis exposed. (Tab A at pp. 291:22-23, 292:1-2, 292:11-13; Tab B at DX7).

80.    No Troy faculty member told him that they had any problems with any of the images in the piece he exhibited in the 2004 spring semester Collaborative Studio student art show at the loft. (Tab A at p. 285:3-7). No one ever said anything negative to him about the picture where someone's penis was exposed. (Tab A at p. 292:14-18). He made an "A" in the 2004 spring semester Collaborative Studio course. (Tab A at p. 260:19-21).

81.    Dews cannot recall how long the show lasted, only commenting that "[i]t may have been a very short amount of time." (Tab A at p. 285:11-15). There was an opening for the show where around fifty people or maybe more, including some faculty members, attended. (Tab A at pp. 285:22-23, 286:1-5, 288:7-10).

82.    If someone wanted to see the show other than at the opening, they could get in to see it if Dews or the other Troy student renting the loft were present. (Tab A at p. 286:16-21). According to Dews, "I think we had hours that it was open. And I think that's also one of the main reasons it wasn't open very long as well." (Tab A at pp. 286:16-23, 287:1).

83.    Dews took all of the photographs for the piece he exhibited for the Spring 2004 student art show subsequent to the alleged arm-grabbing

incident with Joslin. When asked if he took any of them in the student photography studio, he said yes. (Tab A at p. 293:3-16).

84.    Dews did not get model release forms from the individuals he photographed for the 2004 spring semester Collaborative Studio show, although he knew about the forms at the time. (Ta A at p. 294:3-12). Dews said, "No. They were students and had agreed to be my subjects so – and they knew that I was going to be displaying the work." (Tab A at p. 294:6-9).

## Y.    DEWS' SENIOR THESIS SHOW

85.    Dews was "incredibly" pleased with the work he produced in his spring 2005 senior thesis class. (Tab A at p. 201:2-4). He received an "A" in the course, (Tab A at p. 200:18-21), and a number of his senior thesis photographs were exhibited on the walls of the Department of Art and Design's Malone Gallery in the Spring of 2005. (Tab A at p. 202:3-10; Tab B at DX-6; Tab D at p. 8, ¶30). Johnson was Dews' senior thesis teacher, (Tab C at p. 8, ¶30), and he highly praised Dews' senior thesis work. (Tab A at pp. 204:17-23, 205:1-3).

## Z.    NO CONTACT WITH DR. JACK HAWKINS

86.    Dews has never actually met Troy Chancellor Dr. Jack Hawkins. He has only seen Chancellor Hawkins on television and in

photographs. (Tab A at p. 208:8-17). Dews has never spoken to Dr. Hawkins, and Dr. Hawkins has never sent Dews anything in writing. (Tab A at pp. 209:20-23, 210:1-2). Dews is not aware of Dr. Hawkins ever making any statements about Dews' artwork. (Tab A at p. 210:13-16).

## AA.   ED NORIEGA DID NOT VIOLATE DEWS' RIGHTS

87.    The day Dews completed hanging his birth assignment piece in the Adams Memorabilia Room, Noriega, a teacher in the Department of Art and Design, jokingly said to Dews "in a nutshell . . . it was a cry for attention, something in that nature." (Tab A at pp. 182:18-23, 183:1-7). Dews at the time "laughed it off," but did not agree with Noreiga's statement. (Tab A at p. 184:8-12). Dews does not have the opinion that Noreiga made the statement in an attempt to hurt his feelings. (Tab A at p. 184:15-18).

88.    Noreiga served on Dews senior thesis committee. (Tab A at p. 188:7-9). Dews claims that Noriega required Dews to see the campus psychologist while Dews was working on his senior thesis. (Tab A at pp. 189:13-21, 368:2-22). Dews felt Noriega requiring him to do that was inappropriate. (Tab A at p. 197:6-9). Dews did not complain to any Troy employee about Noreiga requiring him to see a psychologist. (Tab A at pp. 199:13-16, 200:5-17).

89.     Dews expressly testified that Noriega did not do anything to him that infringed upon his First Amendment rights. (Tab A at p. 196:18-22).

## BB.    DEWS NEVER COMPLAINED OR UTILIZED ANY APPEALS PROCESS

90.     Dews did not complain to anyone at the Troy or attempt to undertake any appeals process with regard to having to remove his birth assignment piece from the student art show. (Tab A at p. 360:11-17). He did not complain to anyone at the University or attempt to undertake any appeals process with regard to his receiving the grade of "B" instead of an "A" in Joslin's Photo Studio III class. (Tab A at p. 360:18-22).

91.     Although he alleges that he told Allen, his academic advisor at the time, that Joslin allegedly grabbed his arm and told him not to shoot pornography in the student photography lab, he also told Allen not to pursue the matter, even after she allegedly asked him if he wanted to do so. (Tab A at p. 271:10-23).

## CC.    TROYS' WRITTEN POLICIES DID NOT AFFECT DEWS

92.     Dews did not think of Troy's hazing policy when he was taking photographs for the Spring Collaborative Art show, or for his senior thesis. or with regard to any art he created after the his birth assignment piece. (Tab A at p. 338:10-23). Moreover, Dews did not think of Troy's sexual

harassment policy when he was taking photographs for the Spring Collaborative Art show, or for his senior thesis. or with regard to any art he created after the his birth assignment piece. (Tab A at p. 339:1). Dews said he thought about the student handbook when he was creating art after the birth assignment because he believed that "a student could be expelled on grounds that don't seem very valid to [him]." (Tab A at p. 339:7-23).

93.    However, Dews admits he was never expelled, suspended, threatened with expulsion, or threatened with suspension (Tab A at p. 340:1-11). He further admits he was never disciplined for anything that was in Troy's hazing policy, Troy's sexual harassment policy, Troy's code of conduct, or Troy's student handbook (Tab A at pp. 340:15-23, 341:1-2).

94.    Furthermore, no one at Troy, including Johnson, ever told Dews they were going to the police with regard to the photographs of concern in Dews' birth assignment piece, and no police officer ever approached Dews about the photographs. (Tab A at p. 341:12-20). No member of the Troy faculty or administration ever actually said the birth assignment piece was obscene. (Tab A at pp. 358:13-23; 359:1-23; 360:1).

## DD.    HOW DEWS CLAIMS THE ISSUES REGARDING HIS BIRTH ASSIGNMENT PIECE AFFECTED HIS ART

95.    Dews said that concerns regarding his birth assignment piece "[m]ade me much more self-conscious . . . instead of branching out and

becoming outward and really exposed and really going into detail and becoming a greater artist through the university setting, I felt like I pulled inward after that situation." (Tab A at p. 325:3-16). He claims "[t]hat incident significantly altered how I represented myself with my art a lot – and I think anybody can vouch for that, because a lot of the art turned inward. They were focused on me. I started taking a lot more self-portraits and trying to understand myself." (Tab A at p. 326:3-11).

96.    However, Dews received an "A" from Johnson for his fall 2003 Collaborative Studio class; an award from the jury for his birth assignment piece appearing in the 2003 fall semester juried student art show; an "A" from Johnson for his 2004 spring semester Collaborative Studio class, where Dews created and exhibited more art with full frontal nudity; an "A" from Johnson for his spring 2005 senior thesis class for art that "incredibly pleased" Dews; and high praise from his professors for his senior thesis work, including from Johnson. At the end of the spring 2005 semester, Dews graduated from Troy *summa cum laude* with a 3.9 out of 4.0 grade point average. (Tab A at pp. 23:17-20, 24:9-12, 62:14-16, 200:18-21, 201:2-4, 204:17-23, 205:1-3, 260:15-21, 291:1-7, 291:18-21; 291: 22-23, 292:1-2, 292:11-13; Tab B at DX7).

# III.

# ANALYSIS

Defendants Troy University, Dr. Jack Hawkins, Jerry Johnson, and Robert Joslin are entitled to dismissal with prejudice of all claims against them for the following separate reasons:

## A. OFFICIAL CAPACITY CLAIMS SHOULD BE DISMISSED AS REDUNDANT AND POTENTIALLY CONFUSING TO A JURY

Defendants Hawkins, Johnson, and Joslin are sued in their official and individual capacities. (Tab E at p. 1, caption). The official-capacity claims against all three individuals should be dismissed because they are redundant to claims against Troy. Moreover, keeping Hawkins, Johnson, and Joslin in the lawsuit in their official capacity would possibly be confusing to a jury. See Stavropoulos v. Firestone, 361 F.3d 610, 614 n.4 (11th Cir. 2004) ("The court also allowed Stavropoulos's official-capacity Title VII, Title IX, and ADA claims against Firestone, Squires, and Nix to proceed, though it recognized them as redundant to claims against the Board. In its summary judgment order, the district court dismissed these official-capacity statutory actions as redundant."); Portera v. State of Alabama Dept. of Finance, 322 F. Supp. 2d 1285, 1287 (M.D. Ala. 2004) (Thompson, J.) ("[A]ny claim against McClenney in his official capacity is redundant since the [Alabama State] Finance Department is already a defendant."); Garrison v. Montgomery

County Bd. of Education, 2006 WL 625876 at * 9 (M.D. 2006) (Albritton, Senior J.) ("To retain this suit as one against Purcell, et al., in their official capacities and as one against the MCBOE would be redundant and possibly confusing to the jury.") (quotes omitted)

**B.   ALL CLAIMS AGAINST TROY ARE DUE TO BE DISMISSED EITHER BASED ON IMMUNITY, MOOTNESS, OR STANDING**

Troy, an instrumentality of the State of Alabama, is due summary judgment on all claims either because of the doctrine of immunity, the doctrine of mootness, or standing. Specifically, summary judgment is due based on the following:

● Eleventh Amendment immunity bars Dews from recovering any money damages based on alleged violations of the United States Constitution;

● Because Dews has graduated from Troy, he is barred from receiving injunctive or declaratory relief with regard to his federal claims because of the doctrine of mootness;

● Dews does not have standing to challenge Troy's hazing policy, sexual harassment policy, or any other written policy in Troy's student handbook or undergraduate bulletin;

● Dews is barred from any relief, injunctive or otherwise, with regard to his 42 U.S.C. § 1983 claims because Troy is not a "person" acting under color of state law and because of Eleventh Amendment immunity;

● Dews is barred by Section 14 of the Alabama Constitution from recovering any money damages from Troy based on alleged free speech violations of Article I, § 4 of the Alabama Constitution;

● Dews is barred by Section 14 of the Alabama Constitution from bringing an Alabama state contract claim against Troy.

