# EXHIBIT A

### In The Matter Of:

### BLAKE DEWS
v.
### TROY UNIVERSITY, ET AL.

### CV-05-01045-MHT-SRW

---

### BLAKE DEWS
### April 27, 2006

---



## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
www.TylerEaton.com

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO:  CV-05-01045-MHT-SRW

BLAKE DEWS,
     Plaintiff,
vs.
TROY UNIVERSITY, an Alabama
Public State University, et al.,
     Defendants.

DEPOSITION
OF
BLAKE DEWS
April 27, 2006

REPORTED BY:  Gail B. Pritchett
    Certified Realtime Reporter,
    Registered Professional
    Reporter and Notary Public

---

Page 2

STIPULATION

    IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the deposition of
BLAKE DEWS may be taken before Gail B.
Pritchett, Commissioner, Certified
Realtime Reporter, Registered Professional
Reporter and Notary Public;

    That the signature to and
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions;

    That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign
grounds at the time of trial, or at the
time said deposition is offered in
evidence, or prior thereto.

---

Page 3

APPEARANCES

FOR THE PLAINTIFF:
  Mr. R. Martin Adams
  Attorney at Law
  Parkman, Adams & White
  825 Financial Center
  505 North 20th Street
  Birmingham, Alabama 35203

FOR THE DEFENDANT:
  Mr. Joseph V. Musso
  Attorney at Law
  Ogletree, Deakins, Nash,
    Smoak & Stewart, P.C.
  One Federal Place, Suite 1000
  1819 5th Avenue North
  Birmingham, Alabama 35203

OTHERS PRESENT:
  Mr. Jerry Johnson
  Mr. Hal Fulmer
  Mr. Josh McKeown

---

Page 4

INDEX

              PAGE:
EXAMINATION BY MR. MUSSO     6

EXHIBITS

Defendant's Exhibit 1    51
Defendant's Exhibit 2    54
Defendant's Exhibit 3    57
Defendant's Exhibit 4    114
Defendant's Exhibit 5    116
Defendant's Exhibit 6    201
Defendant's Exhibit 7    280
Defendant's Exhibit 8    297
Defendant's Exhibit 9    305
Defendant's Exhibit 10    306
Defendant's Exhibit 11    307
Defendant's Exhibit 12    317
Defendant's Exhibit 13    319

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 5

1     I, Gail B. Pritchett, a
2   Certified Realtime Reporter and Registered
3   Professional Reporter of Birmingham,
4   Alabama, and a Notary Public for the State
5   of Alabama at Large, acting as
6   Commissioner, certify that on this date,
7   as provided by the Federal Rules of Civil
8   Procedure of the United States District
9   Court, and the foregoing stipulation of
10  counsel, there came before me at One
11  Federal Place, Suite 1020, 1819 5th Avenue
12  North, Birmingham, Alabama, on the 27th
13  day of April, 2006, commencing at 9:42
14  a.m., BLAKE DEWS, witness in the above
15  cause, for oral examination, whereupon the
16  following proceedings were had:
17
18          BLAKE DEWS,
19  being first duly sworn, was examined and
20  testified as follows:
21
22          THE COURT REPORTER:  Usual
23  stipulations?

Page 6

1          MR. MUSSO:  That's fine.
2          MR. ADAMS:  Yes.
3
4   EXAMINATION BY MR. MUSSO:
5      Q.   Mr. Dews, my name is Joe
6   Musso, and I represent Troy University as
7   well as the individual defendants Dr.
8   Hawkins, Mr. Johnson, and Mr. Joslin.
9          Have you ever given a
10  deposition before?
11     A.   No, sir.
12     Q.   Okay.  Just a couple of ground
13  rules.  First of all, I always talk loud
14  in a deposition so I get picked up on the
15  voice recorder and so she can hear me.  So
16  don't think I am yelling at you, okay?
17     A.   Okay.
18     Q.   But that is just the way I do
19  it.  And it is important for both of us to
20  kind of speak up so she can hear us.
21  Reading lips is really not what she is
22  here to do, okay?
23     A.   Okay.

Page 7

1      Q.   It is also important, and we
2   both have to be careful of this, that we
3   don't talk on top of each other, because
4   that means she has to take two voices down
5   at the same time.  And although she is
6   good enough to do that she would rather
7   not.  And if we do it too much, she will
8   yell at us, and she can yell pretty loud.
9   That's not true, she is very nice.  But
10  that's one of the reasons it's important
11  not to talk on top of each other.
12          Sometimes I will ask a question
13  and you will think I know what he is
14  asking, so you will start the answer
15  before I finish.  But it's important not
16  to do that for her.  Also it is important
17  to let me finish a question because it is
18  fairer to both of us if you know exactly
19  what the whole question is.  Okay?
20     A.   (Nodding head affirmatively.)
21     Q.   Now, it is also important that
22  you give some type of verbal response.
23  Because if you just shake your head or say

Page 8

1   uh-huh or uh-uh, then again that's not
2   fair to the court reporter to interpret
3   your true meaning, whereas a word can be a
4   true meaning.
5          I know you are a little soft
6   spoken.  And, again, nobody is asking you
7   to yell or anything, but, you know, if
8   somebody asks you to speak up, don't be
9   offended by that, okay?  Because she has
10  to be able to hear.
11          Now, you have never given a
12  deposition before, correct?
13     A.   No, sir.
14     Q.   And is there any reason today
15  you can't give full and complete and
16  honest answers?
17     A.   Now, sir.
18     Q.   State your full name.
19     A.   Robert Blake Dews.
20     Q.   And you prefer to be called
21  Blake?
22     A.   Yes, sir.
23     Q.   I will try to say Mr. Dews,

2 (Pages 5 to 8)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 9

1  but sometimes I will say Blake.
2         What is your current address?
3      A.   1512 33rd Street South,
4  Apartment B.
5      Q.   Is that in Birmingham?
6      A.   Yes, sir.
7      Q.   Is that on the Southside?
8      A.   Yes, sir.
9      Q.   And what is your current phone
10  number?
11     A.   (205) 542-0759.
12     Q.   Is that a cell?
13     A.   Yes.
14     Q.   Do you have a land line?
15     A.   No, sir.
16     Q.   And are you married?
17     A.   No, sir.
18     Q.   Have you ever been married?
19     A.   No, sir.
20     Q.   What is your date of birth?
21     A.   May 31st, 1982.
22     Q.   And have you ever served in
23  the military?

---

Page 10

1      A.   No, sir.
2      Q.   And do you have any children
3  over the age of eighteen --
4      A.   No, sir.
5      Q.   I doubt it, but --
6         MR. ADAMS:  Let him finish the
7  question.
8      Q.   Yes.  Any children over the
9  age of eighteen, I have to make sure of
10  that.
11     A.   No, sir.
12     Q.   Given your age, that wouldn't
13  be likely.  Now, where did you go to high
14  school?
15     A.   Headland High School.
16     Q.   Is that where you graduated?
17     A.   Yes, sir.
18     Q.   Where is Headland High School?
19     A.   It is in lower Alabama.
20     Q.   Lower Alabama, okay.  What
21  large town is that near, just so I
22  can kind of --
23     A.   It is near Dothan, Alabama.

---

Page 11

1         MR. ADAMS:  It's in Headland,
2  Alabama.
3         MR. MUSSO:  It's in Headland,
4  near Dothan.  I'm just trying for my own
5  geography to get an idea where it's at.
6         MR. ADAMS:  It's about twelve
7  miles north of Dothan on 431.
8      Q.   Okay.  And what year did you
9  graduate from Headland?
10     A.   2000 -- no, not 2000.  Yes,
11  yes.
12     Q.   2000?
13     A.   Yes.
14     Q.   And what type of diploma do
15  you have?
16     A.   Just a general diploma.
17     Q.   Have you been to any
18  university other than Troy?
19     A.   I went to Furman University,
20  which is in Greenville, South Carolina.
21     Q.   And how long did you attend
22  Furman?
23     A.   I believe one semester.  Not

---

Page 12

1  that long.
2      Q.   Was Furman the first college
3  you went to?
4      A.   Yes, sir.
5      Q.   And what was your reason for
6  leaving Furman?
7      A.   I dropped my major and hence
8  lost my scholarship.
9      Q.   And what was your major in
10  Furman?
11     A.   Music performance.
12     Q.   What instrument -- or was it
13  voice, vocal?
14     A.   Vocal, uh-huh.
15     Q.   Tenor, bass?
16     A.   Tenor.
17     Q.   I was what they call a stunt
18  bass in choir.  They told me to sing the
19  low notes and shut up every other time.
20  I'm serious.
21         What year did you start at
22  Furman?
23     A.   2001.

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 13

1   Q.   Okay.  So you graduated from
2   Headland, would that have been the spring
3   of 2000?
4   A.   That was so long ago.  I can't
5   even remember what year I graduated, I --
6   Q.   That's fine.
7   A.   I went to Furman right after,
8   so --
9   Q.   That's what I was trying to
10  get.  And I think we both need to be
11  careful that we don't talk on top of each
12  other, okay?
13  A.   Yes, sir.
14  Q.   I need to be as aware of it as
15  you.
16       And you had a scholarship to
17  Furman, correct?
18  A.   Yes, sir.
19  Q.   That you relinquished when you
20  decided you didn't want to be a vocal
21  major anymore, correct?
22  A.   Yes, sir.
23  Q.   Did you then enroll at Troy?

Page 14

1   A.   No, sir.
2   Q.   What did you do after Furman?
3   A.   I went to Wallace Community
4   College to obtain some general studies.
5   Q.   And how long did you attend
6   Wallace Community College?
7   A.   I believe a year.
8   Q.   And which campus of Wallace
9   Community College did you attend?
10  A.   In Dothan.
11  Q.   Dothan.  Did you take any art
12  classes at Wallace Community College?
13  A.   No, sir.
14  Q.   Did you take any art classes
15  at Furman?
16  A.   No, sir.
17  Q.   I take it you were probably
18  still in a lot of your freshman classes
19  that first year, correct?
20  A.   Yes, sir.
21  Q.   Did you actually complete a
22  semester at Furman?
23  A.   Yes, sir.

Page 15

1   Q.   And while you were at Furman
2   or Wallace, were you ever suspended,
3   expelled or disciplined in any way?
4   A.   No, sir.
5   Q.   Now, was it after Wallace
6   Community College that you attended Troy
7   University?
8   A.   Yes, sir.
9   Q.   Was there any large time gap
10  in between or did you --
11  A.   (Shaking head negatively.)
12  Q.   Did you finish one semester at
13  Wallace and then start at Troy the next
14  semester?
15  A.   There wasn't a significant
16  time difference.  It was fairly close.
17  Q.   Okay.  When did you decide you
18  actually wanted to attend Troy University?
19  A.   I believe I decided that
20  before I was even going to Wallace
21  Community College.  I just wanted to get
22  some core classes out of the way.
23  Q.   At the time you decided you

Page 16

1   wanted to go to Troy, had you decided upon
2   a major at that point?
3   A.   I left Furman University
4   knowing that I was interested in art.  So,
5   yes.  I was interested.
6   Q.   Did you have a specific medium
7   of art you were interested in?
8   A.   Photography.
9   Q.   Photography?
10  A.   Uh-huh.
11  Q.   Was there something about
12  Troy's photography program that helped you
13  decide upon Troy?
14  A.   No, sir.
15  Q.   Was Troy close to home, is
16  that one of the reasons you chose Troy?
17  A.   And I had some friends in
18  Troy.
19  Q.   When you were at Wallace
20  Community College, did you receive any
21  type of scholarship?
22  A.   Not to my knowledge, no.
23  Q.   And when you were at Troy

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 17

1  University, did you ever receive any type
2  of scholarship?
3      A.   Yes.
4      Q.   And did that scholarship have
5  a name?
6      A.   An art and design scholarship
7  and a Palladium scholarship, which is the
8  yearbook.
9      Q.   Had you already been taking
10 pictures before you went to Troy?
11     A.   Yes, sir.
12     Q.   When you were at Wallace or at
13 Furman, did you take any photographs for
14 the yearbook or the newspaper, anything
15 like that?
16     A.   No, sir.
17     Q.   Did you have your camera with
18 you when you were at Wallace and Furman
19 just taking pictures for whatever reason?
20     A.   I'm sure I did.
21     Q.   Okay.  Now, when you entered
22 Troy, did you start with an art and design
23 scholarship or was that something you

Page 18

1  earned while you were there?
2      A.   Something I got while I was
3  there.
4      Q.   And what about the yearbook,
5  is that the same?
6      A.   Yes, sir.
7      Q.   Now, did you have to actually
8  apply for the art and design scholarship?
9      A.   I don't believe I formally
10 applied for it.
11     Q.   How did you learn about it?
12     A.   It was pretty much discussed
13 among faculty.
14     Q.   Was it a situation where the
15 faculty knew you and thought you deserved
16 the scholarship?
17     A.   Yes, sir.
18     Q.   And they approached you and
19 offered it to you, am I correct?
20     A.   Basically, yes, sir.
21     Q.   And is that a scholarship you
22 wanted?
23     A.   Obviously, yes.

Page 19

1      Q.   Some of my questions may be
2  obvious, but I still have to ask.
3          Do you recall the term, the
4  semester and year that you received that
5  scholarship?
6      A.   I received two scholarships,
7  and different terms, but I honestly can't
8  recall --
9      Q.   So two art and design
10 scholarships and two different terms --
11 well, let me take that -- you had an art
12 and design scholarship that you received
13 in two different terms, am I correct?
14     A.   Two separate scholarships.
15 The scholarships were semester to
16 semester.
17     Q.   Okay.  Semester to semester,
18 okay.  Just the art and design
19 scholarship, did you receive that for more
20 than one semester?
21     A.   I received two different
22 scholarships, I believe.
23     Q.   I know you received the

Page 20

1  Palladium scholarship, correct?
2      MR. ADAMS:  Are you asking did
3  he get them at the same time?
4      MR. MUSSO:  Did he get them --
5  say the spring of '03 did he get the art
6  and design and did he continue to receive
7  that until he graduated?
8      MR. ADAMS:  That's a better
9  question.
10     A.   I didn't receive it until I
11 graduated.
12     Q.   So you received it -- was it
13 one semester that you got that money?
14     A.   It was one semester and then
15 it was another semester.
16     Q.   Okay.  Now, what about the
17 Palladium, how many semesters did you
18 receive the Palladium scholarship?
19     A.   Two semesters.
20     Q.   Did you apply for that one?
21     A.   I did.
22     Q.   Okay.  Did you ever apply for
23 a scholarship at Troy that you did not

Page 21

1　receive?
2　　　A.　No.
3　　　Q.　And the art and design
4　scholarship, do you know which professor
5　or professors were instrumental in you
6　receiving that?
7　　　A.　No, sir.
8　　　Q.　And the Palladium yearbook
9　scholarship, was that for taking pictures
10　or also writing copy or just anything they
11　asked you to do?
12　　　A.　You know, design of layout and
13　photography.
14　　　Q.　How much was the art and
15　design scholarship?
16　　　A.　I received a quarter tuition
17　initially and worked myself up to full
18　tuition by my last term.
19　　　Q.　And what about the Palladium
20　scholarship?
21　　　A.　Oh, that was the Palladium.
22　　　Q.　Oh, I'm sorry.  The Palladium
23　scholarship, that was -- say twenty-five

Page 22

1　percent of your tuition was at first, and
2　then you worked yourself up to a full
3　tuition from the Palladium?
4　　　A.　Yes.
5　　　Q.　Okay.  And what about the art
6　and design scholarship?
7　　　A.　I honestly can't remember the
8　amount, to the best of my knowledge, I
9　couldn't.
10　　　Q.　Okay.  Did the art and design
11　scholarship cover tuition or did it cover
12　more than tuition, like books?
13　　　A.　It covered tuition.
14　　　Q.　Okay.  And what year did you
15　actually start at Troy, in what semester?
16　　　A.　2002.
17　　　Q.　Wait until you are in your
18　forties and people ask you these
19　questions.
20　　　　I'm sorry, was it the fall of
21　2002?
22　　　A.　It was the summer.
23　　　Q.　Summer of 2002.  When did you

Page 23

1　graduate?
2　　　A.　2005.
3　　　Q.　Okay.  Was that in the spring?
4　　　A.　Uh-huh.
5　　　Q.　I'm sorry, was that a yes?
6　　　A.　Yes, sir.
7　　　Q.　And, again, I'm just doing
8　that for her.  Not picking on you.
9　　　　So the spring of 2005, you
10　graduated.  And from the summer of 2002 to
11　the spring of 2005, did you ever not
12　attend classes one semester, say like a
13　summer semester, even on a --
14　　　A.　No, sir.  I went full time.
15　　　Q.　Okay.  And it's my
16　understanding you graduated with honors?
17　You were summa cum laude?
18　　　A.　Uh-huh.
19　　　Q.　I'm sorry?
20　　　A.　Yes, sir.
21　　　　MR. ADAMS:  Did you say summa
22　cum laude?
23　　　　MR. MUSSO:  Yes.  You and I

Page 24

1　don't understand those terms very well,
2　but he does.
3　　　Q.　I take that back, I'm sure
4　your lawyer was cum laude something.
5　　　　MR. ADAMS:  Something like
6　that.
7　　　Q.　We are just picking on each
8　other, that's all.
9　　　　Okay.  So summa cum laude.  Do
10　you recall what your GPA was when you
11　graduated?
12　　　A.　Three point nine.
13　　　Q.　And that's out of four?
14　　　A.　(Nodding head affirmatively.)
15　　　Q.　Correct?
16　　　A.　Yes, sir.
17　　　　MR. ADAMS:  I'm not familiar
18　with that.
19　　　　MR. MUSSO:  I never could
20　figure out, some schools you hear kids
21　graduate with a four point one out of
22　four, and I'm like how do you do that?
23　You have heard that, right?

Page 25

1    MR. ADAMS:  I have.  It never
2  made sense to me.
3    Q.    And that was your overall GPA?
4    A.    Yes, sir.
5    Q.    Did that include your course
6  work that you took at Wallace and Furman,
7  was that transferred in?
8    A.    I believe there were a couple
9  of classes that weren't transferred in,
10  but for the most part, yes.
11    Q.    Okay.  And did you have a
12  specific GPA that was just for your major?
13    A.    No, sir.
14    Q.    I mean, you know, some people
15  figure out their major grades and on their
16  resume if it was a little higher -- he and
17  I know what we are talking about now.
18    Okay.  Three point nine, there
19  is only point one to work with anyway,
20  so --
21    What was your major that you
22  graduated with?
23    A.    Art program.

Page 26

1    Q.    Was that considered a BA, BS,
2  BFA?  I don't know what they would call
3  it.
4    A.    At the time I believe it was a
5  BA, but I applied for the BFA program
6  which was instituted at the last semester
7  that I attended.
8    Q.    Okay.  And the way it usually
9  works, you graduate under the catalog you
10  start with, is that correct?
11    A.    Yes, sir.
12    Q.    I was an English professor at
13  one time.
14    MR. ADAMS:  Can I ask, not to
15  interrupt you, but what does BFA stand
16  for?
17    A.    Bachelor of fine arts.
18    Q.    And did you have a minor?  Did
19  you graduate with a minor?
20    A.    Did not graduate with a minor.
21    Q.    Okay.  Did you take any
22  courses toward completing a minor?  A
23  better way of saying it, did you ever

Page 27

1  declare a minor but not graduate --
2    A.    I believe I declared a
3  journalism, print journalism minor, but
4  never completed any of those courses
5  because I decided not to go that route.
6    Q.    Okay.  I have a master's in
7  journalism.  Never used.
8    MR. ADAMS:  You are using it
9  now.
10    Q.    And in your bachelor degree in
11  the art program, did you specialize in any
12  particular medium?
13    A.    Photography.
14    Q.    Photography.  And would it be
15  fair to say photography was your main
16  interest in the arts while you were at
17  Troy?
18    A.    As well as art history.
19    Q.    Art history.  Did you have an
20  academic adviser while you were at Troy?
21    A.    I did.
22    Q.    Was it the same person
23  throughout or did it change?

Page 28

1    A.    It changed.
2    Q.    Okay.  Who was your academic
3  adviser at first?
4    A.    Sergei Shillabeer.
5    Q.    She is going to ask you to
6  spell it.
7    A.    If I can.  It's
8  S-h-i-l-l-a-b-e-e-r?  I don't know.
9    Q.    That's phonetically, we can
10  work with it.
11    Now, was Sergei -- and that
12  would be Mr. Shillabeer, correct?
13    A.    Yes.
14    Q.    What department did he teach
15  in?
16    A.    He was in the art department.
17    Q.    Art department, okay.  And did
18  there come a time when you had a different
19  adviser?
20    A.    After Sergei.
21    Q.    Okay.  And after Sergei who
22  was your adviser?
23    A.    Pamela Allen.

7 (Pages 25 to 28)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 29

1      Q.     And was there anyone after Ms.
2   Allen?
3      A.     No, sir.
4      Q.     How long was Mr. -- how long
5   was Sergei your adviser?
6      A.     I couldn't tell you.
7      Q.     What about Ms. Allen?
8      A.     Until I graduated.
9      Q.     Was Sergei your adviser longer
10   than Ms. Allen?
11      A.     No, sir.
12      Q.     Was there a reason that Sergei
13   was no longer your adviser?  Did he leave,
14   did you decide you wanted a different one?
15      A.     I decided I wanted a different
16   one.
17      Q.     And why did you decide that?
18      A.     Basically because Ms. Allen
19   was teaching more classes that I was
20   interested in.
21      Q.     And what classes was Ms. Allen
22   teaching that you were interested in?
23      A.     Print making.

---

Page 30

1      Q.     And what about Sergei, what
2   type of classes was he teaching?
3            MR. ADAMS:  Wait a minute.
4   Were you finished?
5      A.     Yes.
6            MR. MUSSO:  We made that eye
7   contact.
8            MR. ADAMS:  All right.
9      Q.     If there is ever a time you
10   are not finished and I start asking a
11   question, just say wait, I'm not finished
12   and then continue.  If at any time I ask a
13   question you don't understand, say look, I
14   don't understand what you are asking, and
15   I will try to rephrase it.
16            What kind of classes was Sergei
17   teaching?
18      A.     Painting, 2D.
19      Q.     Now, when you started with
20   Sergei, was he assigned to you or was he
21   someone you got to choose?
22      A.     He was assigned to me.
23      Q.     Okay.  And did you have any

---

Page 31

1   problems with Sergei as your adviser?
2      A.     Not at all.
3      Q.     And what about Ms. Allen?
4      A.     Not at all.
5      Q.     If you could quickly run down
6   the professors that taught you your art
7   classes, the best you can recall today.
8   If you forget one of them, it's not the
9   end of the world, but just the best you
10   can do.
11      A.     Bob Joslin, Jerry Johnson,
12   Duane Paxson, Pam Allen, Sergei
13   Shillabeer, Michael Holmes -- no, no,
14   never mind, that's it.
15      Q.     Now, do you think that list is
16   pretty complete of people who taught you?
17   I'm not holding you -- there may be some
18   we missed, but, I mean, is this --
19      A.     Yes.
20      Q.     -- pretty complete?  Okay.
21   Was there any one of these professors that
22   taught you more than any others, one you
23   took a lot of classes with?

---

Page 32

1      A.     There was another on that
2   list.
3      Q.     Who was that?
4      A.     Larry Percy.
5      Q.     Larry Percy, okay.  When I was
6   in college, there was one professor I used
7   to just take everything he taught.  Was
8   there a professor who you took most of
9   your classes with?
10      A.     I took -- I pretty much
11   enjoyed Michael Holmes' classes.  He was
12   the art history professor.  And I took a
13   lot with Ms. Allen and Bob Joslin.
14      Q.     And Bob was the photography
15   professor, correct?
16      A.     Yes.
17      Q.     Was anyone else teaching
18   photography?
19      A.     No, sir.
20      Q.     And Ms. Allen, she taught
21   print making, correct?
22      A.     And a class called Form and
23   Space.  I took Form and Space with her.

8 (Pages 29 to 32)

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 33

1     Q.   And did Mr. Holmes teach you
2 anything other than art history?
3     A.   I took the elective art
4 history courses, so that's -- I was one
5 class away from having a concentration in
6 art history.
7     Q.   What did Mr. Johnson teach
8 you?
9     A.   Collaborative Studio.
10     Q.   Okay.
11     A.   Senior thesis, but he wasn't
12 my adviser at the time.
13     Q.   And what about Mr. Paxson?
14     A.   Collaborative Studio.
15     Q.   And Mr. Percy?
16     A.   Three Dimensional.
17     Q.   And Sergei?
18     A.   Life Drawing.
19     Q.   Now, did you take more than
20 one Collaborative Studio with Mr. Johnson?
21     A.   Yes.
22     Q.   Now, you took a Collaborative
23 Studio course with him in the fall of

Page 34

1 2003, am I correct?
2     A.   Yes.
3     Q.   And you took a Collaborative
4 Studio course in the spring of 2004; was
5 that with Mr. Johnson or with Mr. Paxson?
6     A.   Mr. Johnson.
7     Q.   Okay. So Mr. Johnson was fall
8 of 2003 and spring of 2004?
9     A.   Yes, sir.
10     Q.   Okay. Any other Collaborative
11 Studio classes with Mr. Johnson?
12     A.   No, sir.
13     Q.   And what about Mr. Paxson,
14 when did you take Collaborative Studio
15 with him?
16     A.   At fall 2003. They were
17 teaching together.
18     Q.   Collaboratively teaching
19 Collaborative Studio, is that correct?
20     A.   Yes, sir.
21     Q.   Did you ever take
22 Collaborative Studio just with Mr. Paxson
23 where Mr. Johnson wasn't --

Page 35

1     A.   There were class periods when
2 Mr. Johnson wasn't there and it was just
3 -- or vice versa.
4     Q.   In the spring of 2004, was Mr.
5 Paxson tag-teaming with Mr. Johnson also?
6     A.   No, sir.
7     Q.   So it was just Mr. Johnson?
8     A.   Yes, sir.
9     Q.   Did Mr. Paxson emphasize a
10 part of the class that Mr. Johnson didn't?
11 Or kind of tell me how that worked, how
12 they did it collaboratively.
13     A.   Not that I can remember. I
14 mean, they just kind of simultaneously
15 taught the same things.
16     Q.   Was one professor the lead
17 professor in that class?
18     A.   Mr. Johnson.
19     Q.   Mr. Johnson, okay. And what
20 is Mr. Johnson's title -- or what was his
21 title at that time, if you recall?
22     A.   Can you rephrase the question?
23 I'm not sure what you mean.

Page 36

1     Q.   I mean, was he like a
2 chairperson of a department as well as a
3 professor, was he --
4     A.   Yes, he was the chair of the
5 art department.
6     Q.   And that was in the fall of
7 2003?
8     A.   Yes, sir.
9     Q.   And by the time you graduated,
10 was he still chair of the art department?
11     A.   Yes, sir.
12     Q.   Had he always been chair of
13 the art department while you were a
14 student at Troy?
15     A.   Yes, sir.
16     Q.   Now, have you attended any
17 graduate school?
18     A.   No, sir.
19     Q.   Have you taken any art classes
20 after you graduated from Troy?
21     A.   No, sir.
22     Q.   Any photography classes?
23     A.   No, sir.

Page 37

1    Q.    Have you applied for any
2  graduate schools?
3    A.    No, sir.
4    Q.    Have you considered applying
5  for any graduate schools?
6    A.    Yes, sir.
7    Q.    What graduate schools have you
8  considered applying for -- or have you
9  considered specific schools or just --
10    A.    Yes, sir.
11    Q.    What schools have you
12  considered?
13    A.    Columbia College of Art and
14  Design in Chicago.
15    Q.    Okay.
16    A.    Rhode Island School of Design.
17    Q.    Any others?
18    A.    I haven't thought about that
19  in a while.  Parsons, did I say Parsons?
20    Q.    No.  Where is Parsons?
21    A.    It's in New York.
22    Q.    The city?
23    A.    Uh-huh.

Page 38

1    Q.    Is that yes?
2    A.    Yes, sir.
3    Q.    Again, we are not picking on
4  you.
5    A.    I understand.
6    Q.    Parsons in New York City.  Did
7  you actually go on the Internet or ask for
8  or write for brochures from any of these
9  schools?
10    A.    Yes, sir.
11    Q.    Did you actually fill out any
12  applications or begin to fill out an
13  application for any of these schools?
14    A.    No, sir.
15    Q.    These are just schools you
16  have done a little research on and
17  considered, am I correct?
18    A.    Yes, sir.
19    Q.    And would you have sought a
20  graduate degree emphasizing photography?
21    A.    Columbia College would be the
22  only exception to that, and that would
23  have been museum studies.

Page 39

1    Q.    So Rhode Island School of
2  Design and Parsons would have been
3  photography?
4    A.    Predominantly.
5    Q.    Predominantly.  I know there
6  is more to it, but --
7    A.    Yes, sir.
8    Q.    Were you looking at specific
9  types of degrees, like MFAs or MAs or --
10    A.    MFAs and MAs.
11    Q.    Did Columbia College -- were
12  you looking at an MFA or MA?
13    A.    Columbia College I believe was
14  an MA.
15    Q.    MA.  And what about Rhode
16  Island?
17    A.    Both of the others are MFAs.
18    Q.    Did you actually speak with
19  anyone in any of these colleges,
20  professors there or anyone in the
21  admissions department?
22    A.    I believe I spoke with someone
23  at Columbia.

Page 40

1    Q.    Do you intend in the future as
2  we sit here today to enroll in one of
3  these schools or apply?
4    A.    It is a possibility --
5    Q.    Yes.
6    A.    -- in the future.
7    Q.    When you were a student at
8  Troy or any time thereafter, did you ever
9  ask any of your professors to write you
10  letters of recommendation if you went into
11  graduate school or were going to apply to
12  graduate school?
13    A.    No, sir.
14    Q.    And did you ever go to them
15  and say look, if I consider applying, can
16  I use you as a reference?
17    A.    Ms. Allen maybe.
18    Q.    Anyone else?
19    A.    No, sir.
20    Q.    What was Ms. Allen's response?
21    A.    She would be more than happy
22  to.
23    Q.    Did any of your professors

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 41

1  even without you offering -- I mean, even
2  without you asking say Blake, if you ever
3  want to go to graduate school, I will be
4  happy to write you a letter of
5  recommendation?
6      A.    No, sir.
7      Q.    And when you were at -- now,
8  are you currently employed?
9      A.    Yes, sir.
10     Q.    Where are you currently
11  employed?
12     A.    Thompson's Frame Factory.
13     Q.    Where is that?
14     A.    In Hoover.
15     Q.    And what do you do there?
16     A.    I am a sales associate and a
17  framer.
18     Q.    And what is your rate of pay?
19     A.    I am making eight fifty.
20     Q.    Hourly?
21     A.    Hourly.
22     Q.    How many hours on average do
23  you work a week?

---

Page 42

1      A.    Forty.
2      Q.    And any benefits?
3      A.    I am about to receive health
4  coverage.
5      Q.    Will you have to pay a portion
6  of that?
7      A.    Yes.
8      Q.    Do you know how much you will
9  have to pay, or all of it?
10     A.    I believe it's a quarter.
11     Q.    When you started there, was
12  your rate of pay eight fifty or have you
13  received a raise since then?
14     A.    No, sir.
15     Q.    What did you start at?
16     A.    At eight.
17     Q.    Did it jump from eight to
18  eight fifty?
19     A.    Yes, sir.
20     Q.    Okay.  As a sales associate,
21  do you have any managerial
22  responsibilities?
23     A.    At my current employment?

---

Page 43

1      Q.    Yes.
2      A.    No, sir.
3      Q.    Okay.  Was that the first job
4  you had after you graduated from Troy?
5      A.    Yes, sir.
6      Q.    Are you currently looking for
7  employment elsewhere?
8      A.    Yes, sir.
9      Q.    Okay.  Later on we will get
10  into places you have applied.  I'm just
11  trying to get a good scope of where we are
12  at now in your life.
13         Let's go back to the fall of
14  2003.  The class you were taking with Mr.
15  Johnson was Collaborative -- Collaborative
16  Studio it was called, correct?
17     A.    Yes, sir.
18     Q.    Do you remember the actual
19  number?
20     A.    4435, I believe.
21     Q.    And it was being taught by Mr.
22  Johnson and Mr. Paxson?
23     A.    Yes, sir.

---

Page 44

1      Q.    How many students were in that
2  class?
3      A.    I could not tell you honestly.
4      Q.    I mean, was it ten or twelve
5  or a hundred or --
6      A.    Ten to fifteen to twenty,
7  possibly.
8      Q.    Was the class made up
9  primarily of art majors?
10     A.    Yes, sir.
11     Q.    Do you know of any art majors
12  -- I mean, do you know of any nonart
13  majors who were in the class?
14     A.    Not that I'm aware of.
15     Q.    Did you basically know
16  everyone in the class at least by name?
17     A.    Yes, sir.
18     Q.    Are there a lot of art majors
19  at Troy?
20     A.    In my opinion, no.
21     Q.    Is it a fairly close-knit
22  group?  I'm not saying everybody
23  necessarily likes everybody, but everybody

---

11 (Pages 41 to 44)

Page 45

1   kind of knows everybody?
2       A.   Yes, sir.
3       Q.   Okay.  Is Collaborative Studio
4   a required course for your degree?
5       A.   Yes, sir.
6       Q.   Okay.  Were both Collaborative
7   Studio classes required?
8       A.   There were three Collaborative
9   Studio classes.
10      Q.   And you took all three?
11      A.   Yes.
12      Q.   I know Mr. Johnson taught the
13  one in the fall 2003 and the one in the
14  spring of 2004.  When did you take your
15  other one, your third one?
16      A.   May have been my last year.
17      Q.   Do you recall who taught it?
18      A.   It may have been Mr. Johnson
19  again or -- I'm not sure if it is Ms.
20  Allen, if I took from her or --
21          MR. ADAMS:  If you are not
22  sure, don't answer the question.
23      A.   I'm sorry.  I'm not sure.

Page 46

1          MR. ADAMS:  There you go.
2       Q.   That's fine.  But you did take
3   the third one?
4       A.   I did take the third one.
5       Q.   Now, in a nutshell, what is a
6   Collaborative Studio course?  What are
7   they trying to teach you in Collaborative
8   Studio?
9       A.   I think the goals of each
10  class were a bit different from the
11  previous.
12      Q.   Okay.  So in the first
13  Collaborative Studio course, the one in
14  the fall of 2003, what were the goals of
15  that class?
16      A.   They were more personal as far
17  as each artist coming up with an idea
18  based around one thematic concept.
19      Q.   Were you asked in that first
20  Collaborative Studio I to mix mediums?  I
21  mean, you were a photographer, correct?  I
22  mean, were you asked to borrow from any
23  other mediums to produce a piece of art

Page 47

1   or --
2       A.   I'm not sure.  You would have
3   to ask the faculty whether or not that was
4   -- it was encouraged to mix medium.
5          MR. ADAMS:  What is medium
6   defined as?
7       A.   You have sculpture, painting,
8   photography, mixing them together.
9          MR. ADAMS:  That's what I
10  thought.
11      Q.   What about Collaborative
12  Studio II, what was, in your opinion, the
13  goal of that class?
14      A.   I'm not sure.
15      Q.   What were some of the projects
16  you did in Collaborative Studio II?
17      A.   Okay.  First of all, I don't
18  look at them as like Collaborative Studio
19  I, II and III.
20      Q.   Okay.
21      A.   They were each, you know,
22  equally on a level that -- they each had
23  the same importance.  So another

Page 48

1   Collaborative Studio course --
2       Q.   Let's just say the spring 2004
3   Collaborative Studio, would that be a
4   better way of saying it?
5       A.   Okay.
6       Q.   That just identifies time.
7   What were some of the projects that you
8   did in that Collaborative Studio course?
9       A.   If this is the one I am
10  thinking of, we were to design a piece of
11  artwork around an attic, using the attic
12  as a space of inspiration.  And whatever
13  your interpretation of attic was, you used
14  it that way.
15      Q.   And what projects did you do
16  in the Collaborative Studio course taught
17  in the fall of 2003?
18      A.   Can you repeat that question?
19      Q.   Yes.  In the fall of 2003,
20  were there certain projects that you were
21  assigned in the Collaborative Studio I
22  class -- not I, but the Collaborative
23  Studio class?

Page 49

1    A.    Projects other than the main
2  project?
3      Q.    Yes, I mean, for instance, the
4  main project is birth, and we are going to
5  get into that later, is that correct?
6      A.    Yes, sir.
7      Q.    Were there some other projects
8  that you did in Collaborative Studio --
9      A.    Not to my knowledge.
10     Q.    What about Collaborative
11  Studio -- the third one, whatever time
12  period with whatever professor, do you
13  recall what projects you were doing in
14  that one?
15     A.    The project I did was based on
16  life and death and -- that's basically it
17  in a nutshell.
18     Q.    Do you recall whether the
19  professor who taught that third one
20  assigned the life and death topic or that
21  was just an open-ended topic and you chose
22  that theme?
23     A.    I don't recall.

Page 50

1      Q.    Don't recall.  Okay.  So in
2  the Collaborative Studio course taught in
3  the fall of 2003 -- and y'all are on the
4  semester system, correct?
5      A.    Yes, sir.
6      Q.    Were you ever there when it
7  was on the quarter system?
8      A.    No, sir.
9      Q.    You spoke of earlier as the
10  main assignment.  Was that the assignment
11  that Mr. Johnson asked you to create a
12  piece of work based on the theme of birth?
13     A.    Yes, sir.
14     Q.    Okay.  Did you create any
15  other art in Collaborative Studio in the
16  fall of 2003 other than the piece of art
17  you created for that assignment?  Did any
18  guest artists come in and, you know, help
19  y'all --
20     A.    No, sir.
21     Q.    Now, when did -- how early in
22  the semester did Mr. Johnson -- can we
23  just call it the birth assignment?

Page 51

1      A.    (Nodding head affirmatively.)
2      Q.    Okay.  How early in the
3  semester did Mr. Johnson assign the birth
4  assignment?
5      A.    I believe it was early on in
6  the semester.
7      Q.    Okay.  Now, did he give you --
8  was it written on a piece of paper?  Did
9  he say it orally?
10     A.    There was a piece of paper
11  with that assignment.
12     Q.    Do you recall what that piece
13  of paper said?
14     A.    I believe that was included in
15  the interrogatories.
16     Q.    Okay.  Let me look.
17          (Whereupon, Defendant's
18          Exhibit 1 was marked for
19          identification.)
20     Q.    I'm going to hand you what I
21  have labeled Defendant's Exhibit 1.  And I
22  am just going to ask you to take some time
23  to look at it.  And my question is going

Page 52

1  to be is that the course syllabus for the
2  Collaborative Studio course in the fall of
3  2003?
4      A.    (Reviewing document.)
5      Q.    Is that the course syllabus
6  for the fall 2003?
7      A.    This is the syllabus, but this
8  isn't the assignment sheet.
9      Q.    So there is nothing on there
10  that says what the assignment -- I don't
11  see anything in the papers that were given
12  to me in your answers to interrogatories
13  that has that -- was it something
14  typewritten?
15     A.    Yes, sir.
16     Q.    And that's something Mr.
17  Johnson gave you?
18     A.    Each student.
19     Q.    Each student, okay, gave each
20  student.  I don't see that in this stack.
21  I just saw that.  But do you remember
22  generally what that paper said, how you
23  were to handle that assignment?

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 53

1  A.  We were to come up with a
2  concept around birth, quote/unquote.
3  Q.  Did Mr. Johnson elaborate
4  verbally as to --
5  A.  We elaborated throughout the
6  class.
7  Q.  Okay.  Now, were you told at
8  any time that you had to use more than one
9  medium?
10  A.  Not that I recall.
11  Q.  Did you use more than one
12  medium?
13  A.  I did.
14  Q.  What were the mediums that you
15  used?
16  A.  In a nutshell, sculpture and
17  photography.
18  Q.  Did any of the other class --
19  your other classmates use more than one
20  medium?
21  A.  Yes, sir.
22  Q.  Did any of them use more than
23  two?

Page 54

1  A.  I couldn't tell you.
2  (Whereupon, Defendant's
3  Exhibit 2 was marked for
4  identification.)
5  Q.  I'm going to hand you what I
6  have marked as Defendant's Exhibit Number
7  2 and give you a chance to look at that.
8  My question is going to be is that a
9  photograph of the finished project?
10  A.  It's not a very great one,
11  but, yes.
12  Q.  Did you take this photograph?
13  A.  I did.
14  Q.  You did?
15  A.  I did.
16  Q.  Okay.  Well, maybe I didn't
17  choose the best one.  You took this
18  photograph, it's your finished project?
19  A.  I did.
20  Q.  So from the assignment that
21  Mr. Johnson gave you on birth, this is
22  what you produced as a piece of art,
23  correct?

Page 55

1  A.  Yes, sir.
2  Q.  And did you receive a grade at
3  the end of the semester based on your work
4  on this piece of art in that class?
5  A.  I received an A.
6  Q.  Okay.  Did you receive any
7  type of award?
8  A.  I did.
9  Q.  Okay.  Now, I have some awards
10  that were produced to me.  I know there
11  were two in there, I'm not sure if one of
12  these applied to that piece of art or not.
13  I'm not going to mark these yet, I just
14  want you to look at these and tell me if
15  one of those did apply to Defendant's
16  Exhibit 2.  And if so, then we will put a
17  sticker on that.
18  A.  (Reviewing documents.)  I
19  can't be sure if I was presented with an
20  actual document or if it was some sort of
21  recognition at another exhibit.
22  MR. MUSSO:  Just off the
23  record.

Page 56

1  (Off-the-record discussion.)
2  Q.  We do know that you received
3  an award for the piece of art in
4  Defendant's Exhibit 2, correct?
5  A.  Yes, sir.
6  Q.  And did that award have a
7  title?
8  A.  Not that I'm aware of.
9  Q.  Not that you are aware of.
10  Did it include any type of monetary
11  amount?
12  A.  Not that I'm aware of.
13  Q.  So it was something for the
14  resume, though, correct?
15  A.  I'm sorry?
16  Q.  Was it something for the
17  resume?  Did you put it on your resume?
18  A.  Yes.
19  Q.  Do you have any recollection
20  of whether you received a certificate or a
21  trophy or a plaque?
22  A.  No, sir.
23  Q.  But sitting here today, is

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 57

1 that something you may have received, you
2 just can't remember because it has been
3 too long?
4     A.   Yes, sir.
5     Q.   Okay.
6          (Whereupon, Defendant's
7          Exhibit 3 was marked for
8          identification.)
9     Q.   I'm going to hand you what I
10 have marked as Defendant's Exhibit Number
11 3, and if you would just take a moment to
12 look at that. I believe these are the
13 photos that appear in the final piece, but
14 I'm not sure. That's what I would like
15 for you to tell me.
16     A.   (Reviewing documents.) Yes.
17     Q.   So Defendant's Exhibit 3 are
18 copies -- or photographs that appeared in
19 the final piece in Defendant's Exhibit 2,
20 correct? Or am I incorrect?
21     A.   Yes, sir.
22     Q.   Okay. Did your piece,
23 Defendant's Exhibit 2, have a title?

Page 58

1     A.   It was untitled.
2     Q.   Untitled. And did you choose
3 to untitle it? Did you choose for it to
4 be untitled?
5     A.   It was untitled for a specific
6 reason.
7     Q.   Okay. And why did you -- were
8 you the person who left it untitled for a
9 specific reason?
10     A.   Yes, sir.
11     Q.   And why did you choose to
12 leave it untitled?
13     A.   It's a very lengthy
14 conversation.
15     Q.   Just in a nutshell. Was it an
16 artistic reason?
17     A.   An artistic reason.
18     Q.   So something you as an artist
19 decided to do for artistic reasons?
20     A.   Yes, sir.
21     Q.   Any other reason other than
22 artistic reasons?
23     A.   No, sir.

Page 59

1     Q.   Did you write any type of
2 summary, small paragraph or anything like
3 that for that to be included with it when
4 it was shown?
5     A.   I believe the faculty wrote
6 summaries on the pieces.
7     Q.   Were these summaries ever
8 exhibited with the pieces of art?
9     A.   They were.
10     Q.   Was a summary included with
11 yours?
12     A.   Yes, sir.
13     Q.   Do you know who wrote that
14 summary?
15     A.   No, sir.
16     Q.   Did you have any disagreement
17 with that summary?
18     A.   Not that I can recall.
19     Q.   At any time when you were in
20 the Collaborative Studio class in the fall
21 of 2003, did anyone tell you that the
22 piece of art that was going to be produced
23 by you would appear in any type of art

Page 60

1 show?
2     A.   Can you rephrase that?
3     Q.   Yes. You are sitting in
4 class, Collaborative Studio, fall of 2003,
5 you receive this assignment about birth.
6 Did anyone tell you that the art you
7 created could appear in an art show?
8     A.   My professors for that class.
9     Q.   Which professors?
10     A.   Jerry Johnson.
11     Q.   And who else?
12     A.   Duane Paxson.
13     Q.   How does he spell his first
14 name, do you know?
15     A.   D-u-a-n-e.
16     Q.   Paxson, P-a-x-o-n, is that
17 right?
18          MR. JOHNSON: S-o-n.
19     Q.   P-a-x-s-o-n, okay. What did
20 Mr. Johnson tell you with regard to your
21 piece of art being in an art show?
22     A.   That all of the pieces had
23 potential to be in the show.

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 61

1    Q.    So that would be all of the
2   pieces for all of the students?
3    A.    Any student.  It was a juried
4   art show.
5    Q.    What is a juried art show?
6    A.    Meaning that they have other
7   known artists -- or known to them at
8   least, I wasn't aware of any of the
9   jurors' names or anything like that.  But
10  they have other artists come in and place
11  value on all of the works and give out
12  awards, basically.
13   Q.    Would individual students have
14  to submit work and hope that it would be
15  in the show?
16   A.    Yes, sir.
17   Q.    So not every piece of work
18  submitted would be in the show, am I
19  correct?
20   A.    No, sir.
21   Q.    And the jury would decide what
22  goes in the show?
23   A.    The jury would look at the

Page 62

1   show which was prepared by the faculty or
2   whoever selected the pieces from the
3   department to be in the show and decide on
4   awards, best in show, et cetera.
5    Q.    Okay.  So it was the jury that
6   decided that you would receive the award?
7    A.    I believe.
8    Q.    Okay.  And do you recall
9   anyone who was on that jury?
10   A.    Like I said, no, sir.
11   Q.    Now, was it faculty members
12  who decided what would be in the show?
13   A.    Yes, sir.
14   Q.    Okay.  Ultimately your work
15  was chosen to be in the show, correct?
16   A.    Yes, sir.
17   Q.    Do you know of anyone in the
18  class whose work was not chosen to be in
19  the show?
20   A.    Not that I'm aware of.
21   Q.    Did everyone in the class
22  submit their work to be in the show?
23   A.    As far as I know.

Page 63

1    Q.    Was that ever a requirement in
2   the class, that the work be submitted for
3   the show?
4    A.    I don't believe so.
5    Q.    Did the show have a title?
6    A.    I don't believe so.
7    Q.    And was the show limited to
8   Troy University students?
9    A.    Yes, sir.
10   Q.    Now, earlier you said any
11  student, correct?
12   A.    Yes, sir.
13   Q.    So it didn't have to be an art
14  student, am I correct?
15   A.    No, sir.
16   Q.    I'm not correct?
17   A.    No, I mean, you are correct.
18   Q.    Okay, I'm sorry.  Do you know
19  of any nonart majors or minors whose work
20  was selected for the show?
21   A.    I remember one piece because I
22  remember it was incredible, but I don't
23  know the artist's name.  I think it was a

Page 64

1   pencil drawing of James Dean or something,
2   but it was real incredible.  But that was
3   a nonart major.
4    Q.    That was a --
5    A.    A nonart major.
6    Q.    How did art majors learn about
7   the show?
8    A.    I was made aware within the
9   class.
10   Q.    Within the class.
11   A.    How others were made aware,
12  I'm not sure.  Probably word of mouth.
13   Q.    For instance, did you see any
14  posters or was it put on a campus e-mail
15  system that you are aware of?
16   A.    Possibly on a campus e-mail
17  system, but nothing I'm aware of.
18   Q.    Are you aware of how any
19  nonart majors or minors may have learned
20  of the show?
21   A.    No, sir.
22   Q.    But you learned of the show in
23  the class, am I correct?

16 (Pages 61 to 64)

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 65

1    A.    Yes, sir.
2    Q.    Nowhere but the class?
3    A.    No.
4    Q.    And what did Mr. -- how early
5    in the course was it that Mr. Johnson or
6    Mr. Paxson told you anything about the
7    show?
8    A.    I believe it was midcourse.
9    Q.    So had you already started the
10   birth project before you learned about the
11   show?
12   A.    That would be fair, yes.
13   Q.    Okay.  Did you already know
14   about the birth project before you learned
15   about the show?
16   A.    Yes, sir.
17   Q.    And what did Mr. Johnson tell
18   you about the show?
19   A.    Could you be more specific?
20   Q.    Did he say where the work was
21   going to be exhibited?
22   A.    He did not have -- I'm not
23   sure if he had a location yet, but we were

Page 66

1    going to have a show.
2    Q.    Okay.  Do you recall whether
3    Mr. Paxson said where the location was
4    going to be?
5    A.    No, sir.
6    Q.    At some point did Mr. Johnson
7    tell you where the location was going to
8    be?
9    A.    HAL Hall.
10   Q.    Did he tell that to the whole
11   class?
12   A.    I believe.
13   Q.    Was it Mr. Johnson who said
14   that or was it Mr. Paxson?
15   A.    I couldn't recall that.
16   Q.    One of those professors told
17   you it was going to be in HAL Hall?
18   A.    Yes, sir.
19   Q.    The term is HAL Hall of Honor,
20   correct?
21   A.    Yes.
22   Q.    Can we just call it HAL Hall
23   to make it easier?

Page 67

1    A.    That's fine.
2    Q.    Do you know what the HAL
3    stands for, the H-A-L?
4    A.    Mr. Long, who was the music
5    guy -- I don't know.
6    Q.    Have you ever heard of it
7    called the Hawkins Adams Long Hall of
8    Honor?
9    A.    Yes.
10   Q.    Dr. Adams, do you recall who
11   he was?
12   A.    No, sir.
13   Q.    He was probably before -- have
14   you ever seen his bust statue as being the
15   former president of the University?
16   A.    (Shaking head negatively.)
17   Q.    So you have no idea who he is,
18   am I correct?
19   A.    No, sir.
20   Q.    Do you know any of his family
21   members in town?
22   A.    I don't -- no, sir.
23   Q.    Now, Dr. Hawkins, do you know

Page 68

1    who Dr. Hawkins is?
2    A.    The chancellor.
3    Q.    And what about Long?
4    A.    I believe he is the one -- was
5    one of the great music professors at one
6    point.
7    Q.    So you have never taken a
8    course with any of those gentlemen,
9    correct?
10   A.    No, sir.
11   Q.    Dr. Adams was probably dead
12   before you got there, but --
13        MR. MUSSO:  When did Dr.
14   Adams --
15        MR. JOHNSON:  A while back.
16   Q.    Now, before you were told that
17   it was going to be in the HAL Hall of
18   Honor, had you ever been in the HAL Hall
19   of Honor before?
20   A.    No, sir.
21   Q.    When is the first time you
22   ever stepped foot in the HAL Hall of
23   Honor?

17 (Pages 65 to 68)

Page 69

1    A.   I believe to check out the
2 space just to see about restrictions for
3 my piece, because it is a very large
4 piece.
5    Q.   Did you do that when you were
6 still in the planning stage of your piece?
7    A.   No, sir.
8    Q.   Okay.  I mean, I just --
9 sometimes I think maybe artists think
10 about their piece as they are thinking
11 about the space, I don't know, but that's
12 the reason I asked the question.
13    A.   No, sir.
14    Q.   Does that make sense?
15    A.   Yes, sir.
16    Q.   So you had already conceived
17 of your piece before you went and checked
18 out the space, correct?
19    A.   Yes, sir.
20    Q.   When you went and checked out
21 the space, what did you see in that space
22 at the time?
23    A.   I believe there was old

Page 70

1 artifacts, old photographs, some display
2 cases with things in them.
3    Q.   Anything of interest to you?
4    A.   History is interesting but --
5    Q.   Were they all related to Dr.
6 Adams, by any chance, do you recall?
7    A.   I can't remember.
8    Q.   Okay.  When you went there did
9 someone have to let you into that room or
10 was it open?
11    A.   I believe I went with the
12 class.  I'm not sure, though.
13    Q.   Okay.  But there was already
14 something in that room, correct?
15    A.   Yes, sir.
16    Q.   Just outside of that room did
17 you notice anything, any pictures or
18 displays?
19    A.   No, sir.
20    Q.   For instance, were you aware
21 that the HAL Hall of Honor housed the
22 state band directors hall of fame?
23    MR. JOHNSON:  National.

Page 71

1    MR. MUSSO:  It has both,
2 though, national and state, am I correct?
3    Q.   Were you aware, for instance,
4 that it housed the state band director
5 hall of fame?
6    A.   No, sir.
7    Q.   Were you also aware that the
8 HAL Hall of Honor housed the national band
9 director hall of fame?
10    A.   No.
11    Q.   Were you aware that there was
12 some office space in that building also?
13    A.   No -- well, I knew that there
14 was more space back there, so I assumed.
15    Q.   Okay.  You just knew there was
16 more space, and what was back there --
17    A.   Basically.
18    Q.   Okay.  But you do know that at
19 one point you went into the space where
20 the art was going to be shown, correct?
21    A.   Yes, sir.
22    Q.   And you saw a bunch of
23 historical artifacts, for lack of a better

Page 72

1 term, but you don't recall whether it was
2 centered around one individual or not?
3    A.   No, sir.
4    Q.   Okay.  Do you know how long
5 the HAL Hall of Honor had existed on the
6 campus of Troy University?
7    A.   No, sir.
8    Q.   Do you know how it came about
9 into existence?
10    A.   No, sir.
11    Q.   Do you know whether any
12 particular individual or any particular
13 estate or family donated a large amount of
14 money for that building to exist?
15    A.   I know little about the
16 building other than I was checking out the
17 space to house my work.
18    Q.   I understand, but I still have
19 to ask the questions, okay?
20    A.   Okay.
21    Q.   That's just the way
22 depositions work.
23    The room that you went in and

18 (Pages 69 to 72)

Page 73

1    saw the exhibits, do you have any
2    knowledge whether there were any
3    stipulations put on the university as to
4    what could be housed in that room one way
5    or the other, do you have any knowledge of
6    that?
7         A.    I was told that we had full
8    rein to place what we wanted in there.
9         Q.    And who told you that?
10        A.    Jerry Johnson.
11        Q.    Jerry Johnson.  Anyone else?
12        A.    Not that I know of.
13        Q.    Did Mr. Johnson tell you how
14   long y'all had the use of that room?
15        A.    No, sir.
16        Q.    Have you been back in the HAL
17   Hall of Honor since the show was taken
18   down?
19        A.    Since I removed the piece?
20        Q.    Yes.
21              MR. ADAMS:  Can we just call
22   it the HAL?
23              MR. MUSSO:  Well, we can call

Page 74

1    it the HAL -- or HAL Hall.  It's
2    technically the HAL Hall of Honor.
3         A.    I'm sorry, can you --
4         Q.    Have you been in that space in
5    the HAL Hall of Honor since you removed
6    your piece?
7         A.    No, sir.
8         Q.    Do you know of anyone who has
9    been in that space and told you what was
10   in that room?
11        A.    No, sir.
12        Q.    Did anyone tell you how long
13   that juried show was going to be up, how
14   long it was going to go on?
15        A.    I believe that was through the
16   break and that it would be taken down at
17   some point which would be scheduled after
18   we got back.
19        Q.    And who told you that?
20        A.    That was told to me in the
21   class time before we even put up the work.
22        Q.    Do you recall which professor?
23        A.    Jerry Johnson.

Page 75

1         Q.    You kind of shook your head.
2    Do you know whether it was Jerry or Mr.
3    Paxson?
4         A.    I believe it was Jerry
5    Johnson.
6         Q.    Okay.  Were those the words he
7    used?
8         A.    Not exactly.
9         Q.    Do you recall the words he
10   used exactly?
11        A.    No, sir.
12        Q.    Did that space belong to the
13   art department?
14        A.    I don't know.
15        Q.    Does the art department have a
16   gallery in its own building?
17        A.    Yes, sir.
18        Q.    And where is that gallery
19   located in the building?
20        A.    It's the Malone Gallery, it's
21   located right next to the offices.
22        Q.    In order to get to the Malone
23   Gallery, do you have to go through

Page 76

1    offices?
2         A.    No, sir.
3         Q.    So when you walk in the front
4    door, how do you then get to the -- well,
5    is it the front door you walk in to get to
6    the Malone Gallery?
7         A.    There are a few accesses.
8         Q.    Or is it one of these
9    buildings you can't really tell what is
10   the front door or not?
11        A.    There is a courtyard.
12        Q.    Okay.  So you walk in and what
13   is the first office you see?  Is it the
14   secretary's?
15        A.    The secretary, and that leads
16   off to -- that is set off.  There is a
17   hallway or like a little sitting area, and
18   then you can walk up into the gallery.
19        Q.    Okay.  Was this the first
20   time, to the best of your knowledge, that
21   there was going to be an art show in the
22   HAL Hall -- or the HAL Hall or the HAL
23   Hall of Honor, however you want to --

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 77

1  A.  To the best of my knowledge.
2  Q.  Do you know if there has been
3  any art shows in there since then?
4  A.  Not to my knowledge.
5  Q.  Do you know if that room has
6  been used for any other purpose since then
7  other than the art show and the time you
8  saw those artifacts?
9  A.  Not to my knowledge.
10  Q.  So am I correct that Jerry
11  told you that at some point the show was
12  going to be coming down after you got back
13  from the break?
14  A.  At some point, yes.
15  Q.  Did he tell anybody what point
16  that would be?
17  A.  Not to my knowledge.
18  Q.  Do you know whether Mr.
19  Johnson himself knew when he told you that
20  back in the fall semester how long he
21  could keep that space?
22  A.  No.
23  Q.  Did anyone else tell you

Page 78

1  anything about how long that juried art
2  show may stay up other than Mr. Johnson?
3  A.  No.
4  Q.  Let's just go through
5  Defendant's Exhibit 3 very quickly.  This
6  is just the order that I put them, okay?
7  I'm not going to represent to anyone that
8  this is a specific order that you wanted,
9  okay?
10  A.  (Nodding head affirmatively.)
11  Q.  But this is just the order
12  that I put them.
13  Defendant's Exhibit 3, the
14  first page, the picture of an individual
15  wearing a tie, who is that person?
16  A.  That's me.
17  Q.  Okay.  Did any individual
18  photograph have a title?
19  A.  I'm going to say no, but they
20  had intent, artistic intent, each single
21  one, yes.
22  Q.  That's fine.  What was the
23  artistic intent of this photograph?

Page 79

1  A.  It was to represent feminism.
2  Q.  And let's look -- and at the
3  time that you took this photograph, that
4  was while you were enrolled in the course,
5  correct, of Collaborative Studio in the
6  fall of 2003?
7  A.  This is while I was enrolled
8  in that course.
9  MR. ADAMS:  I'm sorry, what?
10  A.  This was while I was enrolled
11  in that course.
12  Q.  Did you take all of the
13  photographs in Defendant's Exhibit 3 while
14  you were enrolled in the course?
15  A.  Yes, sir.
16  Q.  Did you take these photographs
17  specifically for that piece of art?
18  A.  Not specifically.
19  Q.  But, I mean, did you have the
20  intent when you were taking photographs
21  that these may be included in that piece
22  of art?
23  A.  Yes, sir.

Page 80

1  Q.  Were there any photographs
2  that you took that you did not use in the
3  piece of art?
4  A.  Tons of them.
5  Q.  Have you saved any of those?
6  A.  I have -- yes, I have
7  negatives, originals.
8  Q.  I know we made reference to
9  the thousand photographs in your
10  interrogatories.  Would some of those be
11  in that big pile of photographs?
12  A.  Yes.
13  Q.  Let's look at number two --
14  the second page of Defendant's Exhibit 3.
15  Who is that individual?  Do you know his
16  name?
17  A.  That's Dan Gibbs.
18  Q.  Okay.  And is he a student at
19  Troy?
20  A.  No.
21  Q.  Okay.  How do you know Mr.
22  Gibbs?
23  A.  Friend.

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 81

1   Q.   Friend.  Was he ever a student
2   at Troy?
3   A.   Possibly.
4   Q.   Does he just live in the Troy
5   community?
6   A.   Yes.
7   Q.   Does he work in the Troy
8   community?
9   A.   No, I don't believe.
10  Q.   Do you know whether he was
11  employed at the time you took the
12  photograph?
13  A.   No.
14  Q.   And do you know whose child
15  that is?
16  A.   That's his child.
17  Q.   Do you know the name of the
18  child?
19  A.   Maureen.
20  Q.   That's a little girl, correct?
21  A.   Yes.
22  Q.   And how old was Mr. Gibbs when
23  you took this photograph, do you know?

---

Page 82

1   A.   I have to plead the Fifth on
2   any age.
3   Q.   On any age?  Okay.  When you
4   say you plead the Fifth, you are pleading
5   the Fifth Amendment, correct?
6   MR. ADAMS:  Yes.
7   MR. MUSSO:  What I will do is
8   I will still ask the question, and when I
9   ask the question, he pleads the Fifth, but
10  to make the record clear --
11  MR. ADAMS:  Can we stop for a
12  minute?  Let me talk to him.
13  MR. MUSSO:  Sure.
14  (Whereupon, a break was had
15  from 10:53 a.m. until 11:10
16  a.m.)
17  Q.   Let me just ask a quick
18  question here.  In Defendant's Exhibit 3,
19  it was my intention to ask you the ages of
20  all of these models.  Is it my
21  understanding that you are going to plead
22  the Fifth to that question?
23  A.   Not to each one.

---

Page 83

1   Q.   Okay.  Can we just go through
2   here and tell me, Mr. Gibbs, you are going
3   to plead the Fifth to Mr. Gibbs?
4   A.   I will say I don't know -- I
5   don't know his age.
6   Q.   At the time you took his
7   photograph, did you know his age?
8   A.   No, sir.
9   Q.   The next person, do you know
10  the name of that model?
11  A.   It's Jessica Gibbs.
12  Q.   Is that Mr. Gibbs' wife?
13  A.   It is.
14  Q.   And that's the same baby?
15  A.   Yes, it is.
16  Q.   Are you going to plead the
17  Fifth to her age?
18  A.   I'm saying I don't know her
19  age and I didn't know it at the time.
20  Q.   Okay.  What about the next
21  page, and this is the picture of the
22  woman --
23  A.   Yes.

---

Page 84

1   Q.   -- holding -- I don't know the
2   name of that dress, what is her name?
3   A.   Morgan -- I don't know her
4   last name.
5   Q.   Are you going to plead the
6   Fifth on her?
7   A.   I don't know her age.
8   Q.   Did you know at the time?
9   A.   No, sir.
10  Q.   The next individual, what is
11  his name?
12  A.   Dale Hrebick.
13  Q.   Hrebick?
14  A.   H-r-e-b-i-c-k.
15  Q.   And are you going to plead the
16  Fifth on his age?
17  A.   Don't know his age and didn't
18  know it at the time.
19  Q.   Okay.  What about these other
20  -- the next page, two females?
21  A.   Yes.
22  Q.   And what is the name of the
23  first one with the longer hair?

---

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 85

1   A.    Her name is Holly, don't know
2   her last name.
3   Q.    And what about the female next
4   to her?
5   A.    Rheana Vallery.
6   Q.    Breana or Rheana?
7   A.    Rheana, R-h-e-a-n-a.
8   Q.    That's a pretty name.  And her
9   last name is Vallery?
10   A.    Vallery.
11   Q.    Are you going to plead the
12   Fifth on any of these ladies?
13   A.    I will plead the Fifth on
14   them.
15   Q.    On both of them?
16   A.    Yes.
17   Q.    And the next individual, what
18   is her name?
19   A.    Same -- Rheana Vallery.
20   Q.    Okay.  And the next
21   individual, what is his name?
22   A.    Tim Jones.
23   Q.    Okay.  And do you know his

Page 86

1   age?
2   A.    Didn't know his age, don't
3   know -- don't know it, didn't know it at
4   the time.
5   Q.    And what about the next
6   individual, is that a male or female?
7   A.    That's a female.
8   Q.    And what is her name?
9   A.    I'm forgetting her name.  I
10   don't know.
11   Q.    Are you going to plead the
12   Fifth with her?
13   A.    Don't know her age, didn't
14   know it at the time.
15   Q.    And the next individual?
16   A.    Jacqueline Youngblood.
17   Q.    Okay.
18   A.    And she is twenty-four.
19   Q.    Was that the age at the time
20   of the photo?
21   A.    She is twenty-four now.
22   Q.    What was her age at the time
23   of the photo?

Page 87

1   A.    Twenty-one.
2   Q.    Okay.  And the next
3   individual, is that a male or female?
4   A.    Male.
5   Q.    And who is that?
6   A.    That is Michael.  I don't know
7   his last name.
8   Q.    What about him, are you going
9   to plead the Fifth on him?
10   A.    Don't know it, didn't know it.
11   Q.    That is the age you don't know
12   and didn't know at the time?
13   A.    Exactly.
14   Q.    The next individual?
15   A.    That's Holly again.
16   Q.    Holly -- is she the same girl
17   who appeared --
18   A.    Yes.
19   Q.    -- with the two females
20   leaning up against the fence?
21   A.    Yes, sir.
22   Q.    Okay.  What about her age?
23   A.    Plead the Fifth.

Page 88

1   Q.    Okay.  And the next
2   individual, what is her name?
3   A.    Andrea.
4   Q.    Okay.
5   A.    Don't know her last name.
6   Q.    Okay.  And what about her age?
7   A.    I don't know it.
8   Q.    Did you know it at the time?
9   A.    No, sir.
10   Q.    This next individual?
11   A.    Don't know his name.
12   Q.    Okay.  How did he become one
13   of your subjects for the photograph?
14   A.    Mutual friends.
15   Q.    Mutual friends.  What was the
16   mutual friend's name?
17   A.    Andrea.
18   Q.    Oh, Andrea was the mutual
19   friend's name, and that's one of the girls
20   in the other photograph?
21   A.    Exactly.
22   Q.    What about his age?
23   A.    Don't know.

22 (Pages 85 to 88)

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 89

1  Q.  Did you know at the time?
2  A.  No, sir.
3  Q.  What about the next
4  photograph?
5  A.  That's Connie.
6  Q.  Okay.
7  A.  Don't know her last name.
8  Q.  What about her age?
9  A.  Don't know it, didn't know it.
10  Q.  And the next individual?
11  A.  Travis Woodman.
12  Q.  Okay.  And what about his age?
13  A.  Don't know it, didn't know it.
14  Q.  Okay.  Did you get model
15  release forms for -- did you get any of
16  these individuals to sign a model release
17  form?
18  A.  I was not aware of it, that
19  those were necessary.  So, no, I did not.
20  Q.  At any time when you took
21  photographs when you were a student at
22  Troy University, did you ever get model
23  release forms?

---

Page 90

1  A.  Not for this project.
2  Q.  But for any other projects,
3  for any other class?
4  A.  Once I was made aware that
5  those were necessary for display purposes.
6  Q.  And who made you aware of
7  that?
8  A.  I believe it was Bob Joslin
9  sometime after this.
10  Q.  Were you enrolled in one of
11  Mr. Joslin's courses when he made you
12  aware of that?
13  A.  No, sir.
14  Q.  But it was sometime after you
15  took these photographs?
16  A.  Yes, sir.
17  Q.  Was it in the fall semester of
18  2003?
19  A.  No, sir.
20  Q.  So it was after the fall
21  semester 2003?
22  A.  Afterward.
23  Q.  Do you recall when after?

---

Page 91

1  A.  No, sir.
2  Q.  What did Mr. Joslin tell you?
3  A.  To my understanding, it was
4  that I needed those for display purposes.
5  Q.  Was there a situation that
6  arose where that topic came up?
7  A.  Not that I can recall.  Not
8  any specific situation.
9  Q.  Do you recall whether it's
10  something you asked him or that he brought
11  up, do you recall who brought it up first?
12  A.  He brought it up.
13  Q.  In Defendant's Exhibit Number
14  3, other than yourself, were any of these
15  Troy State -- or Troy University students?
16  A.  We will go through.
17  A.  I take it the baby wasn't.
18  Mr. Gibbs wasn't.  What about his wife
19  Jessica?
20  A.  She was at one point.
21  Q.  Okay.
22  A.  I don't know when.
23  Q.  What about Morgan?

---

Page 92

1  A.  She graduated from the
2  department of art.
3  Q.  Was she a student at the time
4  you took the photograph?
5  A.  No, sir.
6  Q.  Do you know what she was doing
7  in the community at the time you took the
8  photograph?
9  A.  I believe she was in
10  Montgomery working with the Alabama
11  Shakespeare Festival, but I can't be sure.
12  Q.  How is it you came to ask her
13  to be a subject in this photograph?
14  A.  I knew her at the time and
15  told her about the project and told her
16  about the ideas I was trying to put forth
17  and she agreed.
18  Q.  Did she ever have any
19  reluctance in any of the poses that you
20  photographed of her?
21  A.  No.
22  Q.  How about Mr. Gibbs and Ms.
23  Gibbs, how did it come about that you made

---

23 (Pages 89 to 92)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 93

1  them subjects to the photographs?
2      A.    They were friends of mine in
3  the Troy area.
4      Q.    Do they still live in the Troy
5  area?
6      A.    They do.
7      Q.    What about Morgan, where is
8  she at now?
9      A.    I have no idea.
10     Q.    What about -- is it Dale
11 Hrebick?
12     A.    Yes.
13     Q.    How did it come about that he
14 became a subject?
15     A.    He was a professor of mine.
16     Q.    Was he a professor at the time
17 you took the photograph?
18     A.    Yes, sir.
19     Q.    What did he teach?
20     A.    English.
21     Q.    And did you approach him about
22 being the subject for this?
23     A.    I asked him if he would be

Page 94

1  interested in being photographed for the
2  piece, yes.
3      Q.    And at the time you asked him,
4  did you tell him it would be a nude
5  photograph?
6      A.    Yes.
7      Q.    Did he have any reservations
8  about that?
9      A.    No, sir.
10     Q.    I see part of his face is cut
11 off.  Was that a decision that you made?
12     A.    Artistic.
13     Q.    Artistic.  No reason other
14 than artistic, correct?
15     A.    No, sir.
16     Q.    And the next page, Holly and
17 Rhena?
18     A.    Rheana.
19     Q.    Again, that's a pretty name.
20 Were they students at the time that you
21 took this photograph?
22     A.    No, sir.
23     Q.    Was Holly a person in the

Page 95

1  community?
2      A.    Both of them were friends of
3  mine from my hometown.
4      Q.    Okay.  That would be Headland,
5  correct?
6      A.    Not my hometown, I'm sorry.
7  From Dothan.
8      Q.    From Dothan, okay.  Do you
9  know whether they are still in the Dothan
10 community?
11     A.    I really don't know.
12     Q.    And how did it come about that
13 -- I mean, did they know they would be
14 posing nude?
15     A.    Yes.
16     Q.    Let me just ask this general
17 question.  Did any of the individuals who
18 you took photographs for this project, did
19 any of them have any reservations about
20 posing nude that did pose nude?
21     A.    No, sir.
22     Q.    Were there any of these
23 individuals who posed nude and you took

Page 96

1  their photograph but you decided to use a
2  photograph where they were dressed?
3      A.    Let me look.
4      Q.    Okay.
5      A.    No, sir.
6      Q.    And the next one is Rheana,
7  correct, same individual as before?
8      A.    Uh-huh.
9      Q.    Is it Mr. Jones?
10     A.    Yes.
11     Q.    How did it come about that he
12 became one of your subjects?
13     A.    Mutual friends.
14     Q.    Who was the mutual friend
15 again?
16     A.    Andrea.
17     Q.    I'm sorry, you told me that
18 before.
19          And the next individual who is
20 -- I think you said the female, is this
21 individual -- you couldn't remember her
22 name, is that correct?
23     A.    No, sir, I could not.

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 97

1    Q.    Okay.  Does she still live in
2  the Troy area?
3    A.    Eltie, that is her name.
4    Q.    Eltie.  Does she still live in
5  the Troy area?
6    A.    I am not aware of where she
7  lives.  She was a student at the time.
8    Q.    Okay, was a student.  What
9  about Mr. Jones, was he a student at the
10  time?
11    A.    No, sir.
12    Q.    Do you know what he did in the
13  area?
14    A.    No, sir.
15    Q.    What abut Jacqueline, was she
16  a student at the time?
17    A.    Yes, sir.
18    Q.    And do you know where she is
19  at these days?
20    A.    She lives in New Orleans.
21    Q.    Okay.  And the next one is
22  Michael, I'm sorry?
23    A.    Yes.

Page 98

1    Q.    And was Michael a student at
2  the time?
3    A.    No, sir.
4    Q.    Okay.  Do you know where
5  Michael is at these days?
6    A.    I believe he is in Dothan.
7    Q.    Okay.  And the next individual
8  is Holly.  We talked about her.
9    A.    Uh-huh.
10    Q.    And Andrea?
11    A.    Student.
12    Q.    Student.  And Andrea, was she
13  a student at the time?
14    A.    At the time, yes.
15    Q.    Do you know where she is at
16  now?
17    A.    No, sir.
18    Q.    What about the mutual friend
19  of Andrea, the next photograph?
20    A.    Don't know where he is.
21    Q.    Okay.  And --
22    A.    Not a student.
23    Q.    Not a student at the time.

Page 99

1  What about Connie?
2    A.    Student.
3    Q.    She was a student at the time
4  you took the photograph.  Okay.  And is it
5  Travis?
6    A.    Yes.
7    Q.    What about him, was he a
8  student at the time?
9    A.    Yes, he was.
10    Q.    Okay.  And when you took the
11  photographs of these individuals, did
12  these individuals know that this art would
13  be hanging in a juried show or any type of
14  show?
15    A.    They were all made aware of
16  that.
17    Q.    Okay.  Did you take all of
18  these photographs in the same location?
19    A.    Yes, sir.
20    Q.    And what location did you take
21  the photographs in?
22    A.    The studio at the school.
23    Q.    And that's the photography

Page 100

1  studio?
2    A.    Yes, sir.
3    Q.    And is there a professor who
4  oversees that studio, is in charge of it?
5    A.    Robert Joslin.
6    Q.    Anyone other than Robert
7  Joslin that you are aware of?
8    A.    I'm sure that the department
9  oversees it, but not that I am aware of.
10    Q.    How big is the studio?  What
11  is the layout of the studio?
12    A.    I would say it is about as big
13  as this room.
14    Q.    As big as the deposition room?
15    A.    (Nodding head affirmatively.)
16    Q.    Okay.  I don't know my -- I
17  couldn't tell you.  It's about twice the
18  size of my condo in New Orleans.  Probably
19  a little under four hundred square feet.
20  But it's not a very large studio, would
21  that be fair to say?
22    A.    It's fair to say.
23    Q.    Okay.  Did you take all of

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 101

1   these photographs on one day or was it
2   different days?
3       A.   Many days.
4       Q.   Many days?
5       A.   (Nodding head affirmatively.)
6       Q.   Did you have to reserve the
7   room, the studio, to take the photographs?
8       A.   I'm not sure if I did at the
9   time -- so I don't know.
10      Q.   Was that studio there for the
11  use of other students as well?
12      A.   It was.
13      Q.   Okay.  And were there other
14  students interested in photography like
15  you working towards degrees?
16      A.   Yes, sir.
17      Q.   Did that studio also contain
18  equipment?
19      A.   It did.
20      Q.   And what type of equipment?
21  Did it include cameras and lights?
22      A.   Lights.  Cameras at that time,
23  no.

Page 102

1       Q.   Okay.  Did you shoot all of
2   these pictures with your own personal
3   camera?
4       A.   Yes, sir.
5       Q.   Would that include the lenses
6   and all of the other apparatus?
7       A.   Yes, sir.
8       Q.   Was there any equipment in the
9   studio that you used that was the
10  university's equipment?
11      A.   No, sir.
12      Q.   I mean, did you use any
13  lights?
14      A.   I used the lights.
15      Q.   Okay.  I mean --
16      A.   And the backdrops.
17      Q.   And these weren't just lights
18  that you turn on the lights; these were
19  actually lights that photographers used,
20  correct?
21      A.   Uh-huh, yes, sir.
22      Q.   And you say the backdrop.
23  Just for someone who is not a photography

Page 103

1   expert, what do you mean by backdrop?
2       A.   Meaning that the setup was a
3   white backdrop and reflectors all around
4   the subject.
5       Q.   Okay.  Kind of like when I see
6   TV and you see the model standing on the
7   white --
8       A.   Exactly.
9       Q.   I don't know if it's cloth or
10  paper, whatever they pull down?
11      A.   Either.  This was paper.
12      Q.   That was paper.  And do you
13  have -- at that time did you have any of
14  that equipment yourself, the reflectors,
15  the backdrop or the lights?
16      A.   I have a studio light now, I
17  don't know if I had it at the time.
18      Q.   Was it a situation where you
19  needed to use that studio in order to take
20  those pictures?
21      A.   Yes, sir.
22      Q.   Was there any other studio in
23  town that wasn't owned by Troy that you

Page 104

1   could have used?
2       A.   No, there wasn't one.
3       Q.   Okay.  Do you know whether any
4   of that equipment in that room was the
5   personal property of Mr. Joslin that he
6   kept in the room and allowed students to
7   use?
8       A.   No, not at the time.
9       Q.   Okay.  Do you know one way or
10  the other or do you just know that was
11  his --
12      A.   I know he has equipment that
13  he lets students use.
14      Q.   What is some of the equipment
15  he lets students use?
16      A.   A variety of cameras now --
17  I'm not sure at this present day, but
18  before I graduated.
19      Q.   When you were taking -- when
20  you were a student, did you ever use any
21  of his personal equipment?
22      A.   Yes.
23      Q.   And did you ask permission

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 105

1    before you did that?
2         A.    Yes.
3         Q.    Did he always allow you to use
4    it?
5         A.    If it permitted, yes.
6         Q.    What do you mean if it --
7         A.    Meaning if somebody else
8    wasn't going to take out the equipment or
9    use the equipment, then I could, yes.
10        Q.    Okay.  So if it were
11   available?
12        A.    Exactly.
13        Q.    And was there any type of
14   signout procedure if you needed to use any
15   of the equipment in the studio that the
16   university owned?
17        A.    There is a signout procedure.
18        Q.    And that applied to all
19   students?
20        A.    Yes.
21        Q.    And how did that signout
22   procedure work?
23        A.    Basically you signed out the

Page 106

1    equipment, signed your name on it, and had
2    to return it within a specific time if you
3    took it out.  If you used it in-house,
4    then you just could use it in-house.
5         Q.    And in order to make sure that
6    you didn't have five students in the
7    studio at one time trying to take
8    pictures, was there a sign-up sheet for
9    specific dates and times?
10        A.    Yes, sir.
11        Q.    Was there also a system where
12   if you walked in and no one was signed up
13   for that time and the studio was empty,
14   could you just use it?
15        A.    Yes, sir.
16        Q.    Now, when you took these
17   photographs, Defendant's Exhibit 3, did
18   you sign up any -- actually sign up any
19   time periods to reserve the studio?
20        A.    Not that I remember, to be
21   perfectly honest.
22        Q.    Okay.  Do you remember whether
23   you just walked in and the studio was free

Page 107

1    at that time?
2         A.    I know I took most of them at
3    night.
4         Q.    Okay.  Was there a reason you
5    took most of them at night?
6         A.    I would take most of them at
7    night only because there is not a lot of
8    people running around, in and out.  You
9    can have more one-on-one time with your
10   model.  That's my own artistic purpose and
11   reasoning behind that.
12        Q.    Okay.  So the reasons you took
13   these photographs at night versus during
14   the day was for artistic reasons only,
15   correct?
16        A.    I did take some during the
17   day.
18        Q.    Okay.  Do you recall which
19   ones you took during the day and which
20   ones you took at night?
21        A.    I know of one that I know I
22   took during the day, and that was the one
23   of Connie.  I know I took that one during

Page 108

1    the day.
2         Q.    Okay.  And that's the
3    individual who has got the nipple ring and
4    I think the pierced navel, is that
5    correct?
6         A.    Yes.
7         Q.    The older -- I don't want to
8    say older lady, I'm sorry.
9              MR. ADAMS:  She is an older
10   lady.
11             MR. MUSSO:  She is younger
12   than me, probably.  We have been able to
13   identify her without using her age.
14        Q.    Now, you recall taking hers
15   during the day, correct?
16        A.    Yes, sir.
17        Q.    Were all of the other ones at
18   night?
19        A.    From what I can remember, yes.
20        Q.    What time during the night
21   were you taking the pictures?
22        A.    It varied.
23        Q.    Were any of these past

27 (Pages 105 to 108)

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 109

1  midnight?
2      A.   I'm sure some of the shoots
3  ran past midnight, yes.
4      Q.   Did any of them start past
5  midnight, any of the shoots start past
6  midnight?
7      A.   Not that I recall.
8      Q.   Not being a photographer
9  myself, how long would a shoot last on
10 average for these photographs?
11     A.   Truly depends on the model,
12 but anywhere from thirty minutes to two
13 and a half hours.
14     Q.   And if it lasted two and a
15 half hours, is it because the model may
16 not be as experienced at standing still or
17 giving you the pose you want or --
18     A.   Artistic reasons, yes.
19     Q.   Artistic reasons.  Now, the
20 photograph you took of yourself, was that
21 with a tripod?
22     A.   It was.
23     Q.   Okay.  A timer system?

Page 110

1      A.   Yes.
2      Q.   One picture has boards behind
3  the two females.
4      A.   Uh-huh.
5      Q.   Were those boards that were in
6  the studio --
7      A.   Yes, sir.
8      Q.   So those were already there?
9      A.   Yes, sir.
10     Q.   Do you know who owned those
11 boards, was that the university or Bob or
12 someone else?
13     A.   One of those, yes.
14     Q.   You know the owner I guess
15 would be the -- who owned the boards?
16     A.   I don't know the owner.
17     Q.   Okay.  Well, did you come up
18 with the idea to use the boards while you
19 were in the studio taking those pictures
20 or --
21     A.   Yes, sir.
22     Q.   And did you make the decision
23 as to what models would be wearing for

Page 111

1  each shoot?
2      A.   Yes.
3      Q.   Like what clothes they had?
4      A.   Yes, sir.
5      Q.   And did you make the decisions
6  whether they would be nude or not?
7      A.   Yes, sir.
8      Q.   So you maintained complete
9  artistic control over the artist's pose,
10 expressions, what they were wearing or not
11 wearing, am I correct?
12     A.   Well, it's a conversation.
13 That's what taking a photograph is.  It
14 was partly my artistic expression and
15 partly their own expression.
16     Q.   But if you took the picture
17 and you didn't like what you saw, you
18 wouldn't put it in your piece of art,
19 correct?
20     A.   No, sir.
21     Q.   So they didn't have the
22 control to the extent they could decide
23 what goes in that piece of art, correct?

Page 112

1      A.   No, sir.
2      Q.   Now, look at Defendant's
3  Exhibit 2, at that piece of art itself.
4  What type of materials were used to make
5  this piece of art?
6      A.   The paper was a clear paper
7  that could be printed upon.  There is
8  Plexiglas, Crescent mat board.
9      Q.   I'm sorry, is the Plexiglas
10 the cubes?
11     A.   It is.
12     Q.   And the third term you used,
13 I'm not familiar with that?
14     A.   Mat board.  It framed -- you
15 can see these dark lines.
16     Q.   Okay.
17     A.   It framed the images.
18     Q.   Okay.
19     A.   Wood.
20     Q.   And where is the wood?
21     A.   It's basically what the
22 Plexiglas sat down into.
23     Q.   Okay.  So you had a wood

28 (Pages 109 to 112)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 113

1   frame --
2        A.    A big back frame that held all
3   of this weight.
4        Q.    This looks fairly heavy.  Did
5   you know how much it weighed?
6        A.    Anywhere from a hundred to two
7   hundred pounds.
8        Q.    Did it take two people to --
9   was it installed as one piece and then --
10  it is my understanding it hung from the
11  ceiling, correct?
12       A.    It did.
13       Q.    Did it take more than one
14  person to lift it, to put it up in the --
15  hang from the ceiling?
16       A.    Yes, sir.
17       Q.    So it has wood, the mat board,
18  the paper the photographs appear on,
19  correct?
20       A.    Yes, sir.
21       Q.    And then the Plexiglas.  What
22  else?
23       A.    You have got fluorescent

---

Page 114

1   bulbs.
2        Q.    Okay.
3        A.    Wire, electrical wire, toggle
4   switch to turn it on and off, electrical
5   cord to plug it in, cables to hold it,
6   chain.
7        Q.    Okay.  So looking at
8   Defendant's Exhibit Number 2, you can see
9   where you are using two different medium;
10  you are using photography obviously, but
11  also the sculpture of the Plexiglas, the
12  wood, the mat, all of that together, am I
13  correct?
14       A.    Yes, sir.
15       Q.    Now, you in your answers to
16  interrogatories submitted to me some
17  documents.
18       MR. MUSSO:  Off the record.
19       (Off-the-record discussion.)
20       (Whereupon, Defendant's
21       Exhibit 4 was marked for
22       identification.)
23       Q.    I'm going to mark what I have

---

Page 115

1   labeled as Plaintiff's Exhibit Number 4.
2   And I guess the best thing for me to do is
3   for you to just tell me what this is.
4        MR. ADAMS:  Do you mean
5   Defendant's Exhibit 4?
6        MR. MUSSO:  Defendant's
7   Exhibit 4.  I keep thinking of another
8   case.
9        (Off-the-record discussion.)
10       Q.    Just tell me what Defendant's
11  Exhibit 4 is, I guess that's the best way
12  to handle that.
13       A.    Basically an artist statement.
14       Q.    I see the first three pages
15  are typed, correct?
16       A.    Yes, sir, the first four.
17       Q.    First four.  And the rest of
18  the pages are handwritten or drawings, am
19  I correct?
20       A.    Yes, sir.
21       Q.    Now, were all of these
22  pages --
23       MR. ADAMS:  When you say all

---

Page 116

1   of these pages, are you referring to
2   Defendant's Exhibit 4?
3        MR. MUSSO:  4.
4        Q.    Were all of these pages
5   created in order to help you create your
6   piece of art in Defendant's Exhibit 2?
7        A.    These four pages, the
8   typewritten pages, were an artist
9   statement.  The rest were personal
10  journal-type entries just for inspiration.
11       Q.    So let's do this.  Let's have
12  Defendant's Exhibit 4 be the first four
13  pages and put Number 5 on the other pages,
14  kind of separate those out.  Would that be
15  fair?
16       (Whereupon, Defendant's
17       Exhibit 5 was marked for
18       identification.)
19       Q.    Now, let's start with
20  Defendant's Exhibit 4.  Do you call this
21  an artist statement, is that correct?
22       A.    A conceptual statement on that
23  particular piece.

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 117

1       .   Q.    Okay.  Defendant's Exhibit 4,
2   was that something that you were assigned
3   to do in your Collaborative Studio course
4   you took in fall of 2003?
5       A.    Yes, sir.
6       Q.    And is this something you
7   turned in to your professors?
8       A.    I believe I did.
9       Q.    And you say you believe you
10  did, you know.  Did you, didn't you or are
11  you unsure?
12      A.    Yes, sir.
13      Q.    Okay.  Let's turn the page to
14  the second page.  There is some
15  handwriting on this second page.
16      A.    Uh-huh.
17      Q.    When you turned this in to
18  your professor, did it have the
19  handwriting on it?
20      A.    This was -- I placed these
21  pages in my journal, so I was writing on
22  them as I was going along.  So I turned in
23  this without any of the writing to the

---

Page 118

1   professor, but this was my own personal
2   copy.
3       Q.    So Defendant's Exhibit 4 is
4   your personal copy.  The handwriting was
5   that of your own, but you didn't turn in
6   to the professor, correct?
7       A.    I'm sorry?
8       Q.    Okay.  I think you said -- I
9   just want to be sure.  You turned in to
10  the professor the typewritten -- a
11  typewritten copy without the handwriting,
12  correct?
13      A.    Yes, sir.
14      Q.    And in your journal you kept a
15  copy of the typewritten copy and you made
16  some handwriting notes?
17      A.    Yes, sir.
18      Q.    And you didn't turn in those
19  handwritten notes to your professor, did
20  you?
21      A.    No, sir.
22      Q.    Defendant's Exhibit 5 is
23  handwriting notes and sketches; and is

---

Page 119

1   that something kept in your journal?
2       A.    This --
3       Q.    I'm sorry, Defendant Exhibit
4   5.
5       A.    Yes, that's all in my journal.
6       Q.    Is this a journal you keep for
7   all of your work or was this just a
8   specific journal for this piece of art?
9       A.    At the time it was
10  specifically for that piece.
11      Q.    So was it in a separate book?
12      A.    It had its own book.
13      Q.    Had its own book, okay.  And
14  when you say you turned in the first
15  typewritten pages, Defendant's Exhibit 4,
16  did you turn that in to any professor
17  specifically, do you recall?
18      A.    Not specifically.
19      Q.    Okay.  Did you ever show any
20  professor, Mr. Johnson or Mr. Paxson, your
21  journal?
22      A.    Yes, sir.
23      Q.    Okay.  And which one of those

---

Page 120

1   professors?  Or did you show it to both of
2   them?
3       A.    Both.
4       Q.    Did you show it to any other
5   professor at Troy University, your
6   journal?
7       A.    I don't recall.
8       Q.    Okay.  Now, what I would like
9   to do is start from the first time you
10  recall speaking to one of your professors,
11  be it Paxson or Johnson, about your piece
12  of art, you know, what your concept was
13  going to be, you know, what you ultimately
14  wanted to produce.  What I am looking for
15  is the student/professor dialogue that
16  happened throughout the course, and I
17  would like for you to kind of do it
18  chronologically.  Do you understand?
19      A.    Yes, sir.
20      Q.    Having been a professor, we
21  didn't do pieces of art but we did
22  research papers, and you may have talked
23  to your professor about what you were

---

30 (Pages 117 to 120)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 121

1  doing and he may have given you some
2  feedback, I don't know.  But what I want
3  you to do is tell me and do it
4  chronologically and kind of give me the
5  best idea as you can of when things
6  occurred before the show.
7        A.   We received the theme birth,
8  were asked to come up with ideas around
9  that.  Threw those out for I am sure a
10  couple of weeks, if not longer.  Wrote
11  statements or -- wrote statements about
12  the projects that we wanted to continue
13  with, discussed those with both the class
14  and the professors.  And from there on, it
15  was all either, you know, if you are a
16  sculpture person, you are sculpting, you
17  are bringing those sculptures half done in
18  for review.  Just like my photographs, I
19  am bringing photographs in for review
20  periodically -- weekly evaluations, I
21  believe.
22        Q.   Okay.
23        A.   And from there, there is the

Page 122

1  production, the production of the piece
2  and review of that piece up until the
3  show.
4        Q.   Do you recall the date that
5  the show opened?
6        A.   No, sir.
7        Q.   Do you recall it opening on
8  the day that they had the Sound of Seasons
9  concert?
10        A.   Yes, sir.
11        Q.   I do have a document that
12  shows that that was December 2nd that the
13  Sound of Seasons started.  I will pull
14  that out later.
15        A.   Okay.
16        Q.   What time of the year did that
17  semester -- the fall semester 2003 start?
18  Was that in September, October or August?
19        A.   I don't recall.  August maybe.
20        Q.   Auburn plays like five
21  football games before they start.
22             Was this a, for lack of a
23  better term, three-hour class, two-hour

Page 123

1  class?
2        A.   As far as credit?
3        Q.   Yes.
4        A.   Three hours.
5        Q.   So how many times a week would
6  that class meet?
7        A.   I can't recall if it was three
8  or two.  One of those.
9        Q.   Do you recall the room that
10  you met in?
11        A.   Print making room.
12        Q.   Print making room?
13        A.   Uh-huh.  Yes, sir.
14        Q.   Now, you referenced earlier --
15  did you ever conceive a different project
16  or different piece of art and throw that
17  idea out at first?
18        A.   I'm sure I did.  That's what
19  art is about, ships that change.
20        Q.   Do you have any recollection
21  as to what any of those ideas are?
22        A.   No.
23        Q.   Which professor did you talk

Page 124

1  to first about your idea that ultimately
2  became Defendant's Exhibit 2?
3        A.   There was one day in the class
4  where everybody went around and talked
5  about the proposals to all the class and
6  the professors.  So it was all at one
7  time.
8        Q.   And what did you tell them
9  that day about your piece?
10        A.   You can refer to that, Number
11  4.
12        Q.   Did you have that with you,
13  Number 4?
14        A.   I believe I turned it in and
15  then discussed basically what it says
16  there.
17        Q.   That day?
18        A.   Yes, sir.
19        Q.   Okay.  Do you recall who the
20  professor was teaching that day?
21        A.   No, sir.
22        Q.   How soon after you turned
23  Defendant's Exhibit 4 in and had the class

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 125

1 discussion that day did you speak to a
2 professor about your concept listed in
3 Defendant's Exhibit 4?
4     A.    I believe that the statements
5 that we would make were either sort of,
6 you know, well, you need to take that and
7 work that or that sounds really good,
8 let's go forward with that at the time of
9 the class.  So it was that dissertation at
10 that point which decided whether or not
11 you went forward with the work or had to
12 go back to the drawing table with it.
13     Q.    Do you recall what type of
14 feedback or comments you received that day
15 from a professor?
16     A.    Positive.
17     Q.    Positive.  Was that the case
18 from other students as well?
19     A.    Yes, sir.
20     Q.    So you didn't have to go back
21 and radically redesign something based
22 upon what your professor said?
23     A.    No, sir.

Page 126

1     Q.    Do you recall anyone saying
2 anything negative about your concept that
3 day, one of the students?
4     A.    There might have been some
5 kind of constructive criticism, but
6 nothing negative.
7     Q.    And that constructive
8 criticism, would that have been from a
9 professor or a student, or do you recall?
10     A.    A student.
11     Q.    How soon after that day,
12 Defendant's Exhibit 4, did you start
13 snapping pictures?
14     A.    Not certain.
15     Q.    And you said you took these
16 photographs over a period of time?
17     A.    Yes, sir.
18     Q.    Do you recall how long that
19 period of time was?
20     A.    No, sir.
21     Q.    Would it have been days,
22 weeks, months?
23     A.    Months.

Page 127

1     Q.    Were there any models who you
2 photographed that you didn't use their
3 pictures?
4     A.    No, sir.
5     Q.    Did you ever bring any
6 photographs into class?
7     A.    Yes, sir.
8     Q.    Class being the Collaborative
9 Studio class of fall 2003?
10     A.    Yes, sir.
11     Q.    And as you sit here today, do
12 you recall which photographs you brought
13 in?
14     A.    All of them.
15     Q.    Okay.  Did you bring in any of
16 the photographs that show the full frontal
17 male nudity?
18     A.    Yes, sir.
19     Q.    Did you bring in any
20 photographs that showed female breasts or
21 genitalia?
22     A.    Yes, sir.
23     Q.    Do you have any knowledge

Page 128

1 whether Mr. Johnson or Mr. Paxson saw
2 those photographs?
3     A.    Yes, sir.
4     Q.    And how do you know that?
5     A.    I remember a discussion we had
6 on the photographs of Tim Jones.
7     Q.    Okay.  And who did you have
8 that discussion with?
9     A.    Mr. Johnson.
10     Q.    Mr. Johnson.  And did that
11 occur in class?
12     A.    Yes, sir.
13     Q.    And that was before the juried
14 art show?
15     A.    Yes, sir.
16     Q.    Do you recall how long before
17 the juried art show that that discussion
18 happened?
19     A.    No, sir.
20     Q.    Let's see, Mr. Jones'
21 photograph is which one?
22          MR. ADAMS:  It's the black
23 gentleman, isn't it?

32 (Pages 125 to 128)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 129

1    A.   Yes, sir.
2    Q.   So you brought that into
3  class?
4    A.   I did.
5    Q.   And it was the photograph of
6  -- that showed his penis?
7    A.   Not just that photograph, a
8  whole contact sheet is what it is called.
9    Q.   A whole contact sheet.  How
10 big is the contact sheet?
11   A.   Meaning if I took sixteen
12 photographs on one roll of film, sixteen
13 photographs would be shown in small sizes
14 like that (indicating).
15   Q.   And they appeared on that
16 contact sheet?
17   A.   Yes.
18   Q.   Did you keep those contact
19 sheets?
20   A.   I may have them.
21   Q.   Well, if you do, pass them on
22 to your attorney.
23   A.   Okay.

Page 130

1    Q.   Because we would want to see
2  those.
3    A.   Yes, sir.
4    Q.   Do you know as we sit here
5  today whether Mr. Johnson actually saw the
6  picture that has the penis in it?
7    A.   Yes, sir.
8    Q.   How do you know that?
9    A.   He saw every photograph I
10 took.
11   Q.   How do you know he saw every
12 photograph you took?
13   A.   Because I showed them to him.
14   Q.   You gave him the contact
15 sheet, correct?
16   A.   Yes.
17   Q.   But how do you know he looked
18 at every photograph on the contact sheet?
19   A.   I know that we went over each
20 photograph.
21   Q.   Each single one on the contact
22 sheet?
23   A.   (Nodding head affirmatively.)

Page 131

1    Q.   Yes?
2    A.   Yes, sir.
3    Q.   Did he have anything to say
4  about any of the photographs on the
5  contact sheet?
6    A.   He obviously gave me feedback,
7  yes.
8    Q.   What was the feedback he gave?
9    A.   Interested in the work.  There
10 was no negative feedback.
11   Q.   At the time when you gave him
12 the contact sheet, did he know which
13 photographs you were going to select for
14 the piece of art?
15   A.   He pointed at ones he liked
16 more than the others.
17   Q.   Did he point out the one that
18 he -- did he have anything to say about
19 the one that you ultimately chose for the
20 piece?
21   A.   Not that I recall.
22   Q.   At the time that you showed
23 him that contact sheet, did you know

Page 132

1  whether you were going to use that
2  photograph in the piece?
3    A.   No, sir.
4    Q.   At the time you showed him the
5  contact sheet, did you have any
6  front-runner, so to speak, on that sheet
7  that you thought you might use?
8    A.   Not necessarily, no.
9    Q.   Were there any other
10 photographs in that contact sheet where
11 Mr. Jones was nude?
12   A.   Yes, sir.
13   Q.   Nude meaning his genitalia
14 showing?
15   A.   Yes, sir.
16   Q.   Was there any photographs on
17 that contact sheet where his buttocks were
18 showing?
19   A.   Yes, sir.
20   Q.   Were there any photographs on
21 that contact sheet where none of his
22 genitalia were showing?
23   A.   Yes, sir.

33 (Pages 129 to 132)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 133

1  Q.   So were there photographs on
2  that sheet where he was dressed?
3      A.   Not dressed.  In
4  undergarments.
5      Q.   Undergarments.  Were there
6  photographs on that sheet where you could
7  not see his penis --
8      A.   Yes.
9      Q.   -- or you couldn't see any
10 part of his genitalia?
11     A.   Yes.
12     Q.   Where you couldn't see his
13 buttocks?
14     A.   Yes.
15     Q.   Where you couldn't see his
16 penis, buttocks or bare chest?
17     A.   No.
18     Q.   So at least there was the bare
19 chest?
20     A.   Yes, sir.
21     Q.   Were there any other
22 photographs of any other nudity that you
23 specifically recall Mr. Johnson seeing

---

Page 134

1  that you brought to class?
2      A.   As I said, we looked through
3  every photo shoot.
4      Q.   So every time you had a photo
5  shoot, you had a contact sheet?
6      A.   Yes, sir.
7      Q.   And every time you brought a
8  contact sheet into class?
9      A.   Yes, sir.
10     Q.   Okay.
11     A.   When -- after I had taken a
12 shot -- I mean, there might have been a
13 week where I didn't shoot at all.
14     Q.   Okay.  But is it your
15 testimony that you always brought a
16 contact sheet for each model into class --
17     A.   Yes, sir.
18     Q.   -- at some point?
19     A.   Yes, sir.
20     Q.   And those contact sheets, did
21 each of those contact sheets where the
22 model eventually did appear nude in the
23 piece of art, did each of those contact

---

Page 135

1  sheets have the photograph that you
2  ultimately used in the piece of art?
3      A.   Yes, sir.
4      Q.   And in each of those contact
5  sheets, did you discuss each and every
6  photograph on the contact sheet?
7      A.   Not in detail.  Not each --
8  not each photograph.  We would look at
9  them overall and discuss them.
10     Q.   What did you discuss?  What
11 was said?
12     A.   How it related to my proposal.
13     Q.   Okay.  Did Mr. Johnson ever
14 give you, for lack of a better term,
15 constructive criticism, like this
16 photograph doesn't work well or this
17 photograph is not a good photograph or --
18     A.   I'm not sure.
19     Q.   Now, when you brought these
20 into class and had these discussions, were
21 other students present that heard these
22 discussions?
23     A.   Yes.

---

Page 136

1      Q.   Would that have been the case
2  for all of the contact sheets you brought
3  in?
4      A.   I'm not sure.
5      Q.   Now, do you know for a fact
6  that all of the contact sheets you brought
7  in, Mr. Johnson actually saw the nudity on
8  those sheets?
9      A.   I'm sorry, repeat the
10 question.
11     Q.   You brought in a number of
12 contact sheets for all of these
13 individuals, correct?
14     A.   Yes, sir.
15     Q.   Some of these individuals were
16 photographed in the nude?
17     A.   Yes, sir.
18     Q.   Do you know for a fact that
19 Mr. Johnson looked at every photograph on
20 every contact sheet and saw that nudity?
21     A.   I don't know that for certain.
22     Q.   Did he ever have a comment
23 about the nudity on any of those sheets

---

34 (Pages 133 to 136)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 137

1  that you brought into class?
2      A.    There was nothing alarming
3  about any of his comments.
4      Q.    Any comment about the nudity
5  at all?
6      A.    Not that I can recall.
7      Q.    Did any of the students
8  comment about the nudity?
9      A.    Not that I can recall.
10     Q.    Did any of the students not
11 want to look at any of the contact sheets
12 because of the nudity?
13     A.    Not that I can recall.
14     Q.    And on any of the contact
15 sheets that you brought into class, did
16 you tell Mr. Johnson this is the
17 photograph I intend to use for the piece
18 of art?
19     A.    I think there was a selection
20 period where they may have been whittled
21 down to a certain number.  You know, get
22 rid of the bad stuff and then get down to
23 the stuff that you really like and then

Page 138

1  present that as well.  But never was --
2  never did I say this is it.
3      Q.    Okay.  Now, did any of those
4  contact sheets that the individuals who
5  ultimately appeared nude in the piece of
6  art, did any of those contact sheets
7  include photographs that -- on the contact
8  sheet where every photograph was a nude
9  photograph?
10     A.    I can't recall.  I would have
11 to look at the contact sheets.
12     Q.    For instance, Mr. Hrebick's
13 contact sheet, did you ever photograph Mr.
14 Hrebick with clothes on?
15     A.    I did.
16     Q.    Did you ever photograph Holly
17 with clothes on?
18     A.    I did.
19     Q.    Rheana?
20     A.    Rheana.
21     Q.    Rheana, was she photographed
22 with clothes on?
23     A.    I'm not sure.

Page 139

1      Q.    Was Rheana ever photographed
2  where her genitalia was not showing?
3      A.    I'm not sure.
4      Q.    Was she ever photographed
5  where her breasts were not showing?
6      A.    I'm not sure.
7      Q.    Was Jacqueline ever
8  photographed when she wasn't in her
9  underwear, meaning her panties, bustier,
10 or however you pronounce that?
11     A.    Not sure.
12     Q.    And Andrea, was she ever
13 photographed wearing clothes?
14     A.    Yes.
15     Q.    What was she wearing?
16     A.    She wasn't wearing clothes,
17 she had a sheet.
18     Q.    Could you see her genitalia,
19 her breasts in those photographs?
20     A.    I believe so.
21     Q.    In all of those -- were there
22 photographs on that contact sheet where
23 you couldn't see either the genitalia or

Page 140

1  the breasts?
2      A.    I believe so.
3      Q.    And what about the mutual
4  friend who had the -- I think it's like a
5  tattoo under his navel and a tattoo on his
6  arm, the gentleman --
7      A.    Yes.
8      Q.    -- did you take any
9  photographs of him with clothes on?
10     A.    All nude.
11     Q.    They were all nude?
12     A.    Yes.
13     Q.    And when you say all nude,
14 were some of the photographs of his
15 buttocks instead of his front genitalia?
16     A.    Just the front side, I
17 believe.
18     Q.    All of the photographs on that
19 contact sheet were --
20     A.    Yes.
21     Q.    And you brought that in to
22 class and showed that to Mr. Johnson,
23 correct?

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 141

1    A.   Yes, sir.
2    Q.   Okay. When you brought in the
3  contact sheets, did you tell anybody that
4  you definitely were going to be picking a
5  photograph out of each of these contact
6  sheets or did you just simply bring in
7  photographs and --
8    A.   I told -- it was made aware
9  that these were all going to be selected
10  for the piece.
11    Q.   Meaning that there is going to
12  be at least a photograph on that contact
13  sheet selected for the piece, correct?
14    A.   Yes.
15    Q.   What about Connie, did you
16  photograph her with any clothes on?
17    A.   I don't recall.
18    Q.   What about -- the next person
19  is wearing clothes.
20      Do you have any recollection as
21  to when you showed the contact sheet to --
22  was it Mr. Johnson you showed the contact
23  sheet of the gentleman who is photographed

Page 142

1  all in the nude or was it Mr. Paxson or do
2  you recall?
3    A.   Which gentleman are you
4  referring to?
5    Q.   The one wearing the --
6    A.   Those were viewed.
7    MR. ADAMS: Wait a minute, let
8  him finish the question.
9    Q.   The gentleman wearing the
10  glove and he has the tattoo under his
11  navel and he has a tattoo on his arm --
12    MR. ADAMS: Glove on the left
13  hand and part of his head is removed.
14    Q.   And you brought that contact
15  sheet in to class, correct?
16    A.   Yes, I did.
17    Q.   Do you recall which professor
18  you showed that to?
19    A.   No, sir.
20    Q.   You don't recall?
21    A.   (Shaking head negatively.)
22    Q.   What about Andrea, the
23  African-American woman, do you recall

Page 143

1  which professor you showed that contact
2  sheet to?
3    A.   No, sir.
4    Q.   Do you know whether Jerry
5  Johnson ever saw the contact sheet with
6  the gentleman wearing the glove on the
7  left hand?
8    A.   They all saw them. They saw
9  them. I don't remember if it was just him
10  or Duane or both at the same time, but
11  they were all viewed.
12    Q.   By both professors?
13    A.   At some point, yes.
14    Q.   When did Mr. Johnson see that
15  contact sheet of that individual?
16    A.   I can't recall when.
17    Q.   Was it in class?
18    A.   In class or after class.
19    Q.   You can't recall if it was in
20  class?
21    MR. ADAMS: If you don't know,
22  say I don't know.
23    A.   I don't know.

Page 144

1    Q.   What about Andrea, is that the
2  same answer, you don't know when Mr.
3  Johnson saw the contact sheet on that one?
4    A.   I don't know.
5    Q.   What about Connie, is that
6  your answer on that one also, you don't
7  know when he saw the contact sheet on that
8  one?
9    A.   I don't know.
10    Q.   What about -- is it Mr.
11  Woodman? Do you know when he saw the
12  contact sheet on that one?
13    A.   I don't know.
14    Q.   What about Tim Jones, do you
15  know whether it was -- do you know when he
16  saw the contact sheet on that one?
17    A.   Don't know when.
18    Q.   Rheana?
19    A.   I don't know when.
20    Q.   Holly?
21    A.   I don't know when.
22    Q.   Mr. Hrebick?
23    A.   I don't know when.

36 (Pages 141 to 144)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 145

1  Q.    Were you standing there when
2  he was looking at the contact sheet?
3      A.    Uh-huh, yes, sir.
4      Q.    Did you ever just turn in
5  contact sheets and then step away before
6  he looked at them?
7      A.    No, sir.
8      Q.    As you sit here today, do you
9  know whether you ever showed a contact
10 sheet to Mr. Paxson and Mr. Johnson did
11 not see it?
12     A.    No, sir.
13     Q.    Same for Mr. Paxson, did you
14 ever -- was there a situation where you
15 showed a sheet to Mr. Johnson and you know
16 that Mr. Paxson didn't see it?
17     A.    I don't know.
18     Q.    Was there ever a time that you
19 -- that Mr. Johnson or Mr. Paxson -- let
20 me ask you this.
21        Where did you actually assemble
22 this project?  Was it at the university or
23 off university?

---

Page 146

1      A.    Off university.
2      Q.    Where was that, in one place
3  or more than one place?
4      A.    More than one place.
5      Q.    Where were the places that you
6  assembled this?
7      A.    My apartment and Dan Gibbs'
8  house.
9      Q.    What parts did you assemble at
10 your apartment?
11     A.    Cutting down the Plexiglas,
12 stuff like that.  Preparation.  And
13 because he had a large space, I could
14 better assemble it there.
15     Q.    Anywhere else other than Mr.
16 Gibbs' house and your apartment?
17     A.    No, sir.
18     Q.    Now, did any of your
19 professors ever go to either of those two
20 places?
21     A.    Yes, sir.
22     Q.    Okay.  When they went there,
23 did you show them any of your work?

---

Page 147

1      A.    Yes, sir.
2      Q.    And where did you -- how many
3  times -- did those professors go together?
4      A.    Yes, sir.
5      Q.    How many times did they go?
6      A.    Once.
7      Q.    And was that at Mr. Gibbs' or
8  your apartment?
9      A.    Mr. Gibbs'.
10     Q.    And at the time they walked
11 into the -- was it in his living room or
12 garage or what part of his house?
13     A.    Living room.
14     Q.    Okay.  How long did you have
15 it sitting in his living room?
16     A.    Oh, gosh, for a while.
17     Q.    Did you have to buy him a lot
18 of dinners?
19     A.    Yeah.
20        MR. MUSSO:  Off the record.
21        (Off-the-record discussion.)
22     Q.    Did Mr. Johnson and Mr. Paxson
23 go upon your request or did they take it

---

Page 148

1  upon themselves, how did that come about?
2      A.    Upon my request.
3      Q.    Why did you want them to go?
4      A.    I was having issues about
5  hanging, that kind of thing.
6      Q.    So at the time was it your
7  desire to hang it instead of having it
8  just sitting on the floor?
9      A.    It was my desire to hang it.
10 It was their desire to place it on the
11 floor.  I just didn't have enough time to
12 recreate certain elements that were
13 already setting it for being hung.
14     Q.    Okay.  Did they simply just
15 show up at Mr. Gibbs' house or did you go
16 with them from a location to Mr. Gibbs'
17 house?  Did you meet them at the school or
18 how did it come about that they found Mr.
19 Gibbs' house?
20     A.    I directed them to --
21     Q.    Did they show up together?
22     A.    They did.
23     Q.    Did you ask for both of them

---

37 (Pages 145 to 148)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 149

1  to come or did --
2       A.    I just wanted them to come see
3  it -- one of them to come see it, as far
4  -- you know, like I said, about hanging
5  space.
6       Q.    When they walked in the living
7  room, what did they see?  What were the
8  pieces -- was it in pieces or was it
9  together or --
10      A.    There were parts of it that
11  weren't finished.  But pretty much -- I
12  was ninety-eight percent complete.
13      Q.    Okay.  Specifically what did
14  you tell them that day and what did they
15  tell you?  Kind of separate Mr. Johnson
16  and Mr. Paxson.
17      A.    I couldn't separate them, to
18  be honest.
19      Q.    Okay.
20      A.    But there was just --
21  basically the only issue was whether or
22  not to hang it or to sit it.  And they
23  were pretty astounded by it, at least in

Page 150

1  my opinion.
2       Q.    Astounded meaning a good term?
3       A.    In a good way, yes.
4       Q.    Were they surprised at the
5  size?
6       A.    Yes, sir.
7       Q.    I mean, the picture doesn't
8  really show how large it is.  How big is
9  that piece?
10      A.    I would say about four foot by
11  five foot.
12      Q.    Okay.
13      A.    Maybe larger than that.
14      Q.    Were photographs already slid
15  into the cubes?
16      A.    Some of them were, some of
17  them weren't.
18      Q.    Okay.  Which ones were?
19      A.    Couldn't tell you which ones
20  were at the time.
21      Q.    Okay.  Any idea as to any of
22  them at all, whether they were or weren't
23  in there?

Page 151

1       A.    Not which, not which ones, no.
2       Q.    Do you know which ones
3  weren't?
4       A.    No, sir.  They were all
5  viewed, though.
6       Q.    That day?
7       A.    Uh-huh, yes, sir.
8       Q.    And how were they viewed that
9  day?
10      A.    I had the prints, you know, if
11  there was an empty cube -- I had the
12  prints ready to go in.  There might have
13  just been some kind of issue with getting
14  it in or the space that it needed to fit,
15  that kind of thing.
16      Q.    So you had each print?
17      A.    I had all of the prints.
18      Q.    Okay.  And was each print
19  there where one could see if they chose to
20  look at them?
21      A.    Yes, sir.
22      Q.    Do you know whether Jerry or
23  Mr. Paxson actually did look at those

Page 152

1  prints?
2       A.    Yes, because I placed them in
3  the areas that I was thinking about.
4  Because we were negotiating movement of
5  the body and which -- you know, what
6  brought your eye which way, so we were
7  looking at all of the photographs.
8       Q.    Okay.  So did you actually,
9  for instance, hold up the photograph of
10  yourself next to the cube you were going
11  to put it in?
12      A.    Up against the lights, yes, in
13  the location.
14      Q.    You did that for each and
15  every photograph?
16      A.    I placed them all down and we
17  looked at them.
18      Q.    So all of the photographs at
19  that point had been taken and developed?
20      A.    All of them were printed out
21  and ready to slide in.
22      Q.    Okay.  Now, back in the days
23  when I took my one photography class, we

38 (Pages 149 to 152)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 153

1  still used -- we developed our film.  Were
2  these digital or were these --
3      A.    They were hand developed
4  negatives that were scanned into the
5  computer and printed through a computer, a
6  laser printer.
7      Q.    Okay.  And did you know about
8  that process before you began this piece
9  of art?
10     A.    I had to investigate it and
11 research it and find out how to do that.
12     Q.    Did anyone assist you in
13 making these prints?
14     A.    No, sir.
15     Q.    Okay.
16     A.    Oh, yes, sir.  In making the
17 prints?
18     Q.    Yes.
19     A.    One of Bob Joslin's friends,
20 and I can't recall his name.
21     Q.    Was it -- I mean, would it
22 have been an older gentleman, a younger
23 gentleman?

Page 154

1      MR. ADAMS:  When you say
2  prints, are you talking about the ones
3  that came off of the laser printer?
4      Q.    Yes, that you used for the
5  art.
6      A.    Just the printing, now.
7      Q.    Just the printing.  You
8  snapped the photographs, you developed
9  them into proofs, am I correct?
10     A.    I made contact prints for
11 viewing purposes, to analyze and decide
12 which.
13     Q.    Okay.  And when you decided
14 which one to use, how did you make the
15 copy that was slid into the cube?
16     A.    Scanned the negative into a
17 computer at the school --
18     Q.    Okay.
19     A.    -- made digital copies, a CD
20 copy of that, and took that to --
21     Q.    Mr. Joslin's friend?
22     A.    Mr. Joslin's friend.
23     Q.    Was it a male?

Page 155

1      A.    It was a male.
2      Q.    Was it just one friend?
3      A.    Just one.
4      Q.    Did you go to this
5  individual's house or did he have a
6  studio?
7      A.    I did, went to his house.
8      Q.    Okay.  Who put you in touch
9  with this individual?
10     A.    Bob.
11     Q.    Bob.  Did you go to Bob and
12 say Bob, I need -- or Mr. Joslin and say
13 Mr. Joslin, I need help -- I need help in
14 doing this, can you tell me how?
15     A.    I need an idea on how -- on
16 where to print these.
17     Q.    Okay.  And when these were
18 printed, did that help the light shine
19 through?  I mean, were these transparent?
20     A.    Transparents, transparencies.
21     Q.    Okay.  So these were
22 transparencies.  And you needed someone
23 who could help you print these, is that

Page 156

1  correct?
2      A.    Yes, sir.
3      Q.    Okay.  And Mr. Joslin had a
4  friend who could help you print these onto
5  the transparencies?
6      MR. ADAMS:  Is it
7  transparencies or translucent?
8      A.    Transparent paper.  It's
9  specifically made for laser printers.
10     Q.    Okay.  Is that the first time
11 you had ever used that technique in any of
12 your art?
13     A.    Yes, sir.
14     Q.    Okay.  Now -- so at some point
15 you decided that's what you wanted to do
16 for your art, is that correct?
17     A.    For this specific piece, yes.
18     Q.    Yes, for this specific piece.
19 I mean, did you -- again, did you go to
20 Mr. Joslin and say Mr. Joslin, can you
21 tell me, you know, where to go to -- I
22 mean, how did it come about that he sent
23 you to his friend?

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 157

1    A.    I attempted to print at the
2  university and the prints were coming out
3  with lines through them.  So I asked him,
4  you know, whether or not he could point me
5  in a direction where I could find a
6  printer that wouldn't create those.
7    Q.    Okay.  When you used the
8  printer at the university, which printer?
9    A.    Epson 3600.
10    Q.    Which was it, in the studio
11  or --
12    A.    In Bob's office.
13    Q.    Okay.  So Mr. Joslin had a
14  printer in his own office that you could
15  print photographs off?
16    A.    Yes, sir.
17    Q.    So it's a good printer?
18    A.    Yes, sir.
19    Q.    But it couldn't do what you
20  needed to be done?
21    A.    Yes, sir.
22    Q.    So he had a friend who had the
23  machinery?

Page 158

1    A.    Yes, sir.
2    Q.    Okay.  Is this machine in his
3  -- was it in his actual office?
4    A.    Yes, sir.
5    Q.    Okay.  Was that a machine that
6  students had access to to print their
7  work?
8    A.    Yes, sir.
9    Q.    And was that true for all
10  students?
11    A.    Yes, sir.
12    Q.    And did Mr. -- was it a system
13  where you had to sign up for it or just
14  first come/first serve if it's available
15  or how did it work?
16    A.    Kind of both ways, but mostly
17  signing up.
18    Q.    Okay.  So if someone signed up
19  for 3 and it was open at 2:30, if you
20  started using it at 2:30, you had to get
21  off by 3?
22    A.    Yes, sir.
23    Q.    Did Mr. Joslin assist you in

Page 159

1  printing any of the transparencies for
2  this project that was Defendant's Exhibit
3  2?
4    A.    None of the finished pieces.
5    Q.    Any of the -- in other words,
6  at some point you printed something off
7  and you saw the lines, correct?
8    A.    Yes, sir.
9    Q.    Did you go and take that to
10  Mr. Joslin and say here, look at this,
11  look at these lines?
12    A.    Yes, sir.
13    Q.    Do you recall which photograph
14  you showed him?
15    A.    Photograph of Morgan, I
16  believe.
17    Q.    Morgan being --
18    A.    The girl with the cape on
19  that's flying up.
20    Q.    Any other photograph you
21  showed him?
22    A.    Not that I recall.
23    Q.    Did he have any comment about

Page 160

1  that photograph when you showed him?
2    A.    No, sir.
3    Q.    Was he helpful in getting you
4  hooked up with his friend?
5    A.    Yes, sir.
6    Q.    You have no complaints about
7  him hooking you up with his friend, right?
8    A.    No, sir.
9    Q.    And was the friend helpful?
10    A.    Yes, sir.
11    Q.    Did the friend comment about
12  your work in any way that you are aware of
13  while you were printing the photographs?
14    A.    Nothing I can be sure to say.
15    Q.    Was anyone else there when you
16  were printing the photographs at his
17  friend's place?  Did he have an assistant
18  or family member or --
19    A.    His wife was there.
20    Q.    Did either of them actually
21  see the photographs you were printing?
22    A.    The guy saw all of them.
23    Q.    How long did it take to --

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 161

1    A.    Probably about -- about two
2  hours.
3    Q.    Did you actually bring the
4  paper or whatever that was that you
5  printed it onto --
6    A.    Contact sheets?
7    Q.    Yes.
8    A.    No, sir.
9    Q.    Did you use his contact
10  sheets?
11    A.    As I said, I scanned the
12  images at the university, had them on a
13  CD --
14    Q.    Okay.
15    A.    -- and inserted that CD into
16  his computer and printed with his printer.
17    Q.    But the thing that actually
18  printed onto that you slid into there, was
19  that his materials?
20    A.    My materials.
21    Q.    Your materials.  You had
22  purchased those and brought them -- all
23  you used of his was his computer, correct?

---

Page 162

1    A.    His ink.
2    Q.    And his ink.
3    A.    But I paid for his ink.
4    Q.    Do you recall what that cost?
5    A.    No, sir.
6    Q.    Was it an expensive process?
7    A.    I paid for I believe two
8  cartridges of ink.
9    Q.    Did you have to pay for
10  computer time?
11    A.    He didn't make me pay for
12  that.
13    Q.    Did he charge you anything for
14  assisting you or showing you how to do it?
15    A.    No, sir.
16    Q.    So you just paid for the ink?
17    A.    Yes, sir.
18    Q.    Any problem with having to pay
19  for the ink?
20    A.    No, sir.
21    Q.    And was that gentleman nice to
22  you during this, helpful?
23    A.    From what I recall, yes.

---

Page 163

1    Q.    How soon after Jerry Johnson
2  and Mr. Paxson went to Mr. Gibbs' house,
3  how soon was that before the actual show?
4    A.    Two days.
5    Q.    Two days.  That was two days
6  before you brought it to HAL Hall of
7  Honor?
8    A.    Yes, sir.
9    Q.    When you brought it to the HAL
10  Hall of Honor, did you assemble it all in
11  one day?
12    A.    It was already assembled.  Do
13  you mean hung it?
14    Q.    Okay.  So when you brought it,
15  it was one huge piece over there?
16    A.    Yes.
17    MR. ADAMS:  Can we stop here
18  for lunch?
19    MR. MUSSO:  Sure.  I just want
20  to ask him one last question.
21    Q.    Did you use a truck?  How did
22  you --
23    A.    We used a truck.

---

Page 164

1    Q.    Okay.  That's fine.  We will
2  pick back up.
3    (Whereupon, the lunch recess
4    was taken at 12:18 p.m. until
5    1:22 p.m.)
6    Q.    Now, that day at Mr. Gibbs'
7  house, I know Mr. Paxson was there, Mr.
8  Johnson was there, you were there.  Was
9  Mr. Gibbs there at the time?
10    A.    Yes, he was.
11    Q.    Was he there the whole time?
12    A.    I believe.
13    Q.    Was his wife in the room, do
14  you know?
15    A.    She had babies, so --
16    Q.    Okay.
17    A.    No.
18    Q.    Was Mr. Gibbs actually in the
19  room?
20    A.    Mr. Gibbs was.
21    Q.    Do you recall him saying
22  anything?
23    A.    He was basically leaving it up

---

41 (Pages 161 to 164)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 165

1　to me.
2　　Q.　Did he help you build it in
3　any way?
4　　A.　He did.
5　　Q.　And so he had some building
6　skills that were helpful?
7　　A.　Yes, sir.
8　　Q.　So now I think the last time
9　we were discussing you had loaded it up on
10　a truck and you were driving it to campus
11　to bring it to the show --
12　　A.　Yes, sir.
13　　Q.　-- am I correct?  Now, earlier
14　I kept talking about the HAL Hall of
15　Honor.  It's my understanding it's the HAL
16　Hall, and then you had that one room where
17　they had all of that memorabilia?
18　　A.　Yes, sir.
19　　Q.　I'm going to call that the
20　Adams memorabilia room, because that's
21　really -- it was all devoted to Dr. Adams.
22　And I know earlier you said you
23　necessarily don't have knowledge of that,

Page 166

1　but you do recall there being memorabilia,
2　and that is the room that your art and the
3　rest of the art hung -- or was showcased,
4　correct?
5　　A.　Yes, sir.
6　　Q.　Now, when you -- and you said
7　it was a juried show.  How did they decide
8　-- or at what point did they decide which
9　pieces got to be in the show and which
10　ones didn't?  Was that before -- did
11　everybody bring their art up there and
12　they make their decision or did --
13　　A.　I'm not sure if everybody
14　exhibited from the collaborative course,
15　and I believe that -- I believe that the
16　other pieces that were showcased were
17　selected -- I think they were placed in
18　the Malone Gallery and picked out amongst
19　the faculty.  I think that's how they do
20　it typically, but I'm not sure.
21　　Q.　You are not sure in this
22　instance, am I correct?
23　　A.　Yes.

Page 167

1　　Q.　But when you were -- whose
2　truck did you use to drive it out?
3　　A.　Dan's.
4　　Q.　Dan Gibbs?
5　　A.　Dan Gibbs.
6　　Q.　And did Mr. Gibbs help you?
7　　A.　He did.
8　　Q.　Anybody else?
9　　A.　No, sir.
10　　Q.　Now at the time that you were
11　driving it up to Troy, where did you drive
12　it to, was it to the -- that Adams
13　memorabilia room?
14　　A.　Yes, sir.
15　　Q.　So at that time did you know
16　that your piece would actually be in the
17　show?
18　　A.　Yes, sir.
19　　Q.　Was there any time that you
20　had any concern that your piece wouldn't
21　be in the show?
22　　A.　No, sir.
23　　Q.　Would it be fair to say that

Page 168

1　art majors, for the most part, could
2　guarantee in the juried show that they
3　would most likely have their pieces
4　chosen?
5　　A.　I'm sorry, say that --
6　　Q.　You knew your piece was going
7　to be in there, correct?
8　　A.　Yes, sir.
9　　Q.　And you also understood that
10　that wasn't going to necessarily be true
11　for everybody's work?
12　　A.　Yes, I knew that.
13　　Q.　Do you know of any students
14　whose pieces weren't selected?
15　　A.　No, sir.
16　　Q.　But you knew that yours would
17　be in the show, correct?
18　　A.　At that point, yes.
19　　Q.　Did you ever have any doubt
20　that it would be?
21　　A.　That it wouldn't be?
22　　Q.　Wouldn't be, I'm sorry.
23　　A.　No, sir.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 169

1    Q.    Was there ever a time they
2 said okay, we know for sure yours is going
3 to be in the show, or did you assume all
4 along that yours was going to be in the
5 show?
6    A.    I assumed it was going to be
7 from the responses I was getting.
8    Q.    Now, this all happened around
9 the time of the Thanksgiving holidays, am
10 I correct?
11    A.    Yes.
12    Q.    Because the Sound of Seasons
13 -- that might be a good day for us to kind
14 of use as a measuring point.
15    A.    Okay.
16    Q.    When you drove the piece up
17 there, did you -- how long before the show
18 actually opened did you drive the piece up
19 there?
20    A.    I'm not sure if it was the day
21 before or the day of the show.
22    Q.    Had you already eaten your
23 Thanksgiving dinner and it was days after

Page 170

1 that?  I just want to make sure it wasn't
2 before Thanksgiving and -- just kind of
3 get an idea.
4    A.    I remember being incredibly
5 happy that finals were approaching.  So it
6 was right before the break, the extended
7 break.
8    Q.    Okay.  But you are thinking it
9 was a day or two before the show itself
10 opened?
11    A.    A day possibly, if not the day
12 of the show.
13    Q.    And how did you know that it
14 was time for you to bring your work up
15 there?  I mean, was -- did a professor say
16 everybody bring your work up there --
17    A.    I think so.
18    Q.    You say you think so --
19    A.    But I don't know.
20    Q.    As you sit here today, can you
21 say how you knew to bring --
22    A.    I can't say.  I just remember
23 getting up in the morning and knowing --

Page 171

1 so apparently it had been stated when to
2 bring it.
3    Q.    So when you brought your work
4 up there, was that room open, Adams
5 memorabilia --
6    A.    People were bringing work in.
7    Q.    You say people.  Were these
8 other artists or who?
9    A.    Larry Percy was hanging some
10 work.  Mr. Johnson and Mr. Noriega were in
11 the room.
12    Q.    Who is Mr. Noriega?
13    A.    Ed Noriega.
14    Q.    What is his position?
15    A.    He is a professor of design.
16    Q.    Is that in the art department?
17    A.    Yes, sir.
18    Q.    Have you ever taken any
19 classes with Mr. Noriega?
20    A.    Yes.
21    Q.    Which classes did you take
22 with Mr. Noriega?
23    A.    Time and Space?  I want to be

Page 172

1 sure.  Color and Technology, that's the
2 class.
3    Q.    It was Color and Technology.
4 Was it also Time and Space or not, or do
5 you recall?
6    A.    I don't recall.
7    Q.    But you do recall Color and --
8    A.    Color and Technology.
9    Q.    Color and Technology.  Mr.
10 Percy, Mr. Noriega and Mr. Johnson were
11 already there in that room, correct?
12    A.    Yes, sir.
13    Q.    Now, you have a number of
14 different pieces of art from different
15 artists who are going to be in the show,
16 correct?
17    A.    Yes, sir.
18    Q.    Who was it that was going to
19 decide where in that space the different
20 pieces would appear?
21    A.    Mr. Percy was, to my
22 knowledge, deciding where things were
23 going to go.  But I think all of the

43 (Pages 169 to 172)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

---

Page 173

1   professors were.
2       Q.   As we sit here today, do you
3   specifically know who was making those
4   decisions?
5       A.   When I walked into the room,
6   Mr. Percy was hanging things on certain
7   walls, and we were trying to designate a
8   spot for my piece since it was so large.
9       Q.   Now, tell me how that took
10  place where you -- did they come out and
11  look at it in the truck?  How did it come
12  about that a specific space was chosen for
13  your piece?
14      A.   The way that space is
15  designed, there are side walls and a
16  central half wall, I believe -- central
17  half wall.  And there was going to be a
18  large piece here and a large piece on the
19  opposite side.  So my piece was going to
20  have to be one of those spaces.
21      Q.   Okay.  So when you walked
22  toward that Adams memorabilia room, was
23  there -- what type of entrance was it?

---

Page 174

1   Was it glass, was it just a wooden door?
2   Talk to me what we saw as I'm walking up
3   to it.
4       A.   Okay.  We parked on the side.
5   There are steps that lead up into the
6   building and also a ramp for handicapped,
7   disabled, running up.  And I am supposing
8   there is no steps, so we pulled it up the
9   ramp and went through glass doors.  And
10  then there is another -- it is like a
11  hallway and then another set of glass
12  doors.
13      Q.   Okay.  Is there anything else
14  in that hallway?
15      A.   There may have been more
16  memorabilia, other perhaps paintings.
17      Q.   Was it easy to get it through
18  the hallway?
19      A.   Yes.
20      Q.   Who did you speak to with
21  regard to actually where the piece would
22  appear?
23      A.   I can't recall.

---

Page 175

1       Q.   Did you have a preference as
2   to where you wanted it to appear?
3       A.   My only preference was for the
4   piece to be stable and, you know,
5   obviously viewable.  That was my only
6   preference.  I didn't have a preference as
7   far as where to hang.
8       Q.   So which side of the wall
9   didn't matter to you as long as it was
10  stable and viewable, is that correct?
11      A.   It would have been nice to
12  have had the front side, but I was not
13  opposed to, you know --
14      Q.   Was there any art put in the
15  front side?
16      A.   There was.  There was a large
17  black and white painting, I guess it was
18  four foot by four foot.  That's all.
19      Q.   Now, did anyone assist you in
20  hanging the piece?
21      A.   Dan Gibbs.
22      Q.   Okay.  Anyone other than Mr.
23  Gibbs?

---

Page 176

1       A.   No, sir.
2       Q.   What did it require?  I mean
3   hanging it up.
4       A.   A thick, thick cable, these
5   really, really large screw eyes that came
6   out of the top connected to this cable
7   which connected to chains that went up.
8   And we had to take pieces out of the
9   ceiling.  And that wrapped around huge --
10  I don't know what they are called, big
11  chunks of wood.
12      Q.   Was any of that memorabilia
13  that had been in there earlier, was all of
14  that removed?
15      A.   That had all been removed.
16      Q.   Okay.  And do you have any
17  idea where it went?
18      A.   No, sir.
19      Q.   How long did it take you and
20  Mr. Gibbs to hang your piece?
21      A.   I would say a good hour and a
22  half.
23      Q.   And did you ever ask for any

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 177

1  assistance or any type of equipment or
2  electrical cords or anything from any of
3  the other gentlemen in the room or anyone
4  else?
5      A.    Let me counter that with the
6  fact that Dan Gibbs is -- he has a lot of
7  knowledge on -- he did a lot of theater
8  lighting, that kind of thing, so he knew a
9  lot about rigging things.  And so there
10  was a piece of equipment that we needed.
11  However, my budget had been well exceeded
12  in just the materials that I spent on the
13  piece itself.  So I approached Mr. Noriega
14  about that and he provided me with a
15  little bit of money to go buy two pieces,
16  I think it was twenty dollars, around
17  about, to buy two pieces that would
18  actually finish just the hanging job
19  itself.
20      Q.    Did you have to pay him back
21  or was that just a donation from him to
22  your work?
23      A.    It was a donation.

Page 178

1      Q.    Okay.  And did you speak to
2  anyone else that day -- I mean any
3  professor that day about your work, other
4  than Mr. Noriega to get some money to help
5  do the last hanging piece?
6      A.    Is this in preparation or
7  after the show?
8      Q.    Let's just -- just that day.
9  You drive up in the truck.  Did you talk
10  to any professor that morning?
11      A.    About the -- just the subject
12  matter of the work?
13      Q.    Anything, anything whatsoever.
14      A.    Not that I recall.
15      Q.    And you walked in with the
16  piece, correct?
17      A.    Yes, sir.
18      Q.    To hang it up.  While you
19  walked in with the piece and you were
20  hanging it up, did you talk to any
21  professor about the work at all other than
22  what you told me about with Ed Noriega,
23  getting some money for him to help finish

Page 179

1  getting it hung?
2      A.    No, sir.
3      Q.    Okay.  Now, any other time
4  during that time up until midnight did you
5  talk to any professors about anything
6  about that piece, content or otherwise?
7      A.    Not that I can recall.
8      Q.    Now, when you were actually
9  hanging the piece, were Mr. Percy and Mr.
10  Noriega and Mr. Johnson there the whole
11  time?
12      A.    They were there most of the
13  time, if not the whole time.
14      Q.    And did you totally completely
15  hanging the piece that day?
16      A.    I did.
17      Q.    And so all of the photographs
18  were -- did the photographs slide into the
19  cube -- how did that work?
20      A.    I run into some engineering
21  problems and some of them did slide out.
22  Some of them I had to actually place the
23  last Plexiglas plate on top of the pieces.

Page 180

1  So some of them were removable, some of
2  them weren't at the time of the hanging.
3      Q.    By the time you left that day,
4  all of the photographs were in?
5      A.    Yes, they were.
6      Q.    And so the lighting was
7  working?
8      A.    Yes, sir.
9      Q.    It was ready to go?
10      A.    Yes, sir.
11      Q.    And when you walked out that
12  day, did you notice any of the other
13  professors still in there?
14      A.    Not that I can recall.
15      Q.    Now -- and so you didn't talk
16  to any of the professors after you walked
17  out until that midnight?
18      A.    I had classes going on, so I
19  had to hang early in the morning and I
20  went to my classes, and that was that.
21      Q.    Now, from that day forward,
22  did you speak to Mr. Johnson about the
23  content of your work, the subject of your

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 181

1   work?
2       A.    From that day forward
3   meaning --
4       Q.    Yes.  Did Mr. Johnson have any
5   concerns about any of the photographs that
6   appeared in your piece of art?
7       A.    Well, yes, after it was
8   removed.  But are we just -- I need a time
9   line --
10      Q.    We are starting from you hung
11  it, you went to class.  And then from that
12  day forward, did Mr. Johnson have any
13  concern about any of the photographs that
14  were in that piece of art?
15      A.    There were --
16          MR. ADAMS:  I'm just going to
17  object.  Could you be more specific in --
18  I don't want to tell you how to ask the
19  question, Joe, but could you say the next
20  day --
21      Q.    Let me break it down.  A few
22  days later the show actually opened,
23  correct?

Page 182

1       A.    Yes.
2       Q.    It was either that day or the
3   next day?
4       A.    Yes.
5       Q.    Okay.  Before the show
6   actually opened, did Mr. Johnson talk to
7   you about any of the photographs in your
8   piece of art?
9       A.    No.
10      Q.    Okay.  Did any other professor
11  talk to you about it?
12      A.    Mr. Noriega.
13      Q.    Anyone other than Mr. Noriega?
14      A.    Ms. Allen maybe.
15      Q.    Okay.  Anyone other than Mr.
16  Noriega and Ms. Allen?
17      A.    No.
18      Q.    And where was Mr. Noriega when
19  he actually talked to you about the
20  content of the photos?
21      A.    This was I believe -- before I
22  was leaving -- after I had hung it, it was
23  just hanging and, you know, that's kind of

Page 183

1   your moment of glory.  You are looking at
2   your work.
3       Q.    And what did Mr. Noriega say?
4       A.    He did say something about the
5   content and -- in a nutshell said that I
6   was -- it was a cry for attention,
7   something of that nature.
8       Q.    Did you have any problems with
9   him saying that?
10      A.    He said it jokingly, but, of
11  course, it's one of those things where you
12  kind of laugh it off.  But really, yeah, I
13  did have problems with it.
14      Q.    So you didn't like it?
15      A.    I didn't like him saying that,
16  but I wasn't going to say anything at that
17  point.
18      Q.    Did he say that in a
19  derogatory term?
20      A.    No.
21      Q.    Okay.  Did he say anything
22  about the actual contents of the pictures,
23  the genitalia or -- did he say anything --

Page 184

1       A.    There was no direct mentioning
2   of any terms of genitalia.  It was never
3   like --
4       Q.    So all he said was this is a
5   cry for attention?
6       A.    To that extent that you are
7   this sort of artist that wants to be heard
8   loud, loudly, loudly, you know.
9       Q.    And did you agree with his
10  statement at all or disagree with it?
11      A.    I didn't agree with it, I just
12  kind of laughed it off.
13      Q.    Did he say anything else?
14      A.    Not that I can recall.
15      Q.    Did he make that statement, in
16  your opinion, in an attempt to hurt your
17  feelings?
18      A.    No.
19      Q.    Had he ever made statements
20  like that to you before with any of your
21  other work?
22      A.    No, sir.
23      Q.    Did Mr. Noriega know what

46 (Pages 181 to 184)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 185

1  those pictures would portray before that
2  day when he saw it in the Adams
3  memorabilia room?
4      A.  Not anything from my mouth.
5  If the faculty discussed it, that was
6  them.  I don't know if they did or not.
7      Q.  But you never showed him the
8  photographs?
9      A.  No.
10     Q.  Now, Ms. Allen, where did you
11 have a conversation with Ms. Allen?
12     A.  In the same position, the same
13 place as with Mr. Noriega.
14     Q.  So she was in the room also,
15 am I correct?
16     A.  Yes, sir.
17     Q.  And what did she say?
18     A.  She had nothing but very
19 constructed things -- like, wow, this is
20 really great.  Nice things.
21     Q.  I certainly take it you didn't
22 have any problems with what she said?
23     A.  No, sir.

Page 186

1      Q.  Now, have you ever talked to
2  Ms. Allen before that day about any of the
3  photographs that appeared in your piece of
4  art?
5      A.  There is a possibility I had a
6  conversation with her about alternative
7  printing methods with the -- as far as
8  printing them out -- when I was discussing
9  things with Bob Joslin about printing, I
10 was also speaking to her because she does
11 that print making, so --
12     Q.  Did you have any discussion
13 with her about the content of those
14 photos --
15     A.  No, sir.
16     Q.  -- actually the pictures
17 before that day?
18     A.  Not that I recall.
19     Q.  After that day did you -- up
20 until today have you had any conversations
21 with Ms. Allen about what those pictures
22 portrayed?
23     A.  Pertaining to content?

Page 187

1      Q.  Yes, content or --
2      A.  No, sir.
3      Q.  So you never discussed with
4  her, you know, whether she thought those
5  pictures may be appropriate or
6  inappropriate or that there might be a
7  problem with the genitalia being shown or
8  not?
9      A.  No, sir.
10     Q.  And the same question with Mr.
11 Noriega.  From that day when you were
12 hanging the art and he made that one
13 comment about the cry for attention, from
14 that day up until today have you had any
15 discussions with him at all about those
16 photographs, whether they were
17 appropriate, inappropriate or there is a
18 problem with the genitalia being shown?
19     A.  Not that particular incident,
20 but we -- he was one of my advisers during
21 my senior thesis.
22     Q.  Now, when he advised -- in
23 your senior thesis, did you have a main

Page 188

1  adviser or just a committee?
2      A.  I had a main adviser.
3      Q.  And who was your main adviser?
4      A.  Ms. Allen.
5      Q.  Did you have a committee?
6      A.  Yes, sir.
7      Q.  And so was Mr. Noriega one of
8  those on the committee?
9      A.  No, sir -- oh, yes, sir.  Yes.
10     Q.  Who else was on the committee?
11     A.  Mr. Percy.
12     Q.  Mr. Percy.  Did you get to
13 pick your committee?
14     A.  We were allowed to request our
15 committee and they took all of the
16 students and kind of divided up amongst
17 the faculty as far as timing for them,
18 which makes sense.
19     Q.  Did you request Ms. Allen to
20 be the chair of that committee?
21     A.  I did.
22     Q.  And did you request that Mr.
23 Noriega be on that committee?

47 (Pages 185 to 188)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 189

1    A.    I did.
2    Q.    And what about Mr. Percy?
3    A.    I don't believe I requested
4    Mr. Percy.
5    Q.    But did you have a problem
6    with him being on the committee?
7    A.    No, sir.
8    Q.    Do you recall who the other
9    person was that you requested but they
10   weren't on the committee?
11   A.    I believe it -- I don't
12   remember.
13   Q.    Now, did Mr. Noriega ever talk
14   to you about the appropriateness of
15   anything in your senior thesis
16   photographs?
17   A.    He required me to see a
18   psychologist during the procedure, during
19   the whole senior thesis thing.
20   Q.    Mr. Noriega did?
21   A.    Yes.
22   Q.    And do you have any problem
23   with him requiring you to do that?

Page 190

1    A.    I did at the time.
2    Q.    Okay.
3    A.    Yes.
4    Q.    Did there come a time when
5    that perspective changed?
6    A.    It was basically an ultimatum
7    made to me, either you do this or I am
8    going to request to be removed from your
9    committee.
10   Q.    Okay.  Did you ever consider
11   just saying Mr. Noriega, I'm not going to
12   do that, so sayonara, good-bye, I will get
13   someone else for the committee?
14   A.    This was my dilemma.  One
15   professor who is incredibly talented and
16   knows a lot of information on the type of
17   subject matter that I'm dealing with in my
18   thesis or go with another professor that
19   would come at me with a completely
20   different angle halfway through the
21   process.
22   Q.    Did he require that you see a
23   specific psychologist?

Page 191

1    A.    Not a specific one.
2    Q.    Okay.  I guess I can shortcut
3    this.  Is Mr. Noriega requiring you to see
4    a psychologist in any way related to this
5    lawsuit?
6    A.    And my answer would be I don't
7    really know.
8    Q.    Okay.  You can only answer as
9    to what you believe the true answer is.
10   Which psychologist did you see?
11   A.    Fran Scheel, S-c-h-e-e-l.
12   Q.    Did Mr. Noriega tell you why
13   he wanted you to see a psychologist?
14   A.    His reasoning was that the
15   content of my senior thesis exhibit could
16   be incredibly distressing to me because it
17   was a very intuitive introspective, a lot
18   of information about me coming out into
19   the public eye.
20   Q.    Did he ever ask you what you
21   told the psychologist?
22   A.    There may have been some
23   discussion in my --

Page 192

1    MR. ADAMS:  I'm going to
2    object as to patient --
3    MR. MUSSO:  My question is,
4    you know, did Noriega ask him.
5    MR. ADAMS:  If he asked,
6    that's fine.  I'm just going to object to
7    him -- order you not to disclose anything
8    you discussed with your psychologist,
9    okay?
10   A.    Yes.
11   Q.    Did Noriega ever ask you
12   questions as to what you said to your
13   psychologist or what your psychologist
14   said to you?
15   A.    I think there was discussion
16   on it.
17   Q.    Okay.  And did you tell Mr.
18   Noriega that you didn't want to discuss
19   it?
20   A.    My project -- this is how I
21   can answer you.  My project sort of
22   required me to open myself up and to
23   discuss things, which makes sense, because

48 (Pages 189 to 192)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 193

1  the work was introspective and I wanted at
2  least one person to understand where I was
3  coming from in order to get the work out.
4  And that was the whole academic, you know,
5  purpose of studying art. So, yes, I mean,
6  we had -- we disclosed information about
7  each other. I learned some things about
8  him in our conversations.
9      Q.    Okay. And would those have
10  been private things about Mr. Noriega?
11     A.    Yes.
12     Q.    What private things did you
13  learn about Mr. Noriega?
14     A.    I plead the Fifth to not
15  discuss those things, because he wouldn't
16  want me to.
17     Q.    Well, it's not a question of
18  whether he wants you to. It's a question
19  of whether --
20     A.    I would rather not.
21     Q.    I mean, if he wants to plead
22  the Fifth --
23         MR. ADAMS: Let's take a break

Page 194

1  for a minute. Come out here.
2         MR. MUSSO: If Mr. Noriega may
3  have something to do with this lawsuit and
4  that issue, I need to know what those
5  statements are.
6         (Brief recess.)
7      Q.    I believe we were at what did
8  Mr. Noriega tell you that was personal to
9  him?
10     A.    Issues that he had with his
11  father, his sexuality, experiences he had
12  when he lived in New York. That's about
13  it.
14     Q.    Did any of those statements he
15  made to you offend you in any way?
16     A.    No, sir.
17     Q.    Did you find any of those
18  statements in any way harassing to you,
19  either sexually or any other way?
20     A.    No.
21     Q.    Did he ever do anything
22  sexually inappropriate to you?
23     A.    No, sir.

Page 195

1      Q.    So you are not making any
2  claims that he touched you?
3      A.    Never.
4      Q.    Or that he ever said anything
5  to you that was remotely sexual
6  harassment?
7      A.    No, sir.
8      Q.    Or that he in any way harassed
9  you?
10     A.    No, sir.
11     Q.    Or that he was using his
12  position in an inappropriate way?
13     A.    No, sir.
14     Q.    Okay. Or that he even
15  requested to do any of those things?
16     A.    No, sir.
17     Q.    Or that he asked you to do
18  anything that you were uncomfortable with
19  in exchange for a grade?
20     A.    No, sir.
21     Q.    I mean, did you consider him a
22  professor that you looked up to?
23     A.    I would consider him a

Page 196

1  professor that I did look up to, but
2  also -- he was one of those people that
3  made me feel both angry and incredibly
4  grateful all at the same time. He is very
5  complicated.
6      Q.    Did that improve you as an
7  artist?
8      A.    In some ways, and I think in
9  some ways it inhibited me as well.
10     Q.    But is that part of the
11  natural artistic process, that push and
12  pull?
13     A.    The push and pull, yes. The
14  instillment of inhibitions, no.
15     Q.    Did anything he do prohibit
16  you from expressing the art you wanted to
17  express?
18     A.    Yes, in some ways.
19     Q.    Did it infringe upon your
20  First Amendment rights?
21     A.    No. These were things I
22  subjected myself to in some ways.
23     Q.    Okay. One last time, he never

49 (Pages 193 to 196)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 197

1    did anything that was inappropriate, never
2    touched you sexually, never touched you
3    period --
4        A.    The only --
5        Q.    -- in an inappropriate way?
6        A.    The only inappropriate request
7    I feel like I ever received from Mr.
8    Noriega was that of the ultimatum to see a
9    psychologist, that's all.
10       Q.    And you ultimately did?
11       A.    I'm sorry?
12       Q.    You ultimately did see a
13   psychologist?
14       A.    I did.
15       Q.    As we sit here today, do you
16   have any problems with having seen a
17   psychologist?
18       A.    Having seen the psychologist?
19       Q.    Yes.
20           MR. ADAMS:  Do you mean -- and
21   I'm just going to object to the form and
22   say do you mean from what went on at the
23   psychologist's office or the fact that he

Page 198

1    was ordered to go there --
2        Q.    All right.  As you were
3    ordered to go there.  Now, today, looking
4    back on it, was it a good thing that you
5    went?
6        A.    No.
7        Q.    Did it help your art?
8        A.    No.
9        Q.    Are you still displeased at
10   him for making that ultimatum?
11       A.    Yeah.
12       Q.    Did anyone else in your
13   committee know that he made this
14   ultimatum?
15       A.    It was my understanding that
16   he had consulted with other faculty
17   members and had come to that conclusion
18   due to the nature of my work.
19       Q.    What do you base that
20   understanding on?
21       A.    Him telling me.
22       Q.    And what did he tell you?
23       A.    That he had consulted with

Page 199

1    other faculty.
2        Q.    Did he say which other faculty
3    he consulted with?
4        A.    He did not.
5        Q.    Was anyone with you when he
6    said he consulted with other faculty?
7        A.    No, this was all in
8    confidence.
9        Q.    Did you report or tell anyone
10   else who worked at the university that he
11   gave this ultimatum?
12       A.    Not to my knowledge.
13       Q.    Did you complain to anyone at
14   the university who worked at the
15   university that he gave this ultimatum?
16       A.    No, not any faculty.
17       Q.    Any students?
18       A.    My friends, I --
19       Q.    Were they students?
20       A.    Yes.
21       Q.    And who were they?
22       A.    David Noble.
23       Q.    Okay.  Anyone else?

Page 200

1        A.    A student at the time Dusty
2    Pivast (phonetic).
3        Q.    Okay.  Anyone else?
4        A.    No, not that I can think of.
5        Q.    You said not any faculty.  Any
6    administrative staff or --
7        A.    No person employed by the
8    university.
9        Q.    Okay.  Do you know if anyone
10   else told anyone at the university?  Other
11   than you telling me that Mr. Noriega
12   consulted other faculty, do you know of
13   any other way that anyone else at the
14   university would have known that?
15       A.    Known that I had an ultimatum?
16       Q.    Yes.
17       A.    No.
18       Q.    Okay.  Now, were you -- in
19   your senior thesis, what grade did you
20   receive?
21       A.    An A.
22       Q.    Did you receive any type of
23   award or -- if you recall?

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 201

```
1      A.   No.
2      Q.   Were you pleased with the work
3   that you submitted?
4      A.   Incredibly.
5      Q.   I think I have a copy of it.
6   Let me just put it in the record.
7         MR. ADAMS:  Are you going to
8   attach all of these to the deposition?
9         MR. MUSSO:  Yes.
10        MR. ADAMS:  All right.
11        (Whereupon, Defendant's
12        Exhibit 6 was marked for
13        identification.)
14     Q.   I just marked what I have
15  labeled Defendant's Exhibit Number 6.  I'm
16  not saying this is necessarily in the
17  order you like --
18     A.   Okay.
19     Q.   -- or if there is an order
20  that exists.  These are just the ones I
21  have.
22        Are these all of the
23  photographs that were in your final senior
```

Page 203

```
1      A.   Gosh.  I can't be sure.
2      Q.   Was it more than a day?
3      A.   Oh, yes, sir.
4      Q.   Like a semester, a half a
5   semester?
6      A.   Less than that.
7      Q.   Was it advertised in the
8   student newspaper or any other place?
9      A.   It should have been.  Yeah, I
10  believe it was.
11     Q.   Do you recall there being any
12  posters or fliers?
13     A.   There were.
14     Q.   Did you have a, for lack of a
15  better word, a reception or a party?
16     A.   I do -- I still have a copy of
17  our postcard.  We mailed out postcards to
18  patrons.
19     Q.   Did you sell any of that work
20  from that show?
21     A.   I did.
22     Q.   Who did you sell that to?
23     A.   Sold one to a girl named
```

Page 202

```
1   thesis?
2      A.   Not all.
3      Q.   Okay.  So there were some that
4   were --
5      A.   These were exhibited on the
6   wall.  And I had a bin of other
7   photographs, tons of other photographs.
8      Q.   Okay.  So these were the ones
9   exhibited on the wall, correct?
10     A.   Yes.
11     Q.   Who chose the ones exhibited
12  on the wall?
13     A.   Ultimately I had that
14  decision.  I was influenced, you know, and
15  I got feedback from all of the faculty on
16  which photographs they liked, where I
17  should go with it.  Because I had a large
18  quantity of photographs that I had to
19  narrow down.  So I did get feedback.
20     Q.   Where was that exhibited?
21     A.   At the Malone Gallery.
22     Q.   And how long did that exhibit
23  stay up?
```

Page 204

```
1   Gabriel Barnett and sold another one to
2   Mr. Noriega.
3      Q.   And how much did you sell
4   those pieces for?
5      A.   Two hundred fifty apiece.
6      Q.   Per piece.  And those were
7   original prints?
8      A.   Those were original and
9   framed.
10     Q.   Signed?
11     A.   I didn't sign them.
12     Q.   Would that have cost extra?
13     A.   It might have.
14     Q.   But did you have like a
15  reception?
16     A.   We did.
17     Q.   And did Mr. Johnson attend
18  that reception, do you recall?
19     A.   He was there.
20     Q.   Did he have any comments about
21  your work on that senior thesis?
22     A.   All of the comments I received
23  were very -- it was very highly praised.
```

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 205

1  Q.  But do you recall Mr. Johnson
2  praising your work or saying --
3  A.  Oh, yes.  Yes, sir.
4  Q.  Did he have any problems or
5  disagreements with the content of it?
6  A.  No, sir.
7  Q.  He wasn't on your committee,
8  right?
9  A.  No, sir.
10  Q.  Do you know whether he saw any
11  of those photographs before they were hung
12  in your show?
13  A.  It's a possibility, maybe in
14  passing, I don't know -- in passing and
15  saying hey, what do you think about these?
16  But nothing where I sat down with him and
17  discussed anything.
18  Q.  But do you recall ever showing
19  them to him or do you know if anyone else
20  did?
21  A.  I don't recall.
22  Q.  Do you know if anyone else
23  did?

Page 206

1  A.  I don't know.
2  Q.  But he did show up and did
3  praise?
4  A.  Yes.
5  Q.  He just didn't buy one?
6  A.  No, sir.
7  MR. ADAMS:  Because he didn't
8  sign it.
9  MR. JOHNSON:  He wouldn't sign
10  it.
11  Q.  Now, Mr. Fulmer here, do you
12  know who Mr. Fulmer is?
13  A.  I do.
14  Q.  Was he at the show, the
15  reception?
16  A.  I don't recall if he was.  He
17  may have been.
18  Q.  What about Mr. Joslin, was he
19  there?
20  A.  Yes.
21  Q.  Did he have any comments about
22  your work?
23  A.  None whatsoever.

Page 207

1  Q.  Did he ever have any comments
2  about your senior thesis work?
3  A.  The previous question you were
4  referring to my senior thesis?
5  Q.  Yes, I'm sorry.  Did he go to
6  the reception was my question.  And then
7  it was -- I will make it more clear.
8  Did he have any comments at the
9  reception about your work?
10  A.  No, sir.
11  Q.  Okay.  Did he have any
12  comments about your senior thesis at any
13  point in time?
14  A.  I think I may have shown them
15  to him a few times and he just didn't get
16  it.  He just didn't understand, so -- it
17  was never any negativity or positivity, it
18  was just kind of okay.  So, no --
19  Q.  Okay.
20  A.  -- no real comment.
21  Q.  Do you know whether Dr.
22  Hawkins was at your reception?
23  A.  I don't recall seeing him

Page 208

1  there.
2  Q.  Do you know if he ever saw
3  your senior thesis?
4  A.  I don't know.
5  Q.  Do you know if he ever had any
6  comment one way or the other about it?
7  A.  Don't know.
8  Q.  How often have you ever
9  actually met -- have you actually met Dr.
10  Hawkins?
11  A.  No.
12  Q.  Would you know him if he
13  walked in the room?
14  A.  I know his face.
15  Q.  Is that because you have seen
16  it on photographs?
17  A.  Television, photographs.
18  Q.  Do you know whether he
19  attended your -- the juried show where you
20  had the Defendant's Exhibit 2 piece?
21  A.  I was told that he had.  I
22  never saw him.
23  Q.  And who told you?

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 209

1    A.    Mr. Shillabeer.
2    Q.    Anyone else?
3    A.    (Shaking head negatively.)
4    Q.    Did Mr. Shillabeer say that
5    Mr. Hawkins had any comment or did he just
6    simply say he went to the show?
7    A.    I think he -- that he just
8    went to the show.  I can't recall whether
9    or not Mr. Hawkins had a comment directed
10   toward Mr. Shillabeer.
11   Q.    And did Mr. Shillabeer say
12   whether Mr. Hawkins actually stopped and
13   looked at your work as he went to the
14   show?
15   A.    I think he said that he had
16   walked through the exhibit with Mr.
17   Hawkins or that some -- or one of the
18   faculty members had, but he never told me
19   any comments that were made.
20   Q.    Has Dr. Hawkins ever told you
21   anything about any of your artwork ever?
22   A.    I have never spoken to him.
23   Q.    Has he ever sent you anything

Page 210

1    in writing?
2    A.    No.
3    Q.    Are you aware of any
4    statements he has ever made about your
5    artwork ever?
6    A.    No.
7    Q.    Do you know of anyone who is
8    aware of any statements that Dr. Hawkins
9    made about your artwork?
10   A.    I want to say that either Mr.
11   Noriega or Mr. Shillabeer did say
12   something -- something about there being
13   obviously a concern to the subject matter
14   of the piece in question.
15   Q.    But did they attribute that to
16   Dr. Hawkins?
17   A.    I think it was contributed to
18   either Dr. Hawkins or the vice chancellor.
19   Q.    Who would that be?
20   A.    I just remember them saying
21   the vice chancellor.
22   Q.    And do you recall whether it
23   was Mr. Noriega or Mr. Shillabeer who said

Page 211

1    that?
2    A.    I don't recall which.
3    Q.    Do you recall when they said
4    that?
5    A.    It was before the piece was
6    pulled, obviously.  I don't recall when
7    exactly.
8    Q.    Do you recall where you were
9    at when they said that?
10   A.    I want to say that I had
11   talked to Mr. Shillabeer in the courtyard
12   in the Malone -- the Malone building and
13   that I had talked to Mr. Noriega outside
14   of HAL Hall.
15   Q.    And was anyone else present in
16   any of those conversations?
17   A.    No.
18   Q.    And did they say that they
19   actually heard Dr. Hawkins say these
20   things or did they say how they received
21   that information?
22   A.    I can't be sure.
23   Q.    So the show opened on the same

Page 212

1    day as the Sound of Seasons, correct?
2    A.    Yes.
3    Q.    And what is the Sound of
4    Seasons?
5    A.    Orchestral -- I just knew that
6    there were going to be a lot of people at
7    Smith Hall, which is adjacent to HAL Hall,
8    for that concert.
9    Q.    Is it directly adjacent to or
10   is there a building in between?
11   A.    I think there is an alleyway
12   in between.  They are separated buildings,
13   but right next to --
14   Q.    Did you attend the Sound of
15   Seasons program?
16   A.    I did not.
17   Q.    Have you ever attended one of
18   them?
19   A.    No, sir.
20   Q.    Is it your understanding it is
21   an annual event?
22   A.    Not to my knowledge.
23   Q.    Okay.  But you don't know one

53 (Pages 209 to 212)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 213

1  way or the other, correct?
2      A.   I don't know one way or the
3  other.
4      Q.   And do you know whether that
5  is advertised to the general community?
6      A.   I don't know.
7      Q.   Do you know how many people
8  attended that concert?
9      A.   No, no idea.
10     Q.   But you did know that there
11  was going to be a large number of people
12  there, is that correct?
13     A.   I was made aware of that.
14     Q.   And who made you aware of
15  that?
16     A.   Mr. Johnson.
17     Q.   And when did he make you
18  aware?
19     A.   It was either during the class
20  -- the class time before the pieces were
21  to go up or -- right around that time.  It
22  was made aware to me before the piece went
23  up.

Page 214

1      Q.   And was it your understanding
2  that there may be some people who attend
3  the Sound of Seasons who would also attend
4  the show, or did you know one way or the
5  other?
6      A.   We would hope, but you
7  wouldn't know one way or the other.
8      Q.   Do you know whether there was
9  an announcement made at the show?
10     A.   I do not know.
11     Q.   I'm sorry, at the Sound of
12  Seasons that the show was available?
13     A.   Do not know that.
14     Q.   Okay.  Were you there on
15  opening night?
16     A.   Of our show or --
17     Q.   I'm sorry, of your show.
18     A.   Yes.
19     Q.   Okay.  How many people
20  attended that night?
21     A.   I didn't stay the entire
22  night.  I stayed a total of maybe fifteen
23  minutes, was not there very long.

Page 215

1      Q.   Okay.  Was there any attempt
2  made by anyone to warn any individuals in
3  the general public about the content of
4  some of your pictures?
5      A.   I would say there was a more
6  generalized statement made about the show
7  in general, some nudity.  There was a tiny
8  little sign on the door.
9      Q.   Where was that sign?
10     A.   As we discussed, HAL Hall, the
11  glass doors, the hallway, glass doors that
12  enter into the --
13     Q.   Memorabilia room?
14     A.   Yes, on that door walking into
15  the memorabilia room.
16     Q.   And do you know who made that
17  sign?
18     A.   I have no idea.
19     Q.   Do you recall what that sign
20  said?
21     A.   Please be advised, nudity,
22  something like that.
23     Q.   Did you have any problems with

Page 216

1  that sign being there?
2      A.   No, not really.
3      Q.   Do you know whether anyone
4  stood outside the door and directed
5  individuals going in that night that there
6  may be some nudity?
7      A.   There was no one outside the
8  door.
9      Q.   That you saw?
10     A.   That I saw.
11     Q.   And you were there for fifteen
12  minutes?
13     A.   Yes, sir.
14     Q.   Do you know whether any
15  individuals from the Sound of Seasons came
16  over and saw the show?
17     A.   None that I'm aware were at
18  the concert, no, sir.
19     Q.   What time did you go to the
20  show, what time of the evening?
21     A.   There should have -- I don't
22  know.
23     Q.   Was it when the show opened?

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 217

1     A.    It was when the show opened.
2     Q.    What was your understanding of
3 the reason that that sign was there, the
4 little sign?
5     A.    In my opinion, it was based
6 solely upon my work. There were other
7 works involved with nudity, but basically
8 I felt that it was directed toward my
9 work.
10     Q.    Did anyone say that to you or
11 is that your opinion?
12     A.    You know, come to think of it,
13 there might have been some discussion
14 about the content on hanging where Mr.
15 Johnson stated that there might need to be
16 a sign. Whether that was directed toward
17 my work specifically or the fact that
18 there were paintings, drawings, other nude
19 works, I don't know.
20     Q.    Were there any other works
21 that showed genitalia?
22     A.    Yes.
23     Q.    What other works showed

---

Page 218

1 genitalia?
2     A.    There was a life drawing
3 piece, had a woman's vagina showing,
4 breasts. No full male frontal nudity
5 except for in my piece.
6     Q.    Any other photographs showing
7 genitalia?
8     A.    No.
9     Q.    And did you go -- when is the
10 next time you actually went into that
11 space and saw your piece?
12     A.    I went in right before we got
13 out for break just to kind of take a look
14 around, you know, really wanted to give
15 the other pieces other than mine, because
16 I had spent so much time on it, give them
17 the opportunity to move me in some kind of
18 way.
19     Q.    Did anyone go with you?
20     A.    No.
21     Q.    Do you recall what time during
22 the day it was?
23     A.    It was during the day in

---

Page 219

1 between one of my classes, I'm sure.
2     Q.    Was the room open?
3     A.    At that time, if this is --
4 let's see. I'm trying to discern whether
5 it was before I had a conversation with
6 Mr. Johnson or afterwards. I believe at
7 that time it was still open. That was
8 before our conversation.
9     Q.    But, I mean, when you went
10 that day, you wanted to see other
11 students' work more closely, did you have
12 to ask for a key from anybody or ask
13 somebody to let you in?
14     A.    At that time, and that might
15 have been a couple of -- a day or two
16 after the initial opening when I went to
17 view, at that time it was open.
18     Q.    Did you notice anyone else in
19 that room, anyone else in the gallery
20 while you were there?
21     A.    No.
22     Q.    Did you notice anyone else in
23 the HAL building?

---

Page 220

1     A.    The secretary was there. I
2 walked in, there are two openings, two
3 entrances, one entrance that goes directly
4 into the memorabilia room and then another
5 entrance that enters in. And then there
6 is the secretary, you can go down the
7 hall. So that's the way I entered that
8 time.
9     Q.    And was the little sign still
10 there?
11     A.    Yes.
12     Q.    Was anyone standing in the
13 doorway instructing people about the
14 content of the art?
15     A.    Not at that time.
16     Q.    Not at that time, okay. Now,
17 have you ever heard of a program at Troy
18 called the Walter Trumbower Theater
19 Competition?
20     A.    No.
21     Q.    Have no idea what I'm talking
22 about?
23     A.    No.

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 221

1    Q.    Are you aware of any
2  competition where about a thousand
3  students grade nine through twelve come
4  onto campus and participate in activities
5  regarding dramatics and forensics?
6    A.    No.
7    Q.    Do you know anything called
8  the middle school clinic and honor band --
9    A.    No, sir.
10    Q.    -- program?  Aware of any
11  program where around three hundred
12  students, parents, directors come onto
13  campus and participate in an honor band
14  program?
15    A.    No.
16    Q.    So there is that day you go in
17  and you focus on the other students' work
18  more closely, correct?
19    A.    Yes.
20    Q.    Because you had been so
21  involved in your own, just getting it --
22  the excitement of it.  How soon after that
23  did you then go into the -- back into the

Page 222

1  space?
2    A.    That was not until I had had a
3  discussion with Jerry Johnson and Mr.
4  Noriega.
5    Q.    Okay.  And when you say you
6  had a discussion with them, was that a
7  discussion where they were together or two
8  separate discussions or --
9    A.    That was when -- no, they were
10  there together, and we were in Mr.
11  Johnson's office.
12    Q.    Okay.  How did it come about
13  that you knew to be in his office?  Did
14  someone call you into there or --
15    A.    I honestly couldn't remember.
16    Q.    And when you went into his
17  office, tell me what was said -- there was
18  you, correct?
19    A.    Yes.
20    Q.    There was Mr. Noriega?
21    A.    Yes.
22    Q.    And then there was Mr.
23  Johnson?

Page 223

1    A.    Yes.
2    Q.    And it was Mr. Johnson's
3  office?
4    A.    (Nodding head affirmatively.)
5    Q.    Anyone else present?
6    A.    Not that I can recall, no.
7    Q.    What was said to you in that
8  little meeting by Mr. Johnson?
9    A.    That there was concern over my
10  work breaching Alabama obscenity laws and
11  that Mr. Johnson had been notified by the
12  school's attorneys that there might need
13  to be some action taken about my work, my
14  work specifically.
15    Q.    Did Mr. Johnson say anything
16  else during that meeting?
17    A.    He handed me a stack of papers
18  that had the obscenity laws written down
19  and that -- and told me that he had
20  received these from the attorneys.
21    Q.    Did that paper have any
22  handwriting on it?
23    A.    No.

Page 224

1    Q.    And did Mr. Johnson say
2  anything else or give you anything else in
3  this meeting?
4    A.    No.  No physical object.
5    Q.    Did he say anything else in
6  this meeting?
7    A.    Basically that he would be in
8  contact with me and that there were a few
9  different things that I could do.
10    Q.    Did he tell you what those
11  things were?
12    A.    That three photographs were in
13  question, that I could either remove those
14  three or remove the entire piece or censor
15  the three photographs in question in some
16  way that made the questionable parts non
17  -- unviewable.
18    Q.    Did he say which photographs
19  those were?
20    A.    Yes, he did.  The photograph
21  of Tim Jones, the photograph of Rheana
22  Vallery and the two girls holding hands.
23  He also gave me reasons why.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 225

1　Q.　Okay.  So Tim Jones, that's
2　the African-American male?
3　A.　Yes.
4　Q.　And Rheana, that's the female
5　who is also pictured in the photograph of
6　the two females in front of the boards?
7　A.　Yes.
8　Q.　And then there is -- and the
9　third photograph was the two females in
10　front of the boards?
11　A.　Yes.
12　Q.　What else did he say about
13　those photographs?
14　A.　That the photograph of the
15　African-American male, Tim Jones, could be
16　viewed as a scene of masturbation, that
17　the single one of Rheana Vallery was --
18　could be viewed as an act of
19　sadomasochism, in a prurient interest.
20　And that the two girls holding hands --
21　I'm still not quite sure about this one,
22　but that any two figures nude within the
23　same image could be construed as some sort

Page 226

1　of sexual activity, which led me to
2　believe that there was some aggression
3　towards some homosexuality, something like
4　that.
5　Q.　But did Mr. Johnson ever
6　say --
7　A.　Never said that.
8　Q.　But did Mr. Johnson make any
9　statements about aggression and
10　homosexuality?
11　A.　No.
12　Q.　He just simply told you why
13　these three photographs were in question?
14　A.　Yes.  And I think I made a
15　statement at the time about that --
16　Q.　Okay.
17　A.　-- to him.
18　Q.　I'm about to ask you what you
19　told him, but I want to cover everything
20　he told you in this meeting.
21　What else did he tell you in
22　this meeting that you haven't covered so
23　far?

Page 227

1　A.　That he would discuss further
2　with the attorneys and with the head of
3　the communications and fine arts
4　department, so on and so on, and just get
5　back to me on what possibilities there
6　were.
7　Q.　Did he say so on and so on?
8　A.　No, he didn't say so on and so
9　on.
10　Q.　Do you recall what the so on
11　and so on is?
12　A.　Whether or not -- he didn't
13　say that necessarily.  He said he would
14　contact, you know, higher-ups.
15　Q.　Did he say anything else that
16　we haven't covered already?
17　A.　Not that I can recall.
18　Q.　Did Mr. Noriega say anything
19　in this meeting?
20　A.　I believe he was there for
21　some sort of moral support or -- basically
22　to say that he believed in my work, but --
23　Q.　Was he there for your moral

Page 228

1　support or for Jerry's, or do you know?
2　A.　He was in the office before I
3　got there, so -- I don't -- I mean, he
4　didn't say much of anything.  It was
5　mostly Mr. Johnson.
6　Q.　Have you and Ed talked about
7　that day since that day?
8　A.　No, sir.
9　Q.　Okay.  When is the next time
10　you talked to Mr. Johnson about your work?
11　A.　I was contacted right before
12　classes began the next term.
13　Q.　That would be the spring of
14　2004 term, is that correct?
15　A.　Yes.
16　Q.　And you say right before, were
17　we already into January?
18　A.　Yes, sir.
19　Q.　Okay.  Had classes actually
20　started for other people or do you know
21　or --
22　A.　They hadn't started yet, no,
23　sir.

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 229

1    Q.    Did you live on campus?
2    A.    I lived off campus.
3    Q.    And during the holiday days
4  did you stay in that place or did you go
5  home or --
6    A.    I stayed --
7    Q.    Okay.
8    A.    I went home for some of the
9  holidays, but came back because I lived
10  there.
11    Q.    And so did -- I'm sorry, did
12  you say he called you?
13    A.    Yes.
14    Q.    Was it a phone call?
15    A.    Yes.
16    Q.    Were you on your cell phone?
17    A.    Yes.
18    Q.    So he had your number?
19    A.    Yes.
20    Q.    And what did he say on this
21  conversation?
22    A.    That I needed to come in and
23  have a discussion.  So I went into the

Page 230

1  office and -- actually I went to the HAL
2  Hall of Honor to photograph my piece, you
3  know, just to have documentation, stuff
4  like that, standard things.  And three of
5  the pieces were removed, the three in
6  question.
7    Q.    The three in question?
8    A.    Yes.
9    Q.    So the one with Mr. Jones, the
10  one of Rhean --
11    A.    Rheana.
12    Q.    -- Rheana, and the one with
13  Rheana and the other female in front of
14  the boards, is that correct?
15    A.    Yes, sir.
16    Q.    Any other photographs?
17    A.    No.
18    Q.    Anything else done to the
19  piece at all other than the three removed?
20    A.    No.
21    Q.    Was there any damage in
22  removing those three pieces?
23    A.    Yes.

Page 231

1    Q.    What damage?
2    A.    One of the pieces, the front
3  plates had been severed, because it's an
4  incredibly fragile piece gluing Plexiglas
5  together, but one of the pieces of --
6  front plates had been damaged.
7    Q.    And was that one of the pieces
8  where one of the photographs was removed?
9    A.    Yes.
10    Q.    Any other pieces where the
11  photographs weren't removed damaged?
12    A.    No.
13    Q.    Did you give it a good
14  thorough lookover to make sure?
15    A.    Yeah, I looked over it.
16    Q.    Now, I'm sorry, I need to go
17  back to that day when Mr. Noriega and
18  Jerry were in Jerry's office.
19          What did you say to Jerry
20  and/or Mr. Noriega that day?  I forgot to
21  ask you that.
22    A.    I wasn't really sure what to
23  say, you know, other than I was a little

Page 232

1  bit surprised, you know, and kind of,
2  okay, I guess -- I guess you have to do
3  what you have to do, but I'm not -- they
4  asked me, you know, they said do you want
5  to remove the pieces?  No, that would
6  change the integrity of my artwork was my
7  answer.  Do you want to censor them?  Once
8  again, no, that would alter the integrity
9  of my work.  So the only other alternative
10  was to remove it.
11    Q.    That day did Mr. Johnson or
12  Mr. Noriega ask you whether there could be
13  a fourth alternative?
14    A.    No.
15    Q.    Did you say anything else to
16  Mr. Noriega and Mr. Johnson that day other
17  than what we have already discussed?
18    A.    No.
19    Q.    So now we have had the phone
20  call.  You went to the memorabilia room
21  where the art was hanging.  You saw three
22  of your photographs missing.  And did you
23  then go to Mr. Johnson's office that day?

Page 233

1    A.    I went there so that I could
2  -- well, I was very angry at this point.
3  I went to his office, in which my
4  photographs were in his office, and, you
5  know, I said well, before I take the piece
6  down, I would like to photograph it. So
7  he gave me the pieces back and put them
8  back in the piece and photographed it and
9  then had the piece removed.
10    Q.    When you went to the room that
11  day, the memorabilia room, before you went
12  to his office --
13    A.    Yes.
14    Q.    -- you got the call, you went
15  to do the photograph, was the room open or
16  did you have to ask somebody to let you
17  in?
18    A.    I had to ask -- I had to ask
19  the secretary to let me in, and I got in.
20  She, of course, said are you a student,
21  are you of age?  And I got in.  And I said
22  yes, one of my pieces is in there.
23    Q.    That's what she asked you, are

Page 234

1  you a student, are you of age?
2    A.    Yes.
3    Q.    Classes hadn't started then,
4  right?
5    A.    They had not started.
6    Q.    Do you know who that person
7  was who asked you that?
8    A.    I do not know.
9    Q.    Did she have a desk or an
10  office in that building?
11    A.    Like I said, the entranceway,
12  there is a secretary there -- sometimes
13  they weren't there and you couldn't --
14  friends had told me that there were times
15  they couldn't even get into the exhibit
16  because nobody was there and the doors
17  were locked, but -- that's all hearsay.
18    Q.    Which friends told you that?
19    A.    Guinevere Reddick.
20    Q.    Is that her last name?
21    A.    Yes, I think so.  Some other
22  friends in other classes, and I couldn't
23  recall.

Page 235

1    Q.    And they had told you that
2  they went to see the exhibit but that the
3  door was locked and there was no one to
4  let them in?
5    A.    Yes.
6    Q.    Did anyone tell you that they
7  had went to see the exhibit, the door was
8  locked but someone was available to let
9  them in?
10    A.    Yes.
11    Q.    Who told you that?
12    A.    I mean, that was one of those
13  things that was published in the school
14  newspaper.
15    Q.    What was published in the
16  school newspaper?
17    A.    That there -- I believe that
18  there was an article on the fact that
19  permission had to be granted to obtain
20  entrance.
21    Q.    Do you know what that
22  permission required?
23    A.    Either that, A, you were a

Page 236

1  student or, B, that you were eighteen or
2  above.
3    Q.    Now, that's something you read
4  in the newspaper.  Did you get that
5  information from anyone else?
6    A.    It was kind of spurting around
7  campus.
8    Q.    Did you have any problem with
9  that requirement that you had to be a
10  student or eighteen and older?
11    A.    Personally?
12    Q.    Yes, personally.
13    A.    Yes.
14    Q.    Why?
15    A.    I'm a very, very, you know --
16  I support challenging work, graphic work,
17  that's just my whole artistic stance.  And
18  that's my own personal idea.  And I think
19  that artwork, period, should be viewable
20  to anybody of any age.
21    Q.    And is there an opinion you
22  have when we take the personal aspect away
23  that's different from that?  I mean, is

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 237

1  there a part of you -- like, say, this is
2  my personal hat, but as a professional
3  artist I have a different opinion?  Or is
4  that your opinion regardless of what hat
5  you would be wearing?
6       A.    Personal opinion is the
7  artistic opinion, because I am my artwork
8  and that's how I view it.
9       Q.    So you wouldn't put a
10  restriction -- an age restriction on
11  anyone to see any of the photographs that
12  were in your piece, am I correct?
13          MR. ADAMS: Can you -- I'm
14  going to object to the form and ask that
15  you be more specific as to the age --
16       Q.    If you are standing at the
17  door and say a twelve-year-old walked up
18  and was about to walk in that door, would
19  you tell that twelve-year-old you can't go
20  in there because there's pictures that you
21  probably shouldn't see?
22       A.    Would I say that?
23       Q.    Yes.

Page 238

1       A.    No.
2       Q.    Would you have a problem with
3  anyone from the university telling that
4  twelve-year-old that?
5       A.    No.
6       Q.    So when you said personally,
7  that's your personal opinion?
8       A.    Yes.
9       Q.    Do you have any problem with
10  the university having a rule that you had
11  to be either a student or eighteen years
12  old and over?
13       A.    I have a problem with the way
14  it was carried out.
15          MR. ADAMS:  You need to answer
16  his question.  Answer his question.
17       A.    Okay.
18       Q.    My question is did you have a
19  problem with the university having a rule?
20       A.    No.
21       Q.    And that rule being you had to
22  be a student or eighteen years or older?
23       A.    No.

Page 239

1       Q.    And you understood the student
2  to be a Troy State student, right?
3       A.    Yes.
4       Q.    A middle school student from a
5  local middle school is not what we are
6  talking about?
7       A.    Yes.
8       Q.    Or a high school student?
9       A.    Yes.
10       Q.    Now, what problem did you have
11  with it being -- how it was carried out?
12       A.    That this -- the concept of
13  doing this was carried out after the show
14  had opened and had not been planned out
15  efficiently where people who wanted to
16  view this show couldn't get in if there
17  wasn't somebody there to unlock the door.
18  I mean, I was told -- and I was told by a
19  faculty member, and I'm going to go ahead
20  and say I don't remember who the faculty
21  member was, but that this had sort of
22  skyrocketed people actually coming to
23  shows, and people were coming and couldn't

Page 240

1  get in.  And that bothered me a great
2  deal.
3       Q.    Any other problems with how it
4  was carried out?
5       A.    No.
6          MR. ADAMS:  I'm going to
7  object to the form again.  When you say
8  it, are you referring to the entrance and
9  exit policy or the removal of the
10  photographs?
11          MR. MUSSO:  Well, let's say
12  that, the entrance and exit policy.  He
13  has already said, first of all, that the
14  removal of the photographs he talked about
15  were the three he saw missing.
16          MR. ADAMS:  Correct.
17          MR. MUSSO:  But we haven't
18  talked about the removal of the exhibit
19  yet.
20          MR. ADAMS:  Correct.
21       Q.    Okay.  When I said it, to
22  clarify my question, that would be the
23  entrance and exit policy as you understood

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 241

1  it.
2      A.    Did I have a problem with it?
3      Q.    Yes. You have already told me
4  what that problem is, correct?
5      A.    Other than that, no.
6      Q.    Okay. And that's how the
7  entrance and exit policy was carried out?
8      A.    To my understanding.
9      Q.    And your understanding is
10  based on what?
11      A.    Other students discussing the
12  fact that they couldn't get in, that type
13  of thing.
14      Q.    I know you told me the names
15  of some students who said they -- were
16  these students able to see it at all?
17      A.    At some point, yes.
18      Q.    Do you know of any student who
19  just wasn't able to see it at all because
20  of that policy?
21      A.    No, not that I can recall.
22      Q.    Now, when you were in Mr.
23  Johnson's office and there were the three

Page 242

1  photographs, you had told me that you had
2  asked Mr. Johnson to give you the three
3  photographs back, am I correct?
4      A.    Yes.
5      Q.    And you told him -- did you
6  tell him you wanted to photograph the
7  work?
8      A.    Yes.
9      Q.    What else did you tell him
10  that day, if anything?
11      A.    It was very brief in that the
12  phone conversation was that I -- you know,
13  the piece had to be removed or among the
14  different options I had, the censored or
15  removal of the three pieces and the rest
16  could stay up.
17      Q.    Did he tell you what censoring
18  might entail? Hanging a sheet over it or
19  putting it in a cubicle or anything like
20  that?
21      A.    Piece of tape over something
22  or --
23      Q.    Is that what he said or --

Page 243

1      A.    To some way conceal certain
2  elements of a photograph.
3      Q.    But he didn't necessarily say
4  specifically what was in his mind?
5      A.    No, no.
6      Q.    And at any time that day or
7  any time during the history of the world
8  did he ever give you a fourth alternative
9  or any other alternative?
10      A.    None that I can recall.
11      Q.    So he never said Blake, what
12  do you think we should do?
13      A.    No.
14      Q.    And have you told me
15  everything that you told him when you went
16  in there and he had your three photos?
17      A.    Yes, I believe so. That was
18  very short.
19      Q.    What did he say to you?
20      A.    Just, you know, we need it out
21  by this time and here's your photographs,
22  photograph it, do whatever you need to do,
23  document it, that's fine.

Page 244

1      Q.    Was he polite to you at that
2  time?
3      A.    Yes.
4      Q.    Has he ever been -- I know you
5  don't agree with him taking the
6  photographs out, but was he ever anything
7  but polite to you in how he handled it?
8      A.    No, he was always polite.
9      Q.    Was that true of all of the
10  other faculty members?
11      A.    Excepting one.
12      Q.    And that's Mr. Joslin?
13      A.    Yes.
14      Q.    We are going to get into that
15  matter in just a second. But other than
16  that situation we are going to talk about
17  later, any other --
18      A.    No.
19      Q.    Do you know who made the
20  decision --
21      A.    To this day, I don't.
22      Q.    When I say who made the
23  decision, that it come down?

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 245

1    A.    No.
2    Q.    Do you know who made the
3  decision as to why those three
4  photographs?
5    A.    No.
6    Q.    Do you know whether Mr.
7  Johnson agreed or disagreed with that
8  decision?
9    A.    I believe he disagreed.
10   Q.    What caused you to have that
11  belief?
12   A.    I made an A in the class.
13  That would be my assumption.
14   Q.    And how soon after that did
15  the piece actually come down?
16   A.    That day.
17   Q.    And how did that -- how was it
18  removed?  Did you remove it?
19   A.    I got Dan to come help me
20  remove it.
21   Q.    Anyone other than Dan?
22   A.    No.
23   Q.    Same truck?

Page 246

1    A.    Yes.
2    Q.    When you went to remove it,
3  did you have to have someone let you in
4  again?
5    A.    I had to have somebody let me
6  in -- the same lady to let me in to
7  photograph it.  And then I was calling
8  Dan, take it down, which I had already
9  been discussing.
10   Q.    So you took the whole piece
11  down that day, correct?
12   A.    Yes.
13   Q.    And where did you take that
14  piece?
15   A.    Initially I kept it in -- at
16  Dan's house, because I didn't have enough
17  storage.  And then it was transported to a
18  storage facility in Troy.
19   Q.    And who paid for that storage
20  facility?
21   A.    It was Dan's storage facility,
22  and I gave him a little bit of money to
23  keep it.

Page 247

1    Q.    You say a little bit of money.
2  How much?
3    A.    I really can't recall how much
4  it was at the time.
5    Q.    I have rented those, they
6  raise it every day, the rent on those.
7        How long did it stay in that
8  storage facility?
9    A.    It is still in a storage
10  facility, still in that same storage
11  facility, although I have taken it out
12  some to photograph it, other such things,
13  but it is still there.
14   Q.    Are you still paying Dan some
15  money?
16   A.    No.  I have since sold the
17  piece for parts, different parts.  I was
18  going to disassemble it.
19   Q.    I mean, have you sold
20  individual photographs out of the piece or
21  cubes or the -- what parts have you sold?
22   A.    The light box, the bulk of the
23  piece, and I have used the Plexiglas for

Page 248

1  other materials, other work.
2    Q.    Okay.  Did you have any
3  intention with regard to what you were
4  going to do with the piece before you
5  learned that the piece had to come down or
6  anybody had any problems with the content
7  of the piece?  I mean, at some point you
8  knew the show was going to close, right?
9    A.    Exactly.
10   Q.    And you had a large piece of
11  art.  Did you have any idea at that point
12  what you were going to do with it?
13   A.    Hopefully to sell it is what I
14  wanted -- that's what any artist wants to
15  do.  But if not, then to use it for other
16  purposes.  If I had to dismantle it or --
17  and it is still assembled.  I'm just --
18  that's what my contemplation on using
19  it --
20   Q.    If someone wanted to buy the
21  piece as a whole, could you put the light
22  equipment back in it and make some more
23  Plexiglas boxes and --

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 249

1      A.   It is still assembled. But if
2 I -- you mean if I wanted to sell that
3 particular piece?
4      Q.   Yes, if I came there and said
5 I would like to buy that right now, here
6 is X amount of money, could you --
7      A.   I would have to do some repair
8 work on it, but, yes.
9      Q.   Okay. And if I would want it
10 signed, would you do that?
11      A.   (Shaking head negatively.)
12      Q.   No? Okay. Did you ever --
13      MR. ADAMS: I will sign it,
14 Joe.
15      MR. MUSSO: Well, then, now
16 it's not worth anything. That's what you
17 call desecration of art right there.
18      MR. ADAMS: It would be if I
19 signed it.
20      Q.   Now, did anyone ever approach
21 you wanting to buy the piece in whole?
22      A.   No.
23      Q.   Okay. Did you ever put a

Page 250

1 price on the piece?
2      A.   No.
3      Q.   And this juried art show, did
4 anyone put price tags on any of the
5 pieces?
6      A.   Not that I am aware of, no.
7      Q.   And no one was standing there
8 with a credit card machine and a cash
9 register ready to take money, correct?
10      A.   No, sir.
11      Q.   In your senior thesis, were
12 any prices on the merchandise?
13      A.   No.
14      Q.   Did these people approach you
15 and say gee, we would like some of your
16 artwork, can we buy it?
17      A.   It's one of those things where
18 you socialize, get to know people, hand
19 out your card, they contact you.
20      Q.   So after your piece was
21 removed and taken to the storage shed,
22 that day that you and Dan did that, did
23 you ever go back into the hall -- the

Page 251

1 memorabilia hall again, the memorabilia
2 room?
3      A.   No.
4      Q.   Did you ever go back in that
5 building period?
6      A.   No.
7      Q.   When did the show end?
8      A.   I don't recall that. My piece
9 wasn't in it -- well, I had another piece
10 in it that was juried into it, but it's
11 inconsequential.
12      Q.   What happened to that piece?
13      A.   That was returned to me after
14 the show was over. But that was returned
15 to me at the Malone, you know, building,
16 not at the HAL Hall.
17      Q.   Did they bring like
18 everybody's pieces over there and you just
19 went and picked it up, is that how that
20 worked?
21      A.   Exactly.
22      Q.   Do you recall when that was?
23      A.   I don't.

Page 252

1      Q.   Do you know why the show
2 ended?
3      A.   No.
4      Q.   After your piece was removed,
5 did anyone say they went to the show and
6 tried to get into it and couldn't, the
7 door was locked and no one was available?
8      A.   No one that I recall. But,
9 yes, I do remember hearing comments.
10      Q.   Do you know whether they went
11 before or after your piece?
12      A.   After my piece was removed or
13 before?
14      Q.   Yes, after your piece was
15 removed.
16      A.   Yes. This was one of those
17 situations where there was coverage of it
18 and I had people I didn't know talking to
19 me, so -- it's just one of those kind of
20 crazy things where there is a lot of talk
21 all around you.
22      Q.   Did some of the people who
23 came up to you and talk to you, were any

BLAKE DEWS                                                    BLAKE DEWS
TROY UNIVERSITY, ET AL.                                      April 27, 2006

Page 253

1  of them supportive of your position?
2      A.   A lot of them were.
3      Q.   Were any of them derogatory
4  towards you or your piece of art?
5      A.   I had some conservative minded
6  people that were rude to me.
7      Q.   How were they rude to you?
8      A.   Name calling, stuff like that.
9      Q.   What names?
10     A.   Fag, those kind of things.
11     Q.   Anything other than that word?
12     A.   I don't know.  I try to block
13 those kind of things out, but --
14     Q.   Has that language ever been
15 used toward you before that work was put
16 up?
17     A.   No.
18     Q.   Was there any press about the
19 show done before your work was taken down
20 or there was a question with regard to the
21 content of your work?
22     A.   There was an article written,
23 and I can't recall whether it was before

Page 254

1  the piece -- I think -- I believe it was
2  after the piece was taken down.
3      Q.   Did anyone make any comments
4  about your work before you learned the
5  piece was going to be coming down or there
6  was any problems with the content of your
7  piece?
8      A.   No.  I didn't really have a
9  chance to get much feedback, because it
10 was right before that break, so --
11     Q.   And during the break, do you
12 know whether the show was open for people
13 to view?
14     A.   I believe that the faculty
15 were there for a specified amount of time
16 and then they had a break and then came
17 back before the students got back.  So I
18 think in that time there was some employee
19 there that had the keys or whatever, but I
20 can't be certain.
21     Q.   Did you -- any of the students
22 that made these rude remarks, how many of
23 the students did that?

Page 255

1      A.   About not being able to get in
2  or --
3      Q.   No, about -- you said one
4  student used the derogatory term, said
5  fag.
6      A.   Oh.
7      Q.   How many students were rude in
8  that -- what number of students?
9      A.   Out of the forty odd students,
10 I'm going to say, that made comments to
11 me, I would say maybe a quarter of them.
12     Q.   Were not positive?
13     A.   Were derogatory.
14     Q.   Derogatory.  Out of that
15 quarter, say the ten or so, did anyone
16 else use that term fag or a term related
17 to homosexuality or any other --
18     A.   No.  I mean -- there could
19 have been like a grouping of two or three
20 guys, very conservative, that kind of
21 attitude.  And then I had just other kind
22 of glances, looks, menacing type things.
23     Q.   Given some of the photographs

Page 256

1  in the work, you know, the one where you
2  appear, did you anticipate that there may
3  be those comments that were going to come
4  along before this happened?
5      A.   Are you discussing -- you are
6  discussing this photograph?
7      Q.   This photograph, yes.  When I
8  say this photograph, that's the first page
9  of Exhibit 3.
10     A.   No, I would not think at all
11 that a comment would be made about that
12 photograph.
13     Q.   Okay.
14     A.   There was a -- the majority of
15 the negative comments were made after an
16 article in The Trop that displayed the
17 photograph of Tim Jones, African-American
18 male.  Of course, the genitalia was
19 censored in the article, but there was
20 discussion in the article about that.
21     Q.   So that's when the term --
22     A.   That terminology, yes.
23     Q.   -- those terms were used?

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 257

1    A.    Yes.
2    Q.    The terms relating to
3  homosexuality or transgender or whatever,
4  however they -- whatever terms they used?
5    A.    Yes.
6    Q.    But when you --
7        MR. ADAMS:  Do you want to
8  take a break?
9        MR. MUSSO:  Yes, let's take a
10  break.
11        (Whereupon, a break was had
12        from 2:50 p.m. until 2:56 p.m.)
13    Q.    Now, when you created the
14  piece of art that you knew was going to be
15  in the show, did you anticipate there
16  could be some negative comments from
17  students?
18    A.    When you get that close to
19  your work -- I wasn't anticipating
20  anything.  All I was -- I was delving into
21  the work.  All outside things were just
22  kind of -- other than whether it was
23  comments about the work in progress, no, I

Page 258

1  didn't --
2    Q.    Artists do find themselves in
3  controversial situations because of their
4  art, correct?
5    A.    Yes.
6    Q.    I mean, as an artist, did you
7  expect to go through your career without
8  facing some controversy from the public at
9  large, be it negative, positive or
10  whatever reason?
11    A.    I don't think all artists go
12  through controversial --
13    Q.    But some do?
14    A.    Some do.
15    Q.    I mean, I can paint flowers
16  and bunnies and probably not be
17  controversial, right?
18    A.    Yes.
19    Q.    Now, did you complain to any
20  faculty or staff or administrative member
21  at the university about anything any of
22  the students said to you about your
23  artwork?

Page 259

1    A.    That the students said?
2    Q.    Yes.
3    A.    No.
4    Q.    Did you complain to anyone at
5  the university about anything that a
6  professor, administrative staff or staff
7  member said?
8    A.    Other than the situation with
9  Bob Joslin, no.
10    Q.    And we are going to get to
11  that.
12        After that day when you took
13  the work down and you met with Mr. Johnson
14  in his office and talked to him on the
15  phone, did you and Mr. Johnson talk about
16  that piece of art again from that day
17  forward?
18    A.    No.
19    Q.    And you took Collaborative
20  Studio in the spring of 2004, am I
21  correct?
22    A.    Yes, sir.
23    Q.    And was there a show for that

Page 260

1  class?
2    A.    Yes.
3    Q.    And that -- was that based
4  upon -- I think you said the attic
5  concept?
6    A.    Yes.
7    Q.    Who came up with that concept?
8  Was that the professor or the students or
9  one student or --
10    A.    I can't recall where the
11  concept was originated, to be honest.
12    Q.    And, again, was that Mr.
13  Johnson who taught that class?
14    A.    I think so.
15    Q.    Do you recall what your grade
16  was in that class?
17    A.    I made A's in all of my studio
18  courses.
19    Q.    Okay.  So the spring of 2004,
20  you made an A in that Collaborative --
21    A.    Uh-huh, yes, sir.
22    Q.    Did you ever receive a low
23  grade for producing -- by any of your art

Page 261

1  teachers for producing the work in
2  Defendant's Exhibit 2?
3       A.   A low grade from any of my --
4  no.
5       Q.   Any teachers at all on campus
6  that you are aware of, did they --
7       A.   For this particular work, no.
8       Q.   Okay.  Did you receive a low
9  grade from any professor because of the
10 subject matter of any of your work?
11      A.   In my whole career as a
12 student?
13      Q.   Career at Troy, yes.
14      A.   Subject matter?
15      Q.   Yes.
16      A.   I guess that's subjective.
17      Q.   I mean, professors, especially
18 in the art world, are going to sometimes
19 like your art and sometimes not, is that
20 correct?
21      A.   That's true.
22      Q.   But do you think any
23 professors gave you a grade lower than you

Page 262

1  felt you deserved because you were taking
2  pictures of male or female genitalia?
3       A.   Yes.
4       Q.   Who was that?
5       A.   Bob Joslin.
6       Q.   And what grade did he give
7  you?
8       A.   A B.
9       Q.   And do you think you deserved
10 an A?
11      A.   Yes.
12      Q.   Was that in one class or more
13 than one class?
14      A.   That was the last class that I
15 had with him.
16      Q.   The last class you had with
17 him?
18      A.   Yes.
19      Q.   Now, what semester was it when
20 you had your last class with Mr. Joslin?
21      A.   The same semester as the
22 Collaborative Studio course in question.
23      Q.   So that was fall of 2003?

Page 263

1       A.   Yes.
2       Q.   And what was the title of that
3  class, do you recall?
4       A.   Photo Studio III.
5       Q.   Was there a Photo Studio I and
6  II?
7       A.   There were.
8       Q.   And did Mr. Joslin teach
9  those?
10      A.   He did.
11      Q.   And what were your grades in
12 I, Photo Studio I?
13      A.   A.
14      Q.   What about Photo Studio II?
15      A.   A.
16      Q.   Okay.  How was Photo Studio
17 III different than Photo Studio I and II?
18      A.   I is basic photography
19 technicalities, basic image making, that
20 kind of thing, doctrine practices.  Second
21 photo studio, color slide, still the same
22 kind of thing, you know, where to send
23 your photographs, all of that kind of

Page 264

1  thing, how to process them.  And the third
2  is portraiture where you combine both
3  color and black and white, and use the
4  studio.
5       Q.   Now, was there a time when Mr.
6  Joslin said something negative about the
7  content of photographs you were taking?
8       A.   Which photographs --
9       Q.   As in he disagreed with what
10 was being photographed as in --
11      A.   In these (indicating)?
12      Q.   Doesn't have to be Defendant's
13 Exhibit 2.  Any nude -- was there ever a
14 time when he told you he disagreed with
15 you taking nude photographs?
16      A.   Might have mentioned that all
17 photographs needed to be tasteful.  But
18 once again, tasteful is subjective.
19      Q.   Did he ever tell you that he
20 disagreed with the photographs that you
21 took in Defendant's Exhibit Number 2?
22      A.   Yes, he did.
23      Q.   When did he tell you that?

66 (Pages 261 to 264)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 265

1  A.   I had gone to pick up my
2  portfolio for Studio III, this was the end
3  of the semester, and this is -- or not at
4  the end of the semester, it was after we
5  had gotten back.  I went to pick it up and
6  -- this was when we received our grades
7  for that class.  I had a B, and he
8  basically told me that -- not to shoot
9  pornography in his studio and grabbed me
10  by the arm in front of two other students
11  that I know were in there, and there were
12  more.
13  Q.   Who were the two that you know
14  were in there?
15  A.   Melanie Padgett and Katie
16  Vaughn.
17  Q.   How many others were -- just
18  numberswise?
19  A.   Oh, gosh.  There were some in
20  the dark room that may not have seen but
21  been walking in and out and hearing the
22  conversation we were having.
23  Q.   So you were going that day to

Page 266

1  pick up your portfolio.  Would that be the
2  work you produced in that class?
3  A.   In that class.
4  Q.   And what did that portfolio
5  consist of, what photographs were in that
6  portfolio?
7  A.   There were some that I had
8  used in Exhibit 2, others that I had taken
9  specifically for, you know, the Photo III
10  course.
11  Q.   When you say some that you
12  took for Exhibit 2, the piece of work you
13  created for Collaborative Studio, which
14  ones were -- looking at Defendant's
15  Exhibit 2, which ones were in your
16  portfolio in Studio III?
17  A.   This one.
18  Q.   That would be the first page
19  where you were the model?
20  A.   The first page.  And these are
21  the ones I can remember in my portfolio.
22  Second page.
23  Q.   Mr. Gibbs holding his child?

Page 267

1  A.   Third page.
2  Q.   Does she go by Ms. Gibbs?
3  A.   Yes.
4  Q.   Ms. Gibbs holding her child.
5  A.   This one.
6  Q.   What was her name again?
7  A.   Morgan.  That's all I can
8  remember.  Yeah.
9  Q.   Were there any nude
10  photographs in that portfolio you were
11  picking up that day?
12  A.   In the portfolio for Studio
13  III?
14  Q.   Yes.
15  A.   No.
16  Q.   Had you brought any nude
17  photographs to the studio that day?
18  A.   No.
19  Q.   So that day you didn't bring
20  any pictures of any individuals where the
21  genitalia was revealed?
22  A.   No, sir.
23  Q.   Did you ever bring any

Page 268

1  pictures in the Photo Studio III class
2  when you were there of individuals who
3  were nude or had their genitalia showing?
4  A.   Other than to scan those
5  images in as we discussed earlier.  They
6  were -- I was in his office scanning those
7  images in to use them -- to go print them
8  elsewhere.
9  Q.   But you didn't bring them to
10  class?
11  A.   To that particular class, no.
12  Q.   Did you ever bring any of
13  those photos -- any nude photographs to
14  any photo studio class, whether you were a
15  student in that class or not, and show
16  them to other students?
17  A.   No.
18  Q.   Did you ever bring any nude
19  photographs of -- into the photography
20  studio at all and show them to other
21  students, whether Mr. Joslin was there or
22  not?
23  A.   I can't recall that, no.

67 (Pages 265 to 268)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 269

1    Q.    So there was this day that
2  Melanie and -- I'm sorry, what was the
3  name of the other student?
4    A.    Melanie and Katie.
5    Q.    -- and Katie were there, other
6  students were there, and you were going to
7  pick up your portfolio.  How did it come
8  about that Mr. Joslin made this comment
9  about pornography?
10    A.    Well, I asked him, you know,
11  can you kind of explain to me about my
12  grade.  Because I'm an overachiever,
13  granted.  And his reasoning was that I had
14  spent far too much time on my
15  collaborative piece and that my work
16  wasn't at the quality that he thought it
17  should be.  And -- in which case I -- and
18  I can't remember really how it started to
19  get heated, but it turned into something
20  where, you know, he was saying that my
21  work was inappropriate in some way because
22  -- it had started to get heated because I
23  was really -- I was mainly upset about my

Page 271

1  counter?
2    A.    No.
3    Q.    Didn't wear a sling or
4  anything?
5    A.    No.
6    Q.    Did any students witness that?
7    A.    I believe both of those
8  students witnessed it, because I said
9  something to them later about it like is
10  that unreal or what, you know.  And I also
11  went to Ms. Allen and told her about it,
12  because I was really shooken up about it.
13    Q.    And do you know if Ms. Allen
14  did anything after you told her?
15    A.    Ms. Allen told me that it was
16  incredibly inappropriate and that she
17  would pull the faculty together to have a
18  conversation about it with me if I wanted
19  to.  And I just told her I didn't want to
20  deal -- I didn't want to see him anymore,
21  I didn't want to talk to him, because it
22  really upset me.  And that was the last
23  time we talked about that.

Page 270

1  grade.  And it sort of turned into this
2  other thing.  Well, we started to talk
3  about subject matter, and I could tell he
4  was getting angry with me.  And so, you
5  know, I was well, whatever, I'm going to
6  leave, because I didn't want to be -- I
7  didn't want to get to this point where
8  people are yelling, especially while other
9  people are around.  And I started to walk
10  out and he got up and grabbed me and told
11  me not to shoot porno in his studio.
12    Q.    Now, when you say grabbed you,
13  did he -- describe to me -- I saw you grab
14  one of your arms --
15    A.    He physically grabbed one of
16  my arms right above my elbow.
17    Q.    Did it cause you any injury,
18  physical injury?
19    A.    Didn't bruise me.
20    Q.    Did you go to a doctor because
21  of it?
22    A.    No, I didn't.
23    Q.    Take any medication over the

Page 272

1    Q.    Was that the last time you
2  ever had a conversation with Mr. Joslin?
3    A.    No.
4    Q.    I know one time Mr. Joslin
5  helped you to arrange having your
6  photographs --
7    A.    Printed.
8    Q.    -- printed.  Was that after
9  the incident where he grabbed your arm?
10    A.    That was before.
11    Q.    Before?
12    A.    Yes, sir.
13    Q.    How long before?
14    A.    That was still in the work
15  part of my exhibit.  And this was well
16  after that.
17    Q.    And so he used the word porno,
18  correct?
19    A.    Yes.
20    Q.    Did he specifically refer to
21  which photographs he thought were porno?
22    A.    No.
23    Q.    And after that day, did you

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 273

1  ever talk to Mr. Joslin again?
2      A.    As I said before, we had
3  passing conversation, but never anything
4  of substance after that.
5      Q.    And did you ever take any of
6  his classes again?
7      A.    No.  I actually made it a
8  point not to.
9      Q.    Were there any of his classes
10  that you could have taken?
11      A.    There was a class that was
12  required to take, and I substituted it for
13  an independent study instead because of
14  that incident.
15      Q.    Did someone facilitate you to
16  do that in lieu of the required course?
17      A.    Mr. Johnson.
18      Q.    I'm sorry, Mr. Johnson?
19      A.    Mr. Johnson.
20      Q.    Did you tell Mr. Johnson what
21  Mr. Joslin had done?
22      A.    No, I did not.
23      Q.    You just simply went to him

Page 274

1  and asked him if you could take an
2  independent study class in lieu of that
3  photography course?
4      A.    Yes.
5      Q.    Did he ask you why?
6      A.    I think we had a conversation
7  about it, and it had amounted to that that
8  course wasn't going to come around in time
9  for me to graduate or something of that
10  nature, so it was a timing issue as well.
11  And that's what we discussed.
12      Q.    Was it really a timing issue?
13      A.    It was.
14      Q.    And so you did an internship
15  -- where did you do the internship at?
16      A.    I did my internship with
17  Studio 120, David Parker in Dothan,
18  Alabama.
19      Q.    Is that the only internship
20  you ever did while you were there?
21      A.    The only internship, yes.
22      Q.    And did you complete the
23  internship?

Page 275

1      A.    I did.
2      Q.    The one with Mr. Parker?
3      A.    I did.
4      Q.    And did you receive a grade?
5      A.    I did.
6      Q.    What was that grade?
7      A.    An A.
8      Q.    Okay.  And who actually
9  assigned that grade?  I mean, was it --
10      A.    I believe that's Mr. Johnson.
11      Q.    I mean, the way internships
12  work, you certainly work with the person
13  who is your mentor, is that correct?
14      A.    Yes, sir.
15      Q.    And that person is going to
16  give feedback back to a faculty member?
17      A.    Yes, sir.
18      Q.    And was that faculty member
19  Mr. Johnson?
20      A.    Yes, sir.
21      Q.    And based upon that feedback,
22  a grade appears; and that was an A,
23  correct?

Page 276

1      A.    Yes, sir.
2      Q.    Did you ever do any other
3  internship anywhere else, be it Dothan,
4  another state, another country, anything
5  else?
6      A.    No.
7      Q.    Okay.  And was it Mr. Parker?
8      A.    Yes, sir.
9      Q.    How did you learn about Mr.
10  Parker to do the internship with him?
11      A.    That would have been through
12  Bob, but it was maybe a semester or two
13  previous to my internship.  I knew about
14  this internship possibility for a while.
15      Q.    Did your relationship with Bob
16  in any way negatively affect your
17  internship with Mr. Parker?
18      A.    No.
19      Q.    You got along well with Mr.
20  Parker?
21      A.    I did.
22      Q.    What type of work was Mr.
23  Parker's studio doing?

69 (Pages 273 to 276)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 277

1    A.   Commercial photography,
2  portraiture, some industrial stuff as
3  well.
4    Q.   What are you interested in
5  artistically these days?  I mean, are you
6  doing art?
7    A.   I am.
8    Q.   Are you showing your art
9  anywhere around town or anywhere else?
10    A.   I have just recently moved to
11  Birmingham, and so I am gathering work for
12  sort of a prospectus on my concepts of
13  Birmingham, that kind of thing.  But I'm
14  still gathering work to actually go to
15  galleries and start showing.
16    Q.   After you graduated from Troy,
17  did you show your work anywhere else?
18    A.   No.
19    Q.   Is there any other time that
20  Mr. Joslin touched you?
21    A.   No.
22    Q.   And there is no time you
23  brought pornography into the studio?

Page 278

1    MR. ADAMS:  I am going to --
2    A.   I have never --
3    MR. ADAMS:  If you will define
4  that.
5    Q.   Let me -- did you ever bring
6  any photographs into that studio of male
7  penises?
8    A.   No.
9    Q.   Have you ever brought any
10  photographs into that studio of any
11  individuals engaging in any sexual acts,
12  like masturbation, something like that?
13    A.   No.
14    Q.   Do you know whether Mr. Joslin
15  ever saw Defendant's Exhibit 2, that piece
16  that was in the juried show?
17    A.   I can't recall whether he was
18  there or not.  I'm sure he saw it -- I'm
19  sure he did see it.
20    Q.   When you say you are sure, I
21  mean -- were you there when he was there?
22    A.   I never saw him at the
23  exhibit, no.

Page 279

1    Q.   Did he ever tell you he went
2  to the exhibit?
3    A.   No.
4    Q.   Did anyone ever tell you that
5  they saw him at the exhibit?
6    A.   Actually, I think among that
7  conversation that we were having that led
8  up to that kind of loud argument type
9  thing --
10    MR. ADAMS:  The arm-grabbing
11  incident?
12    A.   The arm-grabbing incident,
13  that he had seen it.  This was before
14  everything started to get heated.  But at
15  that time when he was saying what he was
16  saying was that he liked what he saw.
17    Q.   He liked what he saw in the
18  exhibit?
19    A.   Yes.
20    Q.   And that being the exhibit in
21  Defendant's Exhibit 2?
22    A.   Yes.
23    Q.   Now, have we covered all of

Page 280

1  the conversations you had with any Troy
2  State employee about your piece of art in
3  Exhibit 2, the one that was shown at the
4  juried show in the Adams memorabilia room?
5    A.   To my recollection, yes.
6    Q.   Now, you also had a piece in
7  the Collaborative Studio show that spring,
8  correct?
9    A.   Yes.
10    Q.   Is this it, before we stick a
11  sticker on it?
12    A.   Yes.
13    (Whereupon, Defendant's
14    Exhibit 7 was marked for
15    identification.)
16    Q.   I'm going to give you
17  Defendant's Exhibit 7.
18    (Off-the-record discussion.)
19    Q.   Describe to me what Exhibit 7
20  is.
21    A.   This was based on the attic
22  theme.  These are large cyana types, the
23  blue photographs, but you can't see

70 (Pages 277 to 280)

Page 281

1   because it is a black and white print.
2   But the photographs around the two central
3   figures are cyana types. These are mural
4   black and white prints sewn together with
5   hemp, hand-dyed hemp. And the pieces in
6   between are hemp and cyana types, small
7   cyana types.
8       Q.    What was the venue, the space
9   where this hung?
10      A.    A loft in downtown Troy.
11      Q.    Do you know who owned that
12  facility?
13      A.    The lawyer beneath us. I
14  don't recall his name now.
15      Q.    Do you know who rented this
16  facility? I mean, was this like empty
17  space on top of his building --
18      A.    No, this was Jane Ann
19  Fessler's. Jane Ann Fessler rented this
20  loft.
21      Q.    And is Ms. Fessler an art
22  student?
23      A.    Was at the time that I know.

Page 282

1       Q.    Was she a friend of yours?
2       A.    More like an acquaintance.
3       Q.    Okay. Did she actually live
4   in this space as well?
5       A.    She did.
6       Q.    Did you rent a room out of
7   that loft too at any time?
8       A.    I did.
9       Q.    When this show was going on,
10  were you renting a room at that time
11  yourself?
12      A.    I was moving stuff into a
13  room. I basically had all of my stuff
14  crammed into one room so that we could
15  actually have the show there.
16      Q.    When you say moving into a
17  room, you were actually going to use that
18  as living space as well, correct, staying
19  there?
20      A.    Yes.
21      Q.    So Ms. Fessler, did you pay
22  rent to her?
23      A.    I paid rent directly to the

Page 283

1   lawyer downstairs.
2       Q.    The lawyer, okay. But Ms.
3   Fessler also lived in rooms --
4       A.    Adjacent.
5       Q.    Adjacent, okay. Anyone else
6   live in that space above the lawyer
7   besides you and Ms. Fessler?
8       A.    Later on Jacqueline
9   Youngblood.
10      Q.    Was she one of the individuals
11  whose photograph was in DX 2?
12      A.    Yes.
13      Q.    Now, this was work actually in
14  your room, the one --
15      A.    No.
16      Q.    Was this in a loft above your
17  rooms?
18      A.    No. It was one long loft, and
19  it went back into the back, and those were
20  the rooms we used for the exhibit space.
21      Q.    Who chose that space to be the
22  place for the show?
23      A.    The faculty.

Page 284

1       Q.    Did anyone suggest to the
2   faculty that this would be a good space?
3   I mean, for instance, do you know whether
4   Ms. Fessler said we have some space we can
5   use?
6       A.    I think that may have been the
7   case.
8       Q.    Do you know?
9       A.    I don't know.
10      Q.    You didn't go to a faculty
11  member and say hey, we have this great
12  space we can use?
13      A.    Not that I recall.
14      Q.    Was it a good space for that
15  theme?
16      A.    It was all right.
17      Q.    Were you pleased with your
18  piece that was in the show?
19      A.    Yes.
20      Q.    Did any professors help you
21  along with this piece?
22      A.    It was once again sort of that
23  collaborative idea. We were coming in

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 285

1     showing our work, same concept as far as
2 review and critique.
3      **Q.**   Did Mr. Joslin or any other
4 faculty member tell you that they had any
5 problems with any of the images in this
6 piece, Defendant's Exhibit 7?
7      **A.**   No.
8      **Q.**   Were you ever required to take
9 it down before the show was over?
10      **A.**   No.
11      **Q.**   How long did the show last?
12      **A.**   I can't recall that.
13      **Q.**   Was it weeks, months?
14      **A.**   It may have been a very short
15 amount of time.
16      **Q.**   Did any other faculty member
17 -- well, let me ask you this. Did y'all
18 have a reception?
19      **A.**   We had an opening.
20      **Q.**   Opening, okay. So no food?
21      **A.**   No food.
22      **Q.**   Okay. So you had an opening.
23 Did any faculty members attend the

Page 286

1 opening?
2      **A.**   I can recall a few, yes.
3      **Q.**   Do you know whether Mr.
4 Johnson attended the opening?
5      **A.**   Mr. Johnson was there.
6      **Q.**   Did he make any comments about
7 your piece?
8      **A.**   No.
9      **Q.**   Do you know whether Mr. Fulmer
10 was there?
11      **A.**   I don't recall him being
12 there.
13      **Q.**   Do you know whether Mr. Joslin
14 attended?
15      **A.**   I don't recall him.
16      **Q.**   How was this space opened if
17 someone wanted to see the show other than
18 the opening?
19      **A.**   If Jane Ann was present, if I
20 was present, they could get in to see the
21 show. I think we had hours that it was
22 open. And I think that's also one of the
23 main reasons it wasn't open very long as

Page 287

1 well.
2      **Q.**   Did you ever kind of sit there
3 during the hours to help keep it open?
4      **A.**   There were time constraints,
5 because I remember Jane Ann was moving out
6 of her space that she was in -- because
7 she had just decided to move into this
8 location when the decision was made to
9 make that also space for the gallery, the
10 opening, the showing. So she had a time
11 constraint where she had to be out, and
12 she had a lot of stuff, so she had to move
13 it into the spaces, which is why I think
14 the show was not very long at all.
15      **Q.**   I mean, did you ever volunteer
16 time to be there to help let the show be
17 open during the day or at night?
18      **A.**   I can recall being there in
19 the day, the night, and letting some
20 people in to see the show.
21      **Q.**   But you didn't just leave the
22 doors open, because it was personal living
23 space, right?

Page 288

1      **A.**   Yes.
2      **Q.**   Was this advertised in -- on
3 fliers and the school newspaper, the local
4 newspaper, anything to your knowledge?
5      **A.**   Not to my knowledge. I would
6 say probably, but not to my knowledge.
7      **Q.**   How many people showed up for
8 the opening?
9      **A.**   Around about fifty maybe,
10 maybe more.
11      **Q.**   Did anyone comment about your
12 work, either faculty, students, people off
13 the street?
14      **A.**   Some people off the street,
15 people that I didn't know, said that it
16 was interesting.
17      **Q.**   Did anyone at the show or any
18 time after say anything rude to you based
19 upon anything that appeared in this show?
20      **A.**   No.
21      **Q.**   Did you get any press?
22      **A.**   No.
23      **Q.**   What about your senior thesis,

Page 289

1  did you get any press in the local or
2  student paper, any other paper, because of
3  the student thesis?
4      **A.**    Other than maybe a name drop
5  or something like that.
6      **Q.**    Did any student or any member
7  of the community have anything negative to
8  say to you about what they saw in the
9  student thesis?
10     **A.**    No.
11     **Q.**    How long was your student
12 thesis up again?
13     **A.**    Like I said, I can't recall.
14     **Q.**    Now, let's look at this
15 Defendant's Exhibit 7.  On the left, is
16 that a female?
17     **A.**    It is.
18     **Q.**    Who is that?
19     **A.**    Kelly Newsom.
20     **Q.**    Okay.  And did you know how
21 old Ms. Newsom was at the time this photo
22 was taken?
23     **A.**    No.

Page 290

1      **Q.**    Do you know today?
2      **A.**    No.
3      **Q.**    Who is this other individual,
4  the male on the other side?
5      **A.**    It's Greg -- what is his last
6  name?  I can't recall his last name.
7      **Q.**    And did you know how old he
8  was at the time you took the pictures?
9      **A.**    No.
10     **Q.**    Do you know how old he is
11 today?
12     **A.**    No.
13     **Q.**    Now, there are a number of
14 photographs, one, two, three, four, five,
15 six, seven, eight, nine, ten, eleven -- a
16 dozen photographs surrounding each
17 picture.  Are those photographs of hands?
18     **A.**    They are.
19     **Q.**    Do they depict only hands or
20 do they depict any other parts of the
21 body?
22     **A.**    At some points they depict
23 other parts of the body.

Page 291

1      **Q.**    Do any of these on either side
2  depict any genitalia that's visible?
3      **A.**    Well, there are breasts
4  visible in the photographs of Kelly.
5      **Q.**    Any pictures of her vagina?
6      **A.**    Other than in these -- I mean,
7  it's possible in these smaller images.
8      **Q.**    The smaller images are the
9  ones -- from this perspective, looking at
10 this, are the ones on the -- I want to say
11 on the wall, but they are not on the wall,
12 are they?
13     **A.**    They are hanging.
14     **Q.**    They are hanging.  From this
15 it looks like on the wall, but they are
16 not?
17     **A.**    They are not.
18     **Q.**    Those are smaller photos.
19 There may be pictures of her vagina in
20 some of those pictures?
21     **A.**    Possibly.
22     **Q.**    What about the male, any
23 picture of his penis in any of these

Page 292

1  pictures?
2      **A.**    Yes.
3      **Q.**    Okay.  Did anybody have any
4  comments about there being pictures of the
5  male penis?
6      MR. ADAMS:  I'm going to
7  object to the line of questioning -- from
8  what I see in the picture, it looks like a
9  whole person.  Now, it may contain a
10 penis, but it is a whole person --
11     **Q.**    Well, there is a person and
12 his penis is shown, correct?
13     **A.**    Yes.
14     **Q.**    Okay.  Did anyone ever say
15 anything negative about the fact that
16 there was a picture with someone's penis
17 showing in Defendant's Exhibit 7?
18     **A.**    No, I don't think so.
19     **Q.**    And Mr. Johnson had seen these
20 -- did Mr. Johnson see this piece of work
21 before it was shown in this show?
22     **A.**    Yes.
23     **Q.**    Do you know whether Mr. Joslin

73 (Pages 289 to 292)

Page 293

1  saw this?
2      A.    I don't know.
3      Q.    Did you produce this work
4  after you took -- after the arm-grabbing
5  incident?
6      A.    Yes.
7      Q.    Did you take these photographs
8  after the arm-grabbing incident?
9      A.    Yes.
10     Q.    All of them?
11     A.    Yes.
12     Q.    Did you take any of them in
13  the --
14     A.    I did.
15     Q.    -- studio?
16     A.    In the studio, yes.
17     Q.    When you took them in the
18  studio, did you take them during the day
19  or at night, or do you recall?
20     A.    At night, I believe.
21     Q.    Did you sign out or did -- for
22  these or did you just -- the studio was
23  available at that time?

Page 294

1      A.    I believe I -- yeah, it was
2  available at that time.
3      Q.    And did both these individuals
4  -- did you get model release forms on
5  either of these individuals?
6      A.    No.  They were students and
7  had agreed to be my subjects, so -- and
8  they knew that I was going to be
9  displaying the work.
10     Q.    You knew about model release
11  forms at that time, though, didn't you?
12     A.    Yeah.
13     Q.    Now, did they know that this
14  would be shown in public?
15     A.    Yes.
16     Q.    And they knew that they would
17  be shown in the nude in public?
18     A.    Yes.
19     Q.    Let me ask you this, on
20  Defendant's Exhibit 2, did some of the
21  individuals who were photographed where they were
22  their photographs appeared where they were
23  fully clothed, were they aware that their

Page 295

1  photographs would appear in a piece of art
2  where other people would not be clothed?
3      A.    All of the models were aware
4  of what the work was going to be.  Yes.
5  So, yes.
6      Q.    So all of the models knew
7  there was going to be some nudity in it,
8  and that while they may not appear nude --
9      A.    Yes..
10     Q.    -- some other people would,
11  correct?
12     A.    Yes.
13     Q.    And I know we talked about
14  your student thesis show and we have
15  talked about this show in Defendant's
16  Exhibit 7 and we talked about the juried
17  show for the thesis in Exhibit 2.
18         Is there -- first of all, in
19  your student thesis show, that's a picture
20  -- all of those pictures contained -- that
21  are in there, that were on the wall, those
22  contain pictures of you and your father,
23  correct?

Page 296

1      A.    Yes.
2      Q.    Any of the pictures in the bin
3  that weren't hanging on the wall, did they
4  contain pictures of anyone else?
5      A.    Yes.  There is one.
6      Q.    And who was that person?
7      A.    One of my friends from Mobile.
8      Q.    And was that person fully
9  clothed?
10     A.    Clothed.  Not fully clothed,
11  but clothed with no genitalia exposed.
12     Q.    At any time in any of the
13  pictures in the bin did you expose any of
14  your genitalia in any of the photographs?
15     A.    I would say there would be no
16  visible exposing.  It was more of a
17  shadowed dark, but I was exposed, you
18  know, before the camera.
19     Q.    So you felt a draft, would
20  that be fair to say?  By looking at the
21  photograph, you can't necessarily see the
22  genitalia?
23     A.    It's backlit, so my body is in

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 297

1 black and turned to the side so you see my
2 thigh.
3     Q.    Did Mr. Johnson have anything
4 negative to say about any of those
5 pictures?
6     A.    No.
7     Q.    Did any faculty member who saw
8 those pictures have anything negative to
9 say about those pictures?
10     A.    Not that I know of, no.
11         (Whereupon, Defendant's
12         Exhibit 8 was marked for
13         identification.)
14     Q.    Let me put this in, Exhibit 8.
15 This is a description of your work that
16 was in the show for the spring of 2004;
17 and that would be the one on the left, is
18 that correct?
19     A.    Yes.
20     Q.    Did you write that?
21     A.    I did.
22     Q.    And did that appear in a
23 program or was that attached to the --

Page 298

1 near the piece of art or both or --
2     A.    I'm sorry?
3     Q.    How was that disseminated to
4 the public, if it was?
5     A.    It was.  Actually you can see
6 in Exhibit 7 where it's positioned.
7     Q.    Was that in the program also
8 where the public could --
9     A.    No, not in the program.  There
10 wasn't a program.
11     Q.    Did you sell any of the pieces
12 in Defendant's Exhibit 7?
13     A.    I did.
14     Q.    Did you sell as a whole or
15 just --
16     A.    The two smaller pieces.
17     Q.    And who bought those?
18     A.    Ed Noriega.
19     Q.    And how much did he pay for
20 each of those?
21     A.    I think he paid fifty dollars
22 for each of those.
23     Q.    Did you sign them?

Page 299

1     A.    No, sir.
2     Q.    So to date has Mr. Noriega
3 been your biggest patron -- patron is not
4 the right word, but has he been the person
5 who has bought most of your art?
6     A.    Well, as far as monetary, no,
7 but --
8     Q.    Number of pieces?
9     A.    Number of pieces, yes.
10     Q.    Who has paid you the most?
11     A.    Michelle Owens.
12     Q.    And what did she buy from you?
13     A.    I took some photographs of
14 her, and she bought a couple of my pieces
15 that I made myself.
16     Q.    Were you -- I mean, did she --
17 what is the term I'm looking for?  Did she
18 commission you to take those?
19     A.    Yes.
20     Q.    Did you retain the rights to
21 those photos?  In other words -- I mean,
22 did she buy basically all of the negatives
23 or did you say I'm going to take some

Page 300

1 pictures of you and they are my
2 photographs but you can buy some from me?
3     A.    I have the photographs.
4     Q.    So they are yours, you can
5 sell them to whomever you want, correct?
6     A.    Yes.
7     Q.    Were you a student at the
8 time?
9     A.    No.
10     Q.    This was after you graduated?
11     A.    Yes.
12     Q.    When you were a student --
13 when Ed Noriega bought those two
14 photographs in Exhibit 7, were you still a
15 student?
16     A.    Yes.
17     Q.    And when the individuals
18 bought the photographs from your student
19 thesis, were you still a student?
20     A.    Yes.
21     Q.    Did you sell any more pieces
22 of art while you were a student?
23     A.    Not that I can recall.

75 (Pages 297 to 300)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 301

1  Q.   Now, I know you mentioned the
2  individual who you photographed and then
3  she bought some of those photographs.
4  Have you sold -- I know you discussed
5  earlier pieces of Defendant's Exhibit 2
6  that you sold, the lighting package and
7  some -- I think you used some of the
8  Plexiglas in some of your other projects.
9       Have you sold some of your
10  other art since your graduation?
11       A.   I have sold my skills, not so
12  much my individual fine art.
13       Q.   So, in other words, you have
14  maybe sold your time being a photographer?
15       A.   Either that or painting or
16  finishing walls, different kinds of stuff.
17       Q.   Okay.  Did you graduate when
18  you wanted to?
19       A.   Yes.
20       Q.   So you graduated on time as
21  far as your schedule is concerned?
22       A.   Yes.
23       Q.   Other than Mr. Joslin's

Page 302

1  photography class that you didn't take,
2  was there any other class that you didn't
3  take because of anything that happened to
4  you at Troy with regard to your art?
5       A.   No.
6       Q.   Have you been back to Troy
7  University since you graduated?
8       A.   No.
9       Q.   Have you ever enrolled in any
10  other Troy institution --
11       A.   No.
12       Q.   -- you know, Montgomery --
13       A.   No.
14       MR. ADAMS:  Dothan?
15       Q.   Well, the sun never shines on
16  Troy University, am I correct?  Isn't that
17  the motto?
18       MR. FULMER:  Sets.
19       MR. MUSSO:  Never sets.  I was
20  making sure Hal was awake there.
21       MR. FULMER:  It may not shine,
22  but we know it doesn't set.
23       MR. MUSSO:  Know it doesn't

Page 303

1  set, okay.
2       Q.   Okay.  Do you have any audio
3  recordings of any faculty or staff or
4  administrative members of Troy University?
5       A.   No.
6       Q.   Didn't tape any phone
7  conversations that you had with any of
8  those individuals --
9       A.   No, sir.
10       Q.   -- who worked at Troy?  Any
11  audio conversations of any students at
12  Troy related to this lawsuit at all?
13       A.   No.
14       Q.   Any video recordings?
15       A.   No.
16       Q.   You always have to ask that
17  question.
18       MR. ADAMS:  Well, you don't
19  always, but it may come back to pose a
20  problem at a later date.
21       Q.   Now, I know you took a lot of
22  photographs when you were a student
23  related to your courses and probably took

Page 304

1  a lot of photographs just for your own
2  self, your own artistic endeavors that
3  weren't related to your courses, correct?
4       A.   Uh-huh.
5       Q.   Did you take any photographs
6  that are related to this lawsuit while you
7  were either a student or after your
8  graduation?
9       A.   Not yet.
10       Q.   Okay.  When you say not yet,
11  are there any you anticipate taking?
12       A.   I am having a lot of emotions
13  run through me, but -- possibly.
14       Q.   Which one --
15       A.   That's for later use.  But not
16  yet, no, no.  The answer is no.
17       Q.   Well , if you want to take a
18  photograph of me, let me know so I can get
19  my hair cut.
20       MR. ADAMS:  Are you getting
21  close?
22       MR. MUSSO:  Not too far.
23  Let's take a break.

Page 305

1    (Whereupon, a break was had
2    from 3:41 p.m. until 3:55 p.m.)
3    (Whereupon, Defendant's
4    Exhibit 9 was marked for
5    identification.)
6    Q.    I just want to first of all go
7    over some documents that you produced.
8    I'm going to give you Defendant's Exhibit
9    9, which I believe is a copy of a resume.
10    Is that a copy of your resume?
11    I don't know if it's current or not, but
12    is that a copy of your resume?
13    A.    Yes.
14    Q.    Do you know when you prepared
15    that copy?
16    A.    This is the latest one I had.
17    I don't know when.
18    Q.    If you had to sit down today
19    with your resume, would you add anything
20    to that?  I mean, have there been some
21    shows or some art that you want to put on
22    there or anything else?
23    A.    Other than my professional

Page 306

1    experience or work experience, something
2    like that, which is my current job, no.
3    Q.    And what about the address, is
4    there --
5    A.    That has changed.
6    Q.    And we have talked about that?
7    A.    Uh-huh.
8    Q.    Is that yes?
9    A.    Yes.
10    Q.    Was there an e-mail -- do you
11    have an e-mail address?  Is that the same
12    one?
13    A.    It's the same one.
14    Q.    Okay.
15    (Whereupon, Defendant's
16    Exhibit 10 was marked for
17    identification.)
18    Q.    I'm going to give you Number
19    10 which appears to be your W-2 forms for
20    2005.  Just tell me if I'm correct.
21    A.    Yes.
22    Q.    And was this for money you
23    earned at Troy State?

Page 307

1    A.    Yes.
2    Q.    What job were you doing at
3    Troy State?
4    A.    It was a business manager of
5    the Palladium, which is the yearbook.
6    Q.    Let me ask you this, because
7    earlier you talked about the Palladium is
8    a scholarship.  Was that more of a stipend
9    or paid position than a scholarship or --
10    A.    It was a scholarship as well
11    as a paid position.
12    Q.    So you had both?
13    A.    Yes.
14    Q.    So this would reflect your
15    paid position on the Palladium, correct,
16    W-2?
17    A.    Yes.
18    Q.    And, of course, 2006, you
19    don't have a W-2 yet for your current job,
20    right?
21    A.    No.
22    (Whereupon, Defendant's
23    Exhibit 11 was marked for

Page 308

1    identification.)
2    Q.    I'm going to give you what is
3    marked as Defendant's Exhibit 11.  And if
4    you can, just take your time, look through
5    it as much time as you need and just tell
6    me what that is.
7    A.    (Reviewing document.)  This
8    was a case study that I did for a special
9    topics course, managing a nonprofit
10    organization which was instructed by Al
11    Head who at the time was the executive
12    director of the Alabama State Council of
13    the Arts.
14    Q.    What semester did you take
15    that course?
16    A.    Oh, gosh.  I can't remember.
17    Q.    Was it before you took
18    Collaborative in fall of 2003?
19    A.    It was afterward.
20    Q.    Do you recall whether it was
21    at the same time or after you took
22    Collaborative Studio in spring of 2004?
23    A.    It may have been at the same

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 309

1    time.
2        Q.    Who was your professor again?
3        A.    Al Head.
4        Q.    On this copy I have, it has
5    some handwriting.  Is any of that
6    handwriting yours?
7        A.    Yes.
8        Q.    Is any of that handwriting
9    anyone other than yours?
10       A.    Yes.
11       Q.    Do you know how many different
12   people have handwriting on that document?
13       A.    Two.
14       Q.    Okay.  So one of them is yours
15   and who is the other person?
16       A.    Al Head.
17       Q.    Okay.  Just quickly with this
18   red pen, circle that handwriting which is
19   yours, so I will know.
20       A.    Throughout the entire
21   document?
22       Q.    Yes.
23       A.    (Witness complies.)

Page 310

1        Q.    Okay.  So have you made -- can
2    I have my pen?
3        A.    Yes.
4        Q.    I will let you have it after
5    the deposition, but not during the
6    deposition.
7              Have you circled all of that in
8    red which is your handwriting?
9        A.    I have.
10       Q.    And did you actually write
11   this case study yourself?
12       A.    I did.
13       Q.    So all of that is -- are your
14   words?
15       A.    Yes.
16       Q.    And at the time you wrote it,
17   did you believe everything you wrote?
18       A.    There was some things that I
19   had to get through with, so, yes and no.
20       Q.    Any parts that you didn't
21   believe with?
22       A.    I would have to look over it.
23       Q.    Go ahead and look over it.

Page 311

1        A.    (Reviewing document.)
2        Q.    And this again is at the time
3    you wrote it.
4              MR. ADAMS:  Are you asking did
5    he make any false statements at the --
6              MR. MUSSO:  No, I'm saying did
7    he disagree with anything he wrote.  I
8    mean, it doesn't have to be false or true.
9    He could have an opinion, and did he agree
10   with the opinion at the time he wrote it
11   or did he -- I mean, he can say I like
12   Coke and that be --
13             MR. ADAMS:  Well, if he wrote
14   it and he didn't agree with it, then it
15   would be a false representation, would it
16   not?  If you wrote I like Coca-Cola and
17   you really didn't like it, then that's a
18   false representation.
19             MR. MUSSO:  Well, that means
20   you didn't believe what you said, but --
21             MR. ADAMS:  Correct.
22             MR. MUSSO:  If you want to
23   call it a false representation --

Page 312

1              MR. ADAMS:  Whatever.  I mean,
2    I'm just trying to clarify what you are
3    asking.  And you are talking about at the
4    time that he wrote -- the statement was
5    made, did he agree with everything that he
6    said?
7              MR. MUSSO:  Yes.
8              MR. ADAMS:  All right.
9        A.    Yes, then, at the time.
10       Q.    At the time.
11       A.    Obviously I did.
12       Q.    Now, since then has your mind
13   changed on any of the opinions or
14   statements that you wrote?  And you
15   understand that doesn't mean I'm asking
16   you are they now false?  I am saying have
17   you had a change in opinion or --
18       A.    That would mean that I would
19   have to read this entire case study,
20   because I -- I don't have a copy of it
21   anymore.  My copy was relinquished to --
22             MR. ADAMS:  Can I just voir
23   dire a minute and say did you write that

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 313

1  whole document, not the handwritten notes
2  but the part that's typed?
3      A.    Yes.
4          MR. ADAMS:  All right.  If you
5  want him to read it --
6          MR. MUSSO:  No, that's fine.
7      Q.    And at the time you wrote it,
8  you agreed with what you were writing?
9      A.    Yes.
10     Q.    Now, since then your opinion
11 may or may not have changed --
12         MR. MUSSO:  Let's go off the
13 record.
14         (Off-the-record discussion.)
15     Q.    Do you have any knowledge
16 whether your opinion has changed since the
17 time you wrote it?  I mean, like the next
18 semester --
19         MR. ADAMS:  With regard to
20 Defendant's 11?
21         MR. MUSSO:  Yes.
22     Q.    Like the next semester, did
23 you pick up that paper and say gee, you

Page 314

1  know, I don't agree with this part
2  anymore?
3      A.    I haven't picked up the paper
4  since I turned it in and received a grade
5  on it.
6      Q.    Let me ask you this.  Some of
7  the handwriting -- can I have the copy
8  that has the circles?
9          Now, the comments that Mr. Head
10 wrote, were those comments he made before
11 he gave you a grade or after he gave you a
12 grade?
13     A.    Before.
14     Q.    What grade did you get in the
15 class?
16     A.    An A.
17     Q.    Do you recall if this paper
18 received a grade?
19     A.    The majority of the grade was
20 based upon the paper, according to his
21 words.
22     Q.    Did the paper itself receive
23 an A?

Page 315

1      A.    That I can recall, yes.
2      Q.    And did you ever meet with Mr.
3  Head and discuss with him his comments?
4      A.    Sort of through class time
5  that we discussed it.
6      Q.    Did you ever show him any of
7  the comments -- your written comments?
8      A.    No, not any of those.
9      Q.    Well, there is one -- at one
10 point you say comparing policies and
11 procedures and bylaws is not good because
12 Al Head is a dick.
13         What problems did you have with
14 Al Head?
15     A.    Oh, gosh.
16         MR. ADAMS:  I'm sure he didn't
17 see that before he got a grade.
18     A.    If only you knew my father.
19 Spitting image.  No, I just got incredibly
20 frustrated with this paper, so scribbling
21 because I was angry.
22     Q.    Did you tell anyone else that
23 Al Head was what you wrote on page three?

Page 316

1      A.    No, no.
2      Q.    Did you show anyone else in
3  your class?
4      A.    No.
5      Q.    You didn't take any pictures
6  of Al Head, did you?
7      A.    No.
8      Q.    Is that just a student writing
9  on the margins of his paper after he read
10 the comments?
11     A.    It's like a doodle, yeah.
12     Q.    Did you write your statements
13 after you read his statements?
14     A.    Yes.
15     Q.    Okay.
16     A.    So that would be one of those
17 statements that I might take back, because
18 I actually do respect Al Head.
19     Q.    That's fine.  When I graded
20 papers, I don't know what my students
21 wrote about me.
22         MR. ADAMS:  I'm sure you got a
23 few of those too.

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 317

1    MR. MUSSO:  Well, they said
2  dear, d-e-a-r.
3    MR. ADAMS:  What you don't
4  know doesn't hurt you.
5    (Whereupon, Defendant's
6    Exhibit 12 was marked for
7    identification.)
8    Q.  Let me give you 12 --
9    MR. MUSSO:  I just found tacks
10  in my tires, that's how they showed their
11  appreciation.  Five one semester, five
12  different tires.
13    Q.  I just gave you Defendant's
14  Exhibit 12.  Take as much time as you need
15  to look at it.  I'm basically going to ask
16  you what is it?
17    A.  This was the outline before
18  the case study was written.
19    Q.  Is that an outline that you
20  created?
21    A.  Yes.
22    Q.  Okay.  And again, does this
23  have any handwriting on here other than

Page 318

1  Mr. Head's, Defendant's Exhibit 12?
2    A.  It does.
3    Q.  Okay.  Just circle yours.
4    A.  Okay.
5    Q.  I know you have your name and
6  that may be yours, but anything that is
7  your handwriting.
8    A.  (Witness complies.)  Okay.
9    Q.  Now, if you will look at this
10  one, it says UAB Andre Sereno photo.  Did
11  you mean all of that?
12    A.  Sorry.
13    Q.  I just wanted to make sure
14  we --
15    A.  Yes.
16    Q.  Okay.  So what is in red is
17  your handwriting?
18    A.  Yes, sir.
19    Q.  And did you make those
20  handwritten notations after he gave you
21  that back with his handwritten notations?
22    A.  Yes.
23    Q.  Okay.  And at the time you

Page 319

1  wrote that outline, did you agree with
2  what you were writing?
3    A.  At the time, yes.
4    Q.  Okay.  I have a number of
5  newspaper articles that were provided to
6  me in your discovery.  I'm going to give
7  these to you, Defendant's Exhibit 13.
8    (Whereupon, Defendant's
9    Exhibit 13 was marked for
10    identification.)
11    Q.  You can just thumb through
12  these.
13    A.  (Reviewing documents.)  Okay.
14    Q.  What were those newspaper
15  articles generally about?
16    A.  Generally about the piece
17  being removed.
18    Q.  Did you ever talk to a
19  newspaper reporter about the piece being
20  removed?
21    A.  Not initially.
22    Q.  At any time?
23    A.  At one time I did.

Page 320

1    Q.  Okay.  Which reporter did you
2  talk to?
3    A.  Sam Neely -- let's see if it
4  is on here.  Yes.
5    Q.  Which paper did he work for?
6    A.  The Trop, which was the school
7  newspaper.
8    Q.  School newspaper.  So was Mr.
9  Neely a student journalist?
10    A.  A staff writer.
11    Q.  Staff writer.  I mean, he was
12  a student?
13    A.  Yes.
14    Q.  Okay.  Did he use any of your
15  statements in anything he wrote --
16    A.  Yes.
17    Q.  -- that you are aware of?
18    A.  Yes.
19    Q.  Is it in any of the articles
20  you gave me?
21    A.  Yes.  There are some -- a
22  statement I made in this one.
23    Q.  And what is that that he used?

80 (Pages 317 to 320)

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 321

1    A.    I don't consider my art to be
2  pornographic.
3    Q.    And did you actually tell that
4  to the reporter?
5    A.    I did.
6    Q.    I'm not saying sometimes
7  reporters take things out of context, but
8  I'm just saying did you say that to the
9  reporter?
10    A.    Did I say my work wasn't
11  pornographic?
12    Q.    Yes.
13    A.    Yes.
14    Q.    So he properly quoted you?
15    A.    Yes, he did.
16    Q.    What other statements did you
17  make to that reporter?
18    A.    That I was looking for angles,
19  curves, organic shapes, analyzing shapes,
20  deciding what to emphasize.  And this says
21  that adding nude art focuses on analyzing
22  the image, while pornography is more of a
23  process.  That part -- when I said

Page 322

1  pornography is more of a process, I meant
2  that it is more processed, it's more
3  commercial, it's more just done over and
4  over exceedingly.
5    Q.    Do you wish you had said
6  that a little more --
7    A.    I wish it had been more in
8  depth, but once again, journalists do
9  that.
10    Q.    Did you read these newspaper
11  articles that were coming out about the
12  issue?
13    A.    There was one that came out
14  before I even made a statement, and
15  because it was so horribly inaccurate and
16  because I had had people from The Trop
17  pressuring me to make a statement about
18  it, I made one statement.  And that was
19  it, it was quoted.
20    Q.    And what was inaccurate about
21  the one that first came out?
22    A.    First of all, I wasn't a
23  senior graphic design major.  And I don't

Page 323

1  believe that at the time this was printed
2  that the photographs had yet been taken
3  down.
4    Q.    And when you say -- which
5  article is that, the one that has the
6  Freedom Week Activity headline at the top?
7    A.    Yes.
8    Q.    And so you weren't a senior
9  design major, was that --
10    A.    I was not a graphic design
11  major.  I have always been a photo major.
12    Q.    Do you know how they got that
13  wrong?
14    A.    I have no idea.
15    Q.    And you are saying at the time
16  that was written --
17    A.    It had been removed.
18    Q.    When you say it had been --
19    A.    The piece had been removed.
20    Q.    Your piece?
21    A.    Yes.
22    Q.    Defendant's Exhibit 2?
23    A.    My piece.

Page 324

1    Q.    So that was accurate?
2    A.    Yes.
3    Q.    Anything inaccurate other than
4  your not being a senior graphic design
5  major?
6    A.    Nothing inaccurate.  Maybe
7  inappropriate.
8    Q.    What was inappropriate?
9    A.    The fact that it had been
10  covered without any kind of dissertation
11  with the -- between the artist and the
12  reporter.
13    Q.    So, in other words, they wrote
14  the story without getting at least your
15  side first?
16    A.    Yes.
17    Q.    Now, before your piece of art
18  -- before you were asked to take down your
19  piece of art in the juried art show with
20  regard to Defendant's Exhibit Number 2,
21  were you ever asked to take out any pieces
22  of art in any other shows?
23    A.    No.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 325

1    Q.    Or any shows after that?
2    A.    No.
3    Q.    After you learned that there
4 were any concerns about Defendant's
5 Exhibit Number 2, the content of
6 Defendant's Exhibit Number 2, did that in
7 any way affect how you took your pictures
8 or did your art for that which you turned
9 in to your classes?
10    A.    Made me much more
11 self-conscious, made me -- instead of
12 branching out and becoming outward and
13 really exposed and really going into
14 detail and becoming a greater artist
15 through the university setting, I felt
16 like I pulled inward after that situation.
17    Q.    But you were still creating
18 good art in -- I mean, you liked your
19 senior thesis piece a lot?
20    A.    I did.
21    Q.    And you liked the piece that
22 you did for Collaborative that was shown,
23 correct?

Page 326

1    A.    Yes.
2    Q.    And did you continue to take
3 nude pieces and turn them in for course
4 work?
5    A.    That incident significantly
6 altered how I represented myself with my
7 art a lot -- and I think anybody can vouch
8 for that, because a lot of the art turned
9 inward. They were focused on me. I
10 started taking a lot more self-portraits
11 and trying to understand myself and --
12    MR. ADAMS: Is that a yes? He
13 asked if it affected you and --
14    A.    Yes, it affected me.
15    Q.    Well, did -- I know you said
16 it made you turn inward. Did it affect
17 you in any other way?
18    MR. ADAMS: I'm just going to
19 object. Asked and answered.
20    MR. MUSSO: Well, I mean, he
21 said it helped him -- turned inward.
22    Q.    But you also said you were
23 still producing good art, pieces you

Page 327

1 really liked.
2    MR. ADAMS: I am just going to
3 say he answered it earlier.
4    Q.    Let me ask you this. You were
5 still taking nude photographs and turning
6 them in for your class assignments,
7 correct?
8    A.    Yes.
9    Q.    And you were getting A's for
10 that work?
11    A.    Yes.
12    Q.    Did you win any awards after
13 that, the award you won for Defendant's
14 Exhibit 2?
15    A.    I'm not sure.
16    Q.    You still had professors
17 praising your work, correct?
18    A.    Yes.
19    Q.    Your senior thesis went over
20 very well in the eyes of your professors,
21 correct?
22    A.    Yes.
23    Q.    Now, were you ever disciplined

Page 328

1 for any picture you took at Troy
2 University or any piece of art that you
3 created at Troy University?
4    A.    Other than the removal of my
5 piece, I feel that's somewhat of a --
6    Q.    You feel that is discipline?
7    A.    Yes.
8    Q.    Other than that, anything
9 else?
10    A.    No.
11    Q.    Okay. And why do you feel
12 that's discipline?
13    A.    Because obviously there was a
14 question as to whether or not my work was
15 obscene when a university setting should
16 be praising work that steps outside the --
17 this is all in my claim, you know, the
18 case itself, you know, the write-up.
19    Q.    What part of your work weren't
20 they praising?
21    A.    At that time?
22    Q.    Yes.
23    A.    (No response.)

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 329

1   Q.   You got an award, correct?
2   A.   Yes, I did.
3   Q.   You got an A, correct?
4   A.   Yes.
5   Q.   The work was in the show,
6   people got to see it, correct?
7   A.   I was thrown into an unwanted
8   spotlight, called names. I mean, we have
9   discussed this.
10   Q.   But the university didn't call
11   you names, correct?
12   A.   No.
13   Q.   Mr. Johnson never called you
14   names?
15   A.   No.
16   Q.   Did Mr. Joslin ever call you
17   names?
18   A.   Other than a pornographer, no.
19   Q.   So you consider that a
20   derogatory term?
21   A.   Yes. When you are an artist,
22   yes.
23   Q.   Do you have a definition of

Page 330

1   pornography?
2   A.   A definition of pornography
3   would be anything that applies to purient
4   interests. It is a voyeuristic look into
5   sexuality. And it is used for those
6   specific purposes of sexual gratification.
7   Q.   And art can't do the same
8   thing?
9   A.   Art can do the same thing, and
10   there is a thin line there. And that is
11   an age old question, since the birth of
12   art.
13   Q.   And did yours, art, ever cross
14   that line?
15   A.   I never believed that -- the
16   piece in question to be an explicitly
17   sexual piece. It was something more about
18   culture, which you can find in my -- you
19   know, any of my write-ups on it.
20   Q.   I know the theme for
21   Defendant's Exhibit 2 was birth, but what
22   were you trying to say in that piece?
23   A.   You can find that in Exhibit

Page 331

1   4. It's all there.
2   Q.   Okay. So everything you were
3   trying to say is in Exhibit 4?
4   A.   Yes.
5   Q.   Now that you are out of
6   college, you are no longer a student at
7   Troy University, are you going to take any
8   photographs like Defendant's Exhibit 2 in
9   the future, do you know?
10   A.   Not that I know of. Maybe.
11   It's all up to how I feel.
12   Q.   You don't feel constrained
13   about anything Troy has done to you --
14   A.   No.
15   Q.   -- to prevent you from doing
16   the art that you now want to do?
17   A.   I feel that it significantly
18   altered it.
19   Q.   In what way?
20   A.   In some negative ways. I feel
21   as if even the state of Alabama sort of
22   become this -- an area where I am -- I am
23   being suffocated as an artist and

Page 332

1   silenced. And I want to try to fight
2   that, and that's why I'm here today.
3   Q.   Here in this lawsuit?
4   A.   Yeah.
5   Q.   So you haven't considered
6   moving out of the state of Alabama --
7   A.   No.
8   Q.   -- to a state that you feel is
9   more conducive to what you want to do in
10   art?
11   A.   I feel like I want to fight
12   the good fight. And I want to be in an
13   area where I grew up and, you know, speak
14   my mind and be allowed to do that freely.
15   Q.   And was that a decision you
16   came to on your own, that you wanted to
17   fight the good fight?
18   A.   Yes.
19   Q.   In other words, no one at Troy
20   University coerced you or --
21   A.   Well, this --
22   Q.   -- pushed you forward and said
23   this is something you need do?

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 333

1     A.    This incident greatly
2  influenced that.
3     Q.    There is no individual at Troy
4  University who influenced you to bring
5  this lawsuit?
6     A.    No.
7     Q.    This is all on your own?
8     A.    Yes.
9     Q.    Okay.  Now, was there any art
10  you produced at Troy that you couldn't
11  display because of the images in that art?
12     A.    No.  No other.
13     Q.    Now, I know you said there
14  were some students who publicly -- or
15  students who said things to you.  Did they
16  do this in public?
17     A.    Yes.
18     Q.    But, again, Mr. Johnson
19  didn't?
20     A.    No.
21     Q.    And other than Mr. Joslin
22  using the term pornography, no one -- no
23  faculty member or staff member said those

Page 334

1  things to you that publicly humiliated
2  you, correct?
3     A.    There has been also Mr.
4  Noriega's statement on my work being a cry
5  for attention.
6     Q.    But was that public
7  humiliation?  I mean, did he do that to
8  humiliate you in front of the public?
9     A.    We discussed this, but -- he
10  did it in front of public, yes.
11     Q.    Was that in front of Mr.
12  Gibbs?
13     A.    Yes, whoever else was in that
14  building.
15     Q.    So that couldn't have been a
16  legitimate artistic statement about your
17  work?  I'm not saying you agree with it,
18  but couldn't someone come to that
19  conclusion on their own?
20     A.    You can come to a conclusion
21  on your own whether you think work is
22  pornographic or not, but -- yes, I mean,
23  that could have been his own -- just his

Page 335

1  own opinion, but it doesn't necessarily
2  mean you should voice it.  And definitely
3  doesn't mean you should voice it to a
4  student.
5     Q.    Okay.  Now, for instance, did
6  Dr. Hawkins ever say anything to you that
7  embarrassed you or publicly humiliated
8  you?
9     A.    Never spoke to Dr. Hawkins.
10     Q.    Now, other than Mr. Johnson
11  telling you that your piece of art has to
12  come down, be removed from the project or
13  from the show, has there been anything --
14  any policy or procedure in writing at Troy
15  State that influenced you to not create
16  art?
17     A.    Well, I think once again after
18  reviewing the public policy set forth in
19  their handbooks that it's incredibly
20  archaic and -- I mean, just that there is
21  so much -- it's not just in art, it's --
22  my friend Jacqueline who was exhibited,
23  she -- these are all other examples, but

Page 336

1  she had a proposal for her senior capstone
2  that was revoked because it was
3  controversial.  It's a lot of -- I think
4  there's a lot of fear around stepping
5  outside of the box.
6     Q.    Senior capstone, what is that?
7     A.    Basically a senior thesis.
8     Q.    Who was her senior thesis
9  director?
10     A.    I don't know.
11     Q.    What work was denied?
12     A.    She wanted to do some kind of
13  research on the effects of marijuana usage
14  on -- psychology stuff that I'm not --
15     Q.    Do you have any firsthand
16  knowledge as to why it was actually
17  denied?
18     A.    I don't know that exactly, but
19  just using it as an example.
20     Q.    But my question is a little
21  different.
22       Did you ever not -- I mean, for
23  instance, the hazing policy, did you not

84 (Pages 333 to 336)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 337

1 take a photograph because you thought
2 about the hazing policy before you took
3 the photograph?
4     A.    Afterwards -- after this
5 incident, being removed, that's when it --
6 once again, I wrote this sixteen-page
7 paper, I did a case study, I started to
8 really get into that idea of policies,
9 procedures, and how they play into the
10 university setting and how they play into
11 the community setting.  These were not
12 things that I had been confronted with
13 until this incident.  And I was made aware
14 of these things, so it did influence the
15 way I did my work.  I didn't attack my
16 work so -- so, you know -- like I had
17 before.  I didn't attack it.  I did
18 withdraw in some ways.
19     Q.    But, I mean --
20     A.    And those would be artistic
21 ways.
22     Q.    Well, let's just take the
23 hazing policy.  Did it prevent you from

Page 338

1 taking the nude photographs that was in
2 the Collaborative art show?
3          MR. ADAMS:  I'm just going to
4 object on the relevance grounds.
5          MR. MUSSO:  It's very
6 relevant.  The complaint refers to the
7 hazing policy.
8          MR. ADAMS:  Beg your pardon,
9 then.
10     Q.    My question is this:  Did you
11 think of the hazing policy at all when you
12 were taking the photographs for that show?
13     A.    No.
14     Q.    Did you think of the hazing
15 policy at all when you were taking the
16 photographs for your senior thesis?
17     A.    No.
18     Q.    Did you think of the hazing
19 policy at all when you were taking any of
20 your photographs or doing any of your art
21 after Defendant's Exhibit 2 was taken
22 down?
23     A.    No.

Page 339

1     Q.    What about the sexual
2 harassment policy, did you think about
3 that at all when you were creating the art
4 that you created as a student after
5 Defendant's Exhibit 2 came down?
6     A.    No.
7     Q.    What about the student
8 handbook, were you thinking about that
9 when you were creating the art that you
10 created after Defendant's Exhibit 2?
11     A.    I was worried about that on
12 grounds of gossip or --
13          MR. ADAMS:  Just answer his
14 question.  He is asking you about the
15 handbook, not what you are worried about,
16 okay?
17     A.    Yes.
18     Q.    Okay.  And you say yes.  But
19 why?  You mentioned gossip.  What about
20 gossip?
21     A.    Just that a student could be
22 expelled on grounds that don't seem very
23 valid to me.

Page 340

1     Q.    You were never expelled,
2 correct?
3     A.    No, I was not.
4     Q.    You were never suspended?
5     A.    No.
6     Q.    Were you threatened with
7 expulsion?
8     A.    No.
9     Q.    Were you threatened with
10 suspension?
11     A.    No.
12     Q.    Do you know the name of any
13 student who was threatened or expelled --
14     Q.    Okay.  Do you have any -- and
15 you were never disciplined for anything
16 that was in the hazing policy?
17     A.    No.
18     Q.    Or the sexual harassment
19 policy?
20     A.    No.
21     Q.    Or the code of conduct?
22     A.    No.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 341

1   Q.   Or the student handbook?
2   A.   No, not to my knowledge.
3   Q.   Now, your complaint speaks of
4   fear of prosecution.  What was your fear
5   of criminal prosecution?
6   A.   That was when I had been
7   subjected to documents presented by Mr.
8   Johnson on obscenity issues.
9   Q.   Not anything that you pleaded
10  the Fifth for today?
11  A.   No.
12  Q.   Did Mr. Johnson say he was
13  going to go to the police?
14  A.   He never said that to me.
15  Q.   Did anyone at Troy say they
16  were going to the police?
17  A.   No.
18  Q.   Did any police officer ever
19  come to you?
20  A.   No.
21  MR. ADAMS:  Do you need to
22  take a break?
23  A.   If that's possible.

Page 342

1   Q.   You can take a break anytime
2   you want to.  We don't have too much left.
3   A.   Well, then, if not, let's just
4   go.
5   Q.   Are you sure?
6   A.   Yes, sorry.
7   Q.   Again, it's not an endurance
8   contest.
9   Now, the situation with regard
10  to your piece being removed, was that ever
11  discussed in the classrooms that you were
12  a student in?
13  A.   Thereafter?
14  Q.   Yes.
15  A.   There might have been a
16  disclosure in Color and Technology course.
17  And I was also told by other students that
18  it was and actually still is being
19  discussed in classrooms.
20  Q.   Which classes is that?
21  A.   I can't tell you that.  I
22  mean, I don't know that right now.
23  Q.   Maybe as an artist when you

Page 343

1   publicly display your work, there is
2   always going to be the opportunity that
3   public discourse will follow from the
4   public display of work, correct?
5   A.   Always a possibility, yes.
6   Q.   And as an artist, you
7   understand that risk?
8   A.   Yes.
9   Q.   Now, did Troy State University
10  or Mr. Johnson or Mr. Joslin or Dr.
11  Hawkins treat you any differently because
12  of your race?
13  A.   No.
14  Q.   Or your gender?
15  A.   No.
16  Q.   Or your ethnicity?
17  A.   No.
18  Q.   Or your religious beliefs?
19  A.   No.
20  Q.   Or a lack of religious
21  beliefs?  I'm not saying you have a lack
22  of religious belief; or any lack of
23  religious belief?

Page 344

1   A.   No.
2   Q.   Did you have -- the
3   assignment, the birth assignment, correct?
4   A.   Yes.
5   Q.   Was that a contract -- did you
6   have any contract with Troy University in
7   the production of that artwork?
8   MR. ADAMS:  Objection, calls
9   for legal conclusion.
10  Q.   Let me ask you this.  Do you
11  know what a contract is?
12  MR. ADAMS:  He is not a
13  lawyer.
14  Q.   Well, did you agree to give
15  Troy University something or was that
16  simply a part of your class?
17  A.   By giving, what do you mean?
18  Q.   I mean, you were in a class
19  and you were assigned that, correct?
20  A.   Yes.
21  Q.   And if you didn't produce
22  that, you either withdraw the class or you
23  get a failing grade, correct?

86 (Pages 341 to 344)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

Page 345

1    A.   I suppose, yes.
2    Q.   Now, I know you said that Mr.
3  Johnson or someone decided what work got
4  to be in that juried show or not, correct?
5    A.   Yes.
6    Q.   So from the beginning of that
7  class, there was actually no guarantee
8  that your work was going to be in it?
9    A.   Not to my knowledge, no.
10   Q.   He never just promised you,
11  hey, your work is going to be in it?
12   A.   Not that I recall.
13   Q.   Okay.  And you had to do that
14  work for that class whether it was going
15  to be in the show or not, correct?
16   A.   I did.
17   Q.   But you had to in order to get
18  a grade?
19   A.   Yes.
20   Q.   And Bob Joslin had nothing to
21  do with your grade in Collaborative Art
22  fall 2003, correct?
23   A.   I don't know that.

Page 346

1    Q.   Well, you got an A.  So if he
2  had something to do with it, it would be
3  in the positive, correct?
4    A.   Well, I just don't know.
5    Q.   You don't know one way or the
6  other.
7       Do you know whether Dr. Hawkins
8  one way or the other had anything to do
9  with your grade?
10   A.   Don't know.
11   Q.   Do you know whether Bob Joslin
12  had anything to do with regard to the
13  assignment selection of birth or --
14   A.   I don't know.
15   Q.   Do you know whether he had
16  anything to do with having that juried
17  show created?
18   A.   No.
19   Q.   Or Dr. Hawkins?
20   A.   No.
21       MR. MUSSO:  Getting real
22  close.
23       MR. ADAMS:  This is turning

Page 347

1  into a marathon contest.
2       MR. MUSSO:  No.  Come into
3  some of my sexual harassment
4  depositions --
5    A.   I really do need to take a
6  break.
7       MR. ADAMS:  All right.  Take a
8  break.
9       (Whereupon, a break was had
10       from 4:38 p.m. until 4:45 p.m.)
11   Q.   After graduation, did you
12  apply to a number of places where you
13  didn't receive the job for one reason or
14  the other?
15   A.   A number of places, yes.
16   Q.   Did anyone for whom you didn't
17  receive a job from say that they -- you
18  didn't receive that job because of
19  anything that happened to you at Troy
20  State University -- Troy University?
21   A.   That was never stated.
22   Q.   Do you have any knowledge that
23  you didn't receive a job at anywhere you

Page 348

1  applied because of anything that happened
2  to you at Troy University?
3    A.   No -- no knowledge.
4    Q.   Did anyone say to you that you
5  didn't receive a job, I mean, anyone other
6  than the employer itself, because of
7  anything that happened to you at Troy
8  University?
9    A.   No.
10   Q.   And did anyone say that they
11  weren't going to be buying your artwork
12  because of anything that happened to you
13  at Troy University?
14   A.   Yes.
15   Q.   Who was that?
16   A.   I participated in a -- this
17  was while I was still in school.  I
18  participated in TroyFest, and I don't know
19  when that was, but I had someone say that
20  my kind of work doesn't belong here.
21   Q.   Did they see your work -- did
22  you display your work at TroyFest?
23   A.   I did.

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 349

1    Q.    And did you know what they
2  were referring to, the work you were
3  displaying?
4    A.    They weren't referencing the
5  work I was displaying.  The work I was
6  displaying was landscapes.
7    Q.    Okay.  How do you know that it
8  was because of --
9    A.    Okay.
10    Q.    -- what happened at Troy
11  University?
12    A.    That is what I was going to
13  say.  I don't know.  She could have been
14  referencing landscapes.
15    Q.    Do you know whether she was
16  serious at wanting to buy your art anyway,
17  she would have bought it, but for
18  something that happened at Troy State --
19    A.    She was interested and then
20  she basically told me, oh, you are that
21  guy.
22    Q.    Did she pull out the wallet,
23  checkbook?

---

Page 350

1    A.    She hadn't done that yet.
2    Q.    And how much -- if you had
3  sold her your most expensive piece that
4  day, how much would you have made?
5    A.    Around fifteen hundred.
6    Q.    Did you sell any fifteen
7  hundred dollar pieces to anyone that day?
8    A.    I didn't sell those.  I sold
9  some lesser pieces.
10    Q.    Have you ever sold anything
11  for as much as fifteen hundred dollars to
12  anyone?
13    A.    No.
14    Q.    For any individual piece of
15  art, what is the most you sold it for?
16    A.    I couldn't recall.  I really
17  couldn't recall that.
18    Q.    Have you ever -- do you know
19  how much money you have made grossed from
20  selling your art, not necessarily your
21  photography time, but your art?
22    A.    No, I don't know that.
23    Q.    But do you know whether it

---

Page 351

1  would be more than a thousand?
2    A.    Maybe.  I just don't know.
3    Q.    Has your reputation in the --
4  you are currently -- do you consider
5  yourself part of the Birmingham art
6  community now?
7    A.    Not necessarily, not yet.
8    Q.    Do you consider yourself a
9  part of any art community right now?
10    A.    No.
11    Q.    When you were -- after you
12  graduated from Troy, were you a part of
13  any art community before you moved to
14  Birmingham?
15    A.    I don't know.  Possibly.
16    Q.    But when you were at Troy,
17  were you a part of the student art
18  community?
19    A.    More or less.
20    Q.    Were you also a member of the
21  art community while you were a student at
22  Troy?
23    A.    No.

---

Page 352

1    Q.    Did you suffer any emotional
2  or mental distress because of anything
3  Troy University did to you?
4    A.    Yes.
5    Q.    Okay.  Have you suffered any
6  emotional or mental distress because of
7  anything Mr. Johnson did to you?
8    A.    The actions set forth, yes.
9    Q.    What about Bob Joslin?
10    A.    Very much so, yes.
11    Q.    And what about Dr. Hawkins?
12    A.    As a direct result of the
13  actions taken, yes.
14    Q.    What direct actions did he
15  take?
16    A.    Well, if he was the one to
17  remove my piece, that would be my
18  assumption, then, yes.
19    Q.    But if he wasn't the one, can
20  you think of any action that he took,
21  direct or indirect?
22    A.    No.
23    Q.    How much of your mental and

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

Page 353

1 emotional distress did Mr. Johnson create?
2         MR. ADAMS:  Are you saying on
3 a percentage basis or --
4         MR. MUSSO:  Yes.
5         A.    I would say a good fifty
6 percent.
7         Q.    Okay.  Are you still suffering
8 that fifty percent today?
9         A.    Yes.
10        Q.    Has that fifty percent ever
11 lowered or increased since the time he
12 told you that you had to take your work
13 down?
14        A.    Not really.
15        Q.    What about the other fifty
16 percent?
17        A.    Actually --
18        MR. ADAMS:  I'm going to
19 object on the grounds that we haven't
20 concluded -- he has mentioned the doctor
21 -- what is his name?  Dr. Hawkins, but we
22 haven't had a chance to interview him.  He
23 said he attributed some of it to him, but

---

Page 354

1 we don't know what, if any, is his
2 involvement.  So as to that portion of the
3 question, I am going to object as calling
4 for speculation.
5         MR. MUSSO:  But right now he
6 doesn't know --
7         MR. ADAMS:  Correct.
8         MR. MUSSO:  -- whether he had
9 an action, direct or indirect.
10        MR. ADAMS:  Correct.  So for
11 him to answer as to the remaining part,
12 because he has indicated there are two
13 participants, one which we don't know,
14 so --
15        Q.    Well, let me ask you this.
16 Since you don't know and you -- from the
17 time it was taken down up to today, you
18 don't know whether you had a direct or
19 indirect -- had any direct or indirect
20 action, how could you have suffered
21 emotional and mental distress if you don't
22 even know that he did anything, that he
23 caused?

---

Page 355

1         A.    I suppose my assumption was
2 that him being the overseer of that
3 university that he would have some sort of
4 position on the matter and probably a
5 gavel on it.
6         Q.    So, therefore, he may have
7 caused you some emotional --
8         A.    Yes.
9         Q.    -- and mental distress?
10        A.    Yes.
11        Q.    But I used the term may.  I
12 mean, from then to now when you suffer any
13 emotional or mental distress, do you
14 think, hey, Dr. Hawkins did this to me?
15        MR. ADAMS:  I think I'm going
16 to object again as calling for
17 speculation, and he -- I think it's asked
18 and answered by him saying I assumed he
19 did because of his position.
20        MR. MUSSO:  But he doesn't
21 know one way or the other whether he did.
22        Q.    Correct?
23        A.    Yes.

---

Page 356

1         Q.    Now, what about Mr. Johnson,
2 how much of your emotional and mental
3 distress do you attribute to him?
4         MR. ADAMS:  Again, I am going
5 to object because of my earlier grounds,
6 that we don't know what the -- Dr.
7 Hawkins --
8         Q.    Well, without a percentage,
9 you said very much for Mr. Joslin, didn't
10 you?
11        A.    I did.
12        Q.    Okay.  More than Mr. Johnson?
13        A.    I wouldn't say more.
14        Q.    Less than Mr. Johnson?
15        A.    I wouldn't say that either.
16        Q.    How does the emotional or
17 mental distress manifest itself?
18        A.    I think we have discussed this
19 as well.  I mean, my value in my -- my
20 value in myself as an artist and -- when
21 I'm supposed to have people to look up to
22 in an academic setting, and that to be in
23 question even -- even to be in question is

---

89 (Pages 353 to 356)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 357

1  incredibly distressing.
2      Q.   Did you lose any sleep?
3      A.   Yes.
4      Q.   When did you lose sleep?
5      A.   I would say months after -- or
6  months -- at that time on for months.
7      Q.   How many months?
8      A.   I couldn't tell you.  Four,
9  five maybe.  Maybe about half a year.  I
10 was pretty upset about it.
11     Q.   Are you still losing sleep
12 over it?
13     A.   If I dwell on it, yes.
14     Q.   Now, what did Mr. Johnson
15 specifically do that caused you to suffer
16 the emotional and mental distress?
17     A.   Earlier we stated that I was
18 not sure who was the one who removed the
19 piece, but I'm referring to in that
20 instance, whoever was the gavel that
21 decided whether or not -- that's the
22 creation of the emotional distress.
23     Q.   Okay.  What about Mr. Johnson,

Page 358

1  what did he do that caused your mental or
2  emotional distress?
3      A.   That -- the removal of my
4  work, the actual consideration of whether
5  or not my work was obscene or not and
6  making those statements to me left me with
7  feelings of inadequacy as an artist.
8      Q.   Did he ever remove your work
9  that you are aware of?
10     A.   No, he never physical -- I am
11 not aware he physically removed the
12 pieces, I don't know.
13     Q.   Are you aware that he ever
14 called your work obscene?
15     A.   He never said it was obscene.
16     Q.   Did Mr. Johnson ever say your
17 work was obscene?
18     A.   Never to me.
19     Q.   Did anyone at Troy University
20 ever say your work was obscene?
21     A.   If we consider pornography to
22 be obscene, then Mr. Joslin.
23     Q.   Did Mr. Joslin ever say that

Page 359

1  he considered pornography to be obscene?
2      A.   No.
3      Q.   So has anyone at Troy
4  University ever said your work was
5  obscene?
6      A.   I think there's anonymous
7  quotes in these articles, Exhibit 13.
8      Q.   And those were anonymous
9  quotes from --
10     A.   Students.
11     Q.   -- students?  Okay.  But the
12 students don't decide whether the work
13 comes up or comes down, do they?
14     A.   But they certainly affect how
15 another student feels.  But, no, I'm
16 sorry.
17     Q.   But Mr. Johnson certainly
18 doesn't have control over what a student
19 says, does he?
20     A.   Hopefully not.
21     Q.   Did Mr. Joslin?
22     A.   No.
23     Q.   Dr. Hawkins?

Page 360

1      A.   No.
2      Q.   I mean, after they say it, you
3  certainly can go complain and then they
4  can potentially take action if you want
5  them to, right?
6      A.   Yes.
7      Q.   But you didn't do that, did
8  you?
9      A.   No.
10     Q.   Did you ever -- let's go back
11 into this.  Did you ever complain to
12 anyone at the university about your work
13 being taken down, Defendant's Exhibit 2?
14     A.   No.
15     Q.   Did you go through any appeals
16 process?
17     A.   No.
18     Q.   Did you ever -- what about
19 your receiving a grade in Mr. Joslin's
20 class, did you ever complain to anyone or
21 try to go through any appeals process?
22     A.   No.
23     Q.   Weren't you familiar with that

90 (Pages 357 to 360)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 361

1  if you disagree with a grade, there is a
2  way you can challenge that grade above and
3  beyond the professor himself?
4       A.    I hadn't familiarized myself
5  with that until I did my case study, which
6  we discussed.
7       Q.    But at the time of your case
8  study, you didn't go and try to --
9       A.    No.
10      Q.    And at the time of your case
11  study, you didn't try to go and appeal
12  your work being taken down, did you?
13      A.    No.
14      Q.    Now, you said you lost some
15  sleep.  How much sleep were you losing for
16  that period of months?
17      MR. ADAMS:  Object as to the
18  form.  Do you mean per day, per month?
19      Q.    Say per night.  You were
20  sleeping -- you know, I'm lucky to get
21  four hours.  If I get three, I have lost
22  an hour's sleep.
23      Are you someone who sleeps ten

Page 362

1  hours a night and you were getting eight
2  or are you someone who sleeps -- students
3  sometimes don't sleep much.  My question
4  is how much sleep were you losing per
5  night?
6       A.    If I slept on average eight
7  hours a day, which is probably my normal,
8  I would say I went down to about five
9  hours instead.  So I lost maybe three
10  hours of sleep a day.
11      Q.    Did you lose any weight
12  because of the mental and emotional
13  distress?
14      A.    Yes.
15      Q.    How much?
16      A.    A considerable amount.  I
17  mean, once again, I can't give you a
18  direct figure.
19      Q.    You say considerable.  For me,
20  considerable would be a hundred pounds.
21      A.    I understand.
22      Q.    But you are not a big fellow
23  like me, luckily.  Were you losing twenty,

Page 363

1  thirty, forty pounds?
2       A.    Not that much.
3       Q.    How much did you weigh before
4  this incident occurred?
5       A.    I weighed about one sixty.
6       Q.    And how much do you weigh now?
7       A.    I weigh one forty maybe.
8       Q.    Do you have any problems with
9  weighing one forty right now?
10      A.    No.
11      Q.    Do you want to put on that
12  extra twenty?
13      A.    Not necessarily, no.
14      Q.    I know a way to do it.  I
15  mean, Taco Bell, but --
16      Did you ever go below one
17  forty?
18      A.    Yes.
19      Q.    And do you have any
20  recollection as to how low below one
21  forty?
22      A.    Maybe one thirty, the lowest.
23      Q.    And how tall are you?

Page 364

1       A.    Five eleven.
2       Q.    What would you consider your
3  bone structure?
4       A.    Meaning?
5       Q.    I mean -- I'm big boned.  Are
6  you --
7       A.    I don't know.  I'm not big
8  boned.
9       Q.    Has any doctor ever told you
10  what your ideal weight is?
11      A.    No.
12      Q.    Have you ever looked on any
13  chart or anything to see what your ideal
14  weight is for your height, age?
15      A.    No, sir.
16      Q.    Did you suffer any physical
17  ailment because of your loss of weight?
18      A.    No.
19      Q.    Because of your loss of sleep?
20      A.    Huh?
21      Q.    Because of your loss of sleep?
22      A.    Not anything physical, no.
23      Q.    Did the emotional or mental

91 (Pages 361 to 364)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 365

1  distress manifest itself in any physical
2  way?
3       A.    There were times when I may
4  have damaged myself in some ways, hurt
5  myself physically.
6       Q.    In what ways?
7       A.    Oh, gosh. I drank a lot more,
8  cut myself, that's about it.
9       Q.    How much were you drinking
10 before this incident on average?
11      A.    I didn't drink.
12      Q.    Okay. And how much were you
13 drinking afterwards?
14      A.    Maybe every other day.
15      Q.    What were you drinking?
16      A.    Beer, liquor, whatever.
17      Q.    And how much?
18      A.    I want to say a considerable
19 amount, but --
20      Q.    Were you drinking yourself
21 drunk?
22      A.    Yes.
23      Q.    Did it affect your studies at

Page 366

1  school?
2       A.    Amazingly, that's sort of what
3  I just tuned in to, just tried to shut
4  everything else out.
5       Q.    Do you still drink?
6       A.    I do.
7       Q.    Do you drink in excess?
8       A.    No, sir.
9       Q.    When did you stop drinking in
10 excess?
11      A.    Probably once I left Troy,
12 once I graduated.
13      Q.    And do you have any problems
14 with drinking -- I mean, do you mind being
15 a drinker today? Do you mind going out
16 and having a beer, does it disturb you
17 that now you drink?
18      A.    I never thought of it that
19 way, so, no.
20      Q.    And where did you cut
21 yourself?
22      A.    Arms.
23      Q.    Did any of it require

Page 367

1  hospitalization?
2       A.    No.
3       Q.    Did you have to go to a doctor
4  because of it?
5       A.    No.
6       Q.    Did you ever have to go to a
7  doctor because of your drinking?
8       A.    No.
9       Q.    Did you ever take any
10 over-the-counter medication because of any
11 of your emotional and mental distress?
12      A.    Sleeping pills to try to
13 balance myself out.
14      Q.    Did you ever take any of those
15 pills in excess, overdose on them?
16      A.    No, sir.
17      Q.    Did you ever seek any
18 prescription medication because of any of
19 the mental or emotional distress?
20      A.    No.
21      Q.    Were you ever prescribed
22 anything because of the mental or
23 emotional distress?

Page 368

1       A.    No, sir.
2       Q.    Again, I know that you said
3  that Mr. Noriega told you that you had to
4  see that psychologist. And what was that
5  person's name again?
6       A.    Fran Scheel.
7       Q.    Is that person someone who
8  works at the university?
9       A.    Yes.
10      Q.    Is that someone other students
11 can go to?
12      A.    Yes.
13      Q.    I'm not asking you what this
14 person said, but did that cost you
15 anything?
16      A.    That's a free service.
17      Q.    Free service. I'm not asking
18 you what that psychologist or
19 psychiatrist, whatever -- is it
20 psychologist or psychiatrist, or do you
21 know?
22      A.    I believe a psychologist.
23      Q.    Have you sought help from a

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

Page 369

1  psychologist or psychiatrist for any of
2  this mental or emotional distress that is
3  part of your lawsuit?
4      A.    No.
5      Q.    Has the lawsuit itself caused
6  you any mental or emotional distress?
7      A.    Yes, somewhat.
8      Q.    Somewhat.  Has the mental or
9  emotional distress affected any of your
10  family relationships?
11      A.    Yes.
12      Q.    Okay.  In a positive or
13  negative way?
14      A.    In a negative way.
15      Q.    And how -- with whom and how?
16      A.    My brothers.  And how, it is
17  just because I have been so stressed out
18  about -- over a period of time that it has
19  sort of gotten to a point where they have
20  stopped -- we have stopped interacting
21  like we used to.
22      Q.    And do you have more than one
23  brother?

Page 370

1      A.    I have more -- I have two.
2      Q.    Okay.  And was this the
3  situation with both of them?
4      A.    More the situation with one.
5      Q.    What about the other one, have
6  you had any problems with him?
7      A.    Nothing related to the
8  incident.
9      Q.    And the one that you had that
10  related to the incident, were there any
11  other issues that didn't have to do with
12  this incident that you and your brother
13  had issues over?
14      A.    Maybe.  It's one of those
15  things where I'm not quite sure how he
16  feels, because I haven't spoken to him in
17  a while.
18      Q.    But do y'all still see each
19  other at family holidays or anything like
20  that?
21      A.    No.
22      Q.    Any other family members?
23      A.    No.

Page 371

1      Q.    Any personal relationships
2  with other individuals?
3      A.    Not that I can recall.
4      Q.    And by personal, that's both
5  -- could be romantic or nonromantic --
6      A.    Okay.
7      Q.    Correct?
8      A.    Yeah.
9      Q.    Have we discussed all the ways
10  mental and emotional distress may have
11  affected you?
12      A.    To my knowledge, yes.
13      Q.    Is it better today?
14      A.    It's better.  It's a little
15  bit easier, yes.
16      Q.    Is there any artwork you
17  decided not to sell because of anything
18  that happened to you at Troy?
19      A.    No.
20      Q.    Have you ever filed any other
21  lawsuits other than this one?
22      A.    No.
23      Q.    Have you ever been sued by

Page 372

1  anyone?
2      A.    No.
3      Q.    Filed for bankruptcy?
4      A.    No.
5      Q.    Been arrested?
6      A.    No.
7      Q.    So, therefore, you have not
8  been convicted either, correct?
9      A.    No.
10      Q.    Have you ever been a party in
11  a class action or just a class member in a
12  class action that you are aware of?
13      A.    What do you mean?
14      Q.    I mean, for instance, you flew
15  on Delta Air Lines, Delta Air Lines got
16  sued in a class and you received a coupon
17  for ten free -- that you are aware of?
18      A.    Not that I'm aware of, no.
19      Q.    And you could be in a hundred
20  classes and not be aware.
21          Have you taken any photography
22  classes, not necessarily from the
23  university, since you graduated?

Page 373

1  A.  No, sir.
2  Q.  What is Brooks Institute of
3  Photography?
4  A.  I had sort of thought on
5  applying there -- to transfer there while
6  I was in school. And this was before the
7  incident.
8  Q.  And I know you said you were
9  thinking about applying for other jobs.
10 What other jobs are you considering
11 applying for?
12 A.  Do you mean --
13 Q.  Now.
14 A.  From now on? Library, I have
15 applied at a library. Another -- a
16 commercial photographer, his business.
17 That's pretty much it.
18 Q.  But you are going to continue
19 creating art?
20 A.  I will.
21 Q.  Now, we have had a number of
22 -- I have asked a number of questions
23 about conversations you had with

Page 374

1  professors regarding issues in this case.
2  Is there any professor that we
3  haven't talked about?
4  A.  Not to my knowledge.
5  MR. MUSSO: No further
6  questions. Your attorney may have some
7  questions or he may not.
8  MR. ADAMS: What possible
9  question could I have?
10
11 FURTHER THE DEPONENT SAITH NOT
12
13 (Whereupon, the deposition of
14 Blake Dews was concluded at
15 5:10 p.m. on April 27, 2006.)
16
17
18
19
20
21
22
23

Page 375

1  C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6
7  I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the questions
10 and answers thereto were reduced to
11 typewriting under my supervision, and that
12 the foregoing represents a true and
13 correct transcript of the deposition given
14 by said witness upon said hearing.
15 I further certify that I am
16 neither of counsel nor of kin to the
17 parties to the action, nor am I in anywise
18 interested in the result of said cause.
19
20
21
22
23  COMMISSIONER - NOTARY PUBLIC

94 (Pages 373 to 375)

BLAKE DEWS
TROY UNIVERSITY, ET AL.

**A**

able
8:10 108:12 241:16,19
255:1
above
5:14 236:2 270:16 283:6
283:16 361:2 375:8
abut
97:15
academic
27:20 28:2 193:4 356:22
access
158:6
accesses
76:7
according
314:20
accurate
324:1
acquaintance
282:2
act
225:18
acting
5:5
action
1:5 223:13 352:20 354:9
354:20 360:4 372:11,12
375:17
actions
352:8,13,14
activities
221:4
activity
226:1 323:6
acts
278:11
actual
43:18 55:20 158:3 163:3
183:22 358:4
add
305:19
adding
321:21
address
9:2 306:3,11
adjacent
212:7,9 283:4,5
administrative
200:6 258:20 259:6 303:4
admissions
39:21
advertised
203:7 213:5 288:2
advised
187:22 215:21
adviser
27:20 28:3,19,22 29:5,9,13
31:1 33:12 188:1,2,3
advisers
187:20

affect
276:16 325:7 326:16
359:14 365:23
affected
326:13,14 369:9 371:11
affirmatively
7:20 24:14 51:1 78:10
100:15 101:5 130:23
223:4
African–American
142:23 225:2,15 256:17
afterward
90:22 308:19
afterwards
219:6 337:4 365:13
again
8:1,6 23:7 38:3 45:19
87:15 94:19 96:15 156:19
232:8 240:7 246:4 251:1
259:16 260:12 264:18
267:6 273:1,6 284:22
289:12 309:2 311:2
317:22 322:8 333:18
335:17 337:6 342:7
355:16 356:4 362:17
368:2,5
against
87:20 152:12
age
10:3,9,12 82:2,3 83:5,7,17
83:19 84:7,16,17 86:1,2
86:13,19,22 87:11,22
88:6,22 89:8,12 108:13
233:21 234:1 236:20
237:10,15 330:11 364:14
ages
82:19
aggression
226:2,9
ago
13:4
agree
184:9,11 244:5 311:9,14
312:5 314:1 319:1 334:17
344:14
agreed
2:2 92:17 245:7 294:7
313:8
ahead
239:19 310:23
ailment
364:17
Air
372:15,15
al
1:11 308:10 309:3,16
315:12,14,23 316:6,18
Alabama
1:2,10 3:9,18 5:4,5,12
10:19,20,23 11:2 92:10
223:10 274:18 308:12

331:21 332:6 375:4
alarming
137:2
Allen
28:23 29:2,7,10,18,21 31:3
31:12 32:13,20 40:17
45:20 182:14,16 185:10,11
186:2,21 188:4,19 271:11
271:13,15
Allen's
40:20
alleyway
212:11
allow
105:3
allowed
104:6 188:14 332:14
along
117:22 169:4 256:4 276:19
284:21
already
17:9 65:9,13 69:16 70:13
110:8 148:13 150:14
163:12 169:22 172:11
227:16 228:17 232:17
240:13 241:3 246:8
alter
232:8
altered
326:6 331:18
alternative
186:6 232:9,13 243:8,9
although
7:5 247:11
always
6:13 36:12 105:3 134:15
244:8 303:16,19 323:11
343:2,5
Amazingly
366:2
Amendment
82:5 196:20
among
18:13 242:13 279:6
amongst
166:18 188:16
amount
22:8 56:11 72:13 249:6
254:15 285:15 362:16
365:19
amounted
274:7
analyze
154:11
analyzing
321:19,21
Andre
318:10
Andrea
88:3,17,18 96:16 98:10,12
98:19 139:12 142:22

144:1
and/or
231:20
angle
190:20
angles
321:18
angry
196:3 233:2 270:4 315:21
Ann
281:18,19 286:19 287:5
announcement
214:9
annual
212:21
anonymous
359:6,8
another
20:15 32:1 47:23 55:21
115:7 174:10,11 190:18
204:1 220:4 251:9 276:4
276:4 359:15 373:15
answer
7:14 45:22 144:2,6 191:6,8
191:9 192:21 232:7
238:15,16 304:16 339:13
354:11
answered
326:19 327:3 355:18
answers
8:16 52:12 114:15 375:10
anticipate
256:2 257:15 304:11
anticipating
257:19
anybody
77:15 141:3 167:8 219:12
236:20 248:6 292:3
326:7
anymore
13:21 271:20 312:21 314:2
anytime
342:1
anyway
25:19 349:16
anywhere
109:12 113:6 146:15 276:3
277:9,9,17 347:23
anywise
375:17
apartment
9:4 146:7,10,16 147:8
apiece
204:5
apparatus
102:6
apparently
171:1
appeal
361:11
appeals

360:15,21
appear
57:13 59:23 60:7 113:18
134:22 172:20 174:22
175:2 256:2 295:1,8
297:22
appeared
57:18 87:17 129:15 138:5
181:6 186:3 288:19
294:22
appears
275:22 306:19
application
38:13
applications
38:12
applied
18:10 26:5 37:1 43:10
55:12 105:18 348:1
373:15
applies
330:3
apply
18:8 20:20,22 40:3,11
55:15 347:12
applying
37:4,8 40:15 373:5,9,11
appreciation
317:11
approach
93:21 249:20 250:14
approached
18:18 177:13
approaching
170:5
appropriate
187:5,17
appropriateness
189:14
April
1:18 5:13 374:15
archaic
335:20
area
76:17 93:3,5 97:2,5,13
331:22 332:13
areas
152:3
argument
279:8
arm
140:6 142:11 265:10 272:9
arms
270:14,16 366:22
arm–grabbing
279:10,12 293:4,8
arose
91:6
around
46:18 48:11 53:2 72:2
103:3 107:8 121:8 124:4

BLAKE DEWS
TROY UNIVERSITY, ET AL.

283:19,19 302:6 303:19
316:17 318:21 360:10
backdrop
102:22 103:1,3,15
backdrops
102:16
backlit
296:23
bad
137:22
balance
367:13
band
70:22 71:4,8 221:8,13
bankruptcy
372:3
bare
133:16,18
Barnett
204:1
base
198:19
based
46:18 49:15 50:12 55:3
125:21 217:5 241:10
260:3 275:21 280:21
288:18 314:20
basic
263:18,19
basically
18:20 29:18 44:15 49:16
61:12 71:17 105:23 112:21
115:13 124:15 149:21
164:23 190:6 217:7
224:7 227:21 265:8
282:13 299:22 317:15
336:7 349:20
basis
353:3
bass
12:15,18
became
93:14 96:12 124:2
become
88:12 331:22
becoming
325:12,14
beer
365:16 366:16
Beg
338:8
began
153:8 228:12
begin
38:12
beginning
345:6
behind
107:11 110:2
being
5:19 43:21 60:21 67:14

93:22 94:1 109:8 127:8
148:13 159:17 166:1
170:4 187:7,18 189:6
203:11 210:12 216:1
238:21 239:11 255:1
264:10 279:20 286:11
287:18 292:4 301:14
319:17,19 324:4 331:23
334:4 337:5 342:10,18
355:2 360:13 361:12
366:14
belief
245:11 343:22,23
beliefs
343:18,21
believed
227:22 330:15
Bell
363:15
belong
75:12 348:20
below
363:16,20
beneath
281:13
benefits
42:2
besides
283:7
best
22:8 31:7,9 54:17 62:4
76:20 77:1 115:2,11 121:5
better
20:8 26:23 48:4 71:23
122:23 135:14 146:14
203:15 371:13,14
between
2:3 15:10 212:10,12 219:1
281:6 324:11
beyond
361:3
BFA
26:2,5,15
big
80:11 100:10,12,14 113:2
129:10 150:8 176:10
362:22 364:5,7
biggest
299:3
bin
202:6 296:2,13
Birmingham
3:9,18 5:3,12 9:5 277:11,13
351:5,14
birth
9:20 49:4 50:12,23 51:3
53:2 54:21 60:5 65:10,14
121:7 330:11,21 344:3
346:13
bit
46:10 177:15 232:1 246:22

247:1 371:15
black
128:22 175:17 264:3 281:1
281:4 297:1
Blake
1:7,17 2:5 5:14,18 8:19,21
9:1 41:2 243:11 374:14
block
253:12
blue
280:23
board
112:8,14 113:17
boards
110:2,5,11,15,18 225:6,10
230:14
Bob
31:11 32:13,14 90:8 110:11
153:19 155:10,11,11,12
186:9 259:9 262:5
276:12,15 345:20 346:11
352:9
Bob's
157:12
body
152:5 290:21,23 296:23
bone
364:3
boned
364:5,8
book
119:11,12,13
books
22:12
borrow
46:22
both
6:19 7:2,18 13:10 39:17
45:6 71:1 85:15 95:2
120:1,3 121:13 143:10,12
148:23 158:16 196:3
264:2 271:7 294:3 298:1
307:12 370:3 371:4
bothered
240:1
bought
298:17 299:5,14 300:13,18
301:3 349:17
box
247:22 336:5
boxes
248:23
branching
325:12
breaching
223:10
break
74:16 77:13 82:14 170:6,7
181:21 193:23 218:13
254:10,11,16 257:8,10,11
304:23 305:1 341:22

342:1 347:6,8,9
Breana
85:6
breasts
127:20 139:5,19 140:1
218:4 291:3
brief
194:6 242:11
bring
127:5,15,19 141:6 161:3
165:11 166:11 170:14,16
170:21 171:2 251:17
267:19,23 268:9,12,18
278:5 333:4
bringing
121:17,19 171:6
brochures
38:8
Brooks
373:2
brother
369:23 370:12
brothers
369:16
brought
91:10,11,12 127:12 129:2
134:1,7,15 135:19 136:2,6
136:11 137:1,15 140:21
141:2 142:14 152:6
161:22 163:6,9,14 171:3
267:16 277:23 278:9
bruise
270:19
BS
26:1
budget
177:11
build
165:2
building
71:12 72:14,16 75:16,19
165:5 174:6 211:12
212:10 219:23 234:10
251:5,15 281:17 334:14
buildings
76:9 212:12
bulbs
114:1
bulk
247:22
bunch
71:22
bunnies
258:16
business
307:4 373:16
bust
67:14
bustier
139:9
buttocks

132:17 133:13,16 140:15
buy
147:17 177:15,17 206:5
248:20 249:5,21 250:16
299:12,22 300:2 349:16
buying
348:11
bylaws
315:11

C

C
3:1 375:1,1
cable
176:4,6
cables
114:5
call
12:17 26:2 50:23 66:22
73:21,23 116:20 165:19
222:14 229:14 232:20
233:14 249:17 311:23
329:10,16
called
8:20 32:22 43:16 67:7
129:8 176:10 220:18
221:7 229:12 329:8,13
358:14
calling
246:7 253:8 354:3 355:16
calls
344:8
came
5:10 72:8 91:6 92:12
154:3 176:5 216:15
229:9 249:4 252:23
254:16 260:7 322:13,21
332:16 339:5
camera
17:17 102:3 296:18
cameras
101:21,22 104:16
campus
14:8 64:14,16 72:6 165:10
221:4,13 229:1,2 236:7
261:5
cape
159:18
capstone
336:1,6
card
250:8,19
career
258:7 261:11,13
careful
7:2 13:11
Carolina
11:20
carried
238:14 239:11,13 240:4
241:7

BLAKE DEWS
TROY UNIVERSITY, ET AL.

173:11 190:4,19 194:1
198:17 217:12 221:3,12
222:12 229:22 244:23
245:15,19 248:5 256:3
269:7 274:8 303:19
334:18,20 335:12 341:19
347:2
comes
359:13,13
come/first
158:14
coming
46:17 77:12 157:2 191:18
193:3 239:22,23 254:5
284:23 322:11
commencing
5:13
comment
136:22 137:4,8 159:23
160:11 187:13 207:20
208:6 209:5,9 256:11
269:8 288:11
comments
125:14 137:3 204:20,22
206:21 207:1,8,12 209:19
252:9 254:3 255:10
256:3,15 257:16,23
286:6 292:4 314:9,10
315:3,7,7 316:10
commercial
277:1 322:3 373:16
commission
299:18
Commissioner
2:6 5:6 375:23
committee
188:1,5,8,10,13,15,20,23
189:6,10 190:9,13 198:13
205:7
communications
227:3
community
14:3,6,9,12 15:6,21 16:20
81:5,8 92:7 95:1,10
213:5 289:7 337:11
351:6,9,13,18,21
comparing
315:10
competition
220:19 221:2
complain
199:13 258:19 259:4 360:3
360:11,20
complaint
338:6 341:3
complaints
160:6
complete
8:15 14:21 31:16,20 111:8
149:12 274:22
completed

27:4
completely
179:14 190:19
completing
26:22
compliance
2:12
complicated
196:5
complies
309:23 318:8
computer
153:5,5 154:17 161:16,23
162:10
conceal
243:1
conceive
123:15
conceived
69:16
concentration
33:5
concept
46:18 53:2 120:12 125:2
126:2 239:12 260:5,7,11
285:1
concepts
277:12
conceptual
116:22
concern
167:20 181:13 210:13 223:9
concerned
301:21
concerns
181:5 325:4
concert
122:9 212:8 213:8 216:18
concluded
353:20 374:14
conclusion
198:17 334:19,20 344:9
condo
100:18
conducive
332:9
conduct
340:22
confidence
199:8
confronted
337:12
connected
176:6,7
Connie
89:5 99:1 107:23 141:15
144:5
conservative
253:5 255:20
consider
40:15 190:10 195:21,23

321:1 329:19 351:4,8
358:21 364:2
considerable
362:16,19,20 365:18
consideration
358:4
considered
26:1 37:4,8,9,12 38:17
332:5 359:1
considering
373:10
consist
266:5
constrained
331:12
constraint
287:11
constraints
287:4
constructed
185:19
constructive
126:5,7 135:15
construed
225:23
consulted
198:16,23 199:3,6 200:12
contacted
228:11
contain
101:17 292:9 295:22 296:4
contained
295:20
contemplation
248:18
content
179:6 180:23 182:20 183:5
186:13,23 187:1 191:15
205:5 215:3 217:14
220:14 248:6 253:21
254:6 264:7 325:5
contents
183:22
contest
342:8 347:1
context
321:7
continue
20:6 30:12 121:12 326:2
373:18
contract
344:5,6,11
contributed
210:17
control
111:9,22 359:18
controversial
258:3,12,17 336:3
controversy
258:8
conversation

58:14 111:12 185:11 186:6
219:5,8 229:21 242:12
265:22 271:18 272:2
273:3 274:6 279:7
conversations
186:20 193:8 211:16 280:1
303:7,11 373:23
convicted
372:8
copies
57:18 154:19
copy
21:10 118:2,4,11,15,15
154:15,20 201:5 203:16
305:9,10,12,15 309:4
312:20,21 314:7
cord
114:5
cords
177:2
core
15:22
cost
162:4 204:12 368:14
Council
308:12
counsel
2:4,16,18 5:10 375:16
counter
177:5 271:1
country
276:4
COUNTY
375:5
couple
6:12 25:8 121:10 219:15
299:14
coupon
372:16
course
25:5 33:23 34:4 45:4
46:6,13 48:1,8,16 50:2
52:1,2,5 65:5 68:8 79:4
79:8,11,14 117:3 120:16
166:14 183:11 233:20
256:18 262:22 266:10
273:16 274:3,8 307:18
308:9,15 326:3 342:16
courses
26:22 27:4 33:4 90:11
260:18 303:23 304:3
court
1:1 2:13 5:9,22 8:2
courtyard
76:11 211:11
cover
22:11,11 226:19
coverage
42:4 252:17
covered
22:13 226:22 227:16

279:23 324:10
crammed
282:14
crazy
252:20
create
50:11,14 116:5 157:6
335:15 351:5
created
50:17 60:7 116:5 257:13
266:13 317:20 328:3
339:4,10 346:17
creating
325:17 339:3,9 373:19
creation
357:22
credit
123:2 250:8
Crescent
112:4
criminal
341:5
criticism
126:5,8 135:15
critique
285:2
cross
330:13
cry
183:6 184:5 187:13 334:4
cube
151:11 152:10 154:15 179:19
cubes
112:10 150:15 247:21
cubicle
242:19
culture
330:18
cum
23:17,22 24:4,9
current
9:2,9 42:23 305:11 306:2
307:19
currently
41:8,10 43:6 351:4
curves
321:19
cut
94:10 304:19 365:8 366:20
Cutting
146:11
CV-05-01045-MHT-SRW
1:5
cyana
280:22 281:3,6,7

──────────────
          D
──────────────
D
4:1
Dale
84:12 93:10

187:3  192:8  205:17
215:10  232:17  268:5
274:11  301:4  315:5
329:9  334:9  342:11,19
356:18  361:6  371:9
**discussing**
165:9  186:8  241:11  246:9
256:5,6
**discussion**
56:1  114:19  115:9  125:1
128:5,8,17  147:21  186:12
191:23  192:15  217:13
222:3,6,7  229:23  256:20
280:18  313:14
**discussions**
135:20,22  187:15  222:8
**dismantle**
248:16
**display**
70:1  90:5  91:4  333:11
343:1,4  348:22
**displayed**
256:16
**displaying**
294:9  349:3,5,6
**displays**
70:18
**displeased**
198:9
**disseminated**
298:3
**dissertation**
125:9  324:10
**distress**
352:2,6  353:1  354:21
355:9,13  356:3,17  357:16
357:22  358:2  362:13
365:1  367:11,19,23  369:2
369:6,9  371:10
**distressing**
191:16  357:1
**District**
1:1,2  5:8
**disturb**
366:16
**divided**
188:16
**DIVISION**
1:3
**doctor**
270:20  353:20  364:9
367:3,7
**doctrine**
263:20
**document**
52:4  55:20  122:11  243:23
308:7  309:12,21  311:1
313:1
**documentation**
230:3
**documents**

55:18  57:16  114:17  305:7
319:13  341:7
**doing**
23:7  49:13  92:6  121:1
155:14  239:13  276:23
277:6  307:2  331:15
338:20
**dollar**
350:7
**dollars**
177:16  298:21  350:11
**donated**
72:13
**donation**
177:21,23
**done**
38:16  121:17  157:20  230:18
253:19  273:21  322:3
331:13  350:1
**doodle**
316:11
**door**
76:4,5,10  174:1  215:8,14
216:4,8  235:3,7  237:17
237:18  239:17  252:7
**doors**
174:9,12  215:11,11  234:16
287:22
**doorway**
220:13
**Dothan**
10:23  11:4,7  14:10,11  95:7
95:8,9  98:6  274:17
276:3  302:14
**doubt**
10:5  168:19
**down**
7:4  31:5  73:18  74:16
77:12  103:10  112:22
137:21,22  146:11  152:16
181:21  202:19  205:16
220:6  223:18  233:6
244:23  245:15  246:8,11
248:5  253:19  254:2,5
259:13  285:9  305:18
323:3  324:18  335:12
338:22  339:5  353:13
354:17  359:13  360:13
361:12  362:8  375:9
**downstairs**
283:1
**downtown**
281:10
**dozen**
290:16
**Dr**
6:7  67:10,23  68:1,11,13
70:5  165:21  207:21
208:9  209:20  210:8,16,18
211:19  335:6,9  343:10
346:7,19  352:11  353:21

355:14  356:6  359:23
**draft**
296:19
**dramatics**
221:5
**drank**
365:7
**drawing**
33:18  64:1  125:12  218:2
**drawings**
115:18  217:18
**dress**
84:2
**dressed**
96:2  133:2,3
**drink**
365:11  366:5,7,17
**drinker**
366:15
**drinking**
365:9,13,15,20  366:9,14
367:7
**drive**
167:2,11  169:18  178:9
**driving**
165:10  167:11
**drop**
289:4
**dropped**
12:7
**drove**
169:16
**drunk**
365:21
**Duane**
31:12  60:12  143:10
**due**
198:18
**duly**
5:19
**during**
107:13,16,19,22,23  108:15
108:20  162:22  179:4
187:20  189:18,18  213:19
218:21,23  223:16  229:3
243:7  254:11  287:3,17
293:18  310:5
**Dusty**
200:1
**dwell**
357:13
**DX**
283:11
**d-e-a-r**
317:2
**D-u-a-n-e**
60:15

| | E | |
| --- | --- | --- |

**E**
3:1,1  4:1,5  375:1,1

**each**
7:3,11  13:11  24:7  46:9,17
47:21,22  52:18,19,19
78:20  82:23  111:1  130:19
130:21  134:16,21,23
135:4,5,7,8  141:5  151:16
151:18  152:14  193:7
290:16  298:20,22  370:18
**earlier**
50:9  63:10  123:14  165:13
165:22  176:13  268:5
301:5  307:7  327:3  356:5
357:17
**early**
50:21  51:2,5  65:4  180:19
**earned**
18:1  306:23
**easier**
66:23  371:15
**easy**
174:17
**eaten**
169:22
**Ed**
171:13  178:22  228:6
298:18  300:13
**effect**
2:12
**effects**
336:13
**efficiently**
239:15
**eight**
41:19  42:12,16,17,18  290:15
362:1,6
**eighteen**
10:3,9  236:1,10  238:11,22
**either**
103:11  121:15  125:5  139:23
146:19  160:20  182:2
190:7  194:19  210:10,18
213:19  224:13  235:23
238:11  288:12  291:1
294:5  301:15  304:7
344:22  356:15  372:8
**elaborate**
53:3
**elaborated**
53:5
**elbow**
270:16
**elective**
33:3
**electrical**
114:3,4  177:2
**elements**
148:12  243:2
**eleven**
290:15  364:1
**elsewhere**
43:7  268:8

**Eltie**
97:3,4
**embarrassed**
335:7
**emotional**
352:1,6  353:1  354:21
355:7,13  356:2,16  357:16
357:22  358:2  362:12
364:23  367:11,19,23
369:2,6,9  371:10
**emotions**
304:12
**emphasize**
35:9  321:20
**emphasizing**
38:20
**employed**
41:8,11  81:11  200:7
**employee**
254:18  280:2
**employer**
348:6
**employment**
42:23  43:7
**empty**
106:13  151:11  281:16
**encouraged**
47:4
**end**
31:9  55:3  251:7  265:2,4
**endeavors**
304:2
**ended**
252:2
**endurance**
342:7
**engaging**
278:11
**engineering**
179:20
**English**
26:12  93:20
**enjoyed**
32:11
**enough**
7:6  148:11  246:16
**enroll**
13:23  40:2
**enrolled**
79:4,7,10,14  90:10  302:9
**entail**
242:18
**enter**
215:12
**entered**
17:21  220:7
**enters**
220:5
**entire**
214:21  224:14  309:20
312:19

BLAKE DEWS
TROY UNIVERSITY, ET AL.

false
311:5,8,15,18,23 312:16
fame
70:22 71:5,9
familiar
24:17 112:13 360:23
familiarized
361:4
family
67:20 72:13 160:18 369:10
370:19,22
far
46:16 62:23 123:2 149:3
175:7 186:7 188:17
226:23 269:14 285:1
299:6 301:21 304:22
father
194:11 295:22 315:18
fear
336:4 341:4,4
Federal
3:16 5:7,11
feedback
121:2 125:14 131:6,8,10
202:15,19 254:9 275:16
275:21
feel
196:3 197:7 328:5,6,11
331:11,12,17,20 332:8,11
feelings
184:17 358:7
feels
359:15 370:16
feet
100:19
fellow
362:22
felt
217:8 262:1 296:19 325:15
female
85:3 86:6,7 87:3 96:20
127:20 225:4 230:13
262:2 289:16
females
84:20 87:19 110:3 225:6,9
feminism
79:1
fence
87:20
Fessler
281:19,21 282:21 283:3,7
284:4
Fessler's
281:19
Festival
92:11
few
76:7 181:21 207:15 224:8
286:2 316:23
fifteen
44:6 214:22 216:11 350:5,6

350:11
Fifth
82:1,4,5,9,22 83:3,17 84:6
84:16 85:12,13 86:12
87:9,23 193:14,22 341:10
fifty
41:19 42:12,18 204:5 288:9
298:21 353:5,8,10,15
fight
332:1,11,12,17,17
figure
24:20 25:15 362:18
figures
225:22 281:3
filed
371:20 372:3
fill
38:11,12
film
129:12 153:1
final
57:13,19 201:23
finals
170:5
Financial
3:7
find
153:11 157:5 194:17 258:2
330:18,23
fine
6:1 13:6 26:17 46:2 67:1
78:22 164:1 192:6 227:3
243:23 301:12 313:6
316:19
finish
7:15,17 10:6 15:12 142:8
177:18 178:23
finished
30:4,10,11 54:9,18 149:11
159:4
finishing
301:16
first
5:19 6:13 12:2 14:19 22:1
28:3 43:3 46:12,19 47:17
60:13 68:21 76:13,19
78:14 84:23 91:11 115:14
115:16,17 116:12 119:14
120:9 123:17 124:1
156:10 158:14 196:20
240:13 256:8 266:18,20
295:18 305:6 322:21,22
324:15
firsthand
336:15
fit
151:14
five
106:6 122:20 150:11 290:14
317:11,11 357:9 362:8
364:1

flew
372:14
fliers
203:12 288:3
floor
148:8,11
flowers
258:15
fluorescent
113:23
flying
159:19
focus
221:17
focused
326:9
focuses
321:21
follow
343:3
following
5:16
follows
5:20
food
285:20,21
foot
68:22 150:10,11 175:18,18
football
122:21
force
2:12
foregoing
5:9 375:8,12
forensics
221:5
forget
31:8
forgetting
86:9
forgot
231:20
form
2:17 32:22,23 89:17 197:21
237:14 240:7 361:18
formally
18:9
former
67:15
forms
89:15,23 294:4,11 306:19
forth
92:16 335:18 352:8
forties
22:18
forty
42:1 255:9 363:1,7,9,17,21
259:17 332:22
found

148:18 317:9
four
24:13,21,22 100:19 115:16
115:17 116:7,12 150:10
175:18,18 290:14 357:8
361:21
fourth
232:13 243:8
fragile
231:4
frame
41:12 113:1,2
framed
112:14,17 204:9
framer
41:17
Fran
191:11 368:6
free
106:23 368:16,17 372:17
Freedom
323:6
freely
332:14
freshman
14:18
friend
80:23 81:1 96:14 98:18
140:4 154:21,22 155:2
156:4,23 157:22 160:4,7
160:9,11 282:1 335:22
friends
16:17 88:14,15 93:2 95:2
96:13 153:19 199:18
234:14,18,22 296:7
friend's
88:16,19 160:17
front
76:3,5,10 140:15,16 175:12
175:15 225:6,10 230:13
231:2,6 265:10 334:8,10
334:11
frontal
127:16 218:4
front-runner
132:6
frustrated
315:20
full
2:12 8:15,18 21:17 22:2
23:14 73:7 127:16 218:4
fully
294:23 296:8,10
Fulmer
3:22 206:11,12 286:9
302:18,21
Furman
11:19,22 12:2,6,10,22 13:7
13:17 14:2,15,22 15:1
16:3 17:13,18 25:6
further

227:1 374:5,11 375:15
future
40:1,6 331:9

**G**

Gabriel
204:1
Gail
1:20 2:5 5:1
galleries
277:15
gallery
75:16,18,20,23 76:6,18
166:18 202:21 219:19
287:9
games
122:21
gap
15:9
garage
147:12
gathering
277:11,14
gave
52:17,19 54:21 130:14
131:6,8,11 190:22
224:23 233:7 246:22
261:23 314:11,11 317:13
318:20 320:20
gavel
355:5 357:20
gee
250:15 313:23
gender
343:14
general
11:16 14:4 95:16 213:5
215:3,7
generalized
215:6
generally
52:22 319:15,16
genitalia
127:21 132:13,22 133:10
139:2,18,23 140:15
183:23 184:2 187:7,18
217:21 218:1,7 256:8
262:2 267:21 268:3
291:2 296:11,14,22
gentleman
128:23 140:6 141:23 142:3
142:9 143:6 153:22,23
162:21
gentlemen
68:8 177:3
geography
11:5
getting
151:13 160:3 169:7 170:23
178:23 179:1 221:21
270:4 304:20 324:14

BLAKE DEWS
TROY UNIVERSITY, ET AL.

223:22  309:5,6,8,12,18
310:8  314:7  317:23
318:7,17
handwritten
115:18  118:19  313:1  318:20
318:21
hand–dyed
281:5
hang
113:15  148:7,9  149:22
175:7  176:20  178:18
180:19
hanging
99:13  148:5  149:4  171:9
173:6  175:20  176:3
177:18  178:5,20  179:9,15
180:2  182:23  187:12
217:14  232:21  242:18
291:13,14  296:3
happened
120:16  128:18  169:8  251:12
256:4  302:3  347:19
348:1,7,12  349:10,18
371:18
happy
40:21  41:4  170:5
harassed
195:8
harassing
194:18
harassment
195:6  339:2  340:19  347:3
hat
237:2,4
having
33:5  120:20  148:4,7
162:18  197:16,18  238:10
238:19  265:22  272:5
279:7  304:12  346:16
366:16
Hawkins
6:8  67:7,23  68:1  207:22
208:10  209:5,9,12,17,20
210:8,16,18  211:19  335:6
335:9  343:11  346:7,19
352:11  353:21  355:14
356:7  359:23
hazing
336:23  337:2,23  338:7,11
338:14,18  340:17
head
7:20,23  15:11  24:14  51:1
67:16  75:1  78:10  100:15
101:5  130:23  142:13,21
209:3  223:4  227:2
249:11  308:11  309:3,16
314:9  315:3,12,14,23
316:6,18
Headland
10:15,18  11:1,3,9  13:2  95:4
headline

323:6
Head's
318:1
health
42:3
hear
6:15,20  8:10  24:20
heard
24:23  67:6  135:21  184:7
211:19  220:17
hearing
252:9  265:21  375:14
hearsay
234:17
heated
269:19,22  279:14
heavy
113:4
height
364:10
held
113:2
help
50:18  116:5  155:13,13,18,23
156:4  165:2  167:6  178:4
178:23  198:7  245:19
284:20  287:3,16  368:23
helped
16:12  272:5  326:21
helpful
160:3,9  162:22  165:6
hemp
281:5,5,6
hence
12:7
hey
205:15  284:11  345:11
355:14
high
10:13,15,18  239:8
higher
25:16
higher–ups
227:14
highly
204:23
himself
77:19  361:3
historical
71:23
history
27:18,19  32:12  33:2,4,6
70:4  243:7
hold
114:5  152:9
holding
31:17  84:1  224:22  225:20
266:23  267:4
holiday
229:3
holidays

169:9  229:9  370:19
Holly
85:1  87:15,16  94:16,23
98:8  138:16  144:20
Holmes
31:13  32:11  33:1
home
16:15  229:5,8
hometown
95:3,6
homosexuality
226:3,10  255:17  257:3
honest
8:16  106:21  149:18  260:11
honestly
19:7  22:7  44:3  222:15
honor
66:19  67:8  68:18,19,23
70:21  71:8  72:7  73:17
74:2,5  76:23  163:7,10
165:15  221:8,13  230:2
honors
23:16
hooked
160:4
hooking
160:7
Hoover
41:14
hope
61:14  214:6
Hopefully
248:13  359:20
horribly
322:15
hospitalization
367:1
hour
176:21
Hourly
41:20,21
hours
41:22  109:13,15  123:4
161:2  286:21  287:3
361:21  362:1,7,9,10
hour's
361:22
house
72:17  146:8,16  147:12
148:15,17,19  155:5,7
163:2  164:7  246:16
housed
70:21  71:4,8  73:4
Hrebick
84:12,13  93:11  138:14
144:22
Hrebick's
138:12
huge
163:15  176:9
Huh

364:20
humiliate
334:8
humiliated
334:1  335:7
humiliation
334:7
hundred
44:5  100:19  113:6,7  204:5
221:11  350:5,7,11  362:20
372:19
hung
113:10  148:13  163:13  166:3
179:1  181:10  182:22
205:11  281:9
hurt
184:16  317:4  365:4
H–A–L
67:3
H–r–e–b–i–c–k
84:14

I

idea
11:5  46:17  67:17  93:9
110:18  121:5  123:17  124:1
150:21  155:15  170:3
176:17  213:9  215:18
220:21  236:18  248:11
284:23  323:14  337:8
ideal
364:10,13
ideas
92:16  121:8  123:21
identification
51:19  54:4  57:8  114:22
116:18  201:13  280:15
297:13  305:5  306:17
308:1  317:7  319:10
identifies
48:6
identify
108:13
II
47:12,16,19  263:6,14,17
III
47:19  263:4,17  265:2
266:9,16  267:13  268:1
image
225:23  263:19  315:19
321:22
images
112:17  161:12  268:5,7
285:5  291:7,8  333:11
importance
47:23
important
6:19  7:1,10,15,16,21
improve
196:6
inaccurate

322:15,20  324:3,6
inadequacy
358:7
inappropriate
187:6,17  194:22  195:12
197:1,5,6  269:21  271:16
324:7,8
incident
187:19  272:9  273:14
279:11,12  293:5,8  326:5
333:1  337:5,13  363:4
365:10  370:8,10,12  373:7
include
25:5  56:10  101:21  102:5
138:7
included
51:14  59:3,10  79:21
inconsequential
251:11
incorrect
57:20
increased
353:11
incredible
63:22  64:2
incredibly
170:4  190:15  191:16  196:3
201:4  231:4  271:16
315:19  335:19  357:1
independent
273:13  274:2
indicated
354:12
indicating
129:14  264:11
indirect
352:21  354:9,19,19
individual
6:7  61:13  72:2,12  78:14,17
80:15  84:10  85:17,21
86:6,15  87:3,14  88:2,10
89:10  96:7,19,21  98:7
108:3  143:15  155:9
247:20  290:3  301:2,12
333:3  350:14
individuals
89:16  95:17,23  99:11,12
136:13,15  138:4  215:2
216:5,15  267:20  268:2
278:11  283:10  294:3,5,21
300:17  303:8  371:2
individual's
155:5
industrial
277:2
influence
337:14
influenced
202:14  333:2,4  335:15
information
190:16  191:18  193:6  211:21

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

---

**K**

Katie
265:15 269:4,5
keep
77:21 115:7 119:6 129:18
246:23 287:3
Kelly
289:19 291:4
kept
104:6 118:14 119:1 165:14
246:15
key
219:12
keys
254:19
kids
24:20
kin
375:16
kind
6:20 10:22 30:16 35:11,14
45:1 75:1 103:5 116:14
120:17 121:4 126:5 148:5
149:15 151:13,15 158:16
169:13 170:2 177:8
182:23 183:12 184:12
188:16 207:18 218:13,17
232:1 236:6 252:19
253:10,13 255:20,21
257:22 263:20,22,23
269:11 277:13 279:8
287:2 324:10 336:12
348:20
kinds
301:16
knew
18:15 71:13,15 77:19 92:14
168:6,12,16 170:21 177:8
212:5 222:13 248:8
257:14 276:13 294:8,10
294:16 295:6 315:18
knowing
16:4 170:23
knowledge
16:22 22:8 49:9 73:2,5
76:20 77:1,4,9,17 127:23
165:23 172:22 177:7
199:12 212:22 288:4,5,6
313:15 336:16 341:2
345:9 347:22 348:3
371:12 374:4
known
61:7,7 200:14,15
knows
45:1 190:16

**L**

L
2:1
labeled
51:21 115:1 201:15

lack
71:23 122:22 135:14
203:14 343:20,21,22
ladies
85:12
lady
108:8,10 246:6
land
9:14
landscapes
349:6,14
language
253:14
large
5:5 10:21 15:9 69:3 72:13
100:20 146:13 150:8
173:8,18,18 175:16 176:5
202:17 213:11 248:10
258:9 280:22
larger
150:13
Larry
32:4,5 171:9
laser
153:6 154:3 156:9
last
21:18 26:6 45:16 84:4
85:2,9 87:7 88:5 89:7
109:9 163:20 165:8
178:5 179:23 196:23
234:20 262:14,16,20
271:22 272:11 285:11
290:5,6
lasted
109:14
later
43:9 49:5 122:14 181:22
244:17 271:9 283:8
303:20 304:15
latest
305:16
laude
23:17,22 24:4,9
laugh
183:12
laughed
184:12
Law
3:5,13
laws
2:13 223:10,18
lawsuit
191:5 194:3 303:12 304:6
332:3 333:5 369:3,5
lawsuits
371:21
lawyer
24:4 281:13 283:1,2,6
344:13
layout
21:12 100:11

lead
35:16 174:5
leading
2:18
leads
76:15
leaning
87:20
learn
18:11 64:6 193:13 276:9
learned
64:19,22 65:10,14 193:7
248:5 254:4 325:3
least
44:16 61:8 133:18 141:12
149:23 193:2 324:14
leave
29:13 58:12 270:6 287:21
leaving
12:6 164:23 182:22
led
226:1 279:7
left
16:3 58:8 142:12 143:7
180:3 289:15 297:17
342:2 358:6 366:11
legal
344:9
legitimate
334:16
lengthy
58:13
lenses
102:5
less
203:6 351:19 356:14
lesser
350:9
let
7:17 10:6 19:11 51:16 70:9
82:12,17 95:16 96:3
142:7 145:19 177:5
181:21 201:6 219:13
233:16,19 235:4,8 246:3
246:5,6 278:5 285:17
287:16 294:19 297:14
304:18 307:6 310:4
314:6 317:8 327:4
344:10 354:15
lets
104:13,15
letter
41:4
letters
40:10
letting
287:19
let's
43:13 48:2 78:4 79:2
80:13 116:11,11,19 117:13
125:8 128:20 178:8

193:23 219:4 240:11
257:9 289:14 304:23
313:12 320:3 337:22
342:3 360:10
level
47:22
library
373:14,15
lieu
273:16 274:2
life
33:18 43:12 49:16,20 218:2
lift
113:14
light
103:16 155:18 247:22
248:21
lighting
177:8 180:6 301:6
lights
101:21,22 102:13,14,17,18,19
103:15 152:12
liked
131:15 202:16 279:16,17
325:18,21 327:1
likely
10:13 168:3
likes
44:23
limited
63:7
line
9:14 181:9 292:7 330:10,14
lines
112:15 157:3 159:7,11
372:15,15
lips
6:21
liquor
365:16
list
31:15 32:2
listed
125:2
little
8:5 25:16 38:16 72:15
76:17 81:20 100:19
177:15 215:8 217:4
220:9 223:8 231:23
246:22 247:1 322:6
336:20 371:14
live
81:4 93:4 97:1,4 229:1
282:3 283:6
lived
194:12 229:2,9 283:3
lives
97:7,20
living
147:11,13,15 149:6 282:18
287:22

loaded
165:9
local
239:5 288:3 289:1
located
75:19,21
location
65:23 66:3,7 99:18,20
148:16 152:13 287:8
locked
234:17 235:3,8 252:7
loft
281:10,20 282:7 283:16,18
long
11:21 12:1 13:4 14:5 29:4,4
57:3 67:4,7 68:3 72:4
73:14 74:12,14 77:20
78:1 109:9 126:18 128:16
147:14 160:23 169:17
175:9 176:19 202:22
214:23 247:7 272:13
283:18 285:11 286:23
287:14 289:11
longer
29:9,13 84:23 121:10 331:6
look
30:13 40:15 47:18 51:16,23
54:7 55:14 57:12 61:23
79:2 80:13 96:3 112:2
135:8 137:11 138:11
151:20,23 159:10,11
173:11 196:1 218:13
289:14 308:4 310:22,23
317:15 318:9 330:4
356:21
looked
130:17 134:2 136:19 145:6
152:17 195:22 209:13
231:15 364:12
looking
39:8,12 43:6 114:7 120:14
145:2 152:7 183:1 198:3
266:14 291:9 296:20
299:17 321:18
lookover
231:14
looks
113:4 255:22 291:15 292:8
lose
357:2,4 362:11
losing
357:11 361:15 362:4,23
loss
364:17,19,21
lost
12:8 361:14,21 362:9
lot
14:18 31:23 32:13 44:18
107:7 147:17 177:6,7,9
190:16 191:17 212:6
252:20 253:2 287:12

---

BLAKE DEWS
TROY UNIVERSITY, ET AL.

medication
270:23 367:10,18
medium
16:6 27:12 47:4,5 53:9,12
53:20 114:9
mediums
46:20,23 53:14
meet
123:6 148:17 315:2
meeting
223:8,16 224:3,6 226:20
226:22 227:19
Melanie
265:15 269:2,4
member
160:18 239:19,21 258:20
259:7 275:16,18 284:11
285:4,16 289:6 297:7
333:23,23 351:20 372:11
members
62:11 67:21 198:17 209:18
244:10 285:23 303:4
370:22
memorabilia
165:17,20 166:1 167:13
171:5 173:22 174:16
176:12 185:3 215:13,15
220:4 232:20 233:11
251:1,1 280:4
menacing
255:22
mental
352:2,6,23 354:21 355:9
355:13 356:2,17 357:16
358:1 362:12 364:23
367:11,19,22 369:2,6,8
371:10
mentioned
264:16 301:1 339:19
353:20
mentioning
184:1
mentor
275:13
merchandise
250:12
met
123:10 208:9,9 259:13
methods
186:7
MFA
39:12
MFAs
39:9,10,17
Michael
31:13 32:11 87:6 97:22
98:1,5
Michelle
299:11
midcourse
65:8

middle
1:2 221:8 239:4,5
midnight
109:1,3,5,6 179:4 180:17
might
126:4 132:7 134:12 151:12
169:13 187:6 204:13
217:13,15 219:14 223:12
242:18 264:16 316:17
342:15
miles
11:7
military
9:23
mind
31:14 243:4 312:12 332:14
366:14,15
minded
253:5
mine
93:2,15 95:3 218:15
minor
26:18,19,20,22 27:1,3
minors
63:19 64:19
minute
30:3 82:12 142:7 194:1
312:23
minutes
109:12 214:23 216:12
missed
31:18
missing
232:22 240:15
mix
46:20 47:4
mixing
47:8
Mobile
296:7
model
83:10 89:14,16,22 103:6
107:10 109:11,15 134:16
134:22 266:19 294:4,10
models
82:20 110:23 127:1 295:3
295:6
moment
57:11 183:1
monetary
56:10 299:6
money
20:13 72:14 177:15 178:4
178:23 246:22 247:1,15
249:6 250:9 306:22
350:19
Montgomery
92:10 302:12
month
361:18
months

126:22,23 285:13 357:5,6
357:6,7 361:16
moral
227:21,23
Morgan
84:3 91:23 93:7 159:15,17
267:7
morning
170:23 178:10 180:19
most
25:10 32:8 107:2,5,6 168:1
168:3 179:12 299:5,10
350:3,15
mostly
158:16 228:5
motto
302:17
mouth
64:12 185:4
move
218:17 287:7,12
moved
277:10 351:13
movement
152:4
moving
282:12,16 287:5 332:6
much
7:7 18:12 21:14 32:10 42:8
113:5 149:11 204:3
218:16 228:4 247:2,3
254:9 269:14 298:19
301:12 308:5 317:14
325:10 335:21 342:2
350:2,4,11,19 352:10,23
356:2,9 361:15 362:3,4
362:15 363:2,3,6 365:9
365:12,17 373:17
mural
281:3
museum
38:23
music
12:11 67:4 68:5
Musso
3:12 4:3 6:1,4,6 11:3 20:4
23:23 24:19 30:6 55:22
68:13 71:1 73:23 82:7,13
108:11 114:18 115:6 116:3
147:20 163:19 192:3
194:2 201:9 240:11,17
249:15 257:9 302:19,23
304:22 311:6,19,22 312:7
313:6,12,21 317:1,9
326:20 338:5 346:21
347:2 353:4 354:5,8
355:20 374:5
mutual
88:14,15,16,18 96:13,14
98:18 140:3
myself

21:17 109:9 192:22 196:22
299:15 326:6,11 356:20
361:4 365:4,5,8 367:13

--- N ---

N
2:1 3:1 4:1
name
6:5 8:18 17:5 44:16 60:14
63:23 80:16 81:17 83:10
84:2,2,4,11,22 85:1,2,8,9
85:18,21 86:8,9 87:7
88:2,5,11,16,19 89:7
94:19 96:22 97:3 106:1
153:20 234:20 253:8
267:6 269:3 281:14
289:4 290:6,6 318:5
340:12 353:21 368:5
named
203:23
names
61:9 241:14 253:9 329:8,11
329:14,17
narrow
202:19
Nash
3:14
national
70:23 71:2,8
natural
196:11
nature
183:7 198:18 274:10
navel
108:4 140:5 142:11
near
10:21,23 11:4 298:1
necessarily
44:23 132:8 165:23 168:10
201:16 227:13 243:3
296:21 335:1 350:20
351:7 363:13 372:22
necessary
2:15 89:19 90:5
need
13:10,14 125:6 155:12,13,13
155:15 181:8 194:4
217:15 223:12 231:16
238:15 243:20,22 308:5
317:14 332:23 341:21
347:5
needed
91:4 103:19 105:14 151:14
155:22 157:20 177:10
229:22 264:17
Neely
320:3,9
negative
126:2,6 131:10 154:16
256:15 257:16 258:9
264:6 289:7 292:15

297:4,8 331:20 369:13,14
negatively
15:11 67:16 142:21 209:3
249:11 276:16
negatives
80:7 153:4 299:22
negativity
207:17
negotiating
152:4
neither
375:16
never
8:11 24:19 25:1 27:4,7
31:14 68:7 138:1,2 184:2
185:7 187:3 195:3
196:23 197:1,2 207:17
208:22 209:18,22 226:7
243:11 273:3 278:2,22
302:15,19 329:13 330:15
335:9 340:1,4,16 341:14
345:10 347:21 358:10,15
358:18 366:18
New
37:21 38:6 97:20 100:18
194:12
Newsom
289:19,21
newspaper
17:14 203:8 235:14,16
236:4 288:3,4 319:5,14
319:19 320:7,8 322:10
next
15:13 75:21 83:9,20 84:10
84:20 85:3,17,20 86:5,15
87:2,14 88:1,10 89:3,10
94:16 96:6,19 97:21 98:7
98:19 141:18 152:10
181:19 182:3 212:13
218:10 228:9,12 313:17
313:22
nice
7:9 162:21 175:11 185:20
night
107:3,5,7,13,20 108:18,20
214:15,20,22 216:5
287:17,19 293:19,20
361:19 362:1,5
nine
24:12 25:18 221:3 290:15
ninety-eight
149:12
nipple
108:3
Noble
199:22
nobody
8:6 234:16
Nodding
7:20 24:14 51:1 78:10
100:15 101:5 130:23

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

153:16 188:9 203:3
205:3 255:6 265:19
308:16 315:15 349:20
365:7
old
69:23 70:1 81:22 238:12
289:21 290:7,10 330:11
older
108:7,8,9 153:22 236:10
238:22
once
90:4 147:6 232:7 264:18
284:22 322:8 335:17
337:6 362:17 366:11,12
ones
107:19,20 108:17 131:15
150:18,19 151:1,2 154:2
166:10 201:20 202:8,11
266:14,15,21 291:9,10
one-on-one
107:9
only
25:19 38:22 107:7,14
149:21 175:3,5 191:8
197:4,6 232:9 274:19,21
290:19 315:18
onto
156:4 161:5,18 221:4,12
open
70:10 158:19 171:4 192:22
219:2,7,17 233:15 254:12
286:22,23 287:3,17,22
opened
122:5 169:18 170:10 181:22
182:6 211:23 216:23
217:1 239:14 286:16
opening
122:7 214:15 219:16 285:19
285:20,22 286:1,4,18
287:10 288:8
openings
220:2
open-ended
49:21
opinion
44:20 47:12 150:1 184:16
217:5,11 236:21 237:3,4
237:6,7 238:7 311:9,10
312:17 313:10,16 335:1
opinions
312:13
opportunity
218:17 343:2
opposed
175:13
opposite
173:19
options
242:14
oral
5:15

orally
51:9
Orchestral
212:5
order
75:22 78:6,8,11 103:19
106:5 116:5 192:7 193:3
201:17,19 345:17
ordered
198:1,3
organic
321:19
organization
308:10
original
204:7,8
originals
80:7
originated
260:11
Orleans
97:20 100:18
others
3:20 31:22 37:17 39:17
64:11 131:16 265:17
266:8
otherwise
179:6
outline
317:17,19 319:1
outside
70:16 211:13 216:4,7
257:21 328:16 336:5
outward
325:12
over
10:3,8 111:9 126:16 130:19
163:15 216:16 223:9
231:15 238:12 242:18,21
251:14,18 270:23 285:9
305:7 310:22,23 322:3,4
327:19 357:12 359:18
369:18 370:13
overachiever
269:12
overall
25:3 135:9
overdose
367:15
overseer
355:2
oversees
100:4,9
over-the-counter
367:10
Owens
299:11
own
11:4 75:16 102:2 107:10
111:15 118:1,5 119:12,13
157:14 221:21 236:18

304:1,2 332:16 333:7
334:19,21,23 335:1
owned
103:23 105:16 110:10,15
281:11
owner
110:14,16

P

P
2:1 3:1,1
package
301:6
Padgett
265:15
page
4:2 78:14 80:14 83:21
84:20 94:16 117:13,14,15
256:8 266:18,20,22
267:1 315:23
pages
115:14,18,22 116:1,4,7,8,13
116:13 117:21 119:15
paid
162:3,7,16 246:19 282:23
298:21 299:10 307:9,11
307:15
paint
258:15
painting
30:18 47:7 175:17 301:15
paintings
174:16 217:18
Palladium
17:7 20:1,17,18 21:8,19,21
21:22 22:3 307:5,7,15
Pam
31:12
Pamela
28:23
panties
139:9
paper
51:8,10,13 52:22 103:10,11
103:12 112:6,6 113:18
156:8 161:4 223:21
289:2,2 313:23 314:3,17
314:20,22 315:20 316:9
320:5 337:7
papers
52:11 120:22 223:17
316:20
paragraph
59:2
pardon
338:8
parents
221:12
parked
174:4
Parker

274:17 275:2 276:7,10,17
276:20
Parker's
276:23
Parkman
3:6
Parsons
37:19,19,20 38:6 39:2
part
25:30 35:10 94:10 133:10
142:13 147:12 168:1
196:10 237:1 272:15
313:2 314:1 321:23
328:19 344:16 351:5,9,12
351:17 354:11 369:3
participants
354:13
participate
221:4,13
participated
348:16,18
particular
27:12 72:12,12 116:23
187:19 249:3 261:7
268:11
parties
2:3,19 375:17
partly
111:14,15
parts
146:9 149:10 224:16
247:17,17,21 290:20,23
310:20
party
203:15 372:10
pass
129:21
passing
205:14,14 273:3
past
108:23 109:3,4,5
patient
192:2
patron
299:3,3
patrons
203:18
Paxson
31:12 33:13 34:5,13,22
35:5,9 43:22 60:12,16
65:6 66:3,14 75:3 119:20
120:11 128:1 142:1 145:10
145:13,16,19 147:22
149:16 151:23 163:2
164:7
pay
41:18 42:5,9,12 162:9,11,18
177:20 282:21 298:19
paying
247:14
pen

309:18 310:2
pencil
64:1
penis
129:6 130:6 133:7,16
291:23 292:5,10,12,16
penises
278:7
people
22:18 25:14 31:16 107:8
113:8 171:6,7 196:2
212:6 213:7,11 214:2,19
220:13 228:20 239:15,22
239:23 250:14,18 252:18
252:22 253:6 254:12
270:8,9 287:20 288:7,12
288:14,15 295:2,10
309:12 322:16 329:6
356:21
per
204:6 361:18,18,19 362:4
percent
22:1 149:12 353:6,8,10,16
percentage
353:3 356:8
Percy
32:4,5 33:15 171:9 172:10
172:21 173:6 179:9
188:11,12 189:2,4
perfectly
106:21
performance
12:11
perhaps
174:16
period
49:12 126:16,19 137:20
197:3 236:19 251:5
361:16 369:18
periodically
121:20
periods
35:1 106:19
permission
104:23 235:19,22
permitted
105:5
person
27:22 58:8 78:15 83:9
94:23 113:14 121:16
141:18 189:9 193:2 200:7
234:6 275:12,15 292:9,10
292:11 296:6,8 299:4
309:15 368:7,14
personal
46:16 102:2 104:5,21 116:9
118:1,4 194:8 236:18,22
237:2,6 238:7 287:22
371:1,4
personally
236:11,12 238:6

BLAKE DEWS
TROY UNIVERSITY, ET AL.

BLAKE DEWS
April 27, 2006

policies
315:10 337:8
policy
240:9,12,23 241:7,20
335:14,18 336:23 337:2
337:23 338:7,11,15,19
339:2 340:17,20
polite
244:1,7,8
pomo
270:11 272:17,21
pomographer
329:18
pomographic
321:2,11 334:22
pomography
265:9 269:9 277:23
321:22 322:1 330:1,2
333:22 358:21 359:11
portfolio
265:2 266:1,4,6,16,21
267:10,12 269:7
portion
42:5 354:2
portraiture
264:2 277:2
portray
185:1
portrayed
186:22
pose
95:20 109:17 111:9 303:19
posed
95:23
poses
92:19
posing
95:14,20
position
171:14 185:12 195:12 253:1
307:9,11,15 355:4,19
positioned
298:6
positive
125:16,17 255:12 258:9
346:3 369:12
positivity
207:17
possibilities
227:5
possibility
40:4 186:5 205:13 276:14
343:5
possible
291:7 341:23 374:8
possibly
44:7 64:16 81:3 170:11
291:21 304:13 351:15
postcard
203:17
postcards

203:17
posters
64:14 203:12
potential
60:23
potentially
360:4
pounds
113:7 362:20 363:1
practices
263:20
praise
206:3
praised
204:23
praising
205:2 327:17 328:16,20
Predominantly
39:4,5
prefer
8:20
preference
175:1,3,6,6
preparation
146:12 178:6
prepared
62:1 305:14
prescribed
367:21
prescription
367:18
present
3:20 104:17 135:21 138:1
211:15 223:5 286:19,20
presented
55:19 341:7
president
67:15
press
253:18 288:21 289:1
pressuring
322:17
pretty
7:8 18:12 31:16,20 32:10
85:8 94:19 149:11,23
357:10 373:17
prevent
331:15 337:23
previous
46:11 207:3 276:13
price
250:1,4
prices
250:12
primarily
44:9
print
27:3 29:23 32:21 123:11,12
151:16,18 155:16,23 156:4
157:1,15 158:6 186:11
268:7 281:1

printed
112:7 152:20 153:5 155:18
159:6 161:5,16,18 272:7,8
323:1
printer
153:6 154:3 157:6,8,8,14,17
161:16
printers
156:9
printing
154:6,7 159:1 160:13,16,21
186:7,8,9
prints
151:10,12,17 152:1 153:13,17
154:2,10 157:2 204:7
281:4
prior
2:22
Pritchett
1:20 2:6 5:1
private
193:10,12
probably
14:17 64:12 67:13 68:11
100:18 108:12 161:1
237:21 258:16 288:6
303:23 355:4 362:7
366:11
problem
162:18 187:7,18 189:5,22
236:8 238:2,9,13,19
239:10 241:2,4 303:20
problems
31:1 179:21 183:8,13
185:22 197:16 205:4
215:23 240:3 248:6
254:6 285:5 315:13
363:8 366:13 370:6
procedure
5:8 105:14,17,22 189:18
335:14
procedures
315:11 337:9
proceedings
5:16
process
153:8 162:6 190:21 196:11
264:1 321:23 322:1
360:16,21
processed
322:2
produce
46:23 120:14 293:3 344:21
produced
54:22 55:10 59:22 266:2
305:7 333:10
producing
260:23 261:1 326:23
production
122:1,1 344:7
professional

1:22 2:7 5:3 237:2 305:23
professor
21:4 26:12 32:6,8,12,15
35:16,17 36:3 49:12,19
74:22 93:15,16 100:3
117:18 118:1,6,10,19
119:16,20 120:5,20,23
123:23 124:20 125:2,15
125:22 126:9 142:17
143:1 170:15 171:15 178:3
178:10,21 182:10 190:15
190:18 195:22 196:1
259:6 260:8 261:9 309:2
361:3 374:2
professors
21:5 31:6,21 39:20 40:9,23
60:8,9 66:16 68:5 117:7
120:1,10 121:14 124:6
143:12 146:19 147:3
173:1 179:5 180:13,16
261:17,23 284:20 327:16
327:20 374:1
program
16:12 25:23 26:5 27:11
212:15 220:17 221:10,11
221:14 297:23 298:7,9,10
progress
257:23
prohibit
196:15
project
49:2,4,15 54:9,18 65:10,14
90:1 92:15 95:18 123:15
145:22 159:2 192:20,21
335:12
projects
47:15 48:7,15,20 49:1,7,13
90:2 121:12 301:8
promised
345:10
pronounce
139:10
proofs
154:9
properly
321:14
property
104:5
proposal
135:12 336:1
proposals
124:5
prosecution
341:4,5
prospectus
277:12
provided
5:7 177:14 319:5
prurient
225:19
psychiatrist

368:19,20 369:1
psychologist
189:18 190:23 191:4,10,13
191:21 192:8,13,13 197:9
197:13,17,18 368:4,18,20
368:22 369:1
psychologist's
197:23
psychology
336:14
public
1:11,23 2:18 5:4 191:19
215:3 258:8 294:14,17
298:4,8 333:16 334:6,8
334:10 335:18 343:3,4
375:23
publicly
333:14 334:1 335:7 343:1
published
235:13,15
pull
103:10 122:13 196:12,13
271:17 349:22
pulled
174:8 211:6 325:16
purchased
161:22
purient
330:3
purpose
77:6 107:10 193:5
purposes
90:5 91:4 154:11 248:16
330:6
push
196:11,13
pushed
332:22
put
55:16 56:17 64:14 73:3
74:21 78:6,12 92:16
111:18 113:14 116:13
152:11 155:8 175:14
201:6 233:7 237:9
248:21 249:23 250:4
253:15 297:14 305:21
363:11
putting
242:19
P-a-x-o-n
60:16
P-a-x-s-o-n
60:19
P.C
3:15
p.m
164:4,5 257:12,12 305:2,2
347:10,10 374:15

Q

quality

BLAKE DEWS
TROY UNIVERSITY, ET AL.

remotely
195:5
removable
180:1
removal
240:9,14,18 242:15 328:4
358:3
remove
224:13,14 232:5,10 245:18
245:20 246:2 352:17
358:8
removed
73:19 74:5 142:13 176:14
176:15 181:8 190:8 230:5
230:19 231:8,11 233:9
242:13 245:18 250:21
252:4,12,15 319:17,20
323:17,19 335:12 337:5
342:10 357:18 358:11
removing
230:22
rent
247:6 282:6,22,23
rented
247:5 281:15,19
renting
282:10
repair
249:7
repeat
48:18 136:9
rephrase
30:15 35:22 60:2
report
199:9
REPORTED
1:20
reporter
1:21,23 2:7,8 5:2,3,22 8:2
319:19 320:1 321:4,9,17
324:12
reporters
321:7
represent
6:6 78:7 79:1
representation
311:15,18,23
represented
326:6
represents
375:12
reputation
351:3
request
147:23 148:2 188:14,19,22
190:8 197:6
requested
189:3,9 195:15
require
176:2 190:22 366:23
required

45:4,7 189:17 192:22
235:22 273:12,16 285:8
requirement
63:1 236:9
requiring
189:23 191:3
research
38:16 120:22 153:11 336:13
reservations
94:7 95:19
reserve
101:6 106:19
respect
316:18
respective
2:4
response
7:22 40:20 328:23
responses
169:7
responsibilities
42:22
rest
115:17 116:9 166:3 242:15
restriction
237:10,10
restrictions
69:2
result
352:12 375:18
resume
25:16 56:14,17,17 305:9,10
305:12,19
retain
299:20
return
106:2
returned
251:13,14
revealed
267:21
review
121:18,19 122:2 285:2
reviewing
52:4 55:18 57:16 308:7
311:1 319:13 335:18
revoked
336:2
Rhean
230:10
Rheana
85:5,6,7,19 94:18 96:6
138:19,20,21 139:1 144:18
224:21 225:4,17 230:11
230:12,13
Rhena
94:17
Rhode
37:16 39:1,15
rid
137:22

rigging
177:9
right
13:7 24:23 30:8 60:17
75:21 160:7 170:6 198:2
201:10 205:8 212:13
213:21 218:12 228:11,16
234:4 239:2 248:8
249:5,17 254:10 258:17
270:16 284:16 287:23
299:4 307:20 312:8
313:4 342:22 347:7
351:9 354:5 360:5 363:9
rights
196:20 299:20
ring
108:3
risk
343:7
Robert
8:19 100:5,6
roll
129:12
romantic
371:5
rooms
283:3,17,20
route
27:5
rude
253:6,7 254:22 255:7
288:18
rule
238:10,19,21
rules
2:13 5:7 6:13
run
31:5 179:20 304:13
running
107:8 174:7
R-h-e-a-n-a
85:7

―――――――――――
           S
―――――――――――
S
2:1 3:1 4:5
sadomasochism
225:19
SAITH
374:11
sales
41:16 42:20
Sam
320:3
same
2:11 7:5 18:5 20:3 27:22
35:15 47:23 83:14 85:19
87:16 96:7 99:18 143:10
144:2 145:13 185:12,12
187:10 196:4 211:23
225:23 245:23 246:6

247:10 262:21 263:21
285:1 306:11,13 308:21
308:23 330:7,9
sat
112:22 205:16
saved
80:5
saw
52:21 71:22 73:1 77:8
111:17 128:1 130:5,9,11
136:7,20 143:5,8,8 144:3
144:7,11,16 159:7 160:22
174:2 185:2 205:10
208:2,22 216:9,10,16
218:11 232:21 240:15
270:13 278:15,18,22
279:5,16,17 289:8 293:1
297:7
saying
26:23 44:22 48:4 83:18
126:1 164:21 183:9,15
190:11 201:16 205:2,15
210:20 269:20 279:15,16
311:6 312:16 321:6,8
323:15 334:17 343:21
353:2 355:18
sayonara
190:12
says
52:10 124:15 318:10 321:20
359:19
scan
268:4
scanned
153:4 154:16 161:11
scanning
268:6
scene
225:16
schedule
301:21
scheduled
74:17
Scheel
191:11 368:6
scholarship
12:8 13:16 16:21 17:2,4,6,7
17:23 18:8,16,21 19:5,12
19:19 20:1,18,23 21:4,9
21:15,20,23 22:6,11
307:8,9,10
scholarships
19:6,10,14,15,22
school
10:14,15,18 36:17 37:16
39:1 40:11,12 41:3 99:22
148:17 154:17 221:8
235:13,16 239:4,5,8
288:3 320:6,8 348:17
366:1 373:6
schools

24:20 37:2,5,7,9,11 38:9
38:13,15 40:3
school's
223:12
scope
43:11
screw
176:5
scribbling
315:20
sculpting
121:16
sculpture
47:7 53:16 114:11 121:16
sculptures
121:17
Seasons
122:8,13 169:12 212:1,4,15
214:3,12 216:15
second
80:14 117:14,15 244:15
263:20 266:22
secretary
76:15 220:1,6 233:19
234:12
secretary's
76:14
seeing
133:23 207:23
seek
367:17
seem
339:22
seen
67:14 197:16,18 208:15
265:20 279:13 292:19
select
131:13
selected
62:2 63:20 141:9,13 166:17
168:14
selection
137:19 346:13
self
304:2
self-conscious
325:11
self-portraits
326:10
sell
203:19,22 204:3 248:13
249:2 298:11,14 300:5,21
350:6,8 371:17
selling
350:20
semester
11:23 14:22 15:12,14 19:4
19:15,16,17,17,20 20:13
20:14,15 22:15 23:12,13
26:6 50:4,22 51:3,5
55:3 77:20 90:17,21

BLAKE DEWS
TROY UNIVERSITY, ET AL.

sit
40:2  127:11  130:4  145:8
149:22  170:20  173:2
197:15  287:2  305:18
sitting
56:23  60:3  76:17  147:15
148:8
situation
18:14  91:5,8  103:18  145:14
244:16  259:8  325:16
342:9  370:3,4
situations
252:17  258:3
six
290:15
sixteen
129:11,12
sixteen-page
337:6
sixty
363:5
size
100:18  150:5
sizes
129:13
sketches
118:23
skills
165:6  301:11
skyrocketed
239:22
sleep
357:2,4,11  361:15,15,22
362:3,4,10  364:19,21
sleeping
361:20  367:12
sleeps
361:23  362:2
slept
362:6
slid
150:14  154:15  161:18
slide
152:21  179:18,21  263:21
sling
271:3
small
59:2  129:13  281:6
smaller
291:7,8,18  298:16
Smith
212:7
Smoak
3:15
snapped
154:8
snapping
126:13
socialize
250:18
soft

8:5
sold
203:23  204:1  247:16,19,21
301:4,6,9,11,14  350:3,8
350:10,15
solely
217:6
somebody
8:8  105:7  219:13  233:16
239:17  246:5
someone
30:21  39:22  70:9  102:23
110:12  155:22  158:18
190:13  222:14  235:8
246:3  248:20  273:15
286:17  334:18  345:3
348:19  361:23  362:2
368:7,10
someone's
292:16
something
16:11  17:23  18:2  24:4,5
52:13,16  56:13,16  57:1
58:18  64:1  70:14  91:10
117:2,6  119:1  125:21
159:6  183:4,7  194:3
210:12,12  215:22  226:3
236:3  242:21  264:6
269:19  271:9  274:9
278:12  289:5  306:1
330:17  332:23  344:15
346:2  349:18
sometime
90:9,14
sometimes
7:12  9:1  69:9  234:12
261:18,19  321:6  362:3
somewhat
328:5  369:7,8
soon
124:22  126:11  163:1,3
221:22  245:14
sorry
21:22  22:20  23:5,19  45:23
56:15  63:18  74:3  79:9
95:6  96:17  97:22  108:8
112:9  118:7  119:3  136:9
168:5,22  197:11  207:5
214:11,17  229:11  231:16
269:2  273:18  298:2
318:12  342:6  359:16
sort
55:20  125:5  184:7  192:21
225:23  227:21  239:21
270:1  277:12  284:22
315:4  331:21  355:3
366:2  369:19  373:4
sought
38:19  368:23
Sound
122:8,13  169:12  212:1,3,14

214:3,11  216:15
sounds
125:7
South
9:3  11:20
Southside
9:7
space
32:23,23  48:12  69:2,11,18
69:21,21  71:12,14,16,19
72:17  74:4,9  75:12  77:21
146:13  149:5  151:14
171:23  172:4,19  173:12,14
218:11  222:1  281:8,17
282:4,18  283:6,20,21
284:2,4,12,14  286:16
287:6,9,23
spaces
173:20  287:13
speak
6:20  8:8  39:18  125:1
132:6  174:20  178:1
180:22  332:13
speaking
120:10  186:10
speaks
341:3
special
308:8
specialize
27:11
specific
16:6  25:12  37:9  39:8  58:5
58:9  65:19  78:8  91:8
106:2,9  119:8  167:17,18
173:12  181:17  190:23
191:1  237:15  330:6
specifically
79:17,18  119:10,17,18
133:23  149:13  156:9
173:3  217:17  223:14
243:4  266:9  272:20
357:15
specified
254:15
speculation
354:4  355:17
spell
28:6  60:13
spent
177:12  218:16  269:14
Spitting
315:19
spoke
39:22  50:9  335:9
spoken
8:6  209:22  370:16
spot
173:8
spotlight
329:8

spring
13:2  20:5  23:3,9,11  34:4,8
35:4  45:14  48:2  228:13
259:20  260:19  280:7
297:16  308:22
spurting
236:6
square
100:19
stable
175:4,10
stack
52:20  223:17
staff
200:6  258:20  259:6,6
303:3  320:10,11  333:23
stage
69:6
stance
236:17
stand
26:15
standard
230:4
standing
103:6  109:16  145:1  220:12
237:16  250:7
stands
67:3
start
7:14  12:21  15:13  17:22
22:15  26:10  30:10  42:15
109:4,5  116:19  120:9
122:17,21  126:12  277:15
started
30:19  42:11  65:9  122:13
158:20  228:20,22  234:3
234:5  269:18,22  270:2,9
279:14  326:10  337:7
starting
181:10
state
1:11  5:4  8:18  70:22  71:2,4
91:15  239:2  276:4  280:2
306:23  307:3  308:12
331:21  332:6,8  335:15
343:9  347:20  349:18
375:4
stated
171:1  217:15  347:21  357:17
statement
115:13  116:9,21,22  184:10
184:15  215:6  226:15
312:4  320:22  322:14,17
322:18  334:4,16
statements
121:11,11  125:4  184:19
194:5,14,18  210:4,8
226:9  311:5  312:14
316:12,13,17  320:15
321:16  358:6

States
1:1  5:8
statue
67:14
stay
78:2  202:23  214:21  229:4
242:16  247:7
stayed
214:22  229:6
staying
282:18
stenotypy
375:9
step
145:5
stepped
68:22
stepping
336:4
steps
174:5,8  328:16
Stewart
3:15
stick
280:10
sticker
55:17  280:11
still
14:18  19:2  36:10  69:6
72:18  82:8  93:4  95:9
97:1,4  109:16  153:1
180:13  198:9  203:16
219:7  220:9  225:21
247:9,10,13,14  248:17
249:1  263:21  272:14
277:14  300:14,19  325:17
326:23  327:5,16  342:18
348:17  353:7  357:11
366:5  370:18
stipend
307:8
STIPULATED
2:2
stipulation
5:9
stipulations
5:23  73:3
stood
216:4
stop
82:11  163:17  366:9
stopped
209:12  369:20,20
storage
246:17,18,19,21  247:8,9,10
250:21
story
324:14
street
3:8  9:3  288:13,14
stressed

Tyler Eaton Morgan Nichols & Pritchett Inc.

BLAKE DEWS
TROY UNIVERSITY, ET AL.

361:23 372:17
Tenor
12:15,16
term
19:3 21:18 66:19 72:1
112:12 122:23 135:14
150:2 183:19 228:12,14
255:4,16,16 256:21
299:17 329:20 333:22
355:11
terminology
256:22
terms
19:7,10,13 24:1 184:2
256:23 257:2,4
testified
5:20
testimony
134:15
Thanksgiving
169:9,23 170:2
theater
177:7 220:18
their
2:3 25:15,15 62:22 69:10
96:1 111:15 127:2 148:10
158:6 166:11,12 168:3
258:3 268:3 294:22,23
317:10 334:19 335:19
thematic
46:18
theme
49:22 50:12 121:7 280:22
284:15 330:20
themselves
148:1 258:2
thereto
2:22 375:10
thesis
33:11 187:21,23 189:15,19
190:18 191:15 200:19
202:1 204:21 207:2,4,12
208:3 250:11 288:23
289:3,9,12 295:14,17,19
300:19 325:19 327:19
336:7,8 338:16
thick
176:4,4
thigh
297:2
thin
330:10
thing
115:2 148:5 151:15 161:17
177:8 189:19 198:4
241:13 263:20,22 264:1
270:2 277:13 279:9
330:8,9
things
35:15 70:2 121:5 172:22
173:6 177:9 183:11

185:19,20 186:9 192:23
193:7,10,12,15 195:15
196:21 211:20 224:9,11
230:4 235:13 247:12
250:17 252:20 253:10,13
255:22 257:21 310:18
321:7 333:15 334:1
337:12,14 370:15
thinking
48:10 69:10 115:7 152:3
170:8 339:8 373:9
third
45:15 46:3,4 49:11,19
112:12 225:9 264:1 267:1
thirty
109:12 363:1,22
Thompson's
41:12
thorough
231:14
though
56:14 70:12 71:2 151:5
294:11
thought
18:15 37:18 47:10 132:7
187:4 269:16 272:21
337:1 366:18 373:4
thousand
80:9 221:2 351:1
threatened
340:6,9,13
three
24:12 25:18 33:16 45:8,10
115:14 123:4,7 220:1
224:12,14,15 226:13
230:4,5,7,19,22 232:21
240:15 241:23 242:2,15
243:16 245:3 255:19
290:14 315:23 361:21
362:9
three–hour
122:23
Threw
121:9
through
2:3 74:15 75:23 78:4 83:1
91:16 134:2 153:5 155:19
157:3 174:9,17 190:20
209:16 221:3 258:7,12
276:11 304:13 308:4
310:19 315:4 319:11
325:15 360:15,21
throughout
27:23 53:5 120:16 309:20
throw
123:16
thrown
329:7
thumb
319:11
tie

78:15
Tim
85:22 128:6 144:14 224:21
225:1,15 256:17
timer
109:23
times
106:9 123:5 147:3,5
207:15 234:14 365:3
timing
188:17 274:10,12
tiny
215:7
tires
317:10,12
title
35:20,21 56:7 57:23 63:5
78:18 263:2
today
8:14 31:7 40:2 56:23
127:11 130:5 145:8
170:20 173:2 186:20
187:14 197:15 198:3
290:1,11 305:18 332:2
341:10 353:8 354:17
366:15 371:13
together
34:17 47:8 114:12 147:3
148:21 149:9 222:7,10
231:5 271:17 281:4
toggle
114:3
tons
80:4 202:7
top
7:3,11 13:11 176:6 179:23
281:17 323:6
topic
49:20,21 91:6
topics
308:9
total
214:22
totally
179:14
touch
155:8
touched
195:2 197:2,2 277:20
toward
26:22 173:22 209:10 217:8
217:16 253:15
towards
101:15 226:3 253:4
town
10:14 67:21 103:23 277:9
transcript
375:13
transfer
373:5
transferred

25:7,9
transgender
257:3
translucent
156:7
transparencies
155:20,22 156:5,7 159:1
transparent
155:19 156:8
Transparents
155:20
transported
246:17
Travis
89:11 99:5
treat
343:11
trial
2:20
tried
252:6 366:3
tripod
109:21
Trop
256:16 320:6 322:16
trophy
56:21
TroyFest
348:18,22
Troy's
16:12
truck
163:21,23 165:10 167:2
173:11 178:9 245:23
true
7:9 8:3,4 158:9 168:10
191:9 244:9 261:21 311:8
375:12
Truly
109:11
Trumbower
220:18
try
8:23 30:15 253:12 332:1
360:21 361:8,11 367:12
trying
11:4 13:9 43:11 46:7 92:16
106:7 173:7 219:4 312:2
326:11 330:22 331:3
tuition
21:16,18 22:1,3,11,12,13
tuned
366:3
turn
102:18 114:4 117:13 118:5
118:18 119:16 145:4
326:3,16
turned
117:7,17,22 118:9 119:14
124:14,22 269:19 270:1
297:1 314:4 325:8 326:8

326:21
turning
327:5 346:23
TV
103:6
twelve
11:6 44:4 221:3
twelve–year–old
237:17,19 238:4
twenty
44:6 177:16 362:23 363:12
twenty–five
21:23
twenty–four
86:18,21
Twenty–one
87:1
twice
100:17
two
7:4 19:6,9,10,13,14,21
20:19 53:23 55:11 80:13
84:20 87:19 109:12,14
110:3 113:6,8 114:9 123:8
146:19 161:1 162:7 163:4
163:5,5 170:9 177:15,17
204:5 219:15 220:2,2
222:7 224:22 225:6,9,20
225:22 255:19 265:10,13
276:12 282:17 290:14
298:16 300:13 309:13
354:12 370:1
two–hour
122:23
type
7:22 11:14 16:21 17:1 30:2
55:7 56:10 59:1,23 99:13
101:20 105:13 112:4
125:13 173:23 177:1
190:16 200:22 241:12
255:22 276:22 279:8
typed
115:15 313:2
types
39:9 280:22 281:3,6,7
typewriting
375:11
typewritten
52:14 116:8 118:10,11,15
119:15
typically
166:20

U

U
2:1
UAB
318:10
uh–huh
8:1 12:14 16:10 23:4,18
37:23 96:8 98:9 102:21

BLAKE DEWS
TROY UNIVERSITY, ET AL.

waived
2:11
walk
76:3,5,12,18 237:18 270:9
walked
106:12,23 147:10 149:6
173:5,21 178:15,19 180:11
180:16 208:13 209:16
220:2 237:17
walking
174:2 215:14 265:21
wall
173:16,17 175:8 202:6,9,12
291:11,11,15 295:21 296:3
Wallace
14:3,6,8,12 15:2,5,13,20
16:19 17:12,18 25:6
wallet
349:22
walls
173:7,15 301:16
Walter
220:18
want
13:20 41:3 55:14 76:23
108:7 109:17 118:9 121:2
130:1 137:11 148:3 163:19
170:1 171:23 181:18
192:18 193:16 210:10
211:10 226:19 232:4,7
249:9 257:7 270:6,7
271:19,20,21 291:10
300:5 304:17 305:6,21
311:22 313:5 331:16
332:1,9,11,12 342:2
360:4 363:11 365:18
wanted
15:18,21 16:1 18:22 29:14
29:15 73:8 78:8 120:14
121:12 149:2 156:15
175:2 191:13 193:1 196:16
218:14 219:10 239:15
242:6 248:14,20 249:2
271:18 286:17 301:18
318:13 332:16 336:12
wanting
249:21 349:16
wants
184:7 193:18,21 248:14
warn
215:2
wasn't
15:15 33:11 34:23 35:2
61:8 91:17,18 103:23
104:2 105:8 139:8,16
168:10 170:1 183:16
205:7 231:22 239:17
241:19 251:9 257:19
269:16 274:8 286:23
298:10 321:10 322:22
352:19

way
6:18 15:3,22 26:8,23 48:4
48:14 72:21 73:4 104:9
115:11 150:3 152:6
160:12 165:3 173:14
191:4 194:15,18,19 195:8
195:12 197:5 200:13
208:6 213:1,2 214:4,7
218:18 220:7 224:16
238:13 243:1 269:21
275:11 276:16 325:7
326:17 331:19 337:15
346:5,8 355:21 361:2
363:14 365:2 366:19
369:13,14
ways
158:16 196:8,9,18,22
331:20 337:18,21 365:4,6
371:9
wear
271:3
wearing
78:15 110:23 111:10,11
139:13,15,16 141:19 142:5
142:9 143:6 237:5
week
41:23 123:5 134:13 323:6
weekly
121:20
weeks
121:10 126:22 285:13
weigh
363:3,6,7
weighed
113:5 363:5
weighing
363:9
weight
113:3 362:11 364:10,14,17
weren't
25:9 102:17 149:11 150:17
150:22 151:3 168:14
180:2 189:10 231:11
234:13 296:3 304:3
323:8 328:19 348:11
349:4 360:23
whatsoever
178:13 206:23
while
15:1 18:1,2 27:16,20 36:13
37:19 68:15 79:4,7,10,13
110:18 147:16 160:13
178:18 219:20 270:8
274:20 276:14 295:8
300:22 304:6 321:22
348:17 351:21 370:17
373:5
white
3:6 103:3,7 175:17 264:3
281:1,4
whittled

137:20
whole
7:19 66:10 129:8,9 164:11
179:10,13 189:19 193:4
236:17 246:10 248:21
249:21 261:11 292:9,10
298:14 313:1
wife
83:12 91:18 160:19 164:13
win
327:12
wire
114:3,3
wish
322:5,7
withdraw
337:18 344:22
witness
2:10 5:14 271:6 309:23
318:8 375:14
witnessed
271:8
woman
83:22 142:23
woman's
218:3
won
327:13
wood
112:19,20,23 113:17 114:12
176:11
wooden
174:1
Woodman
89:11 144:11
word
8:3 64:12 203:15 253:11
272:17 299:4
words
75:6,9 159:5 299:21 301:13
310:14 314:21 324:13
332:19
worked
21:17 22:2 35:11 199:10,14
251:20 303:10
working
92:10 101:15 180:7
works
26:9 61:11 217:7,19,20,23
368:8
world
31:9 243:7 261:18
worried
339:11,15
worth
249:16
wouldn't
10:12 111:18 157:6 167:20
168:21,22 193:15 206:9
214:7 237:9 356:13,15
wow

185:19
wrapped
176:9
write
38:8 40:9 41:4 59:1
297:20 310:10 312:23
316:12
writer
320:10,11
write-up
328:18
write-ups
330:19
writing
21:10 117:21,23 210:1 313:8
316:8 319:2 335:14
written
51:8 223:18 253:22 315:7
317:18 323:16
wrong
323:13
wrote
59:5,13 121:10,11 310:16,17
311:3,7,10,13,16 312:4,14
313:7,17 314:10 315:23
316:21 319:1 320:15
324:13 337:6
W-2
306:19 307:16,19

X
X
4:1,5 249:6

Y
yeah
147:19 183:12 198:11 203:9
231:15 267:8 294:1,12
316:11 332:4 371:8
year
11:8 12:21 13:5 14:7,19
19:4 22:14 45:16 122:16
357:9
yearbook
17:8,14 18:4 21:8 307:5
years
238:11,22
yell
7:8,8 8:7
yelling
6:16 270:8
York
37:21 38:6 194:12
Youngblood
86:16 283:9
younger
108:11 153:22
y'all
50:3,19 73:14 285:17
370:18

0
03
20:5

1
1
4:6 51:18,21
1:22
164:5
10
4:15 306:16,19
10:53
82:15
1000
3:16
1020
5:11
11
4:16 307:23 308:3 313:20
11:10
82:15
114
4:9
116
4:10
12
4:17 317:6,8,14 318:1
12:18
164:4
120
274:17
13
4:18 319:7,9 359:7
1512
9:3
1819
3:17 5:11
1982
9:21

2
2
4:7 54:3,7 55:16 56:4
57:19,23 112:3 114:8
116:6 124:2 159:3
208:20 261:2 264:13,21
266:8,12,15 278:15
279:21 280:3 283:11
294:20 295:17 301:5
323:22 324:20 325:5,6
327:14 330:21 331:8
338:21 339:5,10 360:13
2D
30:18
2nd
122:12
2:30
158:19,20
2:50
257:12