1. **Troy Is an Instrumentality of the State of Alabama and Has Not Waived Its Sovereign Immunity**

The Eleventh Amendment of the United States Constitution "prohibits federal courts from entertaining suits by private parties against States and their agencies" in the absence of a state's consent. <u>Alabama v. Pugh</u>, 438 U.S. 781 (1978). <u>See also</u> <u>Lassiter v. Alabama A&M University</u>, 3 F.3d 1482, 1485 (11th Cir. 1993) ("The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity.")

a. **Troy is an instrumentality of Alabama**

As the Eleventh Circuit noted in <u>Harden v. Adams</u>, 760 F.2d 1158, 1163-1164 (11th Cir. 1985), Troy is an instrumentality of the State of Alabama entitled to Eleventh Amendment immunity:

"The Alabama Supreme Court has held on at least two occasions that state universities, including Troy State University, are agencies or instrumentalities of the state. *See Massler v. Troy State University,* 343 So.2d 1 (Ala.1977);

*Ellison v. Abbot,* 337 So.2d 756 (Ala.1976). Moreover, Troy State University is subject to substantial state control: its Board of Trustees, which reports to the state legislature yearly on the condition of the University, is composed in part of state officials and in part of gubernatorial appointees. Sections 16-56-1 and 16-56-3, *Code of Alabama* (1975). Troy State must also submit its budget to, and receive appropriations from, the state legislature. Section 16-56-10, *Code of Alabama* (1975). The Alabama Supreme Court has also determined that the Board of Trustees of a state university is entitled to sovereign immunity as an instrumentality of the state. *See Hutchinson v. Board of Trustees of University of Alabama,* 47 Ala.App. 460, 256 So.2d 279 (1971)."

### b.    No waiver of Eleventh Amendment immunity

Alabama has not waived Eleventh Amendment immunity. Alabama v. Pugh, 438 U.S. 781, 782 (1978) (noting that "no consent could be given under Art. I, § 14, of the Alabama Constitution, which provides that 'the State of Alabama shall never be made a defendant in any court of law or equity'"); Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1429 (11th Cir. 1997) (holding Alabama has not waived its Eleventh Amendment immunity).

### 2.    Eleventh Amendment Immunity Bars Money Damages

The Eleventh Amendment to the United States Constitution bars Dews from recovering money damages from Troy for alleged First and Fourteenth Amendment violations. Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) ("Federal courts may not award retrospective relief, for

instance money damages or its equivalent, if the State invokes its immunity."); <u>Zabriske v. Court Administration</u>, 2006 WL 231528 (11th Cir. 2006) ("The district court properly dismissed Plaintiff's claims for money damages as barred by Eleventh Amendment immunity"); <u>Raspberry v. Johnson</u>, 88 F. Supp. 2d 1319, 1324 (M.D. Ala. 2000) (DeMent, J.) ("Plaintiff wisely does not contest this argument because the Eleventh Amendment unequivocally bars suits for money damages against a state by the citizens of that state, unless the state consents to suit or specifically waives its Eleventh Amendment immunity.")

### 3.    <u>Dews' Federal Constitutional Claims for Equitable Relief Are Moot</u>

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969). Any decision on the merits of a moot case would be an impermissible advisory opinion. <u>Church of Scientology Flag Serv. Org. v. City of Clearwater</u>, 777 F.2d 598, 604 (11th Cir. 1985), cert. denied 476 U.S. 1116 (1986).

Dews brings claims for injunctive relief based on the First and Fourteenth Amendments of the United States Constitution.[12] Dews'

---

[12] Tab E, the Complaint, at ¶¶ 58-63 (Count I), at ¶¶72-75 (Count III), at ¶¶78-81 (Count IV) and at ¶¶84-85 (Count V).

graduation from Troy at the end of the 2005 spring semester has rendered those claims moot. He can now longer claim his First or Fourteenth Amendment rights are threatened from Troy's written policies and procedures or from any Troy professor or administrator. Beasley v. Alabama State University, 3 F. Supp. 2d 1325, 1344 (M.D. Ala. 1998) (Thompson, J.):

> While Beasley had standing to pursue injunctive relief when she first filed suit, as well as when she first moved to certify a plaintiff class in June 1996, because she still had several months of eligibility to participate in NCAA athletics at that time, her eligibility has now long expired. Consequently, she can no longer benefit from an order requiring ASU to comply with the mandates of Title IX, and her claim for injunctive relief is now moot.

See also Adler v. Duval County School Bd., 112 F.3d 1475, 1477 (11th Cir. 1997) ("All appellants have graduated, and none are threatened with harm from possible prayers in future Duval County graduation ceremonies."); Pederson v. Louisiana State University, 213 F.3d 858, 874 (5th Cir. 2000) ("As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders their claims for injunctive relief moot."); Cook v. Colgate University, 992 F.2d 17 (2d Cir.1993) (holding that Title IX claims brought by women club ice hockey team at University were moot because the players had graduated), cited with approval in Beasley, 3 F. Supp. 2d at 1343.

Dews now lives in Birmingham, Alabama. (Tab A at p. 9:2-6, 41:10-14). He has not applied for graduate school, only considered it, and the three schools he has considered are colleges located out of state. (Tab A at pp. 36:16-18, 37:1-3, 37-7-23). Troy does not even offer an MA or MFA in art or photography. (Tab C at p. 7, ¶28). Therefore, Dews' claims for injunctive and declaratory relief based on federal constitutional claims are barred by the doctrine of mootness, and there is no exception to save them.

### a.     No class certification

The Complaint makes no request for class certification. (Tab E, passim).[13] Moreover, the deadline to file a motion for class certification was March 15, 2006, (Tab F at p. 2),[14] and no such motion was filed. Therefore, the lawsuit contains no party still enrolled in Troy who can stave off the mootness of the federal constitutional claims for injunctive relief. According to Beasley v. Alabama State University—

> "Beasley has not availed herself of this opportunity to preserve her claims for injunctive relief, though, because she never renewed her motion to certify a plaintiff class after the court first denied it with leave to renew in March 1997, and no class has since been certified in this action.
>      "Consequently, Beasley has not staved off the mootness of her claim for injunctive relief, and she cannot now assert this

---

[13] According to the Middle District of Alabama's Local Rule 23.1,  "[i]n any case sought to be maintained as a class action, the complaint or other pleading asserting a class action, shall include in its caption under the case number, the legend 'Class Action.'" The Complaint in this case has no such assertion in its caption. (Tab E, caption).

[14] Tab F refers to the Court's Uniform Scheduling Order.

claim on behalf of herself or other female student-athletes at ASU. The defendants' motion for summary judgment is therefore due to be granted as to Beasley's sole remaining claim for prospective injunctive relief."

3 F.Supp.2d at 1343.

### b.   The "capable of repetition, yet evading review" exception does not apply

Graduated students often maintain that their claims fall under an exception to the mootness doctrine where the harm is "capable of repetition, yet evading review." Mellen v. Bunting, 327 F.2d 355, 363 (4th Cir. 2003). Graduated students do not ordinarily qualify for this exception to the mootness doctrine because, once they have graduated, they will never again be subject to the school's policies. Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 71 (2d Cir.), cert. denied, 534 U.S. 827 (2001) ("[T]he 'capable of repetition, yet evading review' exception is not available when the issue is students' rights and the complaining students have graduated from the defendant institution.").

### 4.   Dews Has No Constitutional Standing to Bring a Lawsuit Based on His Claims that Troy's Written Policies Violated His Rights

As stated by the Eleventh Circuit in Alabama-Tombigbee Rivers Coalition v. Norton, 338 F.3d 1244, 1252 (11th Cir. 2003), the three required elements for constitutional standing are "(1) 'an 'injury in fact' — a harm

suffered by the plaintiff that is 'concrete' and 'actual or imminent', not 'conjectural' or 'hypothetical'; (2) 'causation — a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant;' and (3) 'redressability' — a likelihood that the requested relief will redress the alleged injury." Dews meets none of those elements with regard to his claims that Troy's hazing policy, sexual harassment policy, and other written policies in Troy's student handbook and undergraduate bulletin violated his constitutional rights.

### a.    No "injury in fact" or "causation"

Dews' own testimony establishes that there exists no "injury in fact." He admits he was never expelled, suspended, threatened with expulsion, or threatened with suspension while at Troy. (Tab A at p. 340:1-11). He further admits he was never disciplined for anything that was in Troy's hazing policy, Troy's sexual harassment policy, Troy's code of conduct, or Troy's student handbook. (Tab A at pp. 340:15-23, 341:1-2).

Because he cannot show injury, he cannot show causation, i.e., a traceable connection between a plaintiff's injury and the complained-of conduct of a defendant. With regard to his allegation that his birth assignment piece was censored, Dews said that Johnson referred to and provided him with a copy of Alabama's obscenity statute in their meeting.

(Tab A at p. 223:17-20). The Alabama legislature, not Troy or any individual defendant, wrote that statute. There is no evidence Dews' birth assignment piece was censored because of the hazing policy, the sexual harassment policy, or any other policy Dews' refers to in his Complaint.

### b. No redressability

In his Complaint, Dews requests a "preliminary and permanent injunction invalidating and restraining enforcement of the University's speech codes."[15] (See Tab E at p. 16-17, ¶62; p. 17, ¶69; p. 19, ¶75; p. 21, ¶¶81, 85; p. 24, ¶4). Because Dews graduated from Troy at the end of the 2005 spring semester and is no longer on campus, neither an injunction invalidating enforcement nor any revision, addition, deletion, modification, or anything else exacted on Troy's written policies can redress any alleged injury Dews suffered.

### 5. Any 42 U.S.C. § 1983 Claim against Troy Must Be Dismissed

The Complaint is not a model of clarity. In Counts One, Three, Four and Five, the Complaint refers to "defendants" as violating 42 U.S.C. § 1983. (Tab E at p. 16, ¶59; at p. 19, ¶73; at p. 20, ¶79; and at p. 21, ¶85). The Complaint does not distinguish between Troy and the three defendants sued in their individual capacity. (Id.) To the extent Dews is bringing a 42

---

[15] "Speech codes" is Dews' term, not Defendants'.

U.S.C. § 1983 claim against Troy, it is due to be dismissed because Troy is not a "person" acting under color of state law and because of Eleventh Amendment Immunity.

### a.    Troy not a "person" acting under color of state law

"In order to succeed on a § 1983 claim, 'a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law.'" Taylor v. Department of Public Safety, 142 Fed.Appx. 373, 374 (11th Cir. 2005) (emphasis in original), quoting Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001). According to Will v. Michigan Dept. of State Police, 491 U.S. 58, 67 (1989), the State is not a "person" within the meaning of § 1983.

The Eleventh Circuit has held that because neither a State nor its officials acting in their official capacities are "persons" under § 1983, claims brought under § 1983 against a State or its officials are due to be dismissed. Ferguson v. Georgia Dept. of Corrections, 2006 WL 997416 at *7 (11th Cir. 2006) (dismissing § 1983 claims for damages against State officials brought in their official capacity because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983, which provides a cause of action only against 'persons' who, under color of state law, deprive an individual of his constitutional rights"). See also McReynolds ex rel. D.M. v.

Alabama Dept. of Youth Services, 2006 WL 821203 at * 4 (M.D. Ala. 2006 (Fuller, J.) ("[T]he ADYS is an arm of the state. Consequently, the Plaintiff cannot maintain an action under §1983 against the ADYS or any ADYS employee in his or her official capacity. Therefore, all such claims are dismissed.")

### b. Eleventh Amendment to the United States Constitution Bars § 1983 Claims against Troy

The Eleventh Amendment to the United States Constitution bars a § 1983 action against Alabama and its instrumentalities unless the State either consents to suit or waives its sovereign immunity with regard to § 1983 claims. Alabama v. Pugh, 438 U.S. 781, 781 (1978) (ruling the Eleventh Amendment barred an action against the State). As established in Part III.B.1.b of this brief, Troy has not waived its Eleventh Amendment immunity.[16] "Moreover, Congress has not abrogated eleventh amendment immunity in § 1983 cases." Carr v. City of Florence, Ala., 916, F.2d 1521, 1524 (11th Cir. 1990). Therefore, the Eleventh Amendment bars a § 1983 claim against Troy.

---

[16] Troy also expressly stated in its Answer to the Complaint that it was an arm of the State of Alabama and that it did not waive any immunity from suit. (Tab G at p. 96, ¶¶99-102).

**6.     Section 14 of the Alabama Constitution Precludes Dews from Recovering Money Damages for his State Constitution Claim**

Count II of the Complaint is brought pursuant to Article I, § 4 of the Alabama Constitution and alleges unlawful abridgement of freedom of speech. (Tab E at p. 17-18, ¶¶64-70). In <u>Alabama Agr. & Mechanical Univ. v. Jones</u>, 895 So. 2d 867, 873 (Ala. 2004), the Alabama Supreme Court noted that § 14 of the Alabama Constitution provides that "the State of Alabama shall never be made a defendant in any court of law or equity" and that "the wall of immunity erected by § 14 is nearly impregnable." The Court in <u>Jones</u> pointed out that the wall <u>is</u> impregnable if a party seeks money damages from the State: "[a]n action <i>is</i> one against the [S]tate when a favorable result for the plaintiff . . . would result in the plaintiff's recovery of money from the [S]tate." 895 So. 2d at 873 (emphasis in original), quoting <u>Shoals Community College v. Colagross</u>, 674 So. 2d 1311, 1314 (Ala. Civ. App. 1995).

**7.     Sovereign Immunity Prohibits Dews' Alabama State Law Contract Claim**

The Sixth Count of the Complaint is an Alabama common law breach of contract claim, which is due to be dismissed pursuant to §14 of the Alabama Constitution. <u>Milton v. Espey</u>, 356 So. 2d 1201, 1202 (Ala. 1978)

("A suit seeking money damages for breach of contract . . . comes within the prohibition of Section 14 as a suit against the State.").

## C.    **DEWS CANNOT PLEAD THE FIFTH AND PROCEED WITH HIS CONSTITUTIONAL CLAIMS**

Defendants are separately due summary judgment with regard to Dews' federal and state constitutional claims for equitable relief <u>and</u> money damages based on Dews' asserting a Fifth Amendment privilege against self-incrimination. In the Complaint, Dews alleges that Defendants violated his federal constitutional free speech rights and his Alabama state constitutional free speech rights by acts of "improperly censoring" from public exhibition his birth assignment piece from HAL Hall. (Tab E at p. 15, ¶ 58; Tab E at at p. 17, ¶ 65).

However, in his deposition, Dews asserted a Fifth Amendment privilege against self-incrimination when asked the age of a nude female who appears in two photographs included in the birth assignment piece for exhibition in HAL Hall. (Tab A at pp. 84:19-23, 85:1-15, 87:14-23; B-DX4 at pp. 6-7). In one of the photographs, the female, totally nude except for a bow tie, is sitting on the ground, her back against some fence boards and head tilted up, and her legs spread open to clearly show genital nudity. (Tab A at pp. 85:3-16; B-DX4 at p. 6). In another photograph, the same female is standing, her genitals exposed as well as one breast. The visual reproduction

of her appears to depict abuse, her shirt torn and her face battered. (A-85:17-19, B-DX4 at p. 7). Dews also pled the Fifth Amendment when asked the name of the other female who appears in the photograph with the nude female leaning against the boards and who is holding the nude female's hand. (Tab A at pp. 84:19-23, 85:1-2; B-DX4 at p. 6).

In <u>New York v. Ferber</u>, 458 U.S. 747 (1982), a unanimous U.S. Supreme Court held that child pornography was a distinct new category of speech without First Amendment protection, holding that the government may constitutionally prohibit the creation or promotion of pornography featuring real children even though it does not meet the obscenity standard set forth in <u>Miller v. California</u>, 413 U.S. 15 (1973). <u>See also</u> <u>U.S. v. Miller</u>, 776 F.2d 978, 980 n.4 (11th Cir. 1985) ("Child pornography is not protected by the First Amendment.").

Alabama state courts have also weighed in, holding that child pornography receives no special constitutional protection. In <u>Perry v. State</u>, 568 So. 2d 339, 341 (Ala. Crim. App. 1990), the Alabama Court of Criminal Appeals, while quoting <u>Ferber</u>, notes that "States are entitled to greater leeway in the regulation of pornographic depictions of children." <u>Perry</u>, 568 So. 2d at 341. While citing <u>Felton v. State</u>, 526 So. 2d 635, 636-637 (Ala. Crim. App. 1986), <u>aff'd</u>, <u>Ex parte Felton</u>, 526 So. 2d 638 (Ala. 1988), the

Court in <u>Perry</u> ruled that "[t]he defendant has no constitutional right to possess child pornography in his home." 568 So. 2d at 342.

Dews cannot have it both ways. He cannot on the one hand claim his birth assignment piece is protected by federal and state constitutional provisions and on the other hand assert a Fifth Amendment privilege against self-incrimination. If the two females, one of whom appears in two photographs displaying full frontal nudity, are under the age of 18, Defendants could establish that Dews' birth assignment piece, where the photographs were displayed, receives no special constitutional protection. An adverse inference should be drawn against Dews with regard to the females' ages, and Defendants' motion for summary judgment granted.

Eleventh Circuit case law supports that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." <u>United States v. A Single Family Residence & Real Property</u>, 803 F.2d 625, 629 n.4 (11th Cir. 1986). <u>See also</u> <u>U.S. v. Two Parcels of Real Property Located in Russell County, Ala.</u>, 92 F.3d 1123, 1129 (11th Cir. 1996):

> "The claimants had a right to assert the Fifth Amendment privilege in this civil forfeiture proceeding. This Court has held, however, that the trier of fact may take an adverse inference against the parties to a civil action refusing to testify on Fifth Amendment grounds. There is an exception to this rule when a claimant in the civil case is also a defendant in the criminal case

and is forced to choose between waiving the privilege and losing the case on summary judgment. The testifying claimants here were not defendants in a criminal case."

Dews is not a defendant in a criminal case. He testified in his deposition that no police officer has ever even approached him about his photographs. (Tab A at p. 341:12-20).

## D.    DEFENDANTS ARE SEPARATELY DUE SUMMARY JUDGMENT ON THE MERITS

For the reasons stated in Part B and Part C of this brief, Defendants are due summary judgment on all claims, and no further analysis is necessary. However, even if one or all of the Defendants were not entitled to summary judgment based on immunity, mootness, standing, or Fifth Amendment adverse inference theories, they all would still be due summary judgment on each and every claim based on the merits.

### 1.    Defendants Are Due Summary Judgment on the First Amendment Claim

Dews' First Amendment claim is based on the following three allegations:

● that Defendants improperly censored his work when Robert Joslin told him not to shoot pornography in the student photography lab, (Tab E at p. 13-14, ¶¶49-52; Tab E at pp. 15-16, ¶¶58-59);

●    that Defendants improperly censored his work from public exhibition at the Adams Memorabilia Room in HAL Hall based on the content and viewpoint of the birth assignment piece, (Tab E at p. 10-13, ¶¶22-48; Tab E at pp. 15-16, ¶¶58-59); and

●    that Troy's sexual harassment policy, hazing policy and certain regulations in Troy's Student Handbook and Undergraduate Bulletin are vague and overbroad, explicitly discriminate on the basis of viewpoint and content discrimination, and unlawfully restrict free speech. (Tab E at pp. 4-10, ¶¶11-21; Tab E at pp. 14-15, ¶¶52-56; and Tab E at p. 16 at ¶¶60-61).

None of these allegations can stand up to a First Amendment analysis. Each allegation will be discussed separately.

###   a.    No constitutional right to shoot pornography in the student photography lab

*(i)    The student photography lab is a classroom, not a public forum.* The purpose of the Department of Art and Design's student photography lab is pedagogical. It exists as an extended classroom for Troy students. It is not open for the general public. (Tab D at p. 8, ¶31). Joslin, a teacher, is in charge of it. (Tab A at p. 100:2-5). The photography studio

contains equipment, including lights and backdrops for student use. (Tab A at p. 102:1-23). Dews took all of the photographs for his birth assignment piece in the studio. (Tab A at pp. 99:17-23, 100:1-2). He took his photographs for the 2004 spring semester Collaborative Studio student art show there too. (Tab A at p. 293:12-16).

In <u>Bishop v. Aronov</u>, 926 F.2d 1066, 1071 (11th Cir. 1991), the Eleventh Circuit held that a University classroom is not an open forum during instruction time.

> "[S]chool facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' <u>Perry Education Assn. v. Perry Local Educators' Assn.</u>, 460 U.S. 37, 47 [103 S. Ct. 948, 956, 74 L. Ed. 2d 794 (1983), or by some segment of the public, such as student organizations. <u>Id</u>. at 46, n.7 [103 S. Ct. at 955 n.7 (citing <u>Widmar v. Vincent</u>). If the facilities have instead been reserved for other intended purposes . . . then no public forum has been created, and school officials may impose *reasonable restrictions* on the speech of students, teachers, and other members of the school community. <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260, 267, 108 S. Ct. 562, 568, 98 L. Ed. 2d 592 (1988) (emphasis added). While the University may make its classrooms available for other purposes, we have no doubt that during instructional periods the University's classrooms are 'reserved for other intended purposes,' *viz.,* the teaching of a particular university course for credit. Thus, we first hold that Dr. Bishop's classroom is not an open forum."

In <u>Virgil v. School Board of Columbia County, Florida</u>, 862 F.2d 1517, 1522 (11th Cir. 1989), the Eleventh Circuit noted that "[o]ne factor identified

in Hazelwood as relevant to the determination of whether an activity could fairly be characterized as part of the curriculum is whether 'the public might reasonably perceive [the activity] to bear the imprimatur of the school." (brackets in original). It is clear that Troy's teacher-staffed student photography lab — which exists so that students like Dews could take photographs to complete class work like the birth assignment — would be perceived by the public to bear the imprimatur of Troy.

   *(ii)*    ***Troy may impose reasonable restrictions.*** As the Eleventh Circuit stated in Aronov, pursuant to the United States Supreme Court's decision in Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260 (1988), where no public forum has been created, a University "may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." 926 F.2d at 1021. (emphasis in original). In Bannon v. School District of Palm Beach, 387 F.3d 1208, 1213-1214 (11th Cir. 2004), the Eleventh Circuit stated that "[b]etween the spectrum of pure student expression and government expression is the intermediate category of school-sponsored expression: when 'students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school,' schools may

censor student expression so long as their action are reasonably related to legitimate pedagogical concerns." (brackets in original).

It is axiomatic that Joslin's request that the student photography lab not be turned into a porn studio is reasonably related to a legitimate pedagogical concern. As Dews said, Joslin "[m]ight have mentioned that all photographs needed to be tasteful." (Tab A at p. 264:12-17). Dews says pornography is "anything that applies to prurient interests. It is a voyeuristic look into sexuality. And it is used for those specific purposes of sexual gratification." (Tab A at p. 330:12-16). Nothing in the First Amendment requires Troy to create a teacher-staffed classroom so that students can use it to shoot photographs for the specific purposes of sexual gratification. See Virgil, 862 F.2d at 1523 (11th Cir. 1989) (holding that removal of readings related to explicit sexuality and excessively vulgar language is a legitimate pedagogical concern). Troy can certainly dissociate itself with pornography. Chandler v. McMinnville School Dist., 978 F.2d 524, 529 (9th Cir. 1992) ("A school has the discretion to disassociate itself from an entire range of speech, including speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences.") (internal quotes omitted).

Moreover, a prohibition against shooting pornography in the student photography lab is based upon content — sexual explicitness — and not the viewpoint of Joslin or anyone else at Troy. See Bannon, 387 F.3d at 1215 (11th Cir. 2004) (noting that "the school did not engage in viewpoint discrimination, but rather censored the murals on the basis of their content").

Finally, the statement by Joslin with regard to shooting pornography in the student photography lab did not adversely affect Dews' ability to photograph nudes in the student photography studio. Joslin's statement did not prevent Dews from snapping more nudes—including full-frontal nudity—in the student lab for Dews' 2004 spring semester Collaborative Studio course. (Tab A at pp. 291:1-7, 291:18-21; 291:22-23, 292:1-2, 292:11-13; Tab B at DX7).

*(iii)* ***Joslin's was Dews' teacher and was free to criticize Dews' work.*** Joslin was Dews' teacher, and he was not out of bounds with the United States Constitution if he exercised his right as a teacher to criticize Dews' photographs as stepping over the line from art into pornography, even if that criticism was in Dews' view condemnatory. As Dews himself stated, "[a]rt and [pornography] can do the same thing, and there is a thin line there. And that is an age old question, since the birth of art." (Tab A at p. 330:2-12). As stated above, Joslin's statement did not prevent Dews from

continuing to take nude photographs (full-frontal nudity) in the student

photography lab for the 2004 spring semester Collaborative Studio course,

which Johnson taught and for which Dews received an "A" grade. (Tab A at

pp. 260:19-21, 291:1-7, 291:18-21; 291:22-23, 292:1-2, 292:11-13; Tab B at

DX7). See Penthouse Intern., Ltd v. Meese, 939 F.2d 1011, 1015-1016

(C.A.D.C. 1991):

> "We do not see why government officials may not vigorously
> criticize a publication for any reason they wish. As part of the
> duties of their office, these officials surely must be expected to
> be free to speak out to criticize practices, even in a
> condemnatory fashion, that they might not have the statutory or
> even constitutional authority to regulate. Cf. Reuber v. United
> States, 750 F.2d 1039, 1059 (D.C.Cir.1984) (a government
> actor may openly criticize a study produced by an employee so
> long as no job-threatening sanction is employed). If the First
> Amendment were thought to be violated any time a private
> citizen's speech or writings were criticized by a government
> official, those officials might be virtually immobilized.

Joslin, Dews teacher, did not violate Dews' First Amendment rights or any

other constitutional rights by criticizing Dews' photography.

### b. No constitutional violation involving the juried student art show

The birth assignment piece was the main assignment for the 2003 fall

semester Collaborative Studio class. (Tab A at p. 50:9-13). Students in the

Collaborative Studio class, including Dews, had the opportunity to make art,

exhibit it in a juried student art show, compete for awards, and receive academic credit. (Tab D at p. 6, ¶23)

Dews testified that from the beginning of the class there was no guarantee that his birth assignment piece was going to be in the juried student art show, (Tab A at p. 345:6-12), and there was no guarantee how long the show would last. (Tab A at p. 73:13-15). Dews believes Johnson told him that the student art show was going to be up "through the [Christmas] break and that it would be taken down at some point which would be scheduled after we got back." (Tab A at pp. 74:12-23, 75:1-5). However, when asked if those were the words Johnson used, Dews answered "[n]ot exactly" and that he could not recall the words Johnson used. (Tab A at p. 75:6-11).

However, the birth assignment piece <u>was</u> chosen to be in the show, (Tab A at p. 55, 62), and it <u>was</u> displayed uncensored alongside other students' art work and was viewed by exhibit-goers while the show ran for several days, including the opening day which was in conjunction with the Sounds of the Season concert.  (Tab A at p. 235:6-10; Tab C at p. 5, ¶20; Tab D at p. 5, ¶19). Fulmer is aware of at least one whole Troy class viewing the exhibit. (Tab C at p. 5, ¶20).

Dews did not like Troy's rule that a person could not be admitted to the show unless he or she was a Troy student or above-18 if unaccompanied by parent or guardian (he would have put no age restriction with regard to access), (Tab A at pp. 236:8-20, 238:16-21), but he ultimately did not have a problem with Troy having that rule. (Tab A at pp. 237:16-23, 238:1-5). Dews' problem was that the door to the exhibit was locked and the secretary designated to open the door was not always within arm's reach, but Dews personally does not know of any student who wasn't able to see the student art show because of Troy's door policy. (Tab A at pp. 238:9-14, 241:18-21). Moreover, that secretary was performing a favor for the Department of Art and Design as she was not assigned to the Department and had other duties on top of providing access to the art show. (Tab D at p. 4-5, ¶18).

In the 2004 spring semester, Troy held a student art show featuring the art created by the spring semester 2004 Collaborative Studio class. It was held in a loft Dews was renting with another Troy art student. Persons wanting to view the show could only gain entrance if Dews or the other student renting the loft were present. (Tab A at p. 286:16-21). Dews made no complaint regarding the entry policy to that show.

While Dews may have wanted the 2003 fall semester juried student art show that exhibited his birth assignment piece to run longer, the reality of

the situation was that the Adams Memorabilia Room where the show was held does not exist on Troy's campus as an art gallery; rather, its purpose is to house and display memorabilia chronicling the career of former Troy University President Dr. Ralph Adams and the history of the University itself. (Tab C at p. 7, ¶21-22; Tab D at p. 5, ¶20-21). While the juried student art show was running, the memorabilia in the Adams Memorabilia Room had to be temporarily stored elsewhere. (Tab C at p. 5-6, ¶23). Fulmer and Johnson were sensitive to the fact the Adams Memorabilia Room was borrowed space. (Tab C at p. 7, ¶25; Tab D at p. 7, ¶24).

Finally, Dews did not want his piece to be, as he called it, "censored." (Tab A at p. 232:3-10). In a meeting with Dews, Johnson explained to Dews why three of the sixteen photographs in the birth assignment piece were "in question" with regard to Alabama's obscenity laws. (Tab A at p. 224:10-13, 224:18-22). It should be noted here, that Dews admitted Johnson was always polite in how he handled the matter. (Tab A at p. 244:1-8). In that meeting, Johnson even provided Dews with a copy of Alabama's obscenity laws. (Tab A at p. 223:17-20). Johnson discussed with Dews options Dews that had with regard to the birth assignment piece, including covering or removing the three photographs in question or removing the entire piece. (Tab A at p. 224:7-17). Those facts do not comport with a teacher hell-bent

on trampling on a student's First Amendment rights. Rather, they show a teacher addressing the situation head-on and being honest with his student.

Dews can disagree with Alabama's obscenity statute all he wants and he can claim his birth assignment piece does not violate the statute, but that does not change the fact that Johnson and Fulmer had concerns that the piece might be in violation. One of the photographs in question is of a male holding his penis, and Alabama's obscenity statute in part defines obscenity as material that displays "masturbation." (Tab A at p. 224:18-22; Ala. Code § 13A-12-200.1.). Another photograph shows two females leaning against a fence and holding hands and one of the female's genitals are exposed. (Tab A at p. 224:18-22). Alabama's obscenity statute in part defines obscenity as material that displays "any act of sexual intercourse" and the "lewd exhibition of the genitals." Ala. Code § 13A-12-200.1. The third photograph shows a female with her genitals exposed and in the photograph she is depicted as abused. (Tab A at p. 224:18-22) Alabama's obscenity statute in part defines obscenity as material that displays "sado-masochistic abuse." Ala. Code § 13A-12-200.1.

Of importance is the that fact that Dews was not told that all of his photographs in his birth assignment piece depicting full-frontal nudity were "in question" regarding Alabama's obscenity statute. In two of his

photographs, a single male model is shown standing with genitalia fully exposed, but those photographs do not show the individual touching his genitalia and he is not depicted in the photograph as abused or with another person. (Tab B at DX3, pp. 5, 14). There is no evidence that Dews was ever instructed that there was any problems with those two photographs as per Alabama's obscenity statute. Again, that does not comport with Troy or Johnson being hell-bent on trampling on Dews' First Amendment rights.

*(i)*    ***The Purpose of the Juried Student Art Show Was Pedagogical, not to Create a Public Forum.*** The purpose and primary reason for holding the student art show was pedagogical. (Tab D at p. 5, ¶23). The show was limited to Troy students. (Tab A at p. 63:7-9). Students had the opportunity to make art; if their work was chosen, they had the opportunity to have it displayed to an audience and to a team of qualified art judges; they competed for awards; and some of them, including Dews, received academic credit. (Tab D at p. 6, ¶23). One need only refer to Dews' Complaint to determine whether the juried student art show could fairly be characterized as an activity the public might reasonably perceive it to bear the imprimatur of Troy. The Complaint states that "[t]he University provided funding for the exhibit in the form of advertising costs, costs of arranging for the works to be housed in a public building, HAL Hall of Honor, costs

associated with the handling of inquiries, and costs associated with contributing instructors' salaries." (Tab E at p. 11, ¶32). <u>See</u> <u>Virgil</u>, 862 F.2d at 1522 (11th Cir. 1989 (noting that one factor identified in <u>Hazelwood</u> as relevant to the determination of whether an activity could fairly be characterized as part of the curriculum is whether the public might reasonably perceive [the activity] to bear the imprimatur of the school.).

   *(ii)*    ***Troy may impose reasonable restrictions***. As the Eleventh Circuit stated in <u>Aronov</u>, pursuant to the U.S. Supreme Court's decision in <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988), where no public forum has been created, a University "may impose *reasonable restrictions* on the speech of students, teachers, and other members of the school community." 926 F.2d at 1021. (emphasis in original); <u>Bannon</u>, 387 F.3d at 1213-1214 (11th Cir. 2004) ("when 'students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school,' schools may censor student expression so long as their action are reasonably related to legitimate pedagogical concerns.") (brackets in original). The concern that three photographs in a student's piece of art might be obscene pursuant to the State's anti-obscenity statute and that those three photographs were being exhibited in a student art show is a legitimate pedagogical concern. In meetings where Johnson was

polite, Johnson provided Dews options with regard to removing the obscenity concerns.[17] The restrictions in the options Johnson communicated to Dews were reasonable in light of the obscenity concerns and potential violation of a state law. Two of the three options did not affect two of the five photographs that depicted full-frontal nudity. Dews may not have liked those three alternatives and he may have chosen what he considered was the lesser of evils, but he was provided with alternatives nonetheless.

*(iii)    Dews suffered no adverse action because nothing Johnson did would likely deter a person of ordinary firmness from the exercise of first amendment rights.* In Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005), the Eleventh Circuit held "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Finding the governmental action chilled plaintiffs' exercise of First Amendment rights, the Bennett Court noted how police officers conducted a "prolonged and organized campaign of harassment," "followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs," "accessed confidential

---

[17] It should be noted that obscenity concerns with regard to Dews birth assignment piece was neither the only reason nor the main reason the juried student art show closed before the beginning of the 2004 spring semester. Of greatest concern was that the Adams Memorabilia Room was borrowed space. (Tab C at pp. 6-7; ¶¶24-25; Tab D at pp. 5-7; ¶¶23-24). However, for purposes of Defendants' summary judgment motion, that is not a material fact.

government databases containing information on the plaintiffs, attempted to obtain arrest warrants against the plaintiffs without probable cause, and produced and mailed to . . . County residents flyers depicting the plaintiffs as criminals terrorizing the county." Id. at 1254-55.

In this case, Dews claims that he was upset that his birth assignment piece was being questioned as obscene and that he was angry at Johnson the day Johnson removed three of the photographs from the birth assignment piece and told him to remove it from the Adams Memorabilia Room. (Tab A at pp. 229:23, 230:1-17, 233:1-9). Dews claims that as a result of the concerns regarding his birth assignment piece, he was chilled in the exercise of his First Amendment rights, that he became "much more self-conscious" and a lot of his art "turned inward," allegedly "significantly alter[ing] how [he] represented [himself] with [his] art." (Tab A at p. 326:3-11).

Dews' allegations regarding the censoring of his birth assignment piece, viewed individually or in the aggregate with his allegations involving Joslin telling him not to shoot pornography and grabbing his arm, are insufficient under a Bennett analysis to show Dews' First Amendment rights were infringed or chilled because those events cannot be said to have the effect of deterring a person of ordinary firmness from the exercise of First Amendment rights. See Taylor v. City of Atlanta Police Dept., 2006 WL

304038 at *12 (N.D. Ga. 2006) (granting summary judgment), where after applying a <u>Bennett</u> analysis, the Court held that —

> "plaintiff's testimony is that Defendant Kinsey threatened to call the police, asked the police officers about arresting Plaintiff Taylor, and that the police officers did not attempt to arrest her. . . . These events cannot be said to have the effect of deterring a person of ordinary firmness from the exercise of First Amendment rights."

Moreover, Johnson did other things to Dews concurrent with or subsequent to the juried student art show which need to be considered in a <u>Bennett</u> analysis, like —

- give Dews an "A" in the 2003 fall semester Collaborative Studio class, (Tab A at p. 55:2-5);

- give Dews an "A" in the 2004 spring semester Collaborative studio class, (Tab A at p. 260:19-21);

- give Dews an "A" in Dews' senior thesis class, (Tab A at p. 280:18-20); and

- highly praise Dews' senior thesis work. (Tab A at pp. 204:17-23, 205:1-3).

The following also happened to Dews concurrent with or subsequent to Dews' birth assignment piece being exhibited in the juried student art show—

- the jury gave him an award for the birth assignment piece, (Tab A at p. 62:14-16);

- he graduated *summa cum laude* with a 3.9/4.0
  grade point average after the Spring 2005
  semester. (Tab A at pp. 23:17-20).

Finally, the alleged censoring of Dews' birth assignment piece did not slow

down Dews in his quest to create art, as is evidenced by the fact that —

- in the 2004 spring semester student art show he
  exhibited more photos showing full-frontal nudity
  (Tab A at pp. at pp. 291:1-7, 291:18-21; 291:22-
  23, 292:1-2, 292:11-13; Tab B at DX7).; and

- he was "incredibly pleased" with the quality of his
  senior thesis art project (Tab A at p. 201:2-4).

See  Taylor 2006 WL 304038 at *12 ("These events cannot be said to have

the effect of deterring a person of ordinary firmness from the exercise of

First Amendment rights, and, in fact, did not deter Plaintiff Taylor.")

**b.    No constitutional violation involving Troy's sexual harrassment policy, its hazing policy, or any other written policies and procedures**

Furthermore, the facts utterly refute Dews' contention that Troy's

sexual harassment policy, its hazing policy, and other written policies

appearing in Troy's student handbook or undergraduate bulletin deprived

him the ability to display his art, chilled his artistic expression, or unlawfully

limited his free expression. (Tab E, passim). As supported by Dews' own

testimony, there is absolutely no evidence that any of Troy's written policies

or procedures caused Dews any harm at all.

As already noted, Dews did not even think of Troy's hazing policy or sexual harassment policy when he was taking photographs for the Spring Collaborative Art show, or for his senior thesis, or with regard to any art he created after the his birth assignment piece. (Tab A at pp. 338:10-13, 339:1). He claims he thought about the student handbook when he was creating art after the birth assignment because he believed that "a student could be expelled on grounds that don't seem very valid to [him]." (Tab A at p. 339:7-23). However, Dews admits he was never expelled, suspended, threatened with expulsion, or threatened with suspension. (Tab A at p. 340). He further admits he was never disciplined for anything that was in Troy's hazing policy, Troy's sexual harassment policy, Troy's code of conduct, or Troy's student handbook (Tab A at pp. 340:15-23, 341:1-2).

Furthermore, no one at Troy, including Johnson, ever told Dews they were going to the police with regard to the photographs of concern in Dews' birth assignment piece, and no police officer ever approached Dews about the photographs. (Tab A at p. 341:12-20).

Because neither Troy's hazing policy, sexual harassment policy, nor any other written policy appearing in the student handbook or undergraduate bulletin was ever used against Dews, it cannot be said that under a Bennett analysis Dews' First Amendment rights were infringed or chilled so as to

deter a person of ordinary firmness from the exercise of First Amendment rights. See Taylor, 2006 WL 304038 at *12 (granting summary judgment under a Bennett analysis where "events cannot be said to have the effect of deterring a person of ordinary firmness from the exercise of First Amendment rights").

Finally, as to Dews' allegation that his birth assignment piece was censored, it should be noted that Dews' said Johnson referred to and provided him with a copy of Alabama's obscenity statute in their meeting. The Alabama legislature, not Troy or any individual defendant, wrote that statute. While there was a concern that three of Dews' photographs might be in violation of that obscenity statute, no member of the Troy faculty or administration ever actually said the birth assignment piece was obscene. (Tab A at pp. 358:13-23; 359:1-23; 360:1).

### 2.    Troy is Due Summary Judgment on the Alabama State Constitution Claim

For the same reasons stated in Part III.D.1, supra, Troy is due summary judgment on the Alabama State Constitution Claim. See J.C. v. WALA-TV, Inc., 675 So. 2d 360, 362 (Ala. 1996) ("In accord with the First Amendment to the United States Constitution is Art. I, § 4 of the Alabama Constitution of 1901.").

### 3.    Troy Is Due Summary Judgment on the Due Process Claims

In Count Three of the Complaint, Dews asserts a due process claim. The Due Process Clause of the Fourteenth Amendment provides constitutional protection for both procedural due process and substantive due process and procedural due process. McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994). Dews does not plead a procedural due process claim in his Complaint. (Tab E, passim). His substantive due process claim is subsumed into his First Amendment claim and therefore is due to be dismissed.

Applying the principles announced by the U.S. Supreme Court in Graham v. Conner, 490 U.S. 386 (1989), because the First Amendment provides an explicit textual source of constitutional protection against denial of free expression, the First Amendment, not the more generalized notion of substantive due process, must be the guide in reviewing Dews' denial of free expression claim. In Graham, the U.S. Supreme Court reviewed an excessive use of force claim against police officers and held that "because the Fourth Amendment provides an explicit textual source of constitutional protection . . . [the Fourth] Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." 490 U.S. at 395. See also  Quantz v. Edwards, 2005 WL 3500838 at *14 (W.D. Wash. 2005) (internal citations omitted)

To the extent that Mr. Quantz is basing his substantive due process claim on the same facts as his freedom of speech claim, the claim must be brought under the First Amendment. When a plaintiff's claim falls within the purview of both substantive due process and of a constitutional amendment, the claim is analyzed under the applicable amendment. This principle has been applied to overlapping substantive due process and First Amendment claims.

As shown in Part III.D.1 above, Troy did not deprive Dews of his First Amendment rights. Therefore, summary judgment with regard to Dews' substantive due process rights are also due to be granted.

### 4. Troy Is Due Summary Judgment on the Equal Protection Claim

#### a. A restatement of the first amendment claim

Dews' equal protection claim is based on the allegation that because his art was allegedly censored he was treated "differently from other similarly situated students." (Complaint at 20, ¶79). Dews also alleges he was treated differently from similarly situated individuals and because of Troy's prohibitions against the use of "sexually degrading or vulgar words . . ." (Complaint at 20, ¶80). Those are nothing more than restatements of his First Amendment claims.

Because his Equal Protection claims are nothing more than restatements of his First Amendment claims, his Equal Protection claims are due to be dismissed also. Therefore, pursuant to Eleventh Circuit

precedent, it is due to be dismissed. <u>Watkins v. Bowden</u>, 105 F.3d 1344, 1354-1355 (11th Cir. 1997) ("To the extent Watkins contends that she was dismissed because of her expressive activity, that claim arises under the First Amendment." <u>Thompson v. City of Starkville</u>, 901 F.2d 456, 468 (5th Cir. 1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amounts to no more than a restatement of his first amendment claim"); <u>Vukadinovich v. Bartels</u>, 853 F.2d 1387, 1391-1392 (7th Cir. 1988), cited with approval in <u>Watkins v. Bowden</u>, 105 F.3d 1344, 1354-1355 (11th Cir. 1997), (finding that plaintiff's equal protection retaliation claim, based on allegation that "he was treated differently because he exercised his right to free speech," "is best characterized as a mere rewording of [his] First Amendment-retaliation claim" ).

### b. <u>No equal protection claim based on a suspect class</u>

An equal protection claim can also be brought to challenge governmental action that distinguishes among people based on a suspect class, such as race or gender. The Complaint makes no such allegation (Complaint, <u>passim</u>), and Dews testified that Troy did not treat him differently because of any such trait.

> Q.    Now, did Troy State University or Mr. Johnson or Mr. Joslin or Dr. Hawkins treat you any differently because of your race?

A.    No.

Q.    Or your gender?

A.    No.

Q.    Or your ethnicity?

A.    No

Q.    Or your religious beliefs?

A.    No.

Q.    Or a lack of religious beliefs? . . .

A.    No.

(Tab A at pp. 343:9-23, 344:1).

**5.    Troy Is Due Summary Judgment on Dews' Alleged Unlawful Conditions Placed on Receipt of State Benefits Claim**

This claim alleges that defendants, "by enacting . . . speech-restrictive regulations," are conditioning "the benefit of a higher education at a state-supported University" on the relinquishment of "rights to freedom of speech, due process, equal protection and association secured by the First and Fourteenth Amendments to the Constitution." (Tab E at p. 21, ¶84).

First, as set forth in Part III.D.1 of this brief, defendants did <u>not</u> violate plaintiff's constitutional rights. Therefore, there is no evidence Dews,

who has already graduated from Troy, was required to relinquish any rights under the First or Fourteenth Amendments to the Constitution.

Second, as set forth in Part III.B.4 of this brief, Dews does not have constitutional standing to bring a lawsuit based on any claim that Troy's written policies violated his rights. As set forth in Part III.B.4, Dews cannot establish any of the three required elements of constitutional standing set forth in the Eleventh Circuit case <u>Alabama-Tombigbee Rivers Coalition v. Norton</u>, 338 F.3d 1244, 1252 (11th Cir. 2003) . Dews cannot show an injury in fact, causation, or redressability.

Third, there is no evidence that any of the individual defendants "enacted . . . speech restrictive regulations." The are no specific allegations in the Complaint that Dr. Hawkins did anything to the plaintiff. (Tab E, <u>passim</u>). Dews has never even met Hawkins.

The only allegation with regard to Joslin is that he told Dews not to shoot pornography in the student photography lab. Dews claims Johnson required him to censor his birth assignment piece. Pursuant to <u>Hazelwood</u>, Joslin's and Johnson's actions were not a violation of Dews' constitutional rights. (See Part III.D.1, <u>supra</u>). Moreover, there is no evidence Joslin or Johnson made their requirements a condition to Dews' receiving the benefit of a higher education. In fact, Dews graduated from Troy *summa cum laude*

with a 3.9/4.0 grade point average. Johnson even gave Dews an "A" in the 2003 fall semester Collaborative Studio course and the 2004 spring semester Collaborative Studio course, where Dews submitted nude photographs showing full-frontal nudity.

**E.     THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE DUE TO BE DISMISSED BASED ON QUALIFIED IMMUNITY AND DISCRETIONARY IMMUNITY**

> **1.     The § 1983 Claims Against the Individual Defendants Are Due to Be Dismissed Based on Qualified Immunity**

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

"For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a

concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." <u>Gonzalez v. Lee County Housing Authority</u>, 161 F.3d 1290, 1295 (11th Cir. 1988) (emphasis added) (quotes omitted). Moreover, the Eleventh Circuit "has established stringent standards for a plaintiff seeking to overcome the affirmative defense of qualified immunity asserted by a government official in an individual capacity." <u>Id</u>.

The Eleventh Circuit has recognized that the concept of qualified immunity is particularly applicable to First Amendment cases, where there is no bright-line standard to put the public actor on notice of a constitutional violation. <u>Dartland V. Metropolitan Dade County</u>, 866 F.2d 1321, 1323 (11th Cir. 1989). Therefore, the individual "is entitled to immunity except in the extraordinary case where . . . balancing [the rights of individuals versus the rights of the government] would lead to the inevitable conclusion" that the plaintiff's rights had been violated. <u>Id</u>. Certainly the facts in this case do not lead to the inevitable conclusion that any defendant's conduct violated Dews' First Amendment rights. Under <u>Hazelwood</u>, the key to a decision is whether the individuals' conduct was reasonable under the circumstances. The facts here do not establish that any individual defendant's conduct was

so unreasonable to make it obvious to the individual that his actions violated Dews' constitutional rights.

### a.  <u>Dr. Hawkins</u>

The Complaint is utterly void of any specific allegation that Dr. Hawkins, Troy's Chancellor, did anything to Dews. (Tab E, <u>passim</u>). Dews has never actually met Dr. Hawkins. He has only seen him on television and in photographs. (Tab A at p. 208:8-17). Dews has never spoken to him, and Dr. Hawkins has never sent Dews anything in writing. (Tab A at pp. 209:20-23, 210:1-2). Moreover, Dews is not aware of Dr. Hawkins ever making any statements about Dews' artwork. (Tab A at p. 210:13-16). Finally, Dr. Hawkins was not the decisionmaker with regard to the closing of the juried art show before the beginning of the 2004 spring semester. Jerry Johnson and Hal Fulmer were. (Tab C at p. 6, ¶24; Tab D at p. 5, ¶23). In short, there is no evidence Dr. Hawkins ever did anything to violate any of Dews constitutional rights.

### b.  <u>Robert Joslin</u>

Dews alleges that Joslin told him not to shoot pornography in the student photography lab. Joslin, who was the teacher assigned oversight of the student lab, certainly was acting within the scope of his discretionary authority to make such a demand upon Dews. However, Joslin's conduct,

even if viewed by Dews as a threat, does not violate any clearly established constitutional right, (see <u>supra</u>, Part III.D.1), and no reasonable person would have known such conduct violated a clearly established constitutional right. Moreover, after Joslin told Dews not to shoot pornography, Dews continued to take nude photographs, including ones showing full-frontal nudity, in the student photography lab. Johnson, Dews teacher in the 2004 spring semester Collaborative Studio, gave Dews an "A" for those photographs, and they were exhibited in the 2004 spring semester Collaborative Studio class art show without incident. <u>See</u> <u>Penthouse Intern., Ltd. v. Meese</u>, 939 F.2d 1011 (C.A.D.C. 1991) (holding that the Former Attorney General and members of his Commission on Pornography did not violate clearly established constitutional or statutory rights of publishers of which reasonable person would have known, by sending letter to distributors of adult magazines asking for response to testimony accusing them of distributing pornography, and thus were protected by qualified immunity)

### c.    <u>Jerry Johnson</u>

Dews alleges that Johnson censored his birth assignment piece. Johnson was Dews' teacher in the 2003 fall semester Collaborative Studio class, where Dews was required to create a piece of art for the birth assignment, and it was Johnson who chose Dews' piece for the juried art

show. (Tab D at p. 1, ¶5). As Dews' teacher, Johnson certainly was acting within his discretionary authority to take action with regard to three photographs in Dews' birth assignment piece that Johnson was concerned might violate Alabama's obscenity statute. Furthermore, no reasonable person could construe Johnson's conduct violated a clearly established constitutional right, and no reasonable person would have known such conduct violated a clearly established right existed at the time Johnson had to make his decision with regard to Dews' birth assignment piece.

There are no Supreme Court or Eleventh Circuit opinions on point, nor does the clearly established weight of authority from other courts, indicate that similar facts to this case establish a First Amendment violation with regard to anything Johnson did. There are many aspects of law with respect to students' speech that are difficult to understand and apply, the least of which is how the <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988), legal framework is applied in university settings. Moreover, it would be difficult for a teacher like Johnson, or anybody for that matter, to understand the full scope of Alabama's obscenity statute, even with the statute right in front of him or her. Judges have to make such determinations on a case-by-case basis.

2.     **The Individual Defendants Are Immune from Civil Liability Under Alabama Law**

Hawkins, Joslin, and Johnson are immune from civil liability from any Alabama law. Under Alabama law, "[a] State agent <u>shall</u> be immune from civil liability in his or personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising his or her judgment in the administration of a department or agency of government." <u>Ex Parte Wood</u>, 852 So. 2d 705, 710 (Ala. 2002). As the Alabama Supreme Court has held, a teacher is granted immunity when exercising judgment in educating students. <u>Ex parte Spivey</u>, 846 So. 2d 322, 332 (Ala. 2002) (holding that defendant teacher "was immune from liability predicated upon the exercise of his judgment in educating students, and we may not second-guess his decision").

a.     **Dr. Hawkins**

Not only is the Complaint silent as to what Dr. Hawkins specifically did to Dews, the Complaint makes no allegations that Dr. Hawkins acted in any fashion other than in his capacity as Troy's Chancellor or in his capacity as Joslin and Johnson's supervisor. In either role, he is immune from civil liability from any Alabama law. <u>See</u> <u>Ex parte Spivey</u>, 846 So. 2d at 331 ("A State agent is also immune from civil liability for exercising judgment in supervising personnel.")

### b.    Robert Joslin

Joslin, who was the teacher assigned oversight of the student lab, certainly was acting within the scope of his discretionary authority to tell Dews not shoot pornographic photos in that student facility.

### c.    Jerry Johnson

As Dews' teacher in the 2003 fall semester Collaborative Studio class where Dews was required to create a piece of art for the birth assignment, Johnson was acting within the scope of his discretionary authority to take action with regard to three photographs in Dews' birth assignment piece that Johnson was concerned might violate Alabama's obscenity statute.

## F.    TROY IS DUE SUMMARY JUDGMENT ON THE STATE LAW CONTRACT CLAIM

The Sixth Count of the Complaint is an Alabama common law breach of contract claim. Not only is it due to be dismissed based on sovereign immunity, see Part III.B.7 supra, it is also due to be dismissed based on the merits.

### 1.    The Allegations in the Complaint

Dews' breach of contract claim consists of two allegations. First, he alleges that the Student Handbook and Undergraduate Bulletin guaranteed "the rights of Plaintiff to 'free inquiry, expression, and assembly' as well as

'procedural and substantive due process.'" (<u>Complaint</u> at 22, ¶ 88). He alleges that "these promises were important to Plaintiff's decision to attend the University and to compensate the University for the education he would receive." <u>Id</u>. He claims that Troy University's "alleged censorship of Plaintiff's work and the existence of the speech codes constitute separate breaches by the University." <u>Id</u>.

Second, he alleges that as a student of Collaborative Studio 4435, he was promised by Johnson, his teacher in the class, that the work would be displayed in the art show at HAL Hall. He alleges that he "fully performed his obligations under the agreement, tendered performance, and detrimentally relied on Defendants' performance, yet Defendants failed to perform their obligations . . . by failing to display Plaintiff's work as promised." (Complaint at p. 22-23, ¶89, ¶ 91).

### 2.    Elements of a State Law Breach of Contract Claim

The elements of a breach of contract claim, of course, are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. <u>Reynolds Metals Co. v. Hill</u>, 825 So. 2d 100, 105-106 (Ala. 2002). "The requisite elements of [a valid contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a

contract." <u>Avis Rent a Car Sys. v. Heilman</u>, 2003 Ala. LEXIS 261, *13 (Ala. 2003).

### a.    The student handbook and undergraduate bulletin

*(i)    **No allegation anything contained in the Student Handbook or Undergraduate Bulletin guaranteed Dews anything on behalf of the the individual defendants.** The Complaint claims that the alleged contractual "promises" involving the Student Handbook and Undergraduate Bulletin were made by the "University" and that the alleged breaches occurred "between the University and Plaintiff." (Tab E at p. 22, ¶88). There are no allegations in the Complaint that anything in the Student Handbook or Undergraduate Bulletin was a promise made by individual defendants Dr. Hawkins, Joslin, or Johnson. (Tab E at p. 22, ¶88, <u>passim</u>). Therefore, there was no valid contract regarding Dr. Hawkins, Joslin, or Johnson with regard to the Student Handbook or Undergraduate Bulletin.

*(ii)    **Dews' own deposition testimony shows there was no breach.** Dews' deposition testimony soundly defeats Dews' breach of contract claim with regard to the Student Handbook and Undergraduate Bulletin. Dews did not think of Troy's hazing policy or its sexual harassment policy when he was taking photographs for the Spring Collaborative Art show or for his senior thesis. (Tab A at p. 338-339). Dews said he thought about the student

handbook when he was creating art after the birth assignment because he believed that "a student could be expelled on grounds that don't seem very valid to [him]." (Tab A at p. 339). However, Dews admits he was never expelled, suspended, threatened with expulsion, or threatened with suspension (Tab A at p. 340). He further admits he was never disciplined for anything that was in Troy's hazing policy, Troy's sexual harassment policy, Troy's code of conduct, or Troy's student handbook (Tab A at pp. 340-341). Therefore, Dews cannot show that "the existence of the speech codes" infringed upon his right of free expression or right to due process.

(iii)   ***The alleged censorship of Dews' birth assignment piece was not a breach of contract.*** Because the alleged censorship of Dews assignment piece was not a violation of the First or Fourteenth Amendment, see Part III.D.1, supra, there was no breach of any contract where Dews was allegedly promised a right to free express and the right to due process.

(iv)   ***The mere existence of the "speech codes" cannot constitute a breach of any contract between the University and Dews.*** Dews contradicts himself when he says on the one hand that the Student Handbook and Undergraduate Bulletin guaranteed him First Amendment rights and then on the other hand he claims that "the existence of the speech codes" in the Student Handbook and Undergraduate Bulletin violate his First Amendment

rights. Either the Student Handbook and Undergraduate Bulletin conferred rights or took them away. Dews cannot have it both ways. What is clear is that there was no meeting of the minds between Dews and Troy with regard to <u>all</u> of the language in the Student Handbook and Undergraduate Bulletin. Where there is no meeting of the minds with regard to all of the key terms, there is no contract.

### b.    No promise to display his work in HAL Hall

Paragraph 24 of the Complaint alleges that "[a]s a requirement of the Course, all enrolled artists [in Collaborative Studio 4435] were instructed by Mr. Johnson to create a piece of art work based on the theme 'birth,' which would  be displayed in the HAL Hall of Honor on the University's campus at the end of the fall semester 2003 going into the following spring semester." (Complaint at p. 10, ¶ 24). However, by Paragraph 89 of the Complaint, that "requirement of the Course" becomes a bargained for term in a contract. Paragraph 89 alleges that Dews "was promised that if he completed the course assignment as instructed by Mr. Johnson, the work would be displayed in the exhibit at HAL Hall of Honor on the University campus."

*(i)* ***No meeting of the minds.*** It is black letter contract law that "[a] contract requires a meeting of the minds between two individuals."

94

<u>Firemen's Fund Ins. Co. v. Gray</u>, 898 So. 2d 735, 759 (Ala. Civ. App. 2004).

Although Paragraph 89 of the Complaint — which contradicts Paragraph 24 of the Complaint — alleges that "Plaintiff . . . was promised that if he completed the course assignment as instructed by Mr. Johnson, the work would be displayed in the exhibit at HAL Hall of Honor on the University campus," that is <u>not</u> was Dews said in his deposition:

> Q.    So from the beginning of that class, there was actually no guarantee that your work was going to be in it?
>
> A.    Not to my knowledge, no.
>
> Q.    He never just promised you, hey, your work is going to be in it?
>
> A.    Not that I recall.
>
> Q.    Okay. And you had to do that work for that class whether it was going to be in the show or not, correct?
>
> A.    I did.

(Tab A at p. 345).

Moreover, there was no meeting of the minds as to how long the show would run. Johnson never told Dews or the rest of the Collaborate Studio class how long the art department had the use of the room. (Tab A at p. 73). Dews testified that he believes Johnson who told him that the student art show was going to be up "through the [Christmas] break and that it would be

taken down at some point which would be scheduled after we got back." (Tab A at pp. 74-75). However, when asked if those were the words Johnson used, Dews answered "[n]ot exactly" and that he could not exactly recall the words Johnson used. (Tab A at p. 75).

 *(ii) No breach.* Paragraph 89 of the Complaint alleges that Dews was "promised . . . the work would be displayed in the exhibit at HAL Hall of Honor on the University campus." It is undisputed that Dews' work was in fact displayed in the Adams Memorabilia Room in HAL Hall. Therefore, there was no breach.

**c. <u>Individual defendants Dr. Hawkins and Joslin cannot be liable for breach of contract because they were not parties to any contract with plaintiff</u>**

 The only individual defendant Dews mentions by name in his contract claim is Johnson. (Tab E at pp. 22-23, ¶¶88-93). Thus, it does not appear that plaintiff intended to even state a claim against Dr. Hawkins or Joslin for breach of contract.

 To the extent that plaintiff did attempt to state a claim against the Dr. Hawkins or Joslin for breach of contract, the attempt fails, and the individual defendants are entitled to summary judgment, because the evidence is undisputed that neither Hawkins nor Joslin were ever a party to any contract with Dews.

Dews' breach-of-contract claim fails as to Dr. Hawkins and Joslin because the undisputed evidence demonstrates that there was no contract. Dews has never actually met Dr. Hawkins. He has only seen him on television and in photographs. (Tab A at p. 208). He has never spoken to Dr. Hawkins, and Dr. Hawkins has never sent Dews anything in writing. (Tab A at pp. 209-210).

There clearly is no evidence that Dews and Joslin ever had a meeting of the minds on anything. All Dews alleges is that Joslin told him what not to do, i.e., shoot pornography in the student photography lab.

The first element of a breach-of-contract claim is that there must have been a valid, binding contract between the parties. Reynolds Metals Co. v. Hill, 825 So. 2d at 105-106. Dews never had any such contract with any of the Dr. Hawkins or Joslin. The undisputed evidence supported by the record demonstrates that any claim of breach of contract against Dr. Hawkins or Joslin fails on the first required element. Furthermore, even assuming, arguendo, that Dews had proved the first element of a breach-of-contract claim, he also fails to allege or offer any evidence of any of the remaining necessary elements. He has neither alleged nor offered any evidence that he performed any obligation under a contract with Dr. Hawkins or Joslin or that or that any Dr. Hawkins or Joslin failed to perform. Finally, Dews has

neither alleged nor offered any evidence that he ever suffered any damages resulting from a breach of any contract with the Dr. Hawkins or Joslin. There is no question of genuine material fact as to Dews' contract claims, and all defendants are entitled to a judgment as a matter of law as to Count VI of the Complaint.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant Troy University, Dr. Jack Hawkins, Robert Joslin, and Jerry Johnson is due to be granted and all of Plaintiff Blake Dews' claims dismissed with prejudice, costs taxed to plaintiff.

Respectfully submitted,

<u>s/ Joseph V. Musso</u>
Bar No:  ASB-4825-O40J
James C. Pennington
Peyton Lacy, Jr.
Attorneys for Defendant
Ogletree, Deakins, Nash,
    Smoak & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama  35203-2118
Telephone:  (205) 328-1900
Facsimile :  (205) 328-6000
Email:joseph.musso@ogletreedeakins.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/EDF system which will send notification of such filing to the following:

James W. Parkman, III
Parkman & Associates
Email:   parkman@graceba.net

William C. White, III
Parkman & Associates
Email:   parkman@graceba.net


Respectfully submitted,

s/ Joseph V. Musso
Bar No:  ASB-4825-O40J
James C. Pennington
Peyton Lacy, Jr.
Attorneys for Defendant
Ogletree, Deakins, Nash,
     Smoak & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama  35203-2118
Telephone:  (205) 328-1900
Facsimile :  (205) 328-6000
Email: joseph.musso@ogletreedeakins.